UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

UNITED STATES OF AMERICA,

    -against-

YASSA ASHBURN, HAILE CUMMINGS,
GERALDO ELAINOR, DANIEL HARRISON,
RICKY HOLLENQUEST, JAMAL LAURENT,
TREVELLE MERRITT, and RALIK ODOM,

                Defendants.

------------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**11-CR-303 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

    Before the court are the pretrial motions of Defendants Ralik Odom ("Odom"), Yassa

Ashburn ("Ashburn"), Daniel Harrison Ruiz ("Harrison Ruiz"), Haile Cummings ("Cummings"),

and Jamal Laurent ("Laurent," and collectively "Defendants").[1] (See Odom Mot. to Suppress

("Odom Mot.") (Dkt. 111); Cummings Mot. for Bill of Particulars ("Cummings Mot.") (Dkt.

113); Laurent Mot. to Suppress ("Laurent Mot. #1") (Dkts. 114-116); Ashburn Mot. for

Discovery & Supporting Documents ("Ashburn Mot.") (Dkt. 121); Harrison Ruiz Mot. for Bill

of Particulars and Severance of Trials ("Harrison Ruiz Mot.") (Dkt. 122); Laurent Mot. for Bill

of Particulars ("Laurent Mot. #2") (Dkt. 123).) For the reasons set forth below, Defendants'

pretrial motions are DENIED in part and HELD IN ABEYANCE in part.

## I.    BACKGROUND

###     A.    Charged Criminal Conduct

    Defendants are charged by a twenty-one count indictment with being members of the Six

Tre Outlaw Gangsta Disciples Folk Nation ("Six Tre Folk Nation" or "the enterprise"), which

---

[1] Trevelle Merritt and Ricky Hollenquest did not file any pretrial motions. While Merritt remains a defendant in this case, Hollenquest has since pleaded guilty to three Counts in the Superseding Indictment (S-3). (Apr. 15, 2014, Minute Entry (Dkt. 140).) Defendant Geraldo Elainor, who did file a pretrial motion, has also pleaded guilty. (Dkts. 127, 136.) Accordingly, the court will not consider Elainor's motions, which are denied.

allegedly was a racketeering enterprise responsible for various acts of violence, murder, attempted murder, and robbery between April 2008 and October 2011. (Superseding Indictment S-3 (Dkt. 71).) According to the Government, the Folk Nation is a nationwide gang founded in Chicago, Illinois in the early 1990s. (Gov't Br. in Opp'n to Defs.'s Pre-Trial Mot. ("Gov't Opp'n") (Dkt. 131) at 1.) In New York, the Six Tre Folk Nation allegedly has been operating in and around the Ebbets Field housing projects in the Flatbush section of Brooklyn for several years. (Id.) Beginning in about 2007, the enterprise allegedly has been responsible for a "slew of gang-related homicides, non-fatal shootings (the victims of which were often innocent bystanders, including a 10-year-old girl), and commercial robberies both in and around Flatbush and elsewhere." (Id.)

The indictment,[2] dated November 15, 2012, charges each Defendant with multiple Counts of criminal conduct. In short, each Defendant is charged with one count of racketeering (Count 1) predicated on sixteen predicate Racketeering Acts ("RAs"),[3] which include, among other things: conspiracy to murder members of a rival Crips gang (RA 1) as well as an associate of a rival gang known as "Specs" (RA 5); the murders of Courtney Robinson on or about April 20, 2008, Anthony Thomas on or about August 9, 2008, and Brent Duncan on or about June 19, 2010 (RAs 2, 3, 9); the attempted murder of an individual known as "Wrinkles" on or about September 13, 2008, John Doe #1 on or about May 15, 2009, and John Doe #3 on or about June 30, 2010 (RAs 4, 6, 12); Hobbs Act robbery and a robbery conspiracy targeting employees of various jewelry stores (RAs 7, 8); Hobbs Act robberies and a robbery conspiracy concerning individuals targeted through Craigslist (RAs 10, 11, 13, 14, 15); and robbery resulting in the murder of one Dasta James on or about January 28, 2011 (RA 16). (Indictment at 4-12.) Each

---

[2] For purposes of this Memorandum and Order, any references to the "indictment" are to the S-3 indictment.

[3] Each Defendant is named in connection with between two and eight individual Racketeering Acts.

2

Defendant is likewise charged with participating in a racketeering conspiracy (Count 2). (Id. at 12-13.)

In addition, individual Defendants are charged in Counts 3-21 with various federal crimes predicated on the same or similar conduct at issue in the Racketeering Acts, including: murder in-aid-of racketeering; assault with a dangerous weapon in-aid-of racketeering; conspiracy to murder in-aid-of racketeering; robbery and robbery conspiracy in violation of the Hobbs Act; unlawful use of a firearm; and causing death through use of a firearm. (Id. at 13-25.)

### B. Pretrial Motions at Issue

In accordance with the briefing schedules set by the court, all Defendants except Trevelle Merritt and Ricky Hollenquest filed separate pretrial motions for the court's consideration. In addition to overlapping in material respects, each Defendant's motion expressly joins or seeks permission to join in the motions of his co-defendants. (Laurent Not. of Mot. (Dkt. 123) at 1; Ashburn Not. of Mot. (Dkt. 121) at 1; Harrison Ruiz Mot. at 1; Odom Mot. at 2; Cummings Not. of Mot. (Dkt. 113) at 1.) The court therefore considers the following requests as having been made jointly by all Defendants: (1) to sever the individual trials from those of co-defendants; (2) to compel a bill of particulars from the Government; (3) to compel the Government to disclose various discovery material on an accelerated basis; and (4) to dissolve the separation order enforced by the Bureau of Prisons. (Laurent Mot. #2; Ashburn Mot.; Harrison Ruiz Mot.; Odom Mot. at 3-7, 9-11; Cummings Mot; Oral Arg. Tr. ("Tr.") at 25-27, Apr. 9, 2014.)

In addition, Defendant Laurent separately moves to suppress a 9 mm Smith and Wesson handgun found in his apartment by officers with the New York Police Department ("NYPD") on the night of June 21, 2010, among other physical evidence, which allegedly was used in the murder of Brent Duncan (Counts 8, 9, and RA 9). (Laurent Mot. #1; Gov't Opp'n at 14.)

3

Defendant Odom also moves to suppress his post-arrest statements and to dismiss all charges against him on the grounds that he was a juvenile at the time of the alleged crimes. (Odom Mot. at 7-9, 11-12.)

In the interests of clarity, the court will address the individual motions of Defendants Laurent and Odom before considering Defendants' joint requests.

## II.     INDIVIDUAL MOTIONS

### A.     Defendant Laurent's Motion to Suppress

Defendant Laurent moves to suppress all evidence, including a 9 mm Smith and Wesson semi-automatic handgun, ammunition, a spent shell casing, and a bag of marijuana seized from his bedroom at a group residence on June 21, 2010, as the result of a warrantless search by the NYPD. (Laurent Mot. #1.) The Government opposes the motion as it relates to the handgun and ammunition, arguing that the officers entered Laurent's room under exigent circumstances and/or to conduct a protective sweep, and that the weapon was properly seized because it was in plain view. (Gov't Opp'n at 14-23.)

In 2010, Laurent was indicted by a grand jury in New York Supreme Court, Kings County, with criminal possession of a firearm, reckless endangerment, and other charges arising from the June 21, 2010, incident that led to the seizure of the handgun and other evidence at issue here. (See Aff. of Counsel in Supp. of Laurent Mot. #1, Ex. A (Indictment # 6052/10) (Dkt. 116-1).) Prior to trial, Laurent moved to suppress the same gun and ammunition at issue here, arguing that it was seized in violation of his Fourth Amendment rights. (Laurent Mot. #1 at 6.) At the evidentiary hearing, the court heard testimony from Police Officer Evan Hodos, one of the officers who conducted the search of Laurent's bedroom. (See Aff. of Counsel in Supp. of Laurent Mot. #1, Ex. C (Suppression Hr'g Tr., June 29, 2012) ("Suppression Tr.") (Dkt. 116-3).)

Finding Officer Hodos' account to be credible, and acknowledging that this is a "borderline" case, Justice Alan Marrus determined that the officers' entry was justified as it occurred under exigent circumstances and that seizure of the gun was permissible because it was in plain view. (Id. at 34-37.) However, neither Officer Hodos' testimony nor the state court's decision on the motion addressed the ammunition that was purportedly also the subject of Laurent's motion.

For the reasons set forth below, the court agrees with the reasoned judgment of Justice Marrus and denies Laurent's motion to suppress the handgun. To the extent Laurent seeks to suppress any other evidence gathered from his bedroom on June 21, 2010, including the above-referenced shell casing, ammunition, and/or bag of marijuana, those aspects of the motion also are denied without prejudice subject to renewal to the extent warranted in light of the addition submissions required by the court. See infra Part II.A.2.c.

### 1. Factual Background

For purposes of this Memorandum and Order, the factual background provided below is derived from Officer Hodos' sworn testimony before Justice Marrus and the briefs of the parties. The court relies on the state court's assessment of the officer's credibility, but makes independent findings of fact based on his testimony in connection with the motion under review.

At approximately 11:40 p.m. on June 21, 2010, NYPD officers responded to a 911 call reporting that shots had been fired at a residence located at 1445 Schenectady Avenue in Brooklyn, New York. (Suppression Tr. at 5-6.) Upon arriving at the private residence approximately five minutes later, Police Officer Evan Hodos and his partner were met outside by Mr. Siedel Chesney and an unidentified man. (Id. at 6-7, 13-14.) Chesney told the officers that he had been awoken by a single gunshot about five to ten minutes ago,[4] and had immediately

---

[4] Laurent claims the shot was fired closer to 5:00 p.m. (Laurent Mot. #1 at 5.)

seen a bullet enter his apartment through the wall, hit a black handbag, and fall to the ground. (Id. at 7-8, 15.) Chesney reported that shortly after the shot, Defendant Laurent—who lived in the room adjacent to Chesney's from which the bullet originated—came into Chesney's room with two other men, apologized to him, and requested that he not call the police as Laurent was on probation. (Id. at 7, 20-21; see also Aff. of Counsel in Supp. of Laurent Mot. #1, Ex. B (Police Report) (Dkt. 116-2).) Once Laurent left his room, Chesney called 911. (Suppression Tr. at 20.) According to Officer Hodos, when he and his partner examined Chesney's bedroom they observed a bullet hole in the wall and bullet fragments on the ground. (Id. at 8-9, 18-19.) Hodos's testimony also indicates that Chesney told the officers that Laurent had left the house after speaking with him, but that Chesney was not sure where Laurent had gone or whether he was still in the building. (Id. at 11, 20-21.)

The officers proceeded to knock on the door of the bedroom from which the bullet had originated, which was locked, having been informed by Chesney that it belonged to Laurent. (Id. at 8-9.) They also yelled to see if anyone was in the room, but received no response. (Id. at 9.) At that time, the officers called a lieutenant to explain the situation—that a shot had been fired from the locked room and that someone may be hurt inside—and asked if they could break down the door to ensure "[their] safety and make sure everything [was] okay inside." (Id. at 9, 20-21.) The officers received permission to do so and proceeded to break down the door and enter the room. (Id. at 9-10.)

Upon entering the small bedroom, the officers conducted a brief search for someone who might be hurt or pose a danger, but were able to "quickly determine[]" that nobody was inside. (Id. at 22-23.) Officer Hodos testified that the only two places a person might be hidden in the bedroom were in the closet and underneath the bed. (Id. at 21.) During the course of their

6

search, which lasted approximately one to two minutes, the officers observed an 8-10 inch slit in the side of the box spring of the bed. (Id. at 9-10, 22-23.) The bed had no sheets or covers on it, and the officers moved nothing in conducting their visual inspection of the bed and box spring. (Id. at 22, 24-25.)

Standing a few feet away from the bed, Officer Hodos observed through the slit what he recognized to be a firearm inside the box spring. (Id. at 10, 23-26.) Officer Hodos called the Evidence Collection Team which removed the loaded weapon from the box spring. (Id. at 10.)

### 2. Analysis

There is no dispute that that Officer Hodos and his partner entered Laurent's bedroom without a warrant. In opposing Laurent's motion to suppress the handgun seized as a result of that search, however, the Government argues that the officers' entry was lawful under the exigent circumstances and/or protective sweep exceptions to the Fourth Amendment's warrant requirement. (Gov't Opp'n at 18-21.) Specifically, the Government asserts that the officers could reasonably have believed that someone was injured inside the bedroom and required immediate assistance and/or that Laurent or one of his associates was still in the room and posed a continuing danger to the officers. (See Suppression Tr. at 20 (noting two other men who were with Laurent when he came to Chesney's room to apologize.) Because the gun was in plain view, the Government argues, it was properly seized as its criminality was readily apparent. (Gov't Opp'n at 21-22.) By contrast, Laurent asserts that the officers' entry into his bedroom was not lawful under either exception to the warrant requirement and, even if it were, the resulting search exceeded the scope permissible under the Fourth Amendment. (Laurent Mot. #1 at 10-11.) Laurent additionally requests that the court hold an evidentiary hearing on the motion, which the Government opposes. (Id.; Gov't Opp'n at 23) As detailed below, the court

concludes that the search and seizure were lawful under the exigent circumstances and plain view exceptions to the Fourth Amendment's warrant requirement, or in the alternative under the protective sweep exception.

### a.    *The Officers' Entry Was Lawful*

The central premise of the Fourth Amendment is that a warrantless search of one's home is presumptively unreasonable. United States v. Simmons, 661 F.3d 151, 156-57 (2d Cir. 2011). However, the requirement that police first obtain a warrant "yield[s] in those situations in which exigent circumstances require law enforcement officers to act without delay." United States v. Moreno, 701 F.3d 64, 73-74 (2d Cir. 2012). One well-recognized exigency requiring immediate action "is the need to assist persons who are seriously injured or threatened with such injury." Simmons, 661 F.3d at 157 (internal quotation marks omitted); see also Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006) ("[L]aw enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury."). In determining whether exigent circumstances exist, the "core question," according to the Second Circuit, "is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer, to believe that there was an 'urgent need to render aid or take action.'" United States v. Klump, 536 F.3d 113, 117-18 (2d Cir. 2008) (citation omitted); United States v. MacDonald, 916 F.2d 766, 769 (2d Cir. 1990). This "objective" inquiry requires the district court to consider "the totality of the circumstances confronting law enforcement agents in the particular case." Klump, 536 F.3d at 117 (quoting MacDonald, 916 F.2d at 769).[5]

---

[5] Laurent's reliance on the six-factor test outlined in McDonald, 916 F.2d at 769-70, is misplaced. As the court noted in Moreno, those factors are "not germane in every exigent circumstances situation," specifically referencing cases in which officers enter a home "not in pursuit of a suspect, but to render aid." Moreno, 701 F.3d at 73 & n.11 (citing Klump, 536 F.3d at 118).

Here, the court is convinced that Officer Hodos and his partner had objectively reasonable grounds for believing that someone inside the bedroom might require immediate assistance. See Michigan v. Fisher, 558 U.S. 45, 47 (noting that the "emergency aid" exigency "requires only an objectively reasonable basis for believing . . . that a person within the house is in need of immediate aid" (internal quotation marks, citations, and brackets omitted)). At the time of their entry, the officers knew that a gun had been recently fired inside the group residence, that the shot had originated in Laurent's bedroom, and that Laurent had subsequently left his room with several other men and requested that his neighbor not contact the police. Further, the officers observed the bullet hole in the wall separating the two bedrooms and upon knocking on the door to Laurent's room received no response. In the absence of any indication that the shot had been fired accidentally, the officers could have reasonably believed that someone may be severely injured in the room where the shot was fired—perhaps fatally so. See Fisher, 558 U.S. at 49 ("Officers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." (citation omitted)).[6] As such, in view of the facts of this case, the court concludes that the exigencies of the moment, as they reasonably appeared to the officers, permitted them—and arguably compelled them—to enter Laurent's bedroom immediately and without a warrant in order to ensure that nobody was injured inside.[7]

---

[6] United States v. Schmidt, 700 F.3d 934, 937-38 (7th Cir. 2012) (warrantless search of a backyard to check for injured persons was permissible under exigent circumstances exception where officers responded to shots fired in the neighborhood and bullet holes and bullet casings were found in areas adjacent to backyard); United States v. Huffman, 461 F.3d 777, 781-86 (6th Cir. 2006) (holding that officers responding to reports of gunshots at a residence, who subsequently viewed bullet holes in the structure and received no response after knocking on the door, lawfully entered under the exigent circumstances to ensure nobody was injured inside); Francis v. Senkowski, No. 92-CV-5275, 1993 WL 276965, at *2 (E.D.N.Y. July 15, 1993) (noting, in dicta, that warrantless entry was lawful under exigent circumstances exception where police responded to 911 call concerning shots fired and found a bullet hole in the ceiling of the apartment below defendant's room); see also United States v. Gambino-Zavala, 539 F.3d 1221, 1225-26 (10th Cir. 2008) (noting "it is well settled that officers can reasonably search for victims upon reports of gunfire" and collecting cases).

[7] In concurring with the state court's determination on this issue, the court refuses to read the exigent circumstances exception so narrowly that it would require officers responding to reports of shots fired to obtain a warrant while a

The court likewise rejects Laurent's argument that the officers' search exceeded the scope permissible under the Fourth Amendment. (See Laurent Mot. #1 at 11.) Where entry into a home is warranted under the exigent circumstances exception, the resulting search "must be strictly circumscribed by the exigencies which justify its initiation." Klump, 536 F.3d at 118. In other words, a generalized search for evidence of criminal activity cannot be predicated on exigent circumstances. See id. Here, the officers' initial entry was necessitated by a need to ensure that nobody inside the room had been injured by the earlier gunshot. Laurent contends that the officers could have visually checked the interior of the bedroom by merely sticking their heads through the open doorway, and therefore violated Laurent's rights once they stepped foot inside. (See Laurent Mot. #1 at 11.) This construction of the exigent circumstances exception is overly narrow. It was objectively reasonable for the officers to enter the room and conduct a brief but thorough search so as to satisfy themselves that nobody inside required assistance.[8] (See Suppression Tr. at 10, 22-23 (noting the search lasted only a minute or two).) At a minimum, the officers were permitted to visually inspect the two hiding places where a victim might be concealed, as identified by Officer Hodos: inside the open closet and underneath the bed. (Suppression Tr. at 21.) Considering the totality of the circumstances as elucidated in Officer Hodos's testimony before the state court, this court finds that the officers' search of

---

potential victim lies injured or potentially dying just beyond the door. Laurent's attempt to characterize the scene on June 21 as a "simple situation—a single bullet fired through a wall," is uncompelling. (Laurent Mot. #1 at 11.) Quite to the contrary, the discharge of a firearm in group residence and the resulting possibility that someone may be injured therein constitutes an ongoing situation for the purposes of the exigent circumstances exception to the Fourth Amendment.

[8] While the court acknowledges Officer Hodos' testimony that he continued searching the room after "quickly determin[ing]" that nobody was injured, the court cannot conclude that a 1-2 minute search of the bedroom—including the two hiding places identified by the officer—was objectively unreasonable given the exigency that prompted their initial entry. See Brigham City, 547 U.S. at 404 ("An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.'" (citation omitted) (emphasis in original)).

Laurent's bedroom did not impermissibly exceed that which was objectively necessary to ensure that a victim was not injured inside.

In the alternative, the officers' search of Laurent's bedroom may be justified as a protective sweep necessary to ensure their own safety following the initial entry.[9] Law enforcement officers may conduct a protective sweep where they possess specific and "'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the . . . scene.'" United States v. Miller, 430 F.3d 93, 98 (2d Cir. 2005) (quoting Maryland v. Buie, 494 U.S. 325, 334 (1990)); Gandia, 424 F.3d at 261 ("[A] Buie protective sweep allows officers to stop a potential ambush by searching for unseen third parties.").

The officers in this case entered Laurent's bedroom in order to search for potential victims only after learning that someone had fired a gun inside. While Mr. Chesney reportedly told the officers that Laurent had left, he did not know Laurent's or his associates' current location or even whether they were still in the building. (Suppression Tr. at 11, 20-21.) Given the high degree of danger to the officers posed by a possible gunman inside the bedroom, Chesney's uncertainty as to Laurent's or his associates' current location, and the necessity of the officers' entry to search for someone who may be injured, it would have been reasonable for the officers to conduct a "quick and limited search" of the room to ensure that there existed no continuing danger to themselves or others. Buie, 494 U.S. at 327. Indeed, his and his partner's

---

[9] A protective sweep is allowed where entry into a residence is made pursuant to a "lawful process." Miller, 430 F.3d at 98. While the Second Circuit has yet to clarify whether the protective sweep exception in non-arrest situations is limited to when officers are engaged in the execution of legal process, or whether it extends to any situation where lawful entry is made, see United States v. Hassock, 631 F.3d 79 (2d Cir. 2011), there are indications in the case law that a protective sweep is proper where the lawful entry is predicated on exigent circumstances, see United States v. Gandia, 424 F.3d 255, 263-64 (2d Cir. 2005).

safety were among the justifications Officer Hodos gave to his lieutenant when requesting permission to enter the room. (Suppression Tr. at 9.) Moreover, as one of two possible places in the room in which a gunman may have been concealed, the officers would have visually inspected the bed in which the handgun was found. See Buie, 494 U.S. at 341 (explaining "that a protective sweep's scope is 'narrowly confined to a cursory visual inspection of those places in which a person might be hiding'" (citation omitted)).

        b.    *Seizure of the Handgun Was Lawful*

Finally, the Government contends that the handgun itself was properly seized under the plain view exception as it was observed by Officer Hodos while searching the bedroom for a possible victim. (See Gov't Opp'n at 21-22.) The court agrees. The plain view exception "authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity." United States v. Gamble, 388 F.3d 74, 76 (2d Cir. 2004) (internal quotation marks omitted).

As just discussed, the officers in this case had a lawful right to access the bedroom in order to conduct a carefully circumscribed search for someone who may require immediate aid. Based on Officer Hodos's sworn testimony, the court is satisfied that the handgun was readily observable through the 8-10 inch slit in the box spring: there were no sheets or blankets on the bed that might obscure the officers' view (Suppression Tr. at 24), the officers did not move anything on or near the bed in order to view that portion of the box spring (id. at 25), and the handgun could be viewed by anyone standing near the bed with the proper downward viewpoint (id. at 25-26.) The court also finds that the officers had probable cause to believe that the handgun was connected to criminal activity without further inspection. See United States v.

Simmons, 861 F. Supp. 2d 307, 310 (S.D.N.Y. 2012) ("The incriminating nature of a gun is immediately apparent."), aff'd, 543 F. App'x 101 (2d Cir. 2013).

On these facts, and in light of the fact that Officer Hodos identified the bed as one of only two places in which a victim or gunman could have been concealed, the court finds that the evidence was properly seized under the plain view exception to the warrant requirement.

      c.    *Necessity of Evidentiary Hearing & Other Evidence Seized*

Finally, Laurent requests an additional evidentiary hearing in connection with his motion to suppress the evidence seized from his bedroom on June 21, 2010. (See Laurent Mot. #1 at 11; Reply Mem. of Law in Supp. of Laurent Mot. #1 ("Laurent Reply") (Dkt. 133) at 8-10.) The Government opposes the request, noting that Laurent has not "raise[d] a factual issue warranting a hearing concerning the weapon recovered from his room." (Gov't Opp'n at 22.)

As the Second Circuit has explained, "an evidentiary hearing on a motion to suppress ordinarily is required if 'the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question.'" United States v. Watson, 404 F.3d 163, 167 (2d Cir. 2005) (citation omitted).

With regard to Laurent's motion to suppress the 9 mm handgun, the Defendant's request for an additional evidentiary hearing is denied as unnecessary. A full suppression hearing has already been held on precisely the same search and seizure at issue here. The state court took sworn testimony from one of the officers who initiated and executed the search of Laurent's bedroom, and Defendant's prior counsel had a full and fair opportunity to cross-examine the witness.[10] Indeed, Laurent submits the transcript of that hearing in support of his suppression

---

[10] That Laurent is not collaterally estopped from relitigating his suppression motion, which was denied by the state court, has no bearing on the court's decision not to hold a second evidentiary hearing. (Laurent Reply at 8-9.)

motion. Simply put, Laurent provides no indication or explanation as to what, if any, additional contested issues of fact concerning the search and seizure require a second evidentiary hearing. What is clear, however, is that counsel's attempt to justify a second hearing on the grounds that her "cross-examination [of the witness] would be different" does not justify a duplicative proceeding. (Tr. at 7.) Nor does the fact that Laurent's current counsel would put forward different arguments favoring suppression speak to why a second evidentiary hearing is necessary. (Id. at 6.) As such, with regard to the handgun alone, Laurent's request for a second evidentiary hearing is denied.

Laurent's motion also purports to seek the suppression of the additional physical evidence seized on June 21, 2010, including the shell casing, ammunition, and a bag of marijuana. (Laurent Mot. #1 at 1, 6-7.) Yet Laurent's reply brief mentions only a request to suppress the firearm. (Laurent Reply at 1-2.) Further complicating matters, the Government's opposition characterizes Laurent's motion as seeking suppression of just the handgun and ammunition, and only mentions the other evidence in passing. (Gov't Opp'n at 14-15.) Given the confused nature of the parties' submissions, and the fact that the prior evidentiary hearing did not address the specifics of where and how this other evidence was seized, the court requires additional information before deciding whether a supplemental evidentiary hearing is required.

Thus, the Government is hereby ordered to advise the court in writing within sixty (60) days of this Memorandum and Order whether it intends to proffer the shell casing, ammunition,

---

See Johnson v. Watkins, 101 F.3d 792, 795-96 (2d Cir. 1996) (holding that under New York law "facts determined in a pretrial suppression hearing cannot be given preclusive effect against a defendant subsequently acquitted of the charges). In deciding Laurent's motion, the court does not adopt the factual findings of Justice Marrus; rather, it relies on the sworn testimony adduced from Officer Hodos—the officer who conducted the warrantless search and who presumably would be the same witness to testify at a second evidentiary hearing. Laurent has not provided the court with any justification as to why a second hearing is required for the court to make its own independent determination of the factual circumstances surrounding the challenged search and seizure.

and/or bag of marijuana seized as evidence at trial and, if so, to detail why it believes a supplemental evidentiary hearing is not warranted. Defendant Laurent may file a response to the Government's submission, if necessary, within thirty (30) days. In the interim, as noted above, Laurent's motion to suppress the shell casing, ammunition, and bag of marijuana is denied without prejudice along with his attendant request for a second evidentiary hearing. Both the motion and request may be renewed if necessary.

**B.      Defendant Odom's Motions to Suppress and Dismiss the Indictment**

Defendant Odom also makes two motions that are independent from those made by his co-defendants. The first seeks suppression of Odom's custodial statement on March 14, 2009, and the second seeks dismissal of all charges against him on the grounds that he was a juvenile at the time of their commission. (Odom Mot. at 7-9, 11-12.) Each is addressed in turn.

### 1.      Suppression of Post-Arrest Statements

First, Odom argues that his post-arrest statements on March 14, 2009, should be suppressed because he was not advised of his Miranda rights. (Odom Mot. at 7-9.) The Government, however, represents in its omnibus opposition that it does not intend to introduce Odom's statements at trial and accordingly that the court need not consider that aspect of the Defendant's motion. (Gov't Opp'n at 24.) Because Odom's counsel did not advance this point at oral argument, the court denies the motion with leave to renew should the Government later seek to admit Odom's post-arrest statements into evidence.

### 2.      Motion to Dismiss Indictment as to Defendant Odom

Second, Odom moves to dismiss all charges against him pursuant to the Juvenile Delinquency Act ("JDA"), 18 U.S.C. §§ 5031 et seq., arguing that he was a juvenile at the time

the charged conduct occurred and that the Government has failed to comply with the JDA's procedures for trying him as an adult. (Odom Mot. at 11-12.)

The JDA governs the prosecution of "juvenile delinquency" in federal court, otherwise defined as a "violation of a law of the United States committed by a person prior to his eighteenth birthday which would have been a crime if committed by an adult." 18 U.S.C. § 5031; see also id. (defining "juvenile" as "a person who has not attained his eighteenth birthday, or for the purpose of proceedings and disposition under this chapter for an alleged act of juvenile delinquency, a person who has not attained his twenty-first birthday"); United States v. Ramirez, 297 F.3d at 185, 191 (2d Cir. 2002) ("By its terms, the JDA does not apply to a person who commits a federal offense on or after the age of eighteen or to a person indicted after the age of twenty-one."). For charges of juvenile delinquency, the JDA sets forth various procedural hurdles for the Government to meet before a minor may be tried as an adult in federal court. However, the "relevant 'act' for purposes of determining federal jurisdiction under [the JDA] is the crime charged in the indictment . . . rather than the discrete predicate acts underlying those charges." United States v. Wong, 40 F.3d 1347, 1365-66 (2d Cir. 1994). "Accordingly, to determine whether the JDA governs a prosecution, a court should look to the defendant's age at the time of the offense or offenses charged in the indictment." Id.

Here, Odom is charged in five counts of the indictment: Count 1 (RICO); Count 2 (RICO Conspiracy); Count 12 (Assault with a Dangerous Weapon In-Aid-Of Racketeering); Count 13 (Unlawful Use of a Firearm in regard to Count 12); and Count 16 (Hobbs Act Robbery Conspiracy). Born on April 15, 1992, Odom turned eighteen on April 15, 2010, and was nineteen years old at the time the indictment was passed down. (Id.) Because the charges against Odom all allege continuing offenses that were not complete until after Odom's

eighteenth birthday, however, the JDA does not apply. Odom's motion to dismiss the indictment accordingly is denied.

As a preliminary matter, the Second Circuit has held that racketeering, racketeering conspiracy, and general conspiracy charges are continuing offenses that are not subject to the JDA provided the defendant's participation continued after his or her eighteenth birthday. See Wong, 40 F.3d at 1367-68 ("We conclude that the defendant's age at the time the substantive RICO or RICO conspiracy offense is completed is the relevant age for purposes of the JDA, and that an adult defendant may properly be held liable under RICO for predicate offenses committed as a juvenile." (emphasis added)); id. ("The [JDA] does not . . . prevent an adult criminal defendant from being tried as an adult simply because he first became embroiled in the conspiracy with which he is charged while still a minor . . . ."); see also United States v. Davilla, 911 F. Supp. 127, 129 (S.D.N.Y. 1996) ("Likewise, 'federal courts have jurisdiction over [non-racketeering] conspiracies begun while a defendant was a minor but completed after his eighteenth birthday . . . .'" (citation omitted)). With regard to Odom, the racketeering and racketeering conspiracy charges in Counts 1 and 2 are alleged to have spanned the period from April 2008 to October 2011, and the Hobbs Act conspiracy charge in Count 16 is alleged to have lasted from January 2009 to August 2011. (Indictment at 4, 12, 22.) Because the charged criminal conduct was not complete until October 2011 and August 2011, respectively—and because Odom's alleged participation in those continuing crimes bridged his eighteenth birthday—the associated Counts are not subject to the requirements of the JDA under the Second Circuit's decision in Wong. Odom's motion therefore is denied with regard to Counts 1, 2, and 16.

17

Whether the criminal conduct charged in Counts 12 and 13—assault in-aid-of racketeering (Count 12) and unlawful use of a firearm in connection with that assault (Count 13)—are continuing offenses for the purposes of the JDA is a closer issue. In United States v. McCall, which is cited by the Government, the Second Circuit concluded that assault in-aid-of racketeering was a continuing offense for purposes of determining the retroactive effect of the Sentencing Reform Act of 1984. 915 F.2d 811, 816 (2d Cir. 1990). (See also Gov't Opp'n at 25.) Specifically, the court reasoned that because a statutory element of the offense, as provided in 18 U.S.C. § 1959(a)(3), was that the assault was committed "for the purpose of maintaining and increasing [defendant's] position in an enterprise engaged in racketeering activity," the offense was subordinate to the continuing racketeering enterprise. Id. Similarly, in United States v. Saavedra, the Second Circuit held that § 1959's racketeering element "proscribes conduct that occurs as an inextricable part of the racketeering enterprise" and thus rendered the crime a continuing offense for purposes of determining venue. 223 F.3d 85, 91 (2d Cir. 2000). "Unlike criminal laws that proscribe isolated acts of violence," the court wrote, "§ 1959 is aimed at those kinds of violent crimes committed as part and parcel of membership in a RICO enterprise." Id.; see also United States v. Rodriguez Umana, No. 3:08-CR-134 (RJC), 2010 WL 1141366, at *2 (W.D.N.C. Mar. 18, 2010) (concluding "an offense under § 1959 is a continuation of an underlying racketeering enterprise" for purposes of venue). But cf. United States v. Delatorre, 157 F.3d 1205, 1210 (10th Cir. 1998) (noting in dicta that a murder in-aid-of racketeering "was complete before [defendant] reached the age of maturity, and therefore constituted an act of juvenile delinquency under the JDA").

Applying the reasoning of McCall and Saavedra, this court concludes that the racketeering element in § 1959 renders the assault in-aid-of racketeering offense charged in

Count 12 a continuing one for purposes of determining federal jurisdiction under the JDA. Here, the Government alleges that Odom committed an assault on John Doe #7 on September 13, 2008, "for the purpose of maintaining and increasing [his] position in the Six Tre Folk Nation," the alleged racketeering enterprise. (Indictment at 19-20; see 18 U.S.C. § 1959.) As the Second Circuit noted in Saavedra, that the assault allegedly was committed in furtherance the Odom's position in an existing racketeering enterprise is an "essential element of that crime." 223 F.3d at 90-92. Thus, the racketeering element in § 1959(a)(3) transforms what would otherwise be a point-in-time offense (i.e., simple assault) to a continuing one that is both subordinate and inextricably bound to the continuing racketeering enterprise.

Accordingly, while the charged assault occurred when Odom was a minor, the offense was not *complete* until Odom's participation in the enterprise allegedly ended in October 2011. Therefore, because the Defendant's participation in the Six Tre Folk Nation—the enterprise charged in connection with the racketeering element of Count 12—is alleged to have continued after he attained his majority, the Count is not subject to the procedural strictures of the JDA.

Likewise, the associated unlawful use of a firearm charged in Count 13 also is not subject to the JDA. (Indictment at 20.) Where, as here, a defendant is charged under 18 U.S.C. § 924(c)(1)(A) with using a firearm in connection with a continuing offense, the subordinate firearms offense itself is also a continuing one. See United States v. Rodriguez-Moreno, 526 U.S. 275, 281 (1999) (holding that § 924 is not a point-in-time offense for venue purposes "when a firearm is used during and in relation to a continuing crime of violence"); United States v. Payne, 591 F.3d 46, 69 (2d Cir. 2010) ("When a defendant is convicted of violating § 924(c)(1)(A) for using or carrying a firearm during and in relation to a crime that is a

continuing offense, the § 924(c)(1) crime itself is a continuing offense [for purposes of venue].").

As such, Odom's motion to dismiss Counts 12 and 13 is denied.

Finally, Odom's request for a pretrial hearing on the court's jurisdiction "where the Government would have to show that Odom's participation in the crimes continued into his majority" is denied. The sole authority cited by the Defendant in support of his request, United States v. Welch, counsels against requiring a pretrial hearing to determine the applicability of the JDA. 15 F.3d 1202, 1208-10 (1st Cir. 1993) (holding that the JDA's "language, structure, legislative history, and related policy considerations, militate against requiring a pretrial evidentiary hearing on jurisdiction"). As the court noted at oral argument, Odom will have an opportunity to renew his challenge to the charges against him after the Government rests its case-in-chief. (Tr. at 22.) See Fed. R. Crim. P. 29.

## III. SHARED MOTIONS

In addition to the individual motions brought by Defendants Odom and Laurent, the pretrial motions of all Defendants overlap in material respects. For the sake of efficiency, and because each Defendants expressly join or seek leave to join in the motions of his co-defendants, the common motions addressed below will be treated as if made by all Defendants.[11] See supra at 3.

### A. Severance

First, each Defendant moves to sever his trial from those of his co-defendants. (Odom Mot. at 9-10; Ashburn Mot. 11-18; Harrison Ruiz Mot. at 4-5; see also Laurent Mot. #2 at 1 (joining in motions brought by co-defendants); Cummings Not. of Mot. (same).) Two grounds are asserted for these requests: (1) Defendants Odom and Harrison Ruiz argue that judicial

---

[11] Again, with the exception of Defendants Hollenquest and Merritt, who filed no pretrial motions.

economy would be served by severance (see Odom Mot. at 9; Harrison Ruiz Mot. at 4); and (2) Defendants Odom, Harrison Ruiz, and Ashburn argue that severance is required due to "spillover prejudice" likely to result from the multitude of violent crimes and robberies alleged in the indictment (Odom Mot. at 10; Harrison Ruiz Mot. at 4-5; Ashburn Mot. at 17-18.) The Government objects, noting that judicial efficiency would not be served by severance and that the danger of spillover prejudice is significantly less in racketeering cases because evidence of uncharged crimes committed in furtherance of the common enterprise is still relevant to each defendant. (Gov't Opp'n at 8-10.) The court agrees with the Government, and Defendants' severance motions accordingly are denied.

Severance is warranted under Federal Rule of Criminal Procedure 14 "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro v. United States, 506 U.S. 534, 539 (1993); United States v. Urso, 369 F. Supp. 2d 254, 269 (E.D.N.Y. 2005) (Garaufis, J.). However, because joint trials promote efficiency and reduce the risk of inconsistent judgments, there is a clear preference in the federal system for joint trials for defendants who are charged in a single indictment. See United States v. Spinelli, 352 F.3d 48, 54-55 (2d Cir. 2003). Moreover, "[j]oint trials are often particularly appropriate in circumstances where the defendants are charged with participating in the same criminal conspiracy." Id.; see also United States v. Salameh, 152 F.3d 88, 115-16 (2d Cir. 1998) (per curiam) (noting that spillover prejudice is much less likely to occur in such cases). The decision whether to grant severance is "committed to the sound discretion of the trial judge." United States v. Blount, 291 F.3d 201, 209 (2d Cir. 2002).

The Second Circuit has recognized that severance may be appropriate in the rare case "in which the sheer volume and magnitude of the evidence against one defendant so dwarfs the proof presented against his co-defendant" such that "severance is required to prevent unacceptable spillover prejudice." Spinelli, 352 F.3d at 55; see also United States v. Cardascia, 951 F.2d 474, 483 (2d Cir. 1991) ("Relief by severance may be more appropriate when the unrelated evidence reflects activities of a violent nature because the risk of substantial prejudice is greater."). However, in applying the concept of spillover prejudice in a racketeering case, the court found it to be "at least overstated if not entirely meritless" because:

> [T]he government must prove an enterprise and a pattern of racketeering activity as elements of a RICO violation. Proof of these elements may well entail evidence of numerous criminal acts by a variety of persons, and each defendant in a RICO case may reasonably claim no direct participation in some of those acts. Nevertheless, evidence of those acts is relevant to the RICO charges against each defendant . . . .

United States v. DiNome, 954 F.2d 839, 843 (2d Cir. 1992). In racketeering cases, therefore, evidence of other defendants' criminal activity is relevant to the charges against each defendant because it tends to prove the existence and nature of the racketeering enterprise in which they were all members. See id.; United States v. Gammarano, No. 06-CR-0072 (CPS), 2007 WL 2077735, at *7-9 (E.D.N.Y. July 18, 2007).

Defendants' "spillover prejudice" arguments thus are insufficient to warrant severance. As the Government rightly notes, this case involves the same types of interconnected proof at issue in DiNome and that are typical in racketeering cases. The remaining six Defendants are all charged with participating in and conspiring to participate in the same racketeering enterprise (Counts 1 and 2), as well as jointly conspiring to murder members of a rival Crips gang (RA 1). Individually, each Defendant is charged in connection with between two and eight individual Racketeering Acts, many of which name multiple Defendants. Evidence of these predicate

offenses is relevant to all Defendants as proof of the enterprise's existence, purposes, and practices. With regard to violent crimes specifically, in addition to the alleged murder conspiracy in RA 1, each Defendant except Defendant Hollenquest is charged in at least one Count or Racketeering Act involving allegations of murder, attempted murder, or a conspiracy to murder, as well as one additional Count relating to the unlawful use of a firearm. Accordingly, the court believes there to be little to no risk of spillover prejudice in this case.

Nor is the court convinced by Defendants' efficiency arguments. A trial involving at most six defendants falls well below the type of unwieldy multi-defendant trial that the Second Circuit has cautioned district courts to avoid when possible. See United States v. Casamento, 887 F.2d 1141, 1151-53 (2d Cir. 1989) (urging district courts to require prosecutors to justify joint trials in cases involving more than ten defendants); see also Urso, 369 F. Supp. 2d at 269 (denying motion to sever on judicial economy grounds in six-defendant racketeering case). Separate trials would necessitate significant duplication of efforts by both the Government and the court, as the same evidence concerning the existence of the enterprise would need to be presented at each trial. Given the strong federal presumption favoring joint trials, especially in racketeering cases, Defendants' generalized arguments that individual trials would be less complex and time-consuming are insufficient to support severance. The motions for severance accordingly are denied.

### B.    Bill of Particulars

Each Defendant also requests a bill of particulars in this case. (Odom Mot. at 1-3; Ashburn Mot. at 2-5; Harrison Ruiz Mot. at 1-3; Cummings Mot. at 2-5; Laurent Mot. #2 at 2-3.) The Government opposes the motions, arguing that the S-3 indictment is itself sufficient to inform Defendants of the nature of the charged offenses, that Defendants have received detailed

information concerning the allegations against them in discovery and in various pretrial proceedings, and that much of the information sought are not items to which Defendants are legally entitled. (Gov't Opp'n at 13-14.)

The court notes that the Government has offered to engage with Defendants and to provide as many of the sought-after materials as possible. (Id.; Tr. at 20.) To wit, on April 8, 2014, the Government sent a letter to counsel for several Defendants offering to provide them with some of the information that was the subject of their requests for bills of particulars. (Apr. 8, 2014, Ltr. (Dkt. 137).) Accordingly, as the court noted during oral argument, it is not clear what remains of Defendants' motions for bills of particulars in light of this latest disclosure. (Tr. at 20-21.) In accordance with the court's ruling at oral argument and with the consent of the parties, Defendants' motions for bills of particulars are held in abeyance until such time as the parties inform the court in writing whether and to what extent they remain necessary. (See Tr. at 20-21; Apr. 14, 2014, Minute Entry.) Defendants are cautioned, however, that generalized requests for bills of particulars are unlikely to be granted.

## C.    Pretrial Discovery

Defendants also jointly move for immediate or otherwise accelerated disclosure of discoverable material under Brady, Giglio, the Jenks Act, and Rule 404(b).[12] (Odom Mot. 3-7; Ashburn Mot. at 6-11; Laurent Mot. #2 at 5-8.) Defendants further request disclosure of the Government's trial exhibits and witness list prior to trial (id.), and the identities of all unindicted co-conspirators "well in advance of trial." (Ashburn Mot. at 5-6.) The Government represents that it has already provided all Rule 16 and Brady materials in its possession—and will continue to do so as it acquires additional information—and that Defendants are not entitled to accelerated

[12] Specifically, Defendant Odom requests production of Rule 404(b) notice at least 60 days prior to trial. (Odom Mot. at 5.) Defendant Laurent moves for Jenks Act material to be disclosed not later than 30 days prior to trial and Rule 404(b) notice to be provided at least 45 days prior to trial. (Laurent Mot. #2 at 4-5.)

24

production of <u>Giglio</u>, the Jenks Act, Rule 404(b), and other trial materials at this stage. (Gov't Opp'n at 3-7.)

As no trial date has been set in this case, Defendants' motions concerning the timing of pretrial disclosure under <u>Brady</u>, <u>Giglio</u>, the Jenks Act, and Rule 404(b), as well as the disclosure of the Government's witness and exhibits lists, are denied without prejudice as premature. The court also notes that the Government has represented that it is aware of and will comply with its <u>Brady</u> and <u>Giglio</u> obligations (Gov't Opp'n at 3-5), which likewise counsels against granting Defendants' discovery motions. <u>See</u> <u>United States v. Messina</u>, No. 11-CR-31 (KAM), 2012 WL 463973, at *12 (E.D.N.Y. Feb. 13, 2012); <u>United States v. Cook</u>, 348 F. Supp. 2d 22, 30 (S.D.N.Y. 2004) (noting "pretrial motions for discovery pursuant to Brady should be denied when the Government has made a good faith representation to the Court and defense counsel that it recognizes and has complied with its Brady disclosure obligations" and collecting cases). Additionally, given the current posture of this case, Defendant Ashburn's request for the identities of unindicted co-conspirators also is premature and denied without prejudice.

Defendants Laurent and Odom separately request the immediate production of specific items or types of evidence pursuant to Federal Rule of Criminal Procedure 16, including:

- "[C]opies of all videos, police reports and insurance claim documents generated by the local and federal investigations of the jewelry store robberies" alleged in Count 16 (Odom Mot. at 7);
- "[C]opies of all surveillance tapes reviewed b[y] the N.Y.P.D. in connection with the shooting and attempted murder of September 13, 2008," at issue in Counts 1, 2, 12, and 13 (<u>id.</u>);
- "[A]ll photographs and documents generated any identification procedure conducted by law enforcement authorities, i.e., photographic and corporeal identifications" concerning Defendants Odom and Laurent (<u>id.</u>; Laurent Mot. #2 at 7);
- Photographs shown to witnesses of the murder of Brent Duncan, to the extent those witnesses identified someone other than Defendant Laurent as the shooter (<u>id.</u>);

- "[C]rime scene photographs" and "the 911 tape(s)" related to the murder of Brent Duncan (id.); and
- "[A] copy of the Craigslist listings referenced in the Hobbs Act robberies" alleged in Counts 1, 17, and 18 (id.)

The Government in turn represents that it has provided all Rule 16 materials in its possession and will continue to do so going forward. (Gov't Opp'n at 3.) However, in the interest of clarifying the contours and scope the all remaining discovery disputes in this case, the Government is hereby directed to file a letter within thirty (30) days of the entry this Memorandum and Order responding to each of the specific requests set forth above and in Defendants' respective motions.

### D.    Dissolution of Separation Orders

Finally, at oral argument counsel for Defendant Laurent made an oral motion to dissolve the separation order that prevents Defendants from meeting with one another while in custody of the Bureau of Prisons, with certain exceptions. (Tr. at 25-27.) The Government strenuously opposed the motion. (Id.) While the Government did not object to the Defendants having co-defendant meetings in anticipation of trial in this case—and indeed offered to facilitate such meetings—it opposed wholesale dissolution of the order on the grounds that nothing had changed since the order was entered both for Defendants' own safety and the safety of other inmates. (Tr. at 26-27.) In view of the violent gang-related crimes with which Defendants are charged, the court does not believe that the circumstances in this case have changed such that removal of the separation order would be appropriate. The motion is accordingly denied.

### IV.    CONCLUSION

For the reasons set forth above, (1) Defendant Laurent's motion to suppress the handgun seized from his bedroom on June 21, 2010, (2) Defendant Odom's motions to suppress his post-arrest statements and to dismiss the indictment under the Juvenile Delinquency Act, and (3)

Defendants' joint motions for (a) severance and (b) to dissolve the separation order enforced by the Bureau of Prisons are DENIED with prejudice. Defendants' joint motions for accelerated disclosure of various discovery and trial materials are DENIED without prejudice as premature. Similarly, Defendant Laurent's motion to suppress the shell casing, ammunition, and/or bag of marijuana seized by police on June 21, 2010, to the extent such motion is made, is DENIED without prejudice and may be renewed should the Government indicate an intention to use the evidence at trial. To that end, the Government is DIRECTED to advise the court in writing within sixty (60) days of this Memorandum and Order whether it intends to proffer the shell casing, ammunition, and/or bag of marijuana as evidence at trial and, if so, to detail why it believes a supplemental evidentiary hearing is not warranted. Defendant Laurent may file a response to the Government's submission, if necessary, within thirty (30) days of the Government's submission.

The Government also is DIRECTED to submit a letter to the court no later than thirty (30) days after entry of this Memorandum and Order responding to each of the specific Rule 16 requests outlined by the court and contained in Defendants Odom's and Laurent's respective motions.

Defendants' motions for bills of particulars are HELD IN ABEYANCE until such time as the parties inform the court whether and to what extent the motions remain necessary.

Finally, Defendant Elainor's pretrial motion likewise is DENIED as he has entered a plea of guilty in this case.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
      May 5, 2014

NICHOLAS G. GARAUFIS
United States District Judge