UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X

 UNITED STATES OF AMERICA

            -against-

 YASSA ASHBURN, JAMAL LAURENT, and
 TREVELLE MERRITT,

                      Defendants.
---------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

**MEMORANDUM & ORDER**

**13-CR-0303 (NGG)**

## I.    INTRODUCTION

       This Memorandum and Order addresses Defendant Jamal Laurent's Omnibus Pre-Trial

Motion. (Not. of Mot. (Dkt. 171).) Laurent, along with Defendants Yassa Ashburn and Trevelle

Merritt, are charged by a fourteen count indictment with numerous racketeering crimes

committed in connection with their membership in the Six Tre Outlaw Gangsta Disciples Folk

Nation ("Six Tre Folk Nation" or "Six Tre"), which was allegedly responsible for numerous acts

of gang-related violence, including homicides, non-fatal shootings, and commercial robberies in

Brooklyn and elsewhere beginning in 2007 through 2011. (Fourth Superseding Indictment[1] (the

"Indictment") (Dkt. 237); Gov't Mem. in Opp'n (Dkt. 180) at 1.) According to the Government,

Six Tre is part of the Folk Nation, a nationwide gang founded in Chicago, Illinois in the early

1990s. (Gov't Mem. in Opp'n at 1.) The Government alleges that Six Tre has approximately 20

to 25 identified members and has been operating in and around the Ebbets Field housing projects

in the Flatbush section of Brooklyn, New York for several years. (Id.) Specifically, Defendants

are charged with being directly responsible for three murders and two attempted murders, as well

as several "smash-and-grab" robberies of high-end jewelry stores (id. at 3), and robberies of

---

[1] This Indictment replaces the Third Superseding Indictment (Dkt. 71), which was filed on November 15, 2012, and
named five additional defendants, each of whom has since pleaded guilty. (See also Dec. 5, 2014, Gov't Ltr. (Dkt.
238) (further explaining differences between the Third and Fourth Superseding Indictments).)

individuals solicited via the Craigslist website—among other crimes—between April 2008 and October 2011. (See generally Indictment.)

The Indictment, filed on December 4, 2014, charges each defendant with racketeering (Count One) and racketeering conspiracy (Count Two), on the basis of twelve predicate Racketeering Acts ("RAs"),[2] which include, among others: conspiracy to murder members of a rival Crips gang (RA 1); the murders of Courtney Robinson on or about April 20, 2008, and Brent Duncan on or about June 19, 2010 (RAs 2, 4); the attempted murder of an individual known as John Doe #2 on or about July 7, 2010 (RA 7); Hobbs Act robbery conspiracy targeting employees of various jewelry stores (RA 3); Hobbs Act robberies and a robbery conspiracy concerning individuals targeted through Craigslist (RAs 5, 6, 8, 9); and robbery resulting in the murder of Dasta James on or about January 28, 2011 (RA 12). (Id. ¶¶ 7-34.) In addition, these defendants are charged in Counts Three through Fourteen with various federal crimes predicated on the same or similar conduct at issue in the Racketeering Acts. Laurent, in particular, is charged with murder in-aid-of racketeering; assault with a dangerous weapon in-aid-of racketeering; and Hobbs Act robbery and robbery conspiracy. (Id. at ¶¶ 35, 39-46.)

In advance of the upcoming trial pursuant to this Indictment, Laurent has moved the court for an order: (1) suppressing historical cell-site information and text messages obtained from two cellular telephones; (2) excluding testimonial statements made by Defendant Merritt, or in the alternative, severing his and Merritt's trials; (3) suppressing statements made by Laurent during questioning by law enforcement while incarcerated at Rikers Island; (4) suppressing Laurent's statements and conduct in response to attempts by law enforcement to execute DNA sample search and seizure warrants; (5) excluding mention of Laurent's alias from the Government's

---

[2] Ashburn is named in connection with two individual RAs; Laurent is named in connection with eight individual RAs; and Merritt is named in connection with four individual RAs.

case-in-chief and the Third Superseding Indictment; and (6) compelling the Government to provide discovery under Federal Rule of Criminal Procedure 16 and <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963).  (<u>See</u> Not. of Mot. at 1; Mem. of Law in Support of Def. Laurent's Omnibus Pre-Trial Mots. ("Omnibus Mot.") (Dkt. 172).)  Merritt joins Laurent's motion to sever their trials.  (Oct. 2, 2014, Ltr. (Dkt. 191).)  In the Memorandum and Order that follows, the court addresses each motion in turn.

## II.     MOTION TO SUPPRESS HISTORICAL CELL-SITE DATA

Laurent first moves to suppress certain historical mobile phone location ("cell-site") data the Government has requested and received from cellular service providers.  He argues that each request for information amounted to a search within the meaning of the Fourth Amendment, and as a result, the Government was required to first obtain a warrant supported by a showing of probable cause.  (Omnibus Mot. at 6-7.)  Because it did not, Laurent maintains, the cell-site data should be suppressed.  (<u>Id.</u> at 7.)  As the Government points out, however, the historical cell-site data was obtained pursuant to court orders authorized under both state and federal law.  (Gov't Mem. in Opp'n at 10.)  Thus, even if each request constituted a Fourth Amendment search requiring a warrant, which the Government disputes, the exclusionary rule does not apply because law enforcement relied in good faith on both the constitutionality of the relevant statutes as well as the authorization provided by judicial officers.  (<u>Id.</u> at 12-13.)  Since the court agrees that the good faith exception to the exclusionary rule applies, regardless of whether the requests for historical cell-site data constituted Fourth Amendment searches, Laurent's motion to suppress is DENIED.

### A.     Background

Laurent's motion concerns historical cell-site data pertaining to two cell phone numbers. First, an officer of the West Hartford Police Department ("WHPD") sought and obtained this

data with respect to (917) 214-4017 (the "4017 phone") in August 2010, in connection with an investigation into a June 2010 robbery at Lux Bond & Green, a jewelry store in West Hartford, Connecticut. Second, in April 2011, federal prosecutors in the Eastern District of New York sought and obtained cell-site data regarding (347) 455-6638 (the "6638 phone") during the course of their investigation into the murder of Dasta James in Brooklyn, New York in January 2011. The following circumstances were involved in each request for cell-site data, respectively.

## 1. The 4017 Application and Order

According to the WHPD application for cell-site data, WHPD officers initially responded to a robbery at Lux Bond & Green on June 25, 2010. (Gov't Mem. in Opp'n, Ex. A, Application and Ex Parte Order to Disclose Telephone or Internet Records ("4017 Application and Order") (Dkt. 180-1) at 1.)[3] Witnesses, including employees and customers, reported that two black males had smashed the display cases, grabbed jewelry, and left the store. (Id.) According to witness reports and video surveillance, two masked men entered the store, and one of them began to smash the watch display cases with a sledgehammer, while the other one removed the watches from the displays.[4] (Id.) The two men then fled from the store, but dropped the sledgehammer (id. at 3), and were observed entering a car bearing the license plate number EYD2881. (Id.) WHPD Officer Mark Puglielli, who was investigating the robbery, subsequently learned that a 1998 Nissan Maxima bearing that license plate had been reported to the New York Police Department ("NYPD") in Brooklyn, New York as having been stolen. (Id.) On June 28, 2010, the NYPD located the vehicle, which had been towed and impounded at a lot in Brooklyn after having accumulated two parking tickets. (Id.) During a search of the vehicle,

---

[3] All citations to pages of the parties' exhibits correspond to the page numbering assigned by the court's electronic docketing system (ECF). By contrast, all citations to pages of the parties' memoranda correspond to the parties' page numbers.

[4] It was later determined that the two men stole 20 Patek Philippe watches, with a total approximate value of $583,250.00. (4017 Application and Order at 3.)

to which the owners consented, WHPD officers recovered a small piece of white paper bearing the telephone number (917) 214-4017, which they determined was registered to cellular service provider T-Mobile. (Id. at 4-5, 6.) The owners of the vehicle confirmed that the piece of paper did not belong to them and had not been in the vehicle before it was stolen. (Id. at 4.)

Officer Puglielli subsequently learned that the NYPD and the Federal Bureau of Investigation ("FBI") had been investigating a group of males in Brooklyn who were thought to be responsible for a series of jewelry store robberies similar to the one that took place at Lux Bond & Green on June 25, 2010. (Id.) These other robberies had taken place between May 2009 and August 2010 at jewelry stores that were located in New York, New Jersey, and Connecticut, and that sold high priced watches, including those manufactured by Patek Philippe. (Id.) One such theft took place on August 18, 2010, when three individuals robbed a jewelry store in Manhattan. (Id.) The suspects drove to the store in a stolen Nissan Maxima, used a sledgehammer to smash a glass window of the store, and stole an "undetermined amount of antique watches." (Id.) One of the three suspects was apprehended and arrested by the NYPD later that day. (Id.) After receiving Miranda warnings, the suspect waived his rights and agreed to speak with law enforcement officers without the presence of counsel. (Id. at 5.) The suspect told officers, among other things, that the group had been responsible for these robberies and that they typically used another car to "take possession of the stolen jewelry and run interference if the police became involved." (Id.) The suspect also explained that he had been recruited by another individual, whose nickname and telephone numbers the suspect provided. (Id.)

Based on this information, along with other details, Officer Puglielli filed an application for an ex parte court order pursuant to section 54-47aa of the General Statutes of Connecticut, seeking subscriber information, call logs, and cell-site data from the 4017 phone for the period

from June 1, 2010 to August 18, 2010.  (Id. at 6.)  On the application, Officer Puglielli indicated

that he believed the foregoing constituted evidence that "a particular person participated or may

have been knowing in the commission of the offense[s]" of first degree robbery and larceny.

(Id.)  On August 30, 2010, Connecticut Superior Court Judge Miano granted the application,

thereby finding that, "[t]he foregoing reasonable and articulable suspicion or exigent

circumstances having been presented to and considered by the undersigned . . . the undersigned

(a) is satisfied therefrom that grounds exist for said application and (b) finds that said affidavit

established grounds for the undersigned to issue [the ex parte] order."  (Id. at 1, 2.)  Pursuant to

the order, Judge Miano required T-Mobile to provide "basic subscriber information" and "call-

identifying information," which included "dialing or signaling information that identifies the

origin, direction, destination or termination of each communication generated or received by a

subscriber or customer" for the 4017 phone as well as for two phone numbers provided by the

suspect on August 18, 2010.  (Id. at 1.)  According to the Government, T-Mobile only provided

this information for the period from June 24, 2010, to July 8, 2010.  (Gov't Mem. in Opp'n at 7.)

T-Mobile did indicate, however, that the subscriber associated with the 4017 account was Peter

Laurent, Defendant Jamal Laurent's father.  (Omnibus Mot., Ex. A (Dkt. 172-1) at 2.)

Ultimately, Jamal Laurent was charged in connection with these robberies in Racketeering Act 3

of Count One (racketeering) and Count Eight (Hobbs Act robbery conspiracy) of the Indictment.

(See Indictment ¶¶ 11, 44.)

### 2.    The 6638 Application and Order

Whereas T-Mobile provided the 4017 phone records to the WHPD in response to a

Connecticut state court order under section 54-47aa, the 6638 phone records were obtained by

the federal government pursuant to section 2703 of the Stored Communications Act ("SCA"), 18

U.S.C. § 2703, in connection with an investigation conducted by the United States Attorney's Office for the Eastern District of New York in April 2011. At that time, the FBI was investigating a murder that took place on January 28, 2011, at 47 McKeever Place, in Brooklyn, New York. The victim, who was later determined to be Dasta James, had been shot twice, once in the back of his head and once in his shoulder. (Gov't Mem. in Opp'n at 7; id., Ex. B ("6638 Application and Order") (Dkt. 180-2) at 3.) At the time of his death, James was found to be in possession of marijuana and approximately $1,960 in cash. (6638 Application and Order at 3.) Just over two months later, law enforcement officers interviewed a suspect—who was later identified as Defendant Trevelle Merritt—regarding his involvement in the James murder.[5] (Gov't Mem. in Opp'n at 7.) On April 6, 2011, Merritt told the officers that on January 28, he conspired with Laurent to rob James, who was a marijuana dealer. (6638 Application and Order at 3.) Merritt explained that after he called James to arrange a purchase of marijuana, Merritt and Laurent met James at 47 McKeever Place. (Id.) After Merritt purchased the marijuana from James, Laurent "pulled out a gun and demanded that the victim give Laurent everything he had." (Id. at 3-4.) When James refused, Merritt stated, Laurent shot at James several times. (Id. at 4.)

    In the application for cell-site data, Assistant United States Attorney ("AUSA") Zainab Ahmad explained that Laurent used the 6638 phone in furtherance of the murder of Dasta James on January 28, 2011. (Id. at 2.) According to AUSA Ahmad's application, Merritt gave James's phone number to Laurent, who called James in Merritt's presence. (Id. at 4.) Merritt also stated that Laurent was using the 6638 phone at the time. (Id.) The application further indicated that toll records from the 6638 phone showed that Laurent called Merritt several times on January 28,

---

[5] Statements made by Defendant Trevelle Merritt regarding the circumstances surrounding this murder are also the subject of Laurent's motion to exclude. See infra Part III.

2011.[6]  (Id.)  These records also showed that while Laurent called James five times between 4:48 p.m. and 4:57 p.m. on the date of the murder, there were no calls between Laurent and James before 4:48 p.m. or after 4:57 p.m. that day.  (Id.)  Lastly, the Government submitted that according to the subscriber records, the 6638 phone was registered to Peter Laurent, Jamal Laurent's father.  (Id.)  Moreover, on or about December 3, 2010, law enforcement officials interviewed Peter Laurent about another phone registered in his name but believed to be used by Jamal Laurent.  (Id.)  During that interview, Peter Laurent confirmed that Jamal Laurent was his son and that he typically provided Jamal Laurent with cell phones, adding that Jamal Laurent "switched cell phone numbers often."  (Id. at 4-5.)

On this basis, the Government filed an application pursuant to the SCA, 18 U.S.C. § 2703(c) and (d), seeking historical cell-site information regarding the 6638 phone for the period from January 28, 2011, to 11 a.m. on the date the application was made, April 19, 2011. (Id. at 1, 6.)  In support of the application, AUSA Ahmad submitted that the Government had offered "specific and articulable facts showing that there [were] reasonable grounds to believe the information sought [was] relevant and material to an ongoing criminal investigation."  (Id. at 3.)  Magistrate Judge Viktor V. Pohorelsky granted the Government's application that same day, finding that the Government had in fact "offered specific and articulable facts showing that there [were] reasonable grounds to believe that the historical cell-site information [was] relevant and material to an ongoing criminal investigation into possible violations of federal criminal laws, including racketeering, murder, robbery and conspiracy offenses in violation of 18 U.S.C. §§ 924(j), 1951(a), 1959, 1962(c) and 1962(d)."  (Id. at 8.)  According to the Government, while Magistrate Judge Pohorelsky ordered the cellular service provider—Metro PCS (id. at 7)—to produce historical cell-site data for the entire period requested, Metro PCS only provided this

---

[6] The 6638 Application and Order does not state how the toll records were obtained.

data for January 28, 2011.  (Gov't Mem. in Opp'n at 9.)  Nevertheless, the Government

eventually charged all three defendants with racketeering conspiracy in Count Two of the

Indictment, which requires the Government to prove that each defendant, including Laurent,

agreed that he or a co-conspirator would commit at least two acts of racketeering in the conduct

of the affairs of the enterprise.  (See Indictment ¶ 34.)  Especially since the Government has

indicated that it will introduce the cell-site evidence at trial (see, e.g., Gov't Mem. in Opp'n at

24), one such act could be the attempted robbery and murder of Dasta James.  (Id. at 21.)

### B.     Legal Standard

Laurent contends that the Government obtained this historical cell-site data in violation of

the Fourth Amendment.  (Omnibus Mot. at 2.)  The Fourth Amendment guarantees that "[t]he

right of the people to be secure in their persons, houses, papers, and effects, against unreasonable

searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable

cause, supported by Oath or affirmation, and particularly describing the place to be searched, and

the persons or things to be seized."  U.S. Const. amend. IV.  "A search conducted without a

warrant is 'per se unreasonable under the Fourth Amendment—subject only to a few specifically

established and well-delineated exceptions.'"  United States v. Maynard, 615 F.3d 544, 566

(D.C. Cir. 2010) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)), aff'd in part sub

nom. United States v. Jones, 132 S. Ct. 945 (2012).  Thus, if obtaining the records sought by the

Government here constitutes a search as defined by the Fourth Amendment, it is presumed that

the Government must, at a minimum, obtain a warrant supported by a showing of probable

cause.  In re Application of United States for an Order Authorizing the Release of Historical

Cell-Site Info. ("Historic Cell-Site Info"), 809 F. Supp. 2d 113, 116 (E.D.N.Y. 2011).

In this context, the SCA provides a federal statutory framework for obtaining historical data from cellular service providers.[7] Pursuant to § 2703, "[a] governmental entity may require a provider of electronic communication service or remote computing service to disclose a record or other information pertaining to a subscriber to or customer of such service . . . only when the governmental entity . . . obtains a court order for such disclosure under subsection (d) of this section." 18 U.S.C. § 2703(c)(1)(B). Such an order "shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." Id. § 2703(d). This showing, however, is lower than the probable cause standard required for a search warrant. United States v. Herron, 2 F. Supp. 3d 391, 401 (E.D.N.Y. 2014).

As Laurent points out, this court has previously found that a request for prolonged historical cell-site records pursuant to § 2703 constitutes a search for the purpose of the Fourth Amendment, thus requiring the issuance of a warrant upon a showing of probable cause. See Historical Cell-Site Info, 809 F. Supp. 2d at 116. In Historical Cell-Site Info, the court explained that in determining whether governmental action constituted a Fourth Amendment search, two factors control: whether "(1) the individual has 'manifested a subjective expectation of privacy' in the thing searched; and (2) 'society is willing to recognize that expectation as reasonable.'" Id. (quoting Kyllo v. United States, 533 U.S. 27, 33 (1979)). Recounting the Supreme Court's decisions in United States v. Knotts, 460 U.S. 276 (1983), and United States v. Karo, 468 U.S. 705 (1984), this court explained that the two cases together stood for the proposition that "the Government's obtaining of some electronically collected location information constitutes a

---

[7] Significantly, Laurent has not alleged a statutory violation in the issuance of either judicial order in this case.

search under the Fourth Amendment depending on the location (<u>Karo</u>) and, potentially, quantity (<u>Knotts</u>) of that information." <u>Historical Cell-Site Info</u>, 809 F. Supp. 2d at 117.

This court then looked to the reasoning in <u>Maynard</u>, 615 F.3d at 555. There, the Court of Appeals for the District of Columbia Circuit held that prolonged electronic surveillance of an individual's location—via the attachment of a GPS tracking device to a vehicle—constituted a Fourth Amendment search. <u>Id.</u> In <u>Maynard</u>, however, the Government's warrantless surveillance had continued for four weeks. <u>Id.</u> By contrast, in <u>Historical Cell-Site Info</u>, the Government had obtained at least 113 days of cumulative cell-site location records. 809 F. Supp. 2d at 118. Based on "<u>Maynard</u>'s persuasive reasoning," the court found that the cell-site location records sought captured "enough of the user's location information for a long enough time period . . . to depict a sufficiently detailed and intimate picture of his movements to trigger the same constitutional concerns as the GPS data in <u>Maynard</u>." <u>Id.</u> at 119. On this basis, the court concluded that "cell-phone users maintain a reasonable expectation of privacy in long-term cell-site location records," and therefore, that the Government's obtaining 113 days of cumulative cell-site location records from the target's cell phone—though obtained pursuant to a court order under § 2703—constituted a Fourth Amendment search. <u>Id.</u> at 119-20, 127.[8]

## C.   Discussion

Laurent argues that here, as in <u>Maynard</u> and <u>Historical Cell-Site Info</u>, the Government's collection of cell-site location data from both the 4017 and 6638 phones for an extended period of time constituted a warrantless search in violation of the Fourth Amendment, and that as a result, this evidence should be suppressed at trial. (Omnibus Mot. at 7.)

---

[8] The court further held that the so-called third-party disclosure doctrine did not apply because "cell phone users have a reasonable expectation of privacy in cumulative cell-site location records, despite the fact that those records are collected and stored by a third party." <u>Historical Cell-Site Info</u>, 809 F. Supp. 2d at 126.

1.    <u>Standing</u>

As the proponent of a motion to suppress, a defendant bears the burden of establishing that he has "standing" to challenge the search or seizure.  <u>Rakas v. Illinois</u>, 439 U.S. 128, 130 n.1 (1978).[9]  To establish Fourth Amendment standing, the defendant must demonstrate a subjective expectation of privacy in the invaded area or object that "society is prepared to recognize as reasonable."  <u>Id.</u> at 143 n.12.  Moreover, "[l]egitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society."  <u>Id.</u>

As Laurent himself points out, T-Mobile has advised that Peter Laurent, Defendant's father, is the customer associated with the 4017 phone (Omnibus Mot. at 3), and Metro PCS has disclosed that Peter Laurent was the subscriber for the 6638 phone as well (<u>id.</u> at 4).  Moreover, Jamal Laurent told Connecticut law enforcement officers in December 2010 that "his own cell phone number was (646) 400-7110," an account for which phone records have not been subpoenaed or produced.  (<u>Id.</u> at 3 n.4.)  Nevertheless, he points out that according to the Government's application with respect to the 6638 phone, Peter Laurent stated in an interview that "although the phone was registered to him, he typically provided his son . . . with cell phones."  (<u>Id.</u> at 4 n.6.)  Consequently, Jamal Laurent asserts that "there is no question that [he] has standing to move to suppress the records" for both the 4017 and 6638 phones.  (<u>Id.</u>)  In

---

[9] In <u>Rakas</u>, the Supreme Court explained that because "Fourth Amendment rights are personal in nature," "the definition of those rights is more properly placed within the purview of Fourth Amendment law than within that of standing."  439 U.S. at 140; <u>see also</u> <u>Minnesota v. Carter</u>, 525 U.S. 83, 87-88 (1998) (citing <u>Rakas</u>, 439 U.S. at 139-40).  Consequently, as many courts have observed, "the question of whether a defendant has 'standing' to bring a Fourth Amendment challenge is more properly subsumed under the substantive analysis of whether the defendant's Fourth Amendment rights were violated."  <u>United States v. Haqq</u>, 278 F.3d 44, 52 (2d Cir. 2002) (Meskill, J., concurring) (citing <u>Rakas</u>, 439 U.S. at 139-40).  Nevertheless, the court finds the concept of "standing" useful in distinguishing between the question of whether Laurent has a reasonable expectation of privacy with respect to cell phones subscribed to by his father and the analysis with respect to whether the Government's obtaining cumulative historical cell-site records constitutes a Fourth Amendment search.  <u>See, e.g.</u>, <u>United States v. Cody</u>, 434 F. Supp. 2d 157, 163 n.3 (S.D.N.Y. 2006) (citing <u>United States v. Fields</u>, 113 F.3d 313, 320 (2d Cir. 1997) ("A defendant lacks 'standing' in the Fourth Amendment context when his contacts with the searched premises are so attenuated that no expectation of privacy he has in those premises could ever be considered reasonable.")).

further support of his argument, Laurent explains that an investigating case agent testified at his bail hearing in a different case, <u>United States v. Laurent</u>, No. 11-CR-322 (JBW) (E.D.N.Y.), that the Government was aware that Peter Laurent provided cell phones to his son, Jamal. (Omnibus Mot. at 4 n.6; <u>see also</u> Bail Hr'g Tr. at 32, <u>Laurent</u>, No. 11-CR-322, ECF No. 12.) The Government itself has stated as much.[10] (Gov't Mem. in Opp'n at 9.)

Nevertheless, this court has previously noted that case law in the Second Circuit is "sparse" on the question of whether a defendant who used a cell phone subscribed to another person has standing to move to suppress information gathered from that phone. <u>See</u> <u>Herron</u>, 2 F. Supp. 3d at 400. In <u>Herron</u>, the court noted that this situation may be analogized to cases involving storage lockers, hotel rooms, and mail packages. <u>Id.</u> Such cases establish that "[o]ne need not be the owner of the property for his privacy interest to be one that the Fourth Amendment protects, so long as he has the right to exclude others from dealing with the property." <u>United States v. Perea</u>, 986 F.2d 633, 639-40 (2d Cir. 1993) (citing <u>Rakas</u>, 439 U.S. at 144 n.12).

For example, one who, with permission of the owner, is in possession of and control over a residence that is not his own home, and who can exclude others from it, can have a legally sufficient privacy interest to establish Fourth Amendment standing to challenge a search of such premises. <u>Id.</u> Similarly, a person who possesses personal property belonging to another and who has the right to exclude third persons from possession of that property has an interest that is similarly protected. <u>United States v. Ochs</u>, 595 F.2d 1247, 1253 (2d Cir. 1979) (defendant had Fourth Amendment standing to object to search of car where car owner allowed defendant to use it whenever he wished and defendant could exclude others from it); <u>see also</u> <u>United States v. Finley</u>, 477 F.3d 250, 259 (5th Cir. 2007) (defendant had standing to challenge retrieval of call

---

[10] The court notes that the Government has not opposed Laurent's motion to suppress on standing grounds.

records and text messages from cell phone issued by his employer—his uncle's business; although defendant could have expected employer to read his messages, employer permitted personal use and thus defendant reasonably expected to be free from intrusion by the government and the general public). This court need not decide, however, whether Laurent in fact had a sufficient privacy interest in his father's cell phones to have standing to object to the introduction of historical cell-site data, for the reasons that follow.

### 2. Fourth Amendment Search

Even if Laurent has a legally sufficient privacy interest in his father's cell phones, the next issue is whether the Government's actions constituted a Fourth Amendment search subject to the warrant and probable cause requirement.[11] Laurent argues that here, just as in Historical Cell-Site Info, the Government's request for historical cell-site records constituted such a search. (Omnibus Mot. at 7.) The Government, however, has challenged the continuing validity of this court's decision in that case. (See generally Gov't Mem. in Opp'n at 16-19.)

Following this court's decision in Historical Cell-Site Info, the Supreme Court affirmed Maynard, although on different grounds. Justice Scalia, writing for the majority, found that the attachment of a GPS device to a vehicle amounted to a search by virtue of the government's physical trespass of private property. Jones, 132 S. Ct. at 949. In a concurrence joined by Justices Ginsberg, Breyer, and Kagan, however, Justice Alito stated that the Fourth Amendment inquiry in Katz provided the proper analytic lens, which was "whether respondent's reasonable expectations of privacy were violated by the long-term monitoring of the movements of the vehicle he drove." Id. at 960. Applying this framework, Justice Alito found that while short-term monitoring of a person's movements was not a search, extended surveillance surely became

---

[11] Although "the warrant requirement is subject to exceptions," e.g., Missouri v. McNeely, 133 S. Ct. 1552, 1558 (2013), the Government has not argued that the request for this data was justified by any such exception.

a search by the time it crossed the four-week mark.[12]  Id. at 963.  Justice Sotomayor agreed that the question was whether the Government had violated the target's reasonable expectation of privacy.  But in a separate concurring opinion, she addressed the issue of whether advances in technology might require the Court to revisit the third-party disclosure doctrine, noting that "it may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties."  Id. at 957.

On this basis, Laurent concludes that this court's decision in Historical Cell-Site Info is firmly supported by a majority of the Supreme Court, and that as a result, the court should conclude here that the Government violated Laurent's reasonable expectation of privacy by obtaining his cell-site data pursuant to § 2703.  (Def. Reply Mem. at 7-8.)  In response, the Government cautions the court against deciding this motion based on the anticipated evolution of Supreme Court decisions.  (Gov't Mem. in Opp'n at 19 (citing Agostini v. Felton, 521 U.S. 203, 237 (1997) (holding that where more recent Supreme Court cases appear to overrule earlier precedent by implication, district courts should not act accordingly "unless and until this Court reinterpreted the binding precedent")).)  Nevertheless, the Government suggests that Jones requires this court to reconsider its prior decision in Historical Cell-Site Info.  (Id. at 17-19 ("Although the majority decided the case on the ground that the government's conduct involved a physical trespass to property, the two concurring opinions suggest that at least five Justices may be inclined to view reliance on the SCA as constitutional.").)[13]  Even if the court declines to

---

[12] In dicta, the majority rejected this sliding-scale approach to determining whether the Government had effected a Fourth Amendment search.  Id. at 954.

[13] In this regard, the Government highlights Justice Alito's observation that "the best solution to privacy concerns may be legislative," and that "Congress and most States have not enacted statutes regulating the use of GPS tracking technology for law enforcement purposes."  (Gov't Mem. in Opp'n at 18 (quoting Jones, 132 S. Ct. at 963-64).)  The Government points out, however, that unlike GPS data, both Congress and Connecticut have enacted statutes governing the release of cell-site data to law enforcement—the SCA and section 54-47aa.  (Id.)  As a result, the Government invites this court to reevaluate its holding in Historical Cell-Site Info, since "the Justices who joined Justice Alito's concurrence may well find the balance struck by Congress in the SCA a reasonable one."  (Id.)

do so, the Government further argues that this case can be distinguished on its facts, which "do not implicate the Court's concern regarding long-term cell-site-location records." (Id. at 19 n.11.) As support, the Government points to that fact that while this court previously held in Historical Cell-Site Info that obtaining 113 days of cell-site records "was tantamount to the prolonged, constant surveillance discussed in Maynard," here, it obtained only fourteen days of cell-site records with respect to the 4017 phone, and just one day of cell-site records with respect to the 6638 phone. (Id. (citing Historical Cell-Site Info, 809 F. Supp. 2d at 118-20).)

In Maynard, which the Supreme Court affirmed on different grounds, the D.C. Circuit held that constant GPS surveillance of a suspect for four weeks constituted a Fourth Amendment search. Maynard, 615 F.3d at 555. Although it drew heavily from Maynard in finding that the collection of 113 days of location records violated individuals' reasonable expectations of privacy, in Historical Cell-Site Info this court did not establish a lower threshold for when government tracking becomes "cumulative" and therefore a search under the Fourth Amendment. See Historical Cell-Site Info, 809 F. Supp. 2d at 127. Nor is it necessary to do so here. See infra Part II.C.3. Because the admissibility of historical cell-site records in this case can be decided based on the basis of the good faith exception, the court declines the invitation to either reconsider or distinguish its prior decision.

3.    Good Faith Exception

As the Supreme Court has explained, "[t]he fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies." Herring v. United States, 555 U.S. 135, 140 (2009). In fact, evidence is only suppressed "if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." United States v. Leon, 468 U.S.

897, 919 (1984) (quoting <u>United States v. Peltier</u>, 422 U.S. 531, 542 (1975)) (internal quotation

marks omitted). First, under this so-called good faith exception, evidence seized pursuant to a

warrant for which actual probable cause does not exist, or which is technically deficient, is

nevertheless admissible if the executing officers relied on the warrant in "objective good faith."

<u>Id.</u> at 923. Second, even in the absence of a judicially obtained warrant, the good faith exception

applies to evidence obtained by police acting in objectively reasonable reliance upon a statute

that is subsequently found to violate the Fourth Amendment. <u>See</u> <u>Illinois v. Krull</u>, 480 U.S. 340,

350 (1987) ("Unless a statute is clearly unconstitutional, an officer cannot be expected to

question the judgment of the legislature that passed the law."); <u>see also</u> <u>Davis v. United States</u>,

131 S. Ct. 2419, 2429 (2011) ("[P]enalizing the officer for the legislature's error . . . cannot

logically contribute to the deterrence of Fourth Amendment violations." (quoting <u>Krull</u>, 480 U.S.

at 350) (internal quotation marks omitted)). And most recently, in <u>Davis</u>, the Supreme Court

extended the holding in <u>Krull</u> to an officer's objectively reasonable reliance on binding appellate

precedent. <u>Davis</u>, 131 S. Ct. at 2429.

Laurent argues that the good faith exception should not apply to the Government's

conduct in this case. (Omnibus Mot. at 20.) In support, Laurent points out that before the

Government applied for historical cell-site data with respect to the 6638 phone, Eastern District

of New York Magistrate Judge James Orenstein had issued two decisions rejecting similar

applications under § 2703(d) on the basis of the targets' Fourth Amendment right to privacy.

<u>See</u> <u>In re Application of United States for an Order Authorizing the Release of Historical Cell-</u>

<u>Site Info.</u> ("<u>In re Application of United States</u>"), 736 F. Supp. 2d 578 (E.D.N.Y. 2010), <u>rev'd</u>,

No. 10-MC-550 (RRM) (E.D.N.Y. Nov. 29, 2010) (Order), ECF No. 11; <u>In re Application of</u>

<u>United States for an Order Authorizing the Release of Historical Cell-Site Info.</u>, No. 10-MC-897

(JO), 2010 WL 5437209 (E.D.N.Y. Dec. 23, 2010). In addition, Laurent notes that the D.C.

Circuit and the Southern District of Texas had also held that individuals have a reasonable

expectation of privacy in historical cell-site data. See Maynard, 615 F.3d 544; In re Application

of United States for Historical Cell Site Data, 747 F. Supp. 2d 827 (S.D. Tex. 2010), vacated,

724 F.3d 600 (5th Cir. 2013). According to Laurent, this put the Government "on notice" that

changing technology was shifting the Fourth Amendment analysis. As a result, he argues,

"[t]here is no question here that the Government knew that their reliance on less than probable

cause to obtain historical cell site [data] was definitely questionable." (Omnibus Mot. at 20.)

This is not enough to render the Government's reliance on court orders issued under the

SCA and section 54-47aa objectively unreasonable. Laurent does not argue that either statute

was "clearly unconstitutional," or that Congress or the Connecticut legislature "wholly

abandoned [their] responsibility to enact constitutional laws." Krull, 480 U.S. at 355.[14] Nor

does Laurent argue that law enforcement officials were not entitled to rely on the validity of the

judicial authorizations. In Leon, the Supreme Court held that notwithstanding the good faith

exception, the government's reliance on a court order is not reasonable where: (1) the magistrate

"wholly abandoned his judicial role," (2) the magistrate was misled by the government's

dishonesty or recklessness in preparing its application; or (3) the authorization was "so facially

deficient" that the executing officers could not reasonably presume it to be valid. Leon, 468 U.S.

at 923. Laurent does not argue, however, that the judges who issued the authorization orders

were misled by false information, that they wholly abandoned their detached and neutral roles, or

that the authorization orders were "so facially deficient" that the government could not

reasonably presume them to be valid. See id.; see also United States v. Suarez-Blanca, No. 07-

---

[14] In fact, as the Government points out, the officers in Krull had relied on a statute that authorized warrantless administrative searches, which required no ex ante judicial ratification. (Gov't Mem. in Opp'n at 15.) Here, by contrast, the Government relied on not only statutes, but also on judicial authorization.

CR-23 (MHS) (AJB), 2008 WL 4200156, at *12-13 (N.D. Ga. Apr. 21, 2008) (report and

recommendation) (applying <u>Leon</u> to § 2703(d) order for cell-site records).  Instead, citing

Magistrate Judge Orenstein's August and December 2010 orders, Laurent maintains only that

"there was precedent within this very district court" for the proposition that a warrant supported

by probable cause was necessary to obtain historical cell-site records.  (Omnibus Mot. at 19.)

These two decisions, however, are insufficient to render either authorization order "clearly

unconstitutional" and thus objectively unreasonable at the time it was issued.  <u>See</u> <u>Krull</u>, 480

U.S. at 355.

### a. *The SCA and the 6638 Phone Records*

With respect to the 6638 records, at the time of the authorization order, the only court of

appeals to address the constitutionality of the SCA had concluded that it complied with Fourth

Amendment.  <u>See</u> <u>In re Application of United States for an Order Directing a Provider of Elec.</u>

<u>Commc'n Serv. to Disclose Records to the Gov't</u>, 620 F.3d 304 (3d Cir. 2010).  The Second

Circuit, for its part, had not rendered a decision on this issue.[15]  Nevertheless, at the time of the

order in April 2011, most federal courts had concluded that defendants have no reasonable

---

[15] Significantly, the Second Circuit has still not directly decided the constitutionality of § 2703(d).  In <u>United States v. McCullough</u>, 523 F. App'x 82 (2d Cir. 2013) (summary order), a non-precedential decision, the panel denied the defendant-appellant's claim for ineffective assistance of counsel on the basis of trial counsel's failure to move to suppress historical cell-site data.  <u>Id.</u> at 83.  This required the defendant to prove both ineffective assistance and prejudice.  <u>Id.</u>  In rejecting his argument, the Second Circuit reasoned that the defendant had not pointed to any case law predating the government's acquisition of the records in June 2008 that would have rendered § 2703(d) "clearly unconstitutional" when applied to its request for historical cell-site data.  <u>Id.</u> at 83-84.  As a result, the court held that the defendant could not establish prejudice because law enforcement officers would have been entitled to rely on the good faith exception.  <u>Id.</u> (citing <u>Krull</u>, 480 U.S. at 349-50).  <u>See also</u> <u>United States v. Pascual</u>, 502 F. App'x 75, 80 (2d Cir. 2012) (summary order) (finding no plain error in the district court's refusal to follow this court's decision in <u>Historical Cell-Site Info</u>, 809 F. Supp. 2d 113, which, it held, was "(at the very least) in some tension with prevailing case law" (citing <u>Smith v. Maryland</u>, 442 U.S. 735, 742-44 (1979); <u>United States v. Miller</u>, 425 U.S. 435, 443 (1976))).

If the Government's request for historical cell-site records were not authorized under the SCA or section 54-47aa, the fact that the Second Circuit had not directly decided whether the search was constitutional may have given rise to a related issue: whether the good faith exception can apply in the absence of binding appellate precedent.  This question has divided district courts.  <u>See, e.g.</u>, <u>United States v. Lopez</u>, 951 F. Supp. 2d 657, 666 (D. Del. 2013) (collecting cases).

expectation of privacy in historical cell-site data.[16]  See, e.g., United States v. Jones, 908 F.

Supp. 2d 203, 211-12 (D.D.C. 2012) (citing cases).[17]  It is therefore no surprise that magistrate

and district judges in this district regularly authorized § 2703(d) orders at the time AUSA Ahmad

made her application.[18]  In fact, even this court had previously approved applications for

historical cell-site data under § 2703(d), before its decision in August 2011 (which was over four

months after the 6638 Application).  See Historical Cell-Site Info, 809 F. Supp. 2d at 114 (citing

In re Application of United States for an Order Authorizing the Use of Two Pen Register and

Trap and Trace Devices, 632 F. Supp. 2d 202 (E.D.N.Y. 2008)).

Moreover, as the Government points out, Magistrate Judge Orenstein's August 2010

order was actually reversed by District Judge Roslynn R. Mauskopf in November 2010—before

the Government's application was made in this case.  See Order, In re Application of United

States, No. 10-MC-550 (E.D.N.Y. Nov. 29, 2010), ECF No. 11.  Thus, at the time Magistrate

Judge Pohorelsky issued his order, it was objectively reasonable for prosecutors to have relied

upon § 2703 to obtain historical cell-site data based on an application alleging only "specific and

articulable facts."  18 U.S.C. § 2703(d).  While a few district courts may have just begun to

---

[16] Laurent himself acknowledges several of the decisions that had been issued prior to Magistrate Judge
Pohorelsky's order in this case.  (See Omnibus Mot. at 19 n.16 (citing United States v. Benford, No. 09-CR-86,
2010 WL 1266507 (N.D. Ind. Mar. 26, 2010); United States v. Suarez-Blanca, No. 07-CR-23 (MHS) (AJB), 2008
WL 4200156 (N.D. Ga. Apr. 21, 2008) (report and recommendation); In re Applications of United States for Orders
Pursuant to Title 18, U.S. Code, Section 2703(d), 509 F. Supp. 2d 76 (D. Mass. 2007))).)

[17] Notably, Jones does not appear to have substantially altered the state of the law as to historical cell-site records.
After Jones, as before, most courts—including in this district—continued to find that a § 2703(d) order is sufficient
without a warrant.  See In re Application of United States for Historical Cell Site Data, 724 F.3d 600, 615 (5th Cir.
2013); United States v. Moreno-Nevarez, No. 13-CR-0841 (BEN), 2013 WL 5631017, at *2 (S.D. Cal. Oct. 2,
2013); In re Smartphone Geolocation Data Application, 977 F. Supp. 2d 129, 147 (E.D.N.Y. 2013); United States v.
Wilson, No. 11-CR-53, 2013 WL 1129199, at *4 (N.D. Ga. Feb. 20, 2013); United States v. Madison, No. 11-CR-
60285, 2012 WL 3095357, at *9 (S.D. Fla. July 30, 2012); In re Application of United States for an Order Pursuant
to Title 18, U.S. Code, Section 2703(d) to Disclose Subscriber Info. and Cell-Site Info., 849 F. Supp. 2d 177, 179
(D. Mass. 2012); United States v. Graham, 846 F. Supp. 2d 384, 387 (D. Md. 2012).  As a counterexample, Laurent
points to United States v. Davis, 754 F.3d 1205 (11th Cir. 2014), which reached the opposite conclusion.  After
Laurent filed his Omnibus Motion, however, the Eleventh Circuit granted a petition for rehearing en banc, and
vacated the Davis panel's decision.  573 F. App'x 925 (11th Cir. 2014) (Mem.).

[18] Magistrate Judge Orenstein had also granted requests for similar data in the past.  See In re Application of United
States, 736 F. Supp. 2d at 580.

challenge the constitutionality of the SCA in this context, it cannot be said that the Government

had knowledge that this search was unconstitutional when it was approved by Magistrate Judge

Pohorelsky in April 2011, and where similar requests had been routinely granted by judges in

this district and elsewhere.  Therefore, because the Government is entitled to the good faith

exception, the court will not apply the exclusionary rule to the 6638 phone records obtained

pursuant to the § 2703 order.  See Davis, 131 S. Ct. at 2429 ("[T]he harsh sanction of exclusion

'should not be applied to deter objectively reasonable law enforcement activity.'" (quoting Leon,

468 U.S. at 919)).

> b.       *Section 54-47aa and the 4017 Phone Records*

Significantly, Laurent has not set forth any argument with respect to the constitutionality

of the order authorizing the WHPD to obtain cell-site records for the 4017 phone.  Nor has the

court been able to identify any Connecticut or federal court decision holding that section 54-47aa

violates the Fourth Amendment in the context of a request for historical cell-site data.  Cf.

O'Meara v. Terra, No. 10-CV-1424 (MRK), 2012 WL 1575435, at *3-4 (D. Conn. May 3, 2012)

(finding, in § 1983 action, that officer's acquisition of internet subscription information pursuant

to a section 54-47aa court order was "neither unlawful nor unreasonable" under the Fourth

Amendment).  In addition, the Government argues that Officer Puglielli's reliance on section 54-

47aa was objectively reasonable because the statute requires law enforcement officials to meet a

more stringent standard than the SCA requires.  (Gov't Mem. in Opp'n at 12.)  The SCA requires

"specific and articulable facts showing that there are reasonable grounds to believe that the

contents of a wire or electronic communication, or the records or other information sought, are

relevant and material to an ongoing criminal investigation."  18 U.S.C. § 2703(d).  By contrast,

under section 54-47aa, an officer must provide "a reasonable and articulable suspicion that a

crime has been or is being committed or that exigent circumstances exist and such call-

identifying or basic subscriber information is relevant and material to an ongoing criminal investigation." Conn. Gen. Stat. Ann. § 54-47aa(b) (amended 2011).  Regardless of whether the Government's assessment of the two standards is correct, however, at the time Judge Miano issued the order in August 2010, section 54-47aa was neither "clearly unconstitutional" nor such an abdication of the legislature's constitutional responsibility that the officer's reliance on the statute and the subsequent authorization order was objectively unreasonable.  See Krull, 480 U.S. at 350.  Laurent has also failed to show that Judge Miano was misled in any way or wholly abandoned his judicial role in issuing the authorizing order.  See Leon, 468 U.S. at 923.

Thus, both Connecticut and federal law enforcement officials, viewed objectively, acted reasonably in relying on judicially authorized search orders pursuant to the SCA and section 54-47aa.  As a result, the applications for and collection of historical cell-site records with respect to both 6638 and 4017 phones were completed in good faith.  Accordingly, Laurent's Motion to Suppress is DENIED.[19]

## III.    MOTION TO EXCLUDE MERRITT'S STATEMENTS

Laurent has also moved to exclude statements made by Defendant Trevelle Merritt to law enforcement officials regarding the murder of Dasta James.  (Omnibus Mot. at 25.)  Laurent argues that unless Merritt testifies at trial, these statements must be excluded pursuant to Crawford v. Washington, 541 U.S. 36 (2004), because they implicate Laurent in James's murder and their introduction would therefore violate his right under the Confrontation Clause of the Sixth Amendment.  (Omnibus Mot. at 25.)  In response, the Government submits that exclusion is not warranted because:  (1) the Merritt statements will be introduced at trial without any

---

[19] Laurent has also moved to suppress text messages from the 6638 phone, which the Government obtained from the cellular service provider pursuant to Magistrate Judge Pohorelsky's order.  (Omnibus Mot. at 22.)  The Government indicated, however, that it will not seek to admit the contents of the messages into evidence at trial, as the messages appeared to have been obtained and produced in error.  (Gov't Mem. in Opp'n at 4 n.3.)  As a result, this motion is DENIED as moot.

specific reference to Laurent, in accordance with <u>Bruton v. United States</u>, 391 U.S. 123 (1968), and its progeny; and (2) the Government will request that the court instruct the jury not to consider the Merritt statements as evidence against Laurent or Ashburn. (Gov't Mem. in Opp'n at 20.) For the reasons that follow, Laurent's motion to exclude is DENIED.

## A. Background

According to the Government, on or about January 28, 2011, Defendants Merritt and Laurent conspired to rob Dasta James, who was selling marijuana at an apartment building in Brooklyn. (Gov't Mem. in Opp'n at 20.) In his statements to law enforcement officers, Merritt said that he initially called James to purchase marijuana that evening. (Omnibus Mot. at 23.) Merritt said that he then met Laurent at the Ebbets Field housing projects, where he told Laurent he was planning to purchase marijuana before heading to downtown Brooklyn. (<u>Id.</u>) When Laurent asked Merritt who he was purchasing marijuana from, Merritt identified James, and Laurent asked Merritt for James's cell phone number. (<u>Id.</u>) Laurent then called James, but Merritt was unsure if Laurent and James spoke. (<u>Id.</u>)[20] According to Merritt's statements, before Laurent and Merritt met James, Laurent told Merritt that he was going to rob James, but that Merritt should buy the marijuana and do nothing else. (<u>Id.</u> at 24.) Merritt and Laurent then met James on the 16th floor of 47 McKeever Place, where Merritt purchased marijuana from James. (<u>Id.</u>) Merritt told law enforcement that he then told James "he had to take a piss," and walked to the building stairwell to urinate. (<u>Id.</u>)

Merritt claims that while he was in the stairwell he heard Laurent and James arguing, and when he returned to the hallway, Merritt saw Laurent and James wrestling and throwing punches at each other. (<u>Id.</u>) Merritt told law enforcement officers that during this fight, he saw Laurent

---

[20] Cell phone records obtained by the Government indicate that Laurent called James minutes before James's murder, but that Laurent never called James again. (6638 Application and Order at 4.)

pull out a silver, long-barreled handgun and shoot James once "in the torso or upper body area."

(Id.)  Merritt then saw James fall to the ground, at which point Merritt ran down the stairwell to

the lobby.  (Id.)  Merritt told law enforcement that while he was running down the stairs, he

heard approximately five or six shots, and then ran through the lobby, into the garage and back to

his apartment.  (Id.)  According to the Government, however, Merritt and Laurent fled through

the building together and then split up once they were outside.  (Gov't Mem. in Opp'n at 20-21;

see also id., Ex. C, Proposed Amendments to Statements by Trevelle Merritt ("Proposed

Redacted Statements") (Dkt. 180-3) at 2.)  In support, the Government has provided defense

counsel with surveillance video of the garage, "which shows two males leaving the apartment

building just after the time of the homicide."  (Omnibus Mot. at 24.)  The Government also

indicates that James was shot twice, once in the left shoulder and once in the back of his head,

and that James died as a result of his injuries.  (Gov't Mem. in Opp'n at 20-21.)

On April 6, 2011, Merritt was arrested and interviewed by NYPD detectives regarding

James's murder.  (Id. at 21.)  Over the next several days, Merritt made five separate statements to

law enforcement officials: (1) an oral statement to an NYPD detective at 9:15 p.m. on April 6;

(2) a handwritten statement, signed at 11:15 p.m. that same night; (3) another handwritten

statement, signed at 12:45 a.m. on April 7; (4) an oral statement to a Kings County Assistant

District Attorney at 1:19 PM on April 7; and (5) an oral statement to FBI agents on April 11.  (Id.

at 22.)  Merritt was ultimately charged in connection with James's murder in Racketeering Act

12 of Counts One and Two of the Indictment, as well as in Count Eleven (Hobbs Act robbery

conspiracy), Count Twelve (attempted Hobbs Act robbery), Count Thirteen (unlawful use of a

firearm), and Count Fourteen (causing death through use of a firearm).  (Indictment ¶¶ 28-31,

47-50.)

At trial, the Government "anticipates offering to admit some or all of Merritt's statements," by eliciting testimony from the interviewing detectives and agents. (Gov't Mem. in Opp'n at 22.) As Laurent concedes, he is not named in the charges specifically related to these crimes. (See Omnibus Mot. at 26.) Nevertheless, all three defendants are charged with racketeering conspiracy in Count Two, which will require the Government to prove that each defendant, including Laurent, agreed that he or a co-conspirator would commit at least two acts of racketeering in the conduct of the affairs of the enterprise. (See Indictment ¶ 34.) As the Government admits, one such act could be the attempted robbery and murder of Dasta James.[21] (Gov't Mem. in Opp'n at 21.)[22]

### B.  Legal Standard

"The crux of [the Confrontation Clause] is that the government cannot introduce at trial statements containing accusations against the defendant unless the accuser takes the stand against the defendant and is available for cross examination." United States v. Taylor, 745 F.3d 15, 28 (2d Cir. 2014) (quoting United States v. Jass, 569 F.3d 47, 55 (2d Cir. 2009)) (internal quotation marks omitted). As a result, "[w]hen the confession of one defendant implicates his co-defendants, Bruton demands a redaction and substitution adequate to remove the overwhelming

---

[21] Laurent further argues that the Government could use the attempted robbery and murder of Dasta James to prove the conspiracy to murder charged in Racketeering Act ("RA") 1, in which Laurent is also named. (Omnibus Mot. at 26.) RA 1 charges all three defendants with conspiracy to cause the death of "members of the Crips gang" located in Brooklyn. (Indictment ¶ 9.) The Government has not proffered any evidence, however, to suggest that Dasta James is a member of the Crips gang or that Defendant Ashburn was a co-conspirator with respect to the Dasta James robbery and murder. In addition, the Government has not indicated that evidence regarding the attempted robbery and murder of Dasta James will be offered with respect to RA 1. (Cf. Gov't Mem. in Opp'n at 21.) Therefore, the court will not consider evidence of this conduct as relevant to Laurent in connection with Count One of the Indictment.

[22] The Government indicates that it will seek to introduce evidence—other than Merritt's statements—regarding Laurent's participation in the attempted murder and robbery of Dasta James, as proof of the existence of the criminal enterprise. (Gov't Mem. in Opp'n at 21 n.12 (citing United States v. Baez, 349 F.3d 90, 93 (2d Cir. 2003)).) The Government claims that under Federal Rule of Evidence 404(b), such proof is also admissible with respect to Laurent as evidence of his knowledge, intent, and identity, and the absence of mistake with regard to other charged crimes. (Id.) Because these arguments are the subject of the Government's Motion to Admit Evidence of Other Acts (Dkt. 197), the court will address them in a separate Memorandum and Order.

probability that a jury will not follow a limiting instruction that precludes its consideration of a redacted confession against a defendant other than the declarant." Id. (quoting Jass, 569 F.3d at 60) (emphasis added) (internal quotation marks omitted). Where "the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence," however, "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction." Richardson v. Marsh, 481 U.S. 200, 211 (1987). Thus, redactions or substitutions are consistent with Bruton "if the altered statement uses words 'that might actually have been said by a person admitting his own culpability in the charged conspiracy while shielding the specific identity of his confederate.'" Taylor, 745 F.3d at 28 (quoting Jass, 569 F.3d at 62); see also United States v. Tutino, 883 F.2d 1125, 1135 (2d Cir. 1989) (upholding redacted statement where "the jury never knew that [the declarant's] original statement named names"). For example, the Second Circuit has previously allowed proper names to be replaced by "another person," Jass, 569 F.3d at 59; "my neighbor," United States v. Yousef, 327 F.3d 56, 149 (2d Cir. 2003); "he," United States v. Kyles, 40 F.3d 519, 526 (2d Cir. 1994); "this guy," "another guy," and "similar language," United States v. Williams, 936 F.2d 698, 699, 701 (2d Cir. 1991); "friend," United States v. Benitez, 920 F.2d 1080, 1087 (2d Cir. 1990); and "others," "other people," and "another person," Tutino, 883 F.2d at 1135.[23]

Conversely, redacted confessions "that simply replace a name with . . . obvious indications of alteration" violate Bruton because they "refer[] directly to the 'existence' of the nonconfessing defendant." Jass, 569 F.3d at 58 (quoting Gray v. Maryland, 523 U.S. 185, 192 (1998)). Moreover, a neutral-word substitution can be "so conspicuously awkward," that the

---

[23] As the Second Circuit has previously observed, "[t]he same attenuation of [the declarant's] statements from [his co-defendants]' guilt that prevents Bruton error also serves to prevent Crawford error. Thus, there is no separate Crawford problem, and we see no indication that Crawford overrules Richardson or expands the holding of Bruton." United States v. Lung Fong Chen, 393 F.3d 139, 150 (2d Cir. 2004). Thus, the Second Circuit's Bruton decisions that predate Crawford remain good law. See Jass, 569 F.3d at 56.

alteration becomes obvious.  <u>Taylor</u>, 745 F.3d at 29 (citing <u>Jass</u>, 569 F.3d at 61).  For example, in <u>Taylor</u>, the Second Circuit found that modified statements containing otherwise neutral redactions nonetheless suggested that the original statements contained actual names.  <u>Id.</u> ("Once it becomes obvious that names have been pruned from the text, the choice of implied identity is narrow.").  There, the court held that where the redacted statements (1) included one co-conspirator's actual name alongside references to additional, unnamed co-conspirators (e.g., "Luana Miller and two other individuals"), and (2) required wording that suffered from "stilted circumlocutions," (e.g., "[t]he robbery was the idea of the person who waited with Luana Miller and [the declarant] at the gas station"), the result was so "unnatural, suggestive, and conspicuous as to offend <u>Bruton</u>, <u>Gray</u>, and <u>Jass</u>."  <u>Id.</u> at 29, 30 ("The jury could immediately infer, on the evidence of the redacted confession alone, that [the declarant] had likely named the co-defendants.").

Ultimately, as the Second Circuit explained in <u>Tutino</u>, and confirmed in <u>Jass</u>, "a <u>Bruton</u> challenge to a redacted confession [is] properly analyzed by reference to two questions:  (1) did the redacted statement give any 'indication to the jury that the original statement contained actual names,' and (2) did the 'statement <u>standing alone</u> . . . otherwise connect co-defendants to the crimes.'"  <u>Jass</u>, 569 F.3d at 58 (emphasis added) (quoting <u>Tutino</u>, 883 F.2d at 1135).  In other words:

> The critical inquiry is . . . not whether a jury might infer from other facts (whether evidence admitted at trial or circumstances such as the number of defendants on trial) that a declarant's neutral allusion to a confederate might have referenced the defendant.  It is whether the neutral allusion sufficiently conceals the fact of explicit identification to eliminate the overwhelming probability that a jury hearing the confession at a joint trial will not be able to follow an appropriate limiting instruction.

Id. at 61.  Accordingly, these cases "do not construe the Confrontation Clause to demand further that a confession be redacted so as to permit no incriminating inference against the non-declarant defendant.  To the contrary, the law assumes that even a redacted statement will prejudice a defendant if it is considered against him."  Id. at 60-61 (emphasis in original).  While "the line between testimony that falls within Bruton's scope and that which does not is often difficult to discern," United States v. Lung Fong Chen, 393 F.3d 139, 149 (2d Cir. 2004), the court is persuaded that with two slight modifications, the Government's proposed substitutions in this case are sufficient to overcome Laurent's Sixth Amendment challenge.

### C.  Discussion

The Government maintains that Laurent's Sixth Amendment rights will be protected by the following measures.  First, the Government has proposed making a set of substitutions for all references to Laurent in Merritt's statements.  (See Proposed Redacted Statements.)  The vast majority of these substitutions consist of replacing references to Laurent with "the guy," except where the context of the reference appears to require additional clarification—for example, "the guy who had called him about going downtown."  (Id. at 1.)  Accordingly, the Government submits that this will prevent error under Bruton, 391 U.S. 123.  (Gov't Mem. in Opp'n at 23.)  Second, "[r]ather than seeking to admit the handwritten statements or audio recordings themselves," the Government indicates that it will call witnesses to testify regarding the substance of those statements "in such a way as to avoid any specific reference to Laurent."  (Id. at 22, 27.)  Third, the Government suggests that the court provide a limiting instruction advising the jury that Merritt's statements may not be considered as evidence against either of his co-defendants, in order to preserve Laurent's Confrontation Clause right under Crawford, 541 U.S. 36.  (Id. at 25.)

In response, Laurent maintains that the Government's proposed redactions will not cure the prejudicial effect of Merritt's statements, and that a limiting instruction would not sufficiently protect his Sixth Amendment rights. (Def. Reply Mem. at 8.) First, Laurent argues that the proposed redactions are insufficient to comply with requirement that the statements be redacted to "eliminate not only the defendant's name, but any reference to his or her existence." (Id. at 9 (emphasis in original) (quoting Richardson, 481 U.S. at 211); see also Omnibus Mot. at 30 ("The frequent mention of Mr. Laurent's name renders redaction impracticable, awkward, and ultimately prejudicial . . . because of the obviousness of the redactions.").) Second, he contends that no matter how the statements are redacted, "unless they are so redacted that they do not mention or allow for the inference of another individual's presence" at James's robbery and murder, the risk that the statements will implicate Laurent is so significant that violation of his Sixth Amendment rights is inevitable. (Omnibus Mot. at 30; see also Def. Reply Mem. at 10 (arguing that instructing the jury that it should consider the statements "only against the self-confessed bystander/witness and not against the alleged shooter is absurd").) In particular, he argues that given the limited number of additional co-defendants at trial, any redaction or substitution of his name "would not avoid prejudice" to Laurent because Merritt's statement "denies all responsibility" for James's death and "places full culpability" on Laurent. (Omnibus Mot. at 29, 30 ("[C]onsidering the totality here of the statement and the context of the trial, any redaction would nonetheless, lead to the inference that Mr. Merritt was accusing Mr. Laurent in the murder of Dasta James.").) Ultimately, Laurent maintains that in light of the other evidence that will be introduced, "the Government's argument that Mr. Merritt's statement will not be 'admitted against' Mr. Laurent because redactions will omit mention of his name attributes superhuman powers of compartmentalization and differentiation to the prospective jurors and is

not supported by common sense."  (Def. Reply Mem. at 9.)  Nevertheless, the court finds

Laurent's arguments to be unavailing.

 1. Adequacy of Proposed Redactions

 In support of his first argument, Laurent points to the Second Circuit's instruction in Jass,

"urg[ing] district courts, wherever possible, to eliminate completely . . . any mention of a non-

declarant defendant's existence."  (Def. Reply Mem. at 10 (quoting United States v. Defreitas,

701 F. Supp. 2d 309, 313 (E.D.N.Y. 2010) (quoting Jass, 569 F.3d at 56 n.5)).)  As Laurent

further notes, the court went on to advise district judges that "[n]eutral pronoun substitution

should be employed only when complete redaction would distort the confession, for example, by

'exclud[ing] substantially exculpatory information, or chang[ing] the tenor of the utterance as a

whole.'"  Jass, 569 F.3d at 56 n.5 (alterations in original) (quoting Yousef, 327 F.3d at 150).

Here, Laurent is surely correct that it is impossible to eliminate any mention of Laurent's

existence from Merritt's statements, since Merritt told law enforcement officers that it was

Laurent who shot Dasta James during the attempted robbery, while Merritt was merely a

bystander.  (Def. Reply Mem. at 10.)  But as the Second Circuit has advised, it is precisely in this

type of situation that neutral pronoun substitution is appropriate.

 For example, in Jass itself, the court permitted substitution of "another person" where

"complete redaction would have changed the substance" of the confession "because

acknowledgement of a confederate was critical to proving that [the declarant]'s admission was to

conspiratorial, as well as substantive" crimes, both of which had been charged in the indictment.

Jass, 569 F.3d at 56 n.5; see also Defreitas, 701 F. Supp. 2d at 315 ("[T]he contention that a

Bruton analysis is different when applied to a conspiracy charged against all defendants is

baseless in light of [Second Circuit precedent].").  Similarly, with respect to the James murder,

Merritt is charged with Hobbs Act robbery conspiracy (Count Eleven) in addition to attempted Hobbs Act robbery (Count Twelve), among other crimes.  (Indictment ¶¶ 28-31, 47-50.)  Thus, complete redaction is also impossible here, where Merritt's claims regarding a confederate's involvement in the James robbery and murder are critical to proving that Merritt is guilty of not just substantive but also conspiracy charges.  See Jass, 569 F.3d at 56 n.5.

As a result, neutral pronoun substitution is appropriate, so long as the substituted language does not otherwise violate Laurent's Sixth Amendment right to confrontation.  The question then becomes whether the redacted statements manifest "'obvious indications of alteration,' or otherwise signal to the jury that the statements had originally 'contained actual names.'"  Jass, 569 F.3d at 62 (quoting Gray, 523 U.S. at 192; Tutino, 883 F.2d at 1135).  These standards reflect that the purpose of the substitutions is not to eliminate references to the fact of a confederate, but rather, to use words "that might actually have been said by a person admitting his own culpability in the charged conspiracy while shielding the specific identity of his confederate."  Taylor, 745 F.3d at 28 (emphasis added) (quoting Jass, 569 F.3d at 62) (internal quotation marks omitted).

Here, the Government's proposed redacted statements do not manifest obvious signs of alteration, or otherwise signal to the jury that they originally contained actual names.  See Jass, 569 F.3d at 62.  The neutral pronoun substitutions that the Government has proposed for replacing all references to Laurent's name, "the guy," "the other guy," or "a guy he knows," are not analogous to obvious alterations such as a blank space, "deleted," or "redacted," which the Supreme Court has previous rejected.  See Gray, 523 U.S. at 192.  Moreover, the Second Circuit has specifically sanctioned the use of the neutral pronoun substitutions proposed in this case.  See Williams, 936 F.2d at 699, 701.  In addition, no other aspect of the Government's proposed

substitutions would signal to a jury that the statements originally contained names—by, for example, identifying some co-conspirators but not others, or through other "awkward circumlocution[s]." Taylor, 745 F.3d at 29-30. Almost every proposed substitution consists of "the guy" or "the other guy." (See generally Proposed Redacted Statements.) The only two notable exceptions come from Merritt's April 6, 2011, oral statement to NYPD Detective Steven Orski, which includes one sentence stating that "[Merritt] purchased a nickel bag of marijuana and as he was leaving he saw **the guy who had called him about going downtown** ~~Tails~~ come from around the corner" (id. at 1); and another providing that, in response to being shown the video from the 47 McKeever Place garage, "Trevelle then identified [the] first male as himself and second male . . . as **the guy he gave a pound on the stairs** ~~Tails~~" (id. at 2).

While this language is somewhat cumbersome, with minor changes, these substitutions do not rise to the level of recurring awkward circumlocutions that contributed to the Second Circuit's holding in Taylor.[24] See Taylor, 745 F.3d at 29 (disapproving redacted statements such as, "[t]he robbery was the idea of the person who waited with Luana Miller and Taylor at the gas station," and "Luana Miller and the other person who had waited with Taylor at the gas station came up with the plan"). Further distinguishing this case from Taylor, the phrasing is not made more problematic by the inclusion of names of some co-conspirators but not others. See id. Ultimately, as the Second Circuit has observed, "Jass does not require the most natural and colloquial rendering of how a drug thief would have shielded the identity of his confederates." Id. at 30. Therefore, the court is satisfied that with slight modification, see supra note 24, the

---

[24] The court notes that these substitutions would be made even less awkward still by further altering the last phrase in each. See Jass, 569 F.3d at 62 n.7 (encouraging district courts to use their "good sense" to redact statements "more plausibly"). Thus, the court requires that the Government remove "about going downtown come from around the corner" from the first sentence. The latter part of the second sentence should also be modified to read as "the guy he fist-bumped."

proposed redacted statements in this case do not give any indication to the jury that the original statement contained actual names.  See Jass, 569 F.3d at 58.

### 2.  Redacted Statements' Connection to Laurent

The second inquiry is whether the redacted statements, "standing alone," otherwise connect Laurent to the crimes.  See id. (quoting Tutino, 883 F.2d at 1135).  Laurent argues that given the circumstances of this case and the nature of Merritt's confession, no type of redaction or substitution would prevent the jury from inferring Laurent's participation in the robbery and murder of Dasta James.  (Omnibus Mot. at 29 ("[T]he court may not accept a redaction without considering the reality of what is being inferred in light of, for example, the number of defendants."); Def. Reply Mem. at 11-12 ("Mr. Merritt's statements basically convert him to an eyewitness rather than an active participant in the robbery and murder. . . . [N]o other evidence is required to infer that another individual—one of Mr. Merritt's co-defendants—orchestrated the entire event.  Given the Government's intent to introduce Mr. Laurent's phone records . . . the proverbial finger will point directly at Mr. Laurent.").)  In so arguing, however, Laurent misconstrues the relevant legal question.

As the Government points out, the "critical inquiry is . . . not whether a jury might infer from other facts (whether evidence admitted at trial or circumstances such as the number of defendants on trial) that a declarant's neutral allusion to a confederate might have referenced the defendant."  Jass, 569 F.3d at 61.  Rather, "the appropriate analysis to be used when applying the Bruton rule requires that [the court] view the redacted confession in isolation from the other evidence introduced at trial."  Williams, 936 F.2d at 700-01 ("If the confession, when so viewed, does not incriminate the defendant, then it may be admitted with a proper limiting instruction even though other evidence in the case indicates that the neutral pronoun is in fact a reference to

the defendant."); <u>see also</u> <u>Jass</u>, 569 F.3d at 62 ("In making this determination, we view the redacted statement in isolation to evaluate its impact on a jury." (citing <u>Richardson</u>, 481 U.S. at 208-09; <u>Yousef</u>, 327 F.3d at 150 (noting that <u>Bruton</u> asks whether the "redacted statement, standing by itself," implicated the defendant))).  As Laurent himself acknowledges, the Supreme Court has clarified that the court's focus is on "the <u>kind</u> of, not the simple <u>fact</u> of, inference." <u>Gray</u>, 523 U.S. at 196 (emphasis in original); <u>see also</u> <u>Jass</u>, 569 F.3d at 60 ("Where a redaction and substitution adequately conceal from a jury a declarant's <u>specific</u> identification of a confederate . . . 'it is a less valid generalization that the jury will not likely obey the instruction to disregard' the confession in its consideration of the guilt of a non-declarant defendant.") (emphasis in original) (quoting <u>Richardson</u>, 481 U.S. at 208).  Thus, in <u>Gray</u>, the Court found the defendant's Confrontation Clause right had been violated where—despite the redactions—the jury could "immediately" infer that the declarant had inculpated the co-defendant, "even were the confession the very first item introduced at trial."  523 U.S. at 196.  The same could not be said in this case.

Nothing in Merritt's redacted statements, viewed in isolation, is facially incriminating to Laurent in particular.  <u>See</u> <u>Richardson</u>, 481 U.S. at 208 (observing that "in this case the confession was not incriminating on its face, and became so only when linked with evidence introduced later at trial").  That the Government will seek to tie Laurent to the crimes through other evidence—such as cell phone records, cell-site data, and the video from the garage—is irrelevant to the Confrontation Clause analysis, because the redacted statements, standing alone, do not connect Laurent, specifically, to the crimes.  <u>See</u> <u>Jass</u>, 569 F.3d at 58 (citing <u>Tutino</u>, 883 F.2d at 1135).  This is a direct consequence of the Government's use of a neutral allusion instead of Laurent's name (or nickname, Tails).  As the Second Circuit has explained:

> In Gray itself, the Supreme Court suggested that the identified Confrontation Clause violation could have been avoided by substituting "a few other guys," a phrase suggesting male confederates, for the names of the defendants. Gray v. Maryland, 523 U.S. at 196. By contrast, Gray explained that redactions "that use shortened first names, nicknames, [or] descriptions as unique as the 'red-haired, bearded, one-eyed man-with-a-limp'" would fall within Bruton's protection. Id. at 195. So too would a description of a defendant as "this white guy" when coupled with particulars as to "age, height, and weight." Harrington v. California, 395 U.S. 250, 253 (1969); see also United States v. Hoover, 246 F.3d 1054, 1059 (7th Cir. 2001) (holding that replacement of defendants' names with terms "incarcerated leader" and "unincarcerated leader" provided jury with "aliases based on their occupations" that "no more concealed their identities" than would "the substitution of 'Mark Twain' for 'Samuel Clemens'"). A simple gender reference, however, lacks the specificity necessary to permit a jury to draw an immediate inference that the defendant is the person identified in the confession.

Jass, 569 F.3d at 63. Similarly, here, the use of neutral pronouns—like "the guy," or "the other guy"—to remove from Merritt's statements all references to Laurent prevents the jury from "immediately" inferring that Merritt named Laurent as a co-conspirator, as opposed to Defendant Ashburn or some other member of the Six Tre Folk Nation. (See Proposed Redacted Statements at 10 (indicating that "the guy who shot [James] is a FOLK street gang member").) In fact, it is only through other evidence that the Government plans to introduce that the statements become incriminating to Laurent in particular. See, e.g., Lung Fong Chen, 393 F.3d at 148 (rejecting Bruton challenge where the declarant's statements implicated co-defendants "only . . . with the assistance of other testimony").

Thus, for the same reason, it is also irrelevant that Laurent and Ashburn are the only other defendants on trial. In Jass, both defendants were charged with (1) conspiracy to transport minors in interstate commerce with the intent of (i) having a minor engage in illegal sexual activity and (ii) producing a visual depiction of a minor engaged in such activity; (2) actual transportation of a minor in interstate commerce with the intent to engage in criminal sexual

activity; and (3) sexual exploitation of a child. 569 F.3d at 50. At trial, the district court admitted a redacted version of the male defendant's confession that stated, for example, "he and the other person attempted to have sexual intercourse while [Victim 2] was watching." On appeal, the non-confessing female defendant argued that because only two adults were involved in the charged crime, only two defendants were on trial, and "the reference to attempted sexual intercourse with 'another person' clearly signaled to the jury that his confederate was a woman," the jury would immediately infer that she was the other person referenced in the confession. Id. at 62.

The Second Circuit rejected this argument, concluding that the jury "would have had to refer to other trial evidence to link [her] to the redacted statement." Id. It reasoned:

> Where a "blank" in a redacted confession indicated that the declarant specifically identified a confederate, Gray observed that "a more sophisticated juror, wondering if the blank refers to someone [other than the defendant], might also wonder how, if it did, the prosecutor could argue the confession is reliable, for the prosecutor, after all, has been arguing that [the defendant], not someone else, helped [the declarant] commit the crime." [523 U.S.] at 193.
>
> Jurors in [the instant] case, however, could not have drawn a similar inference from [the declarant]'s redacted confession because prosecutors employed neutral substitutions that plausibly indicated only that [the declarant] acknowledged having a confederate, but that did not suggest that he had made a specific identification. When a confession is properly redacted in this way, a prosecutor may argue that the confession is reliable without tempting a "more sophisticated juror" to make a further inference as to the reliability of a specific identification made in the confession.

Id. at 63 n.8. The court went on to note that "at most . . . a juror might have inferred from [the declarant]'s confession that the prosecutor believed [the co-defendant] to be the 'other person' that [the declarant] acknowledged in his confession, but—as far as the jury was aware—did not specifically identify." Id. at 62, 63 ("The 'other person' could have been anyone."). Here, where

there are three defendants, the risk that the jury would immediately infer that Merritt had inculpated Laurent specifically—as opposed to Ashburn or any other Six Tre member—is even more remote. See also Defreitas, 701 F. Supp. 2d at 315 ("As a general matter, even where multiple defendants are charged with the same crimes, the use of an out-of-court admission does not violate the Confrontation Clause when accompanied by an instruction limiting its admissibility as against the declarant defendant." (citing In re Terrorist Bombings of U.S. Embassies in E. Afr., 552 F.3d 93, 135-37 (2d Cir. 2008))). As a result, the answer to the second question—whether the redacted statements, "standing alone," otherwise connect Laurent to the crimes—is "no." See Jass, 569 F.3d at 58.

### D. Consistency of Government Charging Theory

Laurent nonetheless argues that, as a practical matter, the Government should not be permitted, on the one hand, to introduce Merritt's statements that the "other guy"—Laurent—actually shot Dasta James, but on the other hand, argue to the jury that Merritt is the one who committed the crimes. (Def. Reply Mem. at 12 ("[T]he Government is simultaneously crediting Mr. Merritt's statement as to Mr. Laurent's alleged role and not crediting the statement against Mr. Merritt himself, as evidenced by the Government's charging decision.").) Regardless of what the Government's actual theory is with respect to the roles played by Merritt and Laurent in the robbery and murder of Dasta James, Laurent is incorrect that the Government's charging decision is necessarily inconsistent with Merritt's statements, taken at face value.

Merritt is charged with Hobbs Act robbery conspiracy (Count Eleven) in violation of 18 U.S.C. § 1951(a), which requires, inter alia, that the Government prove he agreed to rob Dasta James (see Indictment ¶ 47); this is consistent with Merritt's confession that Laurent told Merritt that he "wanted to book" James, and that Merritt agreed "to get [his] weed and stay out of it." (Proposed Redacted Statements at 4.) Merritt is also charged with attempted Hobbs Act robbery

(Count Twelve) (see Indictment ¶ 48), which requires the Government to prove that Merritt took a "substantial step" toward his and Laurent's illegal agreement to rob James. See United States v. Cain, 671 F.3d 271, 279 (2d Cir. 2012) (citing Yousef, 327 F.3d at 134). This is consistent with Merritt's confession that he did in fact purchase marijuana from James and walk away to urinate. (Proposed Redacted Statements at 5.) Merritt is further charged with the unlawful use of a firearm (Count Thirteen) in violation of 18 U.S.C. § 924(c). (See Indictment ¶ 49) Even if the Government seeks to prove that it was Laurent who actually shot James, this charge may be consistent with an aiding and abetting theory of liability, if the Government can prove Merritt had knowledge that Laurent was carrying a gun. See Rosemond v. United States, 134 S. Ct. 1240, 1249 (2014) ("An active participant in a drug transaction has the intent needed to aid and abet a § 924(c) violation when he knows that one of his confederates will carry a gun.").

Finally, Merritt is charged with causing James's death through the use of a firearm (Count Fourteen) in violation of 18 U.S.C. § 924(j), which requires proof of a "murder," as defined by 18 U.S.C. § 1111(a). (See Indictment ¶ 50.) Under § 1111(a), any person who commits a dangerous felony, such as robbery, is guilty of murder if a death occurs during the commission of the felony. 18 U.S.C. § 1111(a). Because § 924(j) incorporates § 1111(a), an aider and abettor can be liable for murder based upon his intent to commit robbery if a co-participant in the robbery causes the death of the victim through the use of a firearm during the commission of the robbery. See United States v. Davis, 491 F. App'x 219, 223 (2d Cir. 2012) (summary order) (affirming appellant's conviction for aiding and abetting a § 924(j) violation (citing United States v. Thomas, 34 F.3d 44, 48 (2d Cir. 1994) (holding that the malice aforethought required for murder can be proved by showing that the killing was committed in commission of a robbery because the malice of robbery satisfies murder's malice requirement)).

In other words, to convict a defendant of aiding and abetting a § 924(j)(1) violation, the Government only needs to prove the defendant aided and abetted the commission of the robbery and that a killing occurred in the course of that robbery; the subjective intent to kill is not required. See United States v. Gonzalez, 399 F. App'x 641, 647, 649 (2d Cir. 2010) (summary order). Again, even assuming that the Government advocates for Merritt's version of the incident, about which the court expresses no view, the Government could prove that Merritt is liable under § 924(j) if it can prove he aided and abetted the robbery of Dasta James and that James was killed during the course of that robbery. See, e.g., United States v. Zayac, 765 F.3d 112, 116-18 (2d Cir. 2014) (affirming conviction for felony murder under § 924(j) despite appellant's claim that co-conspirator actually possessed and fired the gun). Thus, Laurent's argument is without merit.

### E.      Conclusion

The court therefore concludes that as slightly modified by the court, the Government's proposed redacted statements do not indicate to the jury that Merritt's original statements contained actual names; nor do the statements, standing alone, otherwise connect Laurent to the crimes. See Jass, 569 F.3d at 58. Rather, the court concludes that the neutral allusions to "the guy," or "the other guy," sufficiently "conceal[] the fact of explicit identification to eliminate an overwhelming probability" that the jury hearing Merritt's confession will not be able to follow an appropriate limiting instruction. Id. at 60 (emphasis added). Consequently, under Supreme Court and Second Circuit precedent, the introduction of the redacted statements—accompanied by the appropriate limiting instruction—does not violate Laurent's Sixth Amendment right to confrontation. As a result, Laurent's motion to exclude Merritt's statements is DENIED. Accordingly, the court will instruct the jury that these statements may only be considered against Merritt. See also Defreitas, 701 F. Supp. 2d at 315 (indicating that the court would further

instruct the jury that the statements may not be considered to prove the non-declarant's membership in any of the conspiracies or the non-declarant's intent to achieve any of the conspiracies' objectives). The court will so instruct the jury both contemporaneously with the introduction of the statements, and again at the conclusion of trial. See id.

## IV. MOTION FOR SEVERANCE

Laurent also argues that if Merritt's statements are not excluded, Laurent's and Merritt's trials should be severed because he and Merritt are presenting antagonistic defenses. (Omnibus Mot. at 30-32.) By a letter dated October 2, 2014, Merritt also moves for a severance on similar grounds. (Dkt. 191.) The Government argues that severance is not warranted because a joint trial would not result in unfair prejudice to either Laurent or Merritt and that their defenses are not actually antagonistic. (Gov't Mem. in Opp'n at 25.) As the court agrees, both motions are DENIED.

### A. Legal Standard

Federal Rule of Criminal Procedure 8 provides that an indictment "may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b) (noting further that "[a]ll defendants need not be charged in each count"). As the Supreme Court has observed, "[t]here is a preference in the federal system for joint trials of defendants who are indicted together." Zafiro v. United States, 506 U.S. 534, 537 (1993) ("Joint trials 'play a vital role in the criminal justice system.' They promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" (quoting Richardson v. Marsh, 481 U.S. 200, 209, 210 (1987))). Not only do "[c]onsiderations of efficiency and consistency militate in favor of trying jointly defendants who were indicted together," but joint trials are also "particularly appropriate in circumstances where the defendants are charged with participating in

the same criminal conspiracy." United States v. James, 712 F.3d 79, 104 (2d Cir. 2013) (quoting United States v. Spinelli, 352 F.3d 48, 55 (2d Cir. 2003)) (internal quotation marks omitted), cert. denied, 134 S. Ct. 2660 (2014).

Under Federal Rule of Criminal Procedure 14, however, if "a consolidation for trial appears to prejudice a defendant . . . the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). "In order to succeed on a motion for severance, a defendant must show that the prejudice from a joint trial is 'sufficiently severe to outweigh the judicial economy that would be realized by avoiding multiple lengthy trials.'" United States v. Defreitas, 701 F. Supp. 2d 309, 316 (E.D.N.Y. 2010) (quoting United States v. Walker, 142 F.3d 103, 110 (2d Cir. 1998)); see also United States v. Cardascia, 951 F.2d 474, 483 (2d Cir. 1991) (noting that the risk of prejudice is generally outweighed by concerns about judicial economy, the risk of inconsistent verdicts, and the favorable position that later-tried defendants obtain from familiarity with prosecution strategy). Thus, defendants seeking severance must show "not simply some prejudice, but substantial prejudice." United States v. Sampson, 385 F.3d 183, 190 (2d Cir. 2004) (emphasis in original) (quoting United States v. Werner, 620 F.2d 922, 928 (2d Cir. 1980)) (internal quotation marks omitted); see also Walker, 142 F.3d at 110 (describing defendants' burden as "heavy"). Moreover, even where defendants have demonstrated substantial prejudice, severance is not required under Rule 14. Zafiro, 506 U.S. at 538-39. Instead, the decision regarding whether to sever the defendants' trial is a matter committed to the "sound discretion" of the district court, and is "virtually unreviewable." See James, 712 F.3d at 104 (citing United States v. Diaz, 176 F.3d 52, 102 (2d Cir. 1999)).

Accordingly, courts have held that "[w]hen defendants are properly joined under Rule 8, a severance, pursuant to [Rule] 14, should only be granted if there is a serious risk that a joint trial would either compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence." Walker, 142 F.3d at 110 (citing Zafiro, 506 U.S. at 539). In Zafiro, the Supreme Court observed that "[e]vidence that is probative of a defendant's guilt but technically admissible only against a codefendant . . . might present a risk of prejudice." 506 U.S. at 539 (citing Bruton v. United States, 391 U.S. 123 (1968)). The Court proceeded to point out, however, that "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." Id. (citing Richardson v. Marsh, 481 U.S. 200, 211 (1987)). Furthermore, the Court explicitly held that "mutually antagonistic defenses are not prejudicial per se." Id. at 538, 539 ("[I]t is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials."); accord United States v. Nachamie, 28 F. App'x 13, 21 (2d Cir. 2001) (summary order). The Court reasoned that "Rules 8(b) and 14 are designed 'to promote economy and efficiency and to avoid a multiplicity of trials, [so long as] these objectives can be achieved without substantial prejudice to the right of the defendants to a fair trial.'" Zafiro, 506 U.S. at 540 (quoting Bruton, 391 U.S. at 131 n.6). Thus, "[t]o obtain a severance on the ground of antagonistic defenses, a defendant must show that the conflict is so irreconcilable that acceptance of one defendant's defense requires that the testimony offered on behalf of a codefendant be disbelieved." James, 712 F.3d at 105 (alteration in original) (quoting United States v. Benitez, 920 F.2d 1080, 1085-86 (2d Cir. 1990)) (internal quotation marks omitted).

**B. Discussion**

Joinder of these defendants, who are alleged to have participated in the same racketeering conspiracy, was clearly proper under Rule 8(b). See United States v. Nerlinger, 862 F.2d 967,

973 (2d Cir. 1988) ("The established rule is that a non-frivolous conspiracy charge is sufficient to support joinder of defendants under [Rule 8(b)]."). Indeed, Defendants Laurent and Merritt do not challenge this initial determination. Instead, Laurent first appears to argue that the jury will be unable to separate the evidence admissible only with respect to Merritt—the redacted confession—from the evidence admissible against himself. (Omnibus Mot. at 30-31.) Second, both Laurent and Merritt argue that severance is warranted because their defenses are mutually antagonistic. (Id. at 31-32; Oct. 2, 2014, Ltr. at 1.) According to Laurent, "Mr. Merritt's statement so completely inculpates Mr. Laurent while attempting to absolve Mr. Merritt of any responsibility for James' death, that the jury, in order to find Mr. Merritt not guilty of the James murder would necessarily have to find Mr. Laurent guilty of [the crime]." (Id. at 31.)

With respect to Laurent's first argument, courts have long held that "the fact that evidence may be admissible against one defendant but not another does not necessarily require a severance." Spinelli, 352 F.3d at 56 (quoting United States v. Carson, 702 F.2d 351, 367 (2d Cir. 1983)) (internal quotation marks omitted). More importantly, however, the court will explicitly instruct the jury that it may only consider Merritt's confession as evidence against Merritt, and not as evidence with respect to the other defendants. See supra Part III.E. As the Supreme Court has repeatedly pointed out, the risk that jurors will consider a declarant's confession against a non-testifying codefendant "can be cured with proper instructions, and 'juries are presumed to follow their instructions.'" Zafiro, 506 U.S. at 540 (quoting Richardson, 481 U.S. at 211); see also Defreitas, 701 F. Supp. 2d at 317. Moreover, consistent with Bruton and its progeny, the Government will only be permitted to introduce Merritt's statements in redacted form, thus preventing the jury from learning that Merritt specifically identified his co-conspirator, or that he named Laurent in particular. See United States v. Taylor, 745 F.3d 15, 28

(2d Cir. 2014).  In the Second Circuit, this is sufficient to ensure that the joint trial of a declarant and the non-confessing codefendant is fair.  See United States v. Jass, 569 F.3d 47 (2d Cir. 2009).  In fact, the central premise underlying these cases is that—with adequate redaction and appropriate limiting instructions—severance is not necessary because a jury can keep separate the evidence that is admissible only as to the declarant.  See id. at 61 (recognizing the issue is whether the "neutral allusion sufficiently conceals the fact of explicit identification to eliminate the overwhelming probability that a jury hearing the confession at a joint trial will not be able to follow an appropriate limiting instruction").  This is no less true here.

Laurent's second argument, in which Merritt joins, is also unavailing.  As "[m]utually antagonistic defenses are not prejudicial per se," United States v. Haynes, 16 F.3d 29, 32 (2d Cir. 1994) (quoting Zafiro, 506 U.S. at 538) (internal quotation marks omitted), the test is whether the conflict is "so irreconcilable that acceptance of one defendant's defense requires that the testimony offered on behalf of a codefendant be disbelieved," James, 712 F.3d at 105.  Laurent and Merritt clearly fail to meet this standard.  As the Government points out, the surveillance video from the garage strongly suggests that at least two men were involved in the robbery and murder of Dasta James.  Thus, "Merritt cannot hope to exonerate himself by pointing the finger at Laurent."  (Gov't Mem. in Opp'n at 28.)  Moreover, Merritt's confession itself—because it implies the participation of a co-conspirator—further prevents their defenses from being mutually antagonistic.  See United States v. Shareef, 190 F.3d 71, 77 (2d Cir. 1999) (introduction of confession would not create irreconcilable conflict where references to co-defendant were redacted from the declarant's statement (citing Richardson, 481 U.S. at 208-09)).  Specifically, that Merritt was just a bystander (see Oct. 2, 2014, Ltr. at 1), is not inconsistent with the theory that someone other than Laurent shot James.  See, e.g., Jass, 569 F.3d at 62 ("The 'other person'

could have been anyone.").  In other words, in no way does accepting Laurent's defense require

that Merritt's confession be disbelieved.  See James, 712 F.3d at 105.  Therefore, because

Laurent and Merritt have failed to demonstrate that substantial prejudice will result from their

joint trial, their motions to sever are DENIED.

## V.   MOTION TO SUPPRESS LAURENT'S STATEMENTS TO LAW ENFORCEMENT

Next, Laurent moves to suppress statements that he made to law enforcement officers

regarding the robbery of the Lux Bond & Green jewelry store in West Hartford, Connecticut.[25]

Laurent argues that these statements were obtained in violation of his Fifth Amendment right

against self-incrimination under Miranda v. Arizona, 384 U.S. 436 (1966).  (Omnibus Mot. at

38.)  For the reasons that follow, Laurent's motion is DENIED.

### A.   Background

On December 2, 2010, Laurent was interviewed by law enforcement officers at a New

York State correctional facility on Rikers Island, where he was incarcerated pending resolution

of state weapons possession and reckless endangerment charges.  (Omnibus Mot., Ex. B, WHPD

Case/Incident Report ("Case Report") (Dkt. 172-2) at 2.)  The interview, which began at

approximately 2:46 p.m., took place in an interview room at the Rikers Island Intelligence Unit,

where Laurent was questioned by FBI Special Agent Christopher Campbell, NYPD Detective

William Van Pelt, WHPD Detective Mark Puglielli, and a WHPD Officer Juda.  (Id.)  Initially,

---

[25] Laurent also moves to suppress statements that he made to law enforcement officers on July 12, 2010, regarding the murder of Brent Duncan.  (Omnibus Mot. at 40.)  In Racketeering Act 4 of Count One (racketeering), Laurent is charged with murder in connection with Duncan's death.  (Indictment ¶ 12.)  Laurent is also charged in Count Five with murder in aid-of-racketeering for the same crime.  (Id. ¶¶ 39-40.)  While the Government has agreed not to offer these statements during its case-in-chief, it properly reserved the right to introduce them for purposes of impeachment.  (Gov't Mem. in Opp'n at 29 n.14.)  See, e.g., United States v. Douglas, 525 F.3d 225, 248-49 (2d Cir. 2008) ("[S]tatements taken from a defendant in violation of his Miranda rights, though they may not be introduced by the government during its case-in-chief, are nonetheless admissible to impeach statements made by the defendant in the course of his testimony." (citing Harris v. New York, 401 U.S. 222, 226 (1971); Oregon v. Hass, 420 U.S. 714, 721-22 (1975))).

Detective Van Pelt spoke alone with Laurent. (Id.) The Case Report, which was written and signed by Detective Puglielli, states that Detective Van Pelt placed a bottle of water in front of Laurent and explained that the interview was being conducted in connection with an investigation in West Hartford regarding the theft of watches from Lux Bond & Green on June 25, 2010.[26] (Id.)

After Van Pelt and Laurent spoke for a few minutes, Special Agent Campbell, Detective Puglielli, and Officer Juda entered the room, introduced themselves, and reiterated the purpose of their visit. (Id.) Detective Puglielli then advised Laurent of his constitutional rights, using the WHPD Miranda Rights Waiver Form (the "Form"). (Id. at 2, 5.) According to Detective Puglielli, Laurent stated that he understood his rights and that he had been advised of these rights by law enforcement officers on a prior occasion. (Id. at 2.) The Form, which was completed at approximately 2:59 p.m., indicates that Laurent received a General Education Diploma ("GED") in 2009, and that Laurent could read and write in English. (Id. at 5.) Laurent refused, however, to sign the portion of the Form indicating that he waived his Miranda rights. (Id. at 2, 5.) Nonetheless, the interview continued, as Laurent proceeded to answer questions.[27]

Laurent "denied any involvement" with the Lux Bond & Green theft, and stated that he did not know anyone involved in thefts of high-priced watches in general. (Id. at 3.) He also indicated that until his arrest in July 2010, he had been working as a custodian from 6:00 a.m. to 2:00 p.m. at Brooklyn College, although he was unsure whether he had taken a day off on the day of the robbery. (Id.) Laurent further denied ever having travelled to Connecticut, but then

---

[26] The Case Report reflects that at the time of the interview, Laurent was a suspect in the robbery. (Case Report at 2.)

[27] The precise circumstances under which the interview proceeded are unclear, and the Case Report is silent on this question. (See Case Report at 2-3. Compare Gov't Mem. in Opp'n at 30 ("Nonetheless, Laurent elected to proceed with the interview and did not ask to consult with an attorney."), with Omnibus Mot. at 35 ("Nonetheless, the officers continued to question him.").)

stated that he "might have travelled to Connecticut years ago with his father." (Id.) When

Detective Puglielli explained that a piece of paper recovered from a Nissan Maxima used in the

Lux Bond & Green theft contained a cell phone number—(917) 214-4017 (the "4017

number")—that T-Mobile indicated belonged to Laurent's father, Laurent stated that he did not

recognize the number. (Id.) Instead, Laurent claimed that his father's number was (347) 968-

4345. Laurent further stated that his phone number was (646) 400-7110, and that he believed

that this had been his number since June 2010. (Id.) Later in the interview, Detective Van Pelt

confronted Laurent with the fact that after a previous arrest in New York, Laurent provided the

4017 number to an officer and asked that the officer call that number. (Id.) Laurent, however,

denied having provided this number and accused the officer of lying. (Id.)

Laurent then told the interviewers that "he was getting annoyed with the questions," and

asked if he could leave. (Id. at 3-4.) Detective Puglielli told Laurent that "he could leave at any

time." (Id. at 4.) Laurent then stated that if he met with the interviewers again he would have

his attorney with him. (Id.) The interview ended at approximately 3:34 p.m., roughly 48

minutes after it began. According to the Government, Laurent was not handcuffed during the

interview and the interviewers were not armed. (Gov't Mem. in Opp'n at 29.)

> **B.      Discussion**

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal

case to be a witness against himself." U.S. Const. amend. V. "To give force to the

Constitution's protection against compelled self-incrimination, the [Supreme] Court established

in Miranda 'certain procedural safeguards that require police to advise criminal suspects of their

rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation.'"

Florida v. Powell, 559 U.S. 50, 59 (2010) (quoting Duckworth v. Eagan, 492 U.S. 195, 201

(1989)). After Miranda, a person "questioned by law enforcement officers after being 'taken into

custody or otherwise deprived of his freedom of action in any significant way' must first 'be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" Stansbury v. California, 511 U.S. 318, 322 (1994) (per curiam) (quoting Miranda, 384 U.S. at 444). As a result of Miranda's "prophylactic" nature, see Dickerson v. United States, 530 U.S. 428, 437-38 (2000), "[s]tatements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." Stansbury, 511 U.S. at 322.

Laurent argues that "it is undisputed" that he was in custody during the December 2, 2010, interview regarding the Lux Bond & Green robbery. (Omnibus Mot. at 39.) Because this interrogation was custodial, he contends, the government is required to show that he knowingly and voluntarily waived his right to remain silent, for which—he asserts—there is no evidence. (Id. at 40.) In response, the Government disputes both of Laurent's conclusions. First, the Government argues that Laurent was not in custody for Miranda purposes. (Gov't Mem. in Opp'n at 32.) Second, even if the interview was custodial, the Government avers, Laurent failed to invoke his right to remain silent, and implicitly waived this right by continuing to answer questions after having been advised of his rights and given an opportunity to invoke them. (Id. at 33-34.) The court proceeds by addressing each issue—custody, invocation, and waiver—in turn.

      1.   Custody

A law enforcement officer's obligation to administer Miranda warnings attaches "only where there has been such a restriction on a person's freedom as to render him 'in custody.'" Stansbury, 511 U.S. at 322 (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (per curiam)) (internal quotation marks omitted). Under the Supreme Court's Miranda doctrine, "'custody' is a term of art that specifies circumstances that are thought generally to present a

serious danger of coercion." Howes v. Fields, 132 S. Ct. 1181, 1189 (2012); see also Dickerson, 530 U.S. 435 ("[T]he coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be 'accorded his privilege under the Fifth Amendment . . . not to be compelled to incriminate himself.'" (quoting Miranda, 384 U.S. at 439)). In determining whether a person is in custody for Fifth Amendment purposes, the initial step is to ascertain whether, "in light of the objective circumstances of the interrogation, a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." Howes, 132 S. Ct. at 1189 (alteration in original) (citation and internal quotation marks omitted). "[I]n order to determine how a suspect would have 'gauge[d]' his 'freedom of movement,' courts must examine 'all of the circumstances surrounding the interrogation.'" Id. (quoting Stansbury, 511 U.S. at 322, 325). In Howes, the Supreme Court explained that the relevant circumstances for courts to consider include the location of questioning, its duration, statements made during the questioning, the presence or absence of physical restraints, and the release of the interviewee at the end of questioning. Id. (citations omitted).

The Court has also held, however, that "[n]ot all restraints on freedom of movement amount to custody for purposes of Miranda." Id. at 1189, 1190 ("Our cases make clear . . . that the freedom-of-movement test identifies only a necessary and not a sufficient condition for Miranda custody." (quoting Maryland v. Shatzer, 559 U.S. 98, 112 (2010)) (internal quotation marks omitted)). Instead, courts must also ask "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda." Id. at 1189-90. Significantly, "imprisonment alone is not enough to create a custodial situation within the meaning of Miranda." Id. (rejecting the categorical rule that "a prisoner is always in

custody for purposes of <u>Miranda</u> whenever a prisoner is isolated from the general prison population and questioned about conduct outside the prison"). Thus, "[w]hen a prisoner is questioned, the determination of custody should focus on all of the features of the interrogation," including the language used in summoning the prisoner to the interview, and the manner in which the interrogation is conducted. <u>Id.</u> at 1192 ("Fidelity to the doctrine announced in <u>Miranda</u> requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." (quoting <u>Berkemer v. McCarty</u>, 468 U.S. 420, 437 (1984)) (internal quotation marks omitted)).

Because "imprisonment alone is not enough" to establish custody, the court looks to the relevant factors outlined in <u>Howes</u> to determine, in light of the objective circumstances of Laurent's interview, whether a reasonable person would have felt at liberty to terminate the interrogation and leave. <u>Howes</u>, 132 S. Ct. at 1189, 1190. Here, the questioning took place in an interview room at the "Intelligence Unit" of a Rikers Island correctional facility, where Laurent was already being held pending charges in a New York State criminal matter. At the start, Laurent was met by just one interviewer, Detective Van Pelt, who provided Laurent with a bottle of water and explained the purpose of the interview. After a few minutes, three more law enforcement officers entered the room, and then the interview formally began. According to the Case Report, it appears that throughout the course of the interview, Laurent was questioned variously by three interviewers: Detective Van Pelt, Special Agent Campbell, and Detective Puglielli. After approximately 48 minutes, Laurent told the interviewers that he was getting "annoyed" with their questions, and it was at this point that he first asked if he could leave. Detective Puglielli replied that Laurent "could leave at any time," at which point, Laurent left the room.

Laurent correctly points out that despite the Government's contention (see Gov't Mem. in Opp'n at 29), there is no evidence in the record—namely, the Case Report—regarding whether Laurent was handcuffed or the interviewers were armed. (Def. Reply Mem. at 13.) He further argues that even if those facts were proven, "common sense indicates that an individual with a limited prior history of police contact, who was incarcerated at the time of the interview, would not have understood his right to terminate the interview if it was not explicitly explained to him and would have felt compelled to speak with the detectives." (Id. at 14.) Because the test is an objective one, however, the fact that Laurent had a limited history of police contact is irrelevant, at least with respect to whether he was in "custody." See Howes, 132 S. Ct. at 1189. Moreover, Laurent's assertion that he did not understand his right to leave because it was not made clear to him is belied by his own conduct. In fact, as soon as Laurent became "annoyed" by the questioning, he asked if he could leave, was told that he could, and he did. Furthermore, the fact that the questioning immediately ceased when Laurent became "annoyed" strongly suggests that the interview was terminated long before it became coercive. Cf. id. (interrogation is custodial when there is a "serious danger of coercion").

Still, while the Case Report provides substantial information regarding the manner in which the interrogation was conducted, there is little evidence regarding the circumstances in which Laurent was summoned to the interview. See id. at 1192. For example, there is no evidence regarding what Laurent was told before he entered the interview room, nor is it clear whether Laurent was escorted to the Intelligence Unit or whether he had to wait for an escort when he left the interview. See id. at 1188 n.4 (noting that it was "impossible to tell" whether the prisoner's interview was "routine or whether there were special features that may have created an especially coercive atmosphere"). Accordingly, Laurent argues that the lack of video

or other documentary evidence with respect to these issues—among others—requires suppression, or at least, an evidentiary hearing to determine whether he was in custody. (See Def. Reply Mem. at 15.) Significantly, however, Laurent fails to suggest that there is a factual dispute with respect to these issues. (See id. (arguing these circumstances "certainly" had "a potential to amount to a coercive situation").)

It is well established that a defendant must show that "disputed issues of material fact exist before an evidentiary hearing is required." See, e.g., United States v. Viscioso, 711 F. Supp. 740, 745 (S.D.N.Y. 1989). Moreover, this showing "must be made by an affidavit of someone with personal knowledge of the underlying facts." See, e.g., United States v. Shaw, 260 F. Supp. 2d 567, 570 (E.D.N.Y. 2003) (citing United States v. Gillette, 383 F.2d 843, 848 (2d Cir. 1967)). Thus, courts are required to grant such hearings only when the movant's affidavit contains sufficient factual allegations reflecting personal knowledge, which, if proven, would warrant the relief requested. See, e.g., Viscioso, 711 F. Supp. at 745 (citing United States v. Culotta, 413 F.2d 1343, 1345 (2d Cir. 1969)). "Indeed, courts in this district consistently deny hearings where defendants have failed to provide affidavits alleging facts based on personal knowledge." United States v. Wilson, 493 F. Supp. 2d 364, 380 (E.D.N.Y. 2006) (citing United States v. Larranga Lopez, No. 05-CR-655 (SLT), 2006 WL 1307963, at *3 (E.D.N.Y. May 11, 2006) (citing cases)).

Here, the outcome is no different. Laurent's affidavit contains no factual allegations that both reflect his personal knowledge and would create a disputed issue of material fact, let alone provide a basis for granting suppression. (See Laurent Aff. (Dkt. 173) at 1.) Instead, it merely states that he was interviewed by the officers on December 2, 2010, while he was "in custody at Rikers Island," that he refused to sign the Miranda waiver, that the agents "continued to question

[him]," and that his statements should be suppressed as a result. (Id. ¶¶ 5-7.) Therefore, the court denies the request for a hearing. See Viscioso, 711 F. Supp. at 745 (finding no hearing was required where defendant's allegations were "general, conclusory or based on conjecture").

Moreover, given the Supreme Court's decision in Howes, evidence regarding the circumstances under which Laurent was summoned to the interview would have no effect on the court's determination regarding custody in this case. In Howes, the prisoner was told at the outset of the interrogation that he could leave at any time, was not physically restrained or threatened, was not uncomfortable, and was offered food and water. 132 S. Ct. at 1193. In addition, the interview took place in a well-lit, average-sized conference room, and the door was sometimes left open. Id. On the other hand, the prisoner "did not invite the interview or consent to it in advance," nor was he advised "that he was free to decline to speak with the deputies." Id. (noting the defendant was not read Miranda rights). In addition, the interview lasted for at least five hours in the evening, "and continued well past the hour when [the prisoner] generally went to bed." Id. Moreover, the officers who questioned the prisoner were armed, and one of them— according to the prisoner—used "a very sharp tone," and, on one occasion, profanity. Id. Finally, because he was incarcerated, the prisoner "was not free to leave the conference room by himself . . . . Instead, he was escorted to the conference room and, when he ultimately decided to end the interview, he had to wait about 20 minutes for a corrections officer to arrive and escort him to his cell."[28] Id. Nonetheless, "[t]aking into account all of the circumstances of the questioning—including especially the undisputed fact that [the prisoner] was told that he was

---

[28] Therefore, even if Laurent was in fact escorted to and from the Intelligence Unit—for which there is no evidence—this would not distinguish his case from Howes. See also id. at 1192 ("[S]uch procedures are an ordinary and familiar attribute of life behind bars. Escorts and special security precautions may be standard procedures regardless of the purpose for which an inmate is removed from his regular routine and taken to a special location.").

free to end the questioning and to return to his cell," the Court concluded that the prisoner was not in custody for purposes of <u>Miranda</u>. <u>Id.</u> at 1194.

By contrast, Laurent's interview lasted less than 50 minutes and took place during the middle of the afternoon. <u>Cf. id.</u> at 1186 (noting prisoner arrived at conference room between 7 p.m. and 9 p.m. and was questioned for between five and seven hours). More importantly, Laurent received <u>Miranda</u> warnings advising him of his right to remain silent at the beginning of the interview. <u>Cf. id.</u> ("At no time was [the prisoner] given <u>Miranda</u> warnings or advised that he did not have to speak with the deputies.").[29] Finally, as soon as Laurent asked if he could leave, Detective Puglielli told Laurent that he could leave at any time, and Laurent chose to do so immediately. <u>Cf. id.</u> ("[The prisoner] said several times during the interview that he no longer wanted to talk to the deputies, but he did not ask to go back to his cell prior to the end of the interview."). Thus, the case for finding that Laurent was in custody is even weaker than in <u>Howes</u>, where the court ultimately found the defendant was not in custody for Fifth Amendment purposes. And like the prisoner in <u>Howes</u>, Laurent has not argued that he was threatened by the officers, or that he was physically uncomfortable during the interview. <u>See id.</u> at 1193. As a result, the court concludes that viewed objectively, the circumstances of Laurent's interview did not present a serious danger of coercion. <u>See id.</u> at 1189. Consequently, Laurent was not in custody within the meaning of <u>Miranda</u>; and this finding alone is sufficient to deny his motion.

2.      <u>Invocation</u>

Yet even if the court were to conclude that Laurent were in custody for Fifth Amendment purposes, it would not necessarily follow that his statements should be suppressed. Laurent insists that as a result of his lack of advanced education and the "significant psychological

---

[29] Thus, although the prisoner in <u>Howes</u> was told he was free to leave at the onset of the interview, this does not render Laurent's circumstances inherently more coercive, particularly because Laurent received <u>Miranda</u> warnings.

pressure" of the situation, his refusal to sign the Form constituted an invocation of his right to remain silent. (See Omnibus Mot. at 40.) After the Supreme Court's decision in Berghuis v. Thompkins, 560 U.S. 370 (2010), "for a defendant to invoke either the right to remain silent or the right to counsel, he must do so unambiguously." United States v. Plugh, 648 F.3d 118, 128 (2d Cir. 2011). Moreover, the Second Circuit has specifically held that "a refusal to sign a waiver of those rights, however unequivocal, is not itself necessarily sufficient to establish an unambiguous invocation thereof." Id. Instead, invocation and waiver "are entirely distinct inquiries," Smith v. Illinois, 469 U.S. 91, 98 (1984) (per curiam), are governed by different standards, see, e.g., Berghuis, 560 U.S. 370, and "carry critically different consequences." Plugh, 648 F.3d at 125. In this context, it is clear that Laurent did not invoke his Miranda rights by refusing to sign the Form.

Here, the Second Circuit's decision in Plugh is particularly instructive. There, the suspect—who was arrested, handcuffed, and advised of his Miranda rights—told the agents that he understood his rights, but refused to sign a waiver-of-rights form, saying "I am not sure if I should be talking to you," and "I don't know if I need a lawyer." 648 F.3d at 120-21. The court reasoned that "[w]hile his refusal to sign the form presented to him upon arrest may have unequivocally established that he did not wish to waive his rights at that time, his concurrent statements made equally clear he was also not seeking to invoke his rights and thus cut off all further questioning at that point." Id. at 125 (emphasis in original). It further noted the Supreme Court's instruction that if an accused makes no statement, "the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her Miranda rights." Id. at 126 (emphasis in original) (quoting Berghuis, 560 U.S. at 381) (internal quotation marks omitted); see also Davis v. United States, 512 U.S. 452, 461-62 (1994) ("If the suspect's

statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him."). Pointing out that the defendant never expressly stated that he wished to remain silent, the Second Circuit concluded that he did not unambiguously invoke his right to remain silent. Plugh, 648 F.3d at 126-27.[30]

Similarly, although he refused to sign the Form, at no point did Laurent state that he wished to invoke his right to remain silent, nor was his course of conduct "such that the officers should reasonably have been put on notice that . . . no further questioning could occur." See id. at 126 (internal citations omitted). Moreover, unlike the defendant in Plugh, Laurent never made statements that created ambiguity or "bespoke indecision" with respect to invocation. Id. at 125-26. Finally, after Laurent asked to leave and the questioning ceased, Laurent stated that he would have his attorney with him if he ever met the interviewers again. If anything, this strongly suggested both that he understood he had a right to counsel and that he affirmatively chose not to exercise that right during the interview. Given these facts, after Berghuis and Plugh, it is clear that Laurent did not unambiguously invoke his right to remain silent, even though he refused to sign the Form. See id.

### 3. Waiver

Nonetheless, where an interview is custodial—even if the defendant fails to invoke his right to remain silent—any statement made "is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived [Miranda] rights when making the statement." United States v. Taylor, 745 F.3d 15, 23 (2d Cir. 2014) (alteration in

---

[30] While the Second Circuit declined to decide "whether a refusal to sign a waiver-of-rights form could, itself, ever amount to sufficient action to trigger the . . . prophylactic rule . . . it suffice[d] to say, as the facts of this case amply demonstrate, that such a refusal will not always constitute 'sufficient action' particularly where, as here, it is accompanied by statements indicating ambivalence or uncertainty." Plugh, 648 F.3d at 126 (emphasis in original) (internal quotation marks omitted). This caveat does not affect the court's analysis in this case, where Laurent's conduct was even less likely than the defendant's conduct in Plugh to reasonably put the officers on notice that he was invoking his right to remain silent.

original) (quoting Berghuis, 560 U.S. at 382) (internal quotation marks omitted).  In this context, "'knowing' means with full awareness of the nature of the right being abandoned and the consequences of abandoning it, and 'voluntary' means by deliberate choice free from intimidation, coercion, or deception."  Id. at 23-24 ("'A confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time it is given.'  The voluntariness inquiry should examine the 'totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials.'" (quoting United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991))).

"While the government bears the burden of demonstrating a knowing and voluntary waiver, such a waiver need not be express."  Plugh, 648 F.3d at 127; see also Berghuis, 560 U.S. at 384 (stating that "this 'heavy burden' is not more than the burden to establish waiver by a preponderance of the evidence" (citing Colorado v. Connelly, 479 U.S. 157, 168 (1986))).  Rather, "waiver can be clearly inferred from the actions and words of the person interrogated."  North Carolina v. Butler, 441 U.S. 369, 373 (1979).  "Where the prosecution shows that a Miranda warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent."  Plugh, 648 F.3d at 127 (quoting Berghuis, 540 U.S. at 384) (internal quotation marks omitted).  As the Supreme Court has explained, the question "is not one of form, but rather, whether the defendant in fact knowingly and voluntarily waived [his Miranda] rights."  Butler, 441 U.S. at 373.  Thus, the court presumes that an individual who, "with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford."  Berghuis, 560 U.S. at 385.

Laurent contends that the Government has not offered sufficient evidence to establish that he knowingly and voluntarily waived his Miranda rights. (See Def. Reply Mem. at 14 ("It is obvious that [his] refusal to sign the waiver was a refusal to waive his right to remain silent.").) The Government argues, however, that by continuing to answer the interviewers' questions after having received and understood the Miranda warnings, Laurent implicitly waived his right to remain silent. (Gov't Mem. in Opp'n at 33.) Certainly, it is well established that "waiver can be inferred from the actions and words of the person interrogated." Plugh, 648 F.3d at 127 (quoting Butler, 441 U.S. at 373) (internal quotation marks omitted). In particular, "a suspect who has received and understood the Miranda warnings, and has not invoked his Miranda rights, waives the right to remain silent by making an uncoerced statement to the police." Berghuis, 560 U.S. at 388-89. And here, there is no dispute that Laurent was advised of his Miranda rights before the interview began. The question therefore becomes whether Laurent knowingly and voluntarily waived his right to remain silent by continuing to answer questions for the subsequent approximately 40 minutes. Under Plugh, this turns on whether Laurent was fully aware of "the nature of the right being abandoned and the consequences of abandoning it," and whether he was free from intimidation, coercion, or deception. See Taylor, 745 F.3d at 23.

Here, the Government has shown by a preponderance of the evidence that Laurent's waiver was knowing and voluntary. See Berghuis, 560 U.S. at 384. With respect to Laurent's knowledge, the Case Report indicates that Laurent expressly stated that he understood his rights. (Case Report at 2.) Laurent also told the interviewers that he had been advised of his Miranda rights by law enforcement officers on a prior occasion. (Id.) See United States v. Spencer, 995 F.2d 10, 11-12 (2d Cir. 1993) (per curiam) (noting in this respect that "this arrest was not [the defendant's] first encounter with the criminal justice system"). His statement at the end of the

interview—that he would bring his lawyer the next time he was questioned (Case Report at 4)—further corroborates Laurent's awareness of his <u>Miranda</u> rights and the consequences of abandoning them.

In maintaining that his waiver was not voluntary, Laurent cites to his high school GED education to argue that he experienced "significant psychological pressure from the mere fact of . . . custodial interrogation."  (Omnibus Mot. at 40; <u>see also</u> Def. Reply Mem. at 14 ("The coercive nature of the interrogation combined with a lack of familiarity with police procedure . . . mandate suppression . . . .").)  As further support, Laurent points out that the Case Report indicates the officers "confronted" Laurent with certain information and "stated that he was lying."  (Def. Reply Mem. at 15.)  There is no evidence, however, that the circumstances of his questioning were sufficient to overbear Laurent's will.  <u>See</u> <u>Taylor</u>, 745 F.3d at 23.  In particular, Laurent does not contend that the officers threatened, intimidated, or deceived him in any way. <u>See</u> <u>Plugh</u>, 648 F.3d at 128 (affirming district court's finding of voluntariness where defendant "was never threatened physically or psychologically abused in any manner, or made any type of promises such that his will was overborne").  To the contrary, Laurent was permitted to leave as soon as he became "annoyed" by the interviewers' questioning.  In fact, the court is struck by the absence of evidence suggesting that these circumstances gave rise to the level of coercion necessary to find that Laurent's statements were made involuntarily.  <u>See</u> <u>Taylor</u>, 745 F.3d at 25 (citing <u>Connelly</u>, 479 U.S. at 157 (stressing the "crucial element of police overreaching" in assessing voluntariness)).  Thus, on this record alone, the court is satisfied that Laurent knowingly and voluntarily waived his rights "through a 'course of conduct indicating waiver.'" <u>Plugh</u>, 648 F.3d at 128.

Significantly, Laurent does not dispute the Case Report's account of the interview. Instead, he argues that his waiver was not knowing or voluntary because "there is no indication that [he] initialed the form to signify understanding." (Omnibus Mot. at 40.) While it is generally true that "a suspect who reads, acknowledges, and signs an 'advice of rights' form before making a statement has knowingly and voluntarily waived Miranda rights," Taylor, 745 F.3d at 23, obtaining a suspect's signature on an advice-of-rights form is not a necessary condition for establishing a knowing and voluntary waiver. Accord Berghuis, 560 U.S. 385-86; United States v. Tutino, 883 F.2d 1125, 1138 (2d Cir. 1989) (confession properly admitted even though defendant did not affirmatively state that he wished to confess, where "he nodded his head and said 'yes' when asked if he understood his rights"); United States v. Boston, 508 F.2d 1171, 1175 (2d Cir. 1974) ("a written waiver is not required"). In fact, courts have specifically held that by proceeding to answer questions, a defendant can be found to have waived his Miranda rights despite his refusal to sign a waiver form. See, e.g., Spencer, 995 F.2d at 11-12; Boston, 508 F.2d at 1175 (finding implicit waiver even though "refusal to execute a written waiver may be taken as an indication that no waiver was intended or freely given"); United States v. Parris, No. 13-CR-17 (DAB), 2014 WL 2745332, at *13-14 (S.D.N.Y. June 17, 2014) (although defendant refused to sign the advice-of-rights form to indicate his understanding and waiver, where he told investigators he understood his rights and had prior encounters with the criminal justice system, defendant waived Miranda rights by proceeding to answer questions).

Here, Laurent explicitly stated he understood the warnings, admitted to having received them on a previous occasion, and—after answering the officers' questions for nearly 50 minutes—informed them that he was becoming "annoyed" and would bring his attorney to any future visits. As a result, the Government has demonstrated by a preponderance of the evidence

that Laurent's waiver of <u>Miranda</u> rights was knowing and voluntary, despite his refusal to sign

the Form.  Accordingly, even if he were in "custody," since Laurent was provided with <u>Miranda</u>

warnings, did not unambiguously invoke his right to remain silent, and implicitly waived this

right by proceeding to answer questions, his motion to suppress his statements to law

enforcement officers on December 2, 2010, is DENIED.

## VI.     MOTIONS RELATED TO LAURENT'S REFUSAL TO PROVIDE DNA SAMPLE

Laurent has also made two motions with respect to his refusal to provide the Government

with a sample of his DNA pursuant to two search and seizure warrants.  First, Laurent moves to

exclude from trial any reference to his conduct and statements in connection with two attempts

by law enforcement to execute these warrants in 2011.  (Omnibus Mot. at 41-42.)  Second,

Laurent moves to compel the Government to disclose both the DNA warrants and the underlying

applications.  (<u>Id.</u> at 43-46, 51.)  Although they are related, the court proceeds by considering

each motion separately.

### A.     Motion to Suppress Statements and Conduct in Response to Execution of Warrants

The Government has argued that Laurent's refusal to provide a DNA sample pursuant to

lawful search and seizure warrants is relevant evidence of his consciousness of guilt with respect

to the Lux Bond & Green robbery.  (Gov't Mem. in Opp'n at 36.)  Laurent maintains, however,

that his resistance is inadmissible under Federal Rules of Evidence 401 and 403, both because it

is irrelevant and because the probative value of this evidence is substantially outweighed by its

prejudicial effect.  (Omnibus Mot. at 41-42.)  For the following reasons, while certain evidence

of Laurent's refusal to submit to DNA testing is admissible, other evidence is not.  As a result,

the motion is GRANTED in part and DENIED in part.

1. <u>Background</u>

During October and November of 2011, Laurent was in federal custody pending trial on charges in a separate criminal case. <u>See</u> Order of Detention, <u>United States v. Laurent</u>, No. 11-CR-322 (JBW) (E.D.N.Y. Apr. 13, 2011), ECF No. 8. (<u>See also</u> Omnibus Mot. at 33.) At that time, WHPD Detective Mark Puglielli and NYPD Detective William Van Pelt were investigating the June 2010 robbery of the Lux Bond & Green jewelry store in West Hartford, Connecticut.[31] (Omnibus Mot. at 36.) In connection with that investigation, Detectives Puglielli and Van Pelt obtained a warrant in New York State Supreme Court permitting them to obtain a sample of Laurent's DNA by buccal swab, and authorizing them to exercise "reasonable force" in doing so. (Omnibus Mot., Ex. H, WHPD Case/Incident Reports ("Case Reports") (Dkt. 172-8) at 2.)

At approximately 12:15 p.m. on October 20, 2011, the date the warrant was obtained, Detectives Puglielli and Van Pelt attempted to execute the warrant by meeting Laurent while he was in the custody of the U.S. Marshals Service in the Eastern District of New York. (<u>Id.</u> at 3.) After the detectives advised Laurent that they had obtained a warrant authorizing the swab, and showed him the court order, Laurent stated that his DNA was already on file and that his attorney had not told him about the warrant. (<u>Id.</u>) According to the detectives, Laurent further stated that he would not submit to swabbing and asked them if they were going to fight him to obtain his DNA sample. (<u>Id.</u>) After the detectives attempted to persuade Laurent to comply, Laurent allegedly grabbed the swab held by Detective Van Pelt, and snapped the stick portion of the swabbing. (<u>Id.</u>) As he was being escorted back to his cell, Laurent apparently told the detectives that they could "suck his dick." (<u>Id.</u>)

---

[31] Laurent is charged in connection with the robbery of employees of jewelry stores in New York, New Jersey, and Connecticut in Racketeering Act 3 of Count One (racketeering) and Count Eight (Hobbs Act robbery conspiracy) of the Indictment. (<u>See</u> Indictment ¶¶ 11, 44.) The circumstances surrounding the June 2010 robbery of Lux Bond & Green are set forth in detail in Part II.A.1 <u>supra</u>.

On November 14, 2011, Detective Van Pelt and two other WHPD officers, Juda and Cavedon, obtained another search warrant authorizing them to obtain a sample of Laurent's DNA by buccal swab.  (Id. at 4.)  On November 15, 2011, Detective Van Pelt and the officers attempted to execute this second search warrant during Laurent's previously scheduled court appearance at the Kings County Courthouse, before New York State Supreme Court Judge Suzanne M. Mondo.[32]  (Id.)  Judge Mondo explained to Laurent that the officers had obtained a valid search and seizure warrant, and that if he did not submit to the swab, law enforcement officers could seek a "full force" order.  (Id.)  Again, Laurent refused to provide a sample of his DNA, stating that he had provided DNA samples in the past.  (Id.)  After he was escorted from the courtroom, Laurent allegedly became agitated and turned over a table and chair in the conference room where he was being held.  (Id. at 5.)  At that point, law enforcement officers decided not to further pursue execution of the DNA warrant that day.  (Id.)

2.     Discussion

Federal Rule of Evidence 401 provides that evidence is relevant if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Pursuant to Rule 403, however, the court may exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[33]  And district courts are given "broad discretion over the admission of evidence," including under Rule 403.  United

---

[32] Laurent was scheduled to appear before Judge Mondo in connection with Laurent's indictment in a separate New York State criminal matter, People v. Laurent, Indictment No. 6052/2010.  (Omnibus Mot. at 32-33, 37.)

[33] The Supreme Court has explained that "unfair prejudice" means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."  Old Chief v. United States, 519 U.S. 172, 180 (1997) (quoting Fed. R. Evid. 403 advisory committee's note); see also United States v. McCallum, 584 F.3d 471, 476 (2d Cir. 2009).

States v. Contorinis, 692 F.3d 136, 144 (2d Cir. 2012) (quoting United States v. McDermott, 245 F.3d 133, 140 (2d Cir. 2001)).

Laurent argues first that his statements and conduct with respect to his refusal to provide a DNA sample are not relevant to whether he is guilty of the Lux Bond & Green robbery.  (Def. Reply Mem. at 16 ("The fact that Mr. Laurent uttered a profanity or overturned a table and chair has absolutely no tendency to make it more likely than not that he committed that crime.  Mr. Laurent's statements and conduct have nothing to do with racketeering, with his alleged membership in the Six Tre Folk Nation, or with the facts of the alleged robbery itself.").) Second, Laurent insists that even if this evidence is relevant, it should be excluded from trial under Rule 403.  (Omnibus Mot. at 41.)  In support of this argument, Laurent points to the fact that he resisted execution of the DNA warrants because he was aware that his DNA was already on file.  (Id.)  As a result, he contends, the probative value of this evidence is substantially outweighed by the danger that the jury would infer that Laurent refused to provide a DNA sample out of fear that it would implicate him in the robbery.  (Id. at 41-42.)

The Government counters that Laurent's refusal to submit to swabbing is relevant evidence of his consciousness of guilt with respect to the jewelry store robbery, which it should be permitted to argue to the jury.  (Gov't Mem. in Opp'n at 36.)  Furthermore, the Government maintains that because Laurent is charged with murder, attempted murder, and multiple robberies, among other crimes, there is "little or no chance" of undue prejudice resulting from presenting evidence related to Laurent's resistance to swabbing.  (Id.)  In reply, Laurent insists that consciousness of guilt is not a proper purpose for admitting evidence.  (Def. Reply Mem. at 16.)  Moreover, he asserts that by arguing that his refusal to provide a DNA sample demonstrates consciousness of guilt, the Government effectively "put[s] words in his mouth, against which he

cannot defend himself without potentially endangering his Fifth Amendment right against self-incrimination." (Id.)  The court first takes up Laurent's argument with respect to relevance under Rule 401 before conducting the Rule 403 analysis.

<em>a. Rule 401</em>

i. Laurent's Statements and Conduct

Laurent's Rule 401 argument is correct, to a certain extent.  With respect to the officers' attempted execution of the October 20, 2011, search and seizure warrant, Laurent's statements—asking the officers if they were going to fight him to obtain the DNA sample, and telling the officers that they could "suck his dick"—and his conduct—snapping the test swab in half—render no fact of consequence in this case more or less probable.  See Fed. R. Evid. 401.  That is, the fact that Laurent demonstrated a cavalier and disrespectful attitude toward law enforcement says nothing about his consciousness of guilt.[34]  The same is true of Laurent's behavior in response to the officers' second attempt to collect his DNA on November 15, 2011.  Thus, the fact that he turned over a table and chair in a conference room after being advised by Judge Mondo that the officers possessed a valid warrant to obtain his DNA is not relevant evidence.  In other words, that Laurent became agitated after a court appearance regarding DNA swabbing has no tendency to show that he was more or less aware of any guilt in the Lux Bond & Green robbery.  Id.  Therefore, the Government may not introduce evidence during its case-in-chief regarding Laurent's statements and behavior in connection with his resistance to the execution of the DNA search and seizure warrants.

---

[34] The court presumes, for the sake of Rule 401 analysis, that consciousness of guilt is a proper purpose for the admission of evidence during the Government's case-in-chief.  As the court explains below, this is in fact a proper purpose.  See infra Part VI.A.2.a.ii.

ii.     Laurent's Resistance to Swabbing Generally

By contrast, evidence of the fact of Laurent's refusal to submit to swabbing is relevant. This is because, as decisions by the Supreme Court and Second Circuit illustrate, the Government is permitted—in certain circumstances—to offer evidence of such refusal as proof of a defendant's consciousness of guilt in a criminal trial.  In <u>South Dakota v. Neville</u>, 459 U.S. 553 (1983), the Supreme Court held that a drunk-driving suspect's refusal to take a blood-alcohol test, after a police officer had lawfully requested it, was not testimony coerced by the officer and was therefore not protected by the suspect's Fifth Amendment right against self-incrimination.  <u>Id.</u> at 563-64 ("[T]he values behind the Fifth Amendment are not hindered when the state offers a suspect the choice of submitting to the blood-alcohol test or having his refusal used against him.").  The Court reasoned that because the test was "safe, painless, and commonplace," and the state "could legitimately compel the suspect, against his will, to accede to the test," this action was "no less legitimate" when the state offered a second option of refusing the test, "with the attendant penalties for making that choice."[35]  <u>Id.</u> at 563 (citing <u>Schmerber v. California</u>, 384 U.S. 757, 771 (1966)).

Just four days before the Court announced its decision in <u>Neville</u>, the Second Circuit decided <u>United States v. Terry</u>, 702 F.2d 299 (1983).  In that case, after the defendants had been arrested, the government attempted on two occasions to obtain palm prints to determine whether any of their prints matched prints found on a paper bag containing heroin that had been seized on the day of their arrests.  <u>Id.</u> at 314.  The defendants refused, stating that they would not supply prints in the absence of their lawyers.  <u>Id.</u>  At trial, the court permitted the government to

---

[35] South Dakota's motor vehicle law expressly provided that the refusal to submit to a chemical test or to allow a withdrawal of bodily substances could be used against a defendant at trial.  S.D. Codified Laws §§ 32-23-10.1, 19-13-28.1 (originally enacted at Session Law 1980, Ch. 230, §§ 1, 2).  <u>Accord</u> <u>Deering v. Brown</u>, 839 F.2d 539, 541-44 (9th Cir. 1988) (holding that a defendant's refusal to submit to a blood test is not testimonial and not compelled and therefore admissible to show consciousness of guilt, even if such refusal is a <u>criminal offense</u> in its own right, under Alaska law).

introduce these refusals as evidence of defendants' consciousness of guilt.[36] Id.  The district

court refused, however, to permit defendants to elicit evidence that they had contemporaneously

expressed the desire to consult counsel, reasoning that these assertions were inadmissible hearsay

and unnecessary for a fair understanding of the evidence of refusal, since the government could

"take prints as a matter of right[]," and defendants had "no legal basis of any kind to refuse

prints."  Id. (alteration in original).

On appeal, the Second Circuit held that because the government had a right to obtain

prints pursuant to a lawful custodial arrest, without the presence of counsel, the defendants'

refusals to provide prints was admissible as evidence of consciousness of guilt.  Id.; see also

Grigg v. Phillips, 401 F. App'x 590, 594 n.2 (2d Cir. 2010) (summary order) (citing Terry in

finding that a defendant's failure to provide fingerprints and participate in a lineup was

admissible as evidence of consciousness of guilt).  The court noted, however, that testimony

regarding defendants' statements that they desired counsel was admissible under the exception to

the hearsay rule provided by Federal Rule of Evidence 803(3), since their contemporaneous

statements were relevant to each defendant's state of mind, "i.e., whether they had a

consciousness of guilt in refusing to furnish the prints or were acting in good faith."  Terry, 702

F.2d at 314.

Thus, taken together, Neville and Terry stand for the proposition that a defendant's

refusal to submit to the collection of a bodily substance through a safe, painless, commonplace—

and lawfully requested—test may be properly admitted as evidence of his consciousness of guilt

without violating the Fifth Amendment.  See Neville, 459 U.S. at 563-64; Terry, 702 F.2d at 314.

Since the collection of DNA by buccal swab is also a safe, painless, and commonplace

---

[36] The government also sought to admit their refusals to explain why the government's fingerprint expert had not identified the print on the paper bag, after that fact had been brought out by defense counsel.  Terry, 702 F.2d at 314.

procedure, the court therefore holds that the refusal to submit to valid search and seizure warrants authorizing such collection may be admitted, consistent with the Fifth Amendment, against a defendant as evidence of his consciousness of guilt. While neither party has cited, nor is the court able to identify, any binding precedent with respect to this specific issue, federal courts in other circuits have reached the same conclusion. See Wade v. Sheets, No. 09-CV-632, 2012 WL 870221, at *17-21 (S.D. Ohio Mar. 14, 2012), report and recommendation adopted, No. 09-CV-632, 2012 WL 4087238 (S.D. Ohio Sept. 17, 2012); United States v. Franklin, No. 99-CR-238, 2000 WL 217527, at *4 (E.D. Pa. Feb. 14, 2000) ("As Mr. Franklin had been under lawful arrest when the blood sample was requested, we can see no infirmity in having permitted the defendant's second refusal to be considered by the jury as circumstantial evidence of guilt."), aff'd, 248 F.3d 1131 (3d Cir. 2000). Cf. United States v. Harris, 660 F.3d 47, 52 (1st Cir. 2011) (observing that "[w]hether a refusal to provide [DNA] evidence would permit a rational inference of guilt depends (like flight) on the circumstances," but noting "evidence of such a refusal might well be impermissible under some circumstances" (citing United States v. Moreno, 233 F.3d 937, 940-41 (7th Cir. 2000) (holding that a defendant's refusal to consent to a warrantless search may not be presented as evidence of guilt))).

The facts in Wade, in particular, closely parallel those in this case. There, the defendant refused to submit to DNA testing, even after being advised that police had a search warrant authorizing them to use force, if necessary, to obtain a sample of his DNA. Wade, 2012 WL 870221, at *20 n.5. Police eventually obtained a DNA sample from the defendant by restraining him on the floor, holding his nose, and taking a swab from his mouth. Id. The defendant subsequently filed a habeas corpus petition pursuant to 28 U.S.C. § 2254(d), alleging ineffective assistance of counsel based on his trial counsel's failure to object to the prosecution's argument

that his refusal to provide a DNA sample was evidence of consciousness of guilt. <u>Id.</u> at *17. But the court rejected the defendant's ineffective assistance claim. <u>Id.</u> at *21 ("Petitioner has referred to, and this Court is not aware of any decision of the United States Supreme Court indicating that it is improper for a prosecutor to argue that refusal to submit to DNA testing may be considered as evidence of consciousness of guilt . . . . ." (citing <u>Neville</u>, 459 U.S. at 565)).

Similarly, Laurent's refusal to submit to a buccal swab is relevant and probative evidence of his consciousness of guilt. There is no indication—and Laurent has not suggested—that either of the search and seizure warrants was legally invalid.[37] <u>Cf., e.g.</u>, <u>United States v. Runyan</u>, 290 F.3d 223, 249 (5th Cir. 2002) ("[T]he circuit courts that have directly addressed this question have unanimously held that a defendant's refusal to consent to a warrantless search may not be presented as evidence of guilt."). Additionally, the officers here sought to execute a buccal swab, which, as the court has already observed, is a safe, painless, and commonplace procedure. <u>See</u> <u>Neville</u>, 459 U.S. at 563. Therefore, Laurent was not entitled to resist efforts to secure a DNA sample without exposing himself to the inference at trial that he was doing so out of fear that it would implicate him in the Lux Bond & Green robbery. <u>See id.</u>; <u>Terry</u>, 702 F.2d at 314.

Of course, Laurent is entitled to introduce evidence that he refused swabbing because his counsel had not told him about the warrant, <u>see</u> <u>Terry</u>, 702 F.2d at 314, or because he believed law enforcement already had his DNA on file.[38] As the Second Circuit pointed out, these

---

[37] <u>But see generally</u> <u>infra</u> Part VI.B.

[38] In this respect, <u>United States v. Mitchell</u>, No. 06-CR-20034 (JWL), 2006 WL 3246915, at *4 (D. Kan. Nov. 8, 2006), is instructive. There, the defendant refused officers' request for a DNA sample, contending that they already had a DNA sample on file. <u>Id.</u> The court understood the defendant to be referring to the sample collected by the Department of Corrections for all convicted felons. <u>Id.</u> In finding that the officers nevertheless had a legitimate reason to collect his DNA, the court noted that one of the detectives testified that there was no chain of custody on the other sample, which rendered it inadmissible in court. <u>Id.</u> ("Consequently, they needed a new DNA sample from which they could legitimize, or preserve, a chain of custody."). The court went on to reject defendant's argument that his statements in response to the request for a DNA sample were inadmissible under the Fifth Amendment because they were obtained in response to "interrogation" within the meaning of <u>Miranda</u>, 384 U.S. 436. <u>Mitchell</u>, 2006 WL 3246915, at *4.

statements are admissible hearsay under Rule 803 because they are relevant to Laurent's state of mind at the point of his refusal. See id.; Fed. R. Evid. 803(3). If Laurent places his state of mind at issue, however, the Government may introduce evidence with respect to his statements on both dates that he refused to be swabbed, and with respect to his conduct on October 20, 2011.[39] To the extent Laurent suggests that wanting access to counsel or believing that his DNA sample had already been taken constitute good faith bases for resisting the DNA warrants, see Terry, 702 F.2d at 314, his statements to the officers, and his snapping the test swab in half, would become relevant evidence (and may be introduced by the Government under Rule 803(3) or as an opposing party's prior statement under Rule 801(d)(2)). Specifically, this behavior makes it less probable that his refusal to provide a DNA sample was in good faith.[40] See Fed. R. Evid. 401. Therefore, so long as Laurent does not put his state of mind at issue, only the fact of his refusal to submit to buccal swabbing—and not his statements and conduct on October 20 and November 15, 2011—are relevant evidence of Laurent's consciousness of guilt.

> b. *Rule 403 Analysis*

Even though evidence of the fact of Laurent's refusal to provide a DNA sample is relevant, its admissibility remains subject to Rule 403 analysis. No federal court appears to have explicitly addressed the admissibility, in the Rule 403 context, of a suspect's refusal to submit to a valid DNA warrant as evidence of consciousness of guilt.[41] In the Second Circuit, however,

---

[39] Laurent's conduct in the conference room after his court appearance on November 15, 2011, would still not be relevant to his state of mind regarding consciousness of guilt. But see infra, note 40.

[40] Laurent's behavior on both dates that he refused to be swabbed, including on November 15, 2011, is also relevant and thus admissible if Laurent suggests—which, to this point, he has not—that the officers did not make a genuine, good faith attempt to execute the warrant on either date. In that case, his November 15 behavior is relevant because it was only after officers learned that he overturned the table and chair that they decided not to further pursue obtaining a sample of his DNA that day. (Case Reports at 5.)

[41] In Franklin, however, the district court excluded one of the defendant's two refusals to submit to a valid DNA warrant. See 2000 WL 217527, at *4 n.1. The court explained that in its instructions, "[it] told the jury not to consider defendant's first refusal . . . . Although we did not tell the jury why, we did so because his first refusal was so he could seek advice of counsel who told him to cooperate. The second refusal was relevant to show why the

70

the introduction of probative evidence does not generate undue prejudice under Rule 403 where the evidence does not involve "conduct more serious than the charged crime." United States v. Williams, 205 F.3d 23, 34 (2d Cir. 2000); see also United States v. Desposito, 704 F.3d 221, 234 (2d Cir. 2013) (same). Here, as the Government points out, Laurent is charged with murder, attempted murder, multiple robberies, and other related crimes. (Gov't Mem. in Opp'n at 36.) In this light, the risk that unfair prejudice would be generated by the admission of evidence regarding Laurent's refusal to submit to DNA swabbing is very limited. See, e.g., Williams, 205 F.3d at 34 (defendant charged with drug importation conspiracy was not unfairly prejudiced by introduction of uncharged criminal conduct that included participation in marijuana deal and credit card fraud). As a result, the court finds no difficulty in concluding that the probative value of Laurent's refusals to provide a DNA sample—as evidence of his consciousness of guilt—is not substantially outweighed by the danger of any resulting unfair prejudice.[42] See Fed. R. Evid. 403. Consequently, evidence of the fact of Laurent's refusal to submit to a valid buccal swab warrant in both October and November 2011 is admissible during the Government's case-in-chief.

---

F.B.I. had to rely on blood samples on the defendant's clothing and to show an effort to conceal from which the jury might infer consciousness of guilt." Id. (internal citation omitted). Nonetheless, it did not explain the legal basis for its instruction with respect to the defendant's first refusal, and this court declines to engage in speculation on this point.

[42] In this regard, the court notes that a small number of state courts have also conducted Rule 403-style balancing tests with respect to the admission of defendants' refusals to provide DNA samples. Where defendants have refused to submit to lawfully requested DNA tests, these courts appear to consistently find that that the probative value of this evidence with respect to consciousness of guilt is not substantially outweighed by the danger of unfair prejudice. See, e.g., Thomas v. State, 919 A.2d 49, 60-63 (Md. 2007) ("[A]ny possible prejudicial effect of appellant's struggle to avoid the drawing of blood did not so clearly outweigh the probative value of the evidence so as to render the [lower] court's admission of the evidence an abuse of discretion."); Williams v. State, 386 S.W.3d 609, 615 (Ark. Ct. App. 2011) (further holding that introducing evidence of refusal was not needlessly cumulative despite introduction of DNA test results themselves).

3.        Conclusion

In sum, the court holds that consciousness of guilt is a proper purpose for which the Government may offer certain evidence related to Laurent's refusal to submit to valid DNA search and seizure warrants.  To this end, the Government is permitted to introduce the fact of Laurent's refusal to provide a DNA sample pursuant to a valid warrant on two separate occasions.[43]  Evidence with respect to Laurent's statements on November 15, 2011, and with respect to his statements and conduct on October 20, 2011, however, is not admissible because it is not relevant to his consciousness of guilt.  But if Laurent himself places his state of mind at issue, the Government may introduce evidence of these statements, as well as his conduct on October 20, 2011.  Evidence regarding Laurent's behavior in the conference room in New York Supreme Court on November 15, 2011, is also not relevant under Rule 401 and therefore inadmissible, unless Laurent argues that the officers' attempt to execute the search and seizure warrant was not made in good faith.  Therefore, Laurent's motion to exclude is GRANTED in part and DENIED in part.

**B.        Motion to Compel DNA Search and Seizure Warrants**

As the court explained, whether law enforcement officers have obtained a valid search and seizure warrant is a central issue in determining whether a suspect's refusal to provide a DNA sample may be introduced as evidence of consciousness of guilt.  See supra Part VI.A.2.a.ii.  Here, the Government contends that the officers obtained court orders on October 20, 2011, and November 14, 2011.  (See Case Reports at 2, 4.)  Accordingly, the court concluded that Laurent's refusals to provide a DNA sample may be introduced as evidence of his consciousness of guilt with respect to the Lux Bond & Green robbery.  In his Omnibus Motion,

---

[43] The court believes the Government is still attempting to obtain a DNA sample from Laurent.  If the Government does in fact obtain this sample before trial, Laurent may renew his motion to exclude evidence of his prior refusals.

however, Laurent indicates that he has not received a copy of either the October 20, 2011, or the

November 14, 2011, search and seizure warrants authorizing the collection of his DNA by buccal

swab.  (Omnibus Mot. at 50.)  As a result, Laurent has moved to compel the Government to

disclose these documents, claiming that he is entitled to them under Federal Rule of Criminal

Procedure 16.  (Id. at 43-46, 51.)  The Government has opposed this motion.  (Gov't Mem. in

Opp'n at 38.)

Rule 16 provides in relevant part that upon the defendant's request, the Government

"must permit the defendant to inspect and to copy or photograph books, papers, documents . . . or

copies or portions of any of these items, if the item is within the government's possession,

custody, or control and: (i) the item is material to preparing the defense; [or] (ii) the government

intends to use the item in its case-in-chief at trial."  Fed. R. Crim. P. 16(a)(1)(E).  The

Government argues that disclosure of the October 20, 2011, and November 14, 2011, DNA

search and seizure warrants is not required because the Government is not planning to introduce

Laurent's DNA sample at trial,[44] and the warrants are not otherwise material to Laurent's

defense.  (Gov't Mem. in Opp'n at 38.)  In particular, the Government contends that a search

warrant and application is material to preparing the defense only "in so much as the defendant is

entitled to move to suppress the items seized."  (Id. (citing United States v. Nunez, No. 89-CR-

730, 1989 WL 161534, at *1 (S.D.N.Y. Dec. 22, 1989) (finding search warrants and supporting

affidavits were not material to preparation of the defense where defendant had not set forth facts

supporting that he had a privacy interest in the premises searched)).)  Here, because the officers

did not successfully execute the search warrants, the Government argues, not only is the

Government unable to introduce Laurent's DNA as evidence at trial, but there is nothing for

---

[44] But see supra note 43.  If the Government does obtain a sample of Laurent's DNA, presumably this argument is
moot.

Laurent to move to suppress.  (Id.)  Accordingly, the Government asserts that the warrants are

not material to Laurent's defense.  (Id.)

Laurent contends, however, that he is entitled to "any application made in relation to the

DNA evidence."[45]  (Omnibus Mot. at 51.)  In support, he makes two arguments.  First, Laurent

claims that because he has moved to suppress his statements and behavior, his motion "would

have been enhanced" with this information.  (Id.)  Second, Laurent submits that because the

Government "already had Mr. Laurent's DNA sample," "it is essential to the Defense to know

why an additional DNA sample was thought to be necessary," especially if the Government "is

questioning" the match between Laurent's prior DNA sample and DNA found on a

sledgehammer recovered from the Lux Bond & Green robbery.  (Def. Reply Mem. at 18-19.)

Laurent's second argument is readily dismissed.  Any report regarding a DNA test that is

within the Government's possession or control and is material to preparing Laurent's defense

must be disclosed pursuant to Rule 16(a).  See Fed. R. Crim. P. 16(a)(1)(F) (further requiring

that an attorney for the Government know—or through due diligence could know—that the item

exists).  In addition, "the Government has a constitutional duty to disclose evidence favorable to

the accused where such evidence is 'material' to guilt or punishment," including "not only

evidence that tends to exculpate the defendant, but also evidence that is useful to impeach the

credibility of a government witness."  United States v. Coppa, 267 F.3d 132, 139 (2d Cir. 2001)

(citing Brady v. Maryland, 373 U.S. 83, 87 (1963); Giglio v. United States, 405 U.S. 150, 154

(1972)).  Therefore, if the Government intends to introduce DNA evidence, to the extent the

warrant application contains material favorable to Laurent's defense, the Government is already

---

[45] Laurent has offered, however, to abandon this request in the event the Government agrees not to offer "any
testimony surrounding the state court's order for his DNA, [his] appearance in court pursuant to that order, his
reaction to the court order compelling the taking of his DNA, and his statements regarding that request."  (Omnibus
Mot. at 51.)

under an obligation to disclose it.  Moreover, in issuing its own search warrant authorizing the

Government to do so, this court has already explained to Laurent and his counsel the basis for

requiring Laurent to provide a sample of his DNA, even though a copy of his DNA profile

already exists in the National DNA Indexing System.  (<u>See</u> Oct. 24, 2014, Min. Entry; <u>see also</u>

Oct. 23, 2014, Hr'g Tr. at 13 ("[P]robable cause . . . has been properly shown by the government

to require that a sample of the defendant's DNA be provided, in order to conduct the appropriate

tests and analysis to ascertain whether the DNA on the sledgehammer . . . is a match to the DNA

of the defendant.  So this is not unusual.  This is not something that hasn't been done thousands

of times before, and it's totally appropriate.").)

       With respect to his first argument, Laurent does not clarify precisely how having access

to the warrants and application would enhance his motion.  Nevertheless, because the validity of

the DNA search and seizure warrants is central to finding that the Government may introduce

evidence of Laurent's refusal to comply as evidence of consciousness of guilt, the court

presumes that Laurent would seek to challenge the validity of those warrants in moving to

suppress his response.  On this basis, the court concludes that the warrants and applications are

material.  Evidence is material "if it could be used to counter the government's case or to bolster

a defense."  <u>United States v. Stevens</u>, 985 F.2d 1175, 1180 (2d Cir. 1993).  Materiality means

more, however, "than that the evidence in question bears some abstract logical relationship to the

issues in the case.  There must be some indication that the pretrial disclosure of the disputed

evidence would have enabled the defendant significantly to alter the quantum of proof in his

favor."  <u>United States v. Maniktala</u>, 934 F.2d 25, 28 (2d Cir. 1991) (quoting <u>United States v.

Ross</u>, 511 F.2d 757, 762-63 (5th Cir. 1975)).  If Laurent can prove that the warrants were invalid,

he could be entitled to suppression of his refusal to provide a DNA sample.  <u>See, e.g.</u>, <u>Runyan</u>,

290 F.3d at 249 (noting that the circuit courts that have directly addressed this question "have unanimously held that a defendant's refusal to consent to a warrantless search may not be presented as evidence of guilt"). Therefore, this evidence bears more than just "some abstract logical relationship" to the issues. Maniktala, 934 F.2d at 28. Rather, access to the warrant and application may enable Laurent to prevent the Government from arguing that his refusal to provide a DNA sample demonstrates his consciousness of guilt with regard to the Lux Bond & Green robbery, with which he is charged in the Indictment. (See Indictment ¶¶ 11, 44.) As a result, disclosure of these documents could enable Laurent to significantly alter the quantum of proof in his favor. See Maniktala, 934 F.2d at 28. Accordingly, they are material within the meaning of Rule 16.

Therefore, the Government is hereby ORDERED to disclose copies of the October 20, 2011, and November 14, 2011, DNA search and seizure warrants to Laurent.[46] Furthermore, the Government is ORDERED by Friday, January 9, 2015, to show cause why the underlying warrant applications should not also be disclosed.[47] Accordingly, Laurent's motion to compel disclosure of the 2011 DNA search and seizure warrants and applications is GRANTED in part and STAYED in part.

## VII. MOTION TO EXCLUDE LAURENT'S ALIAS

The Third Superseding Indictment alleged that Laurent is also known as "Tails" and "Gunner." (Superseding Indictment (S-3) (Dkt. 71) at 1.) In his Omnibus Motion, Laurent moved pursuant to Federal Rule of Evidence 403 to (1) exclude from trial any reference to the

---

[46] In this regard, the court notes that the Government claims to have shown the October 20, 2011, warrant to Laurent himself during the officers' attempt to execute it. (See Case Reports at 3.)

[47] For example, production of the underlying applications may be bared by Rule 16(a)(2) if they contain documents "made by an attorney for the government or other government agent in connection with investigating or prosecuting the case." The court further notes that Rule 16 does not authorize the discovery or inspection of "statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500." Fed. R. Crim. P. 16(a)(2).

alias "Gunner" and (2) to redact this alias from the Third Superseding Indictment as well.

(Omnibus Mot. at 42-43.)  In its response, however, the Government indicated that it did not

oppose this motion.  (Gov't Mem. in Opp'n at 44 n.18.)  Additionally, all references to the alias

"Gunner" were removed from the Fourth Superseding Indictment, which was docketed on

December 5, 2014, after the parties had briefed this motion.  (<u>Compare</u> Superseding Indictment

(S-4) (Dkt. 237) at 1, ¶¶ 6, 8, 33, 35, 40, 42-46, <u>with</u> Superseding Indictment (S-3) at 1, ¶¶ 2, 7,

27, 38-39, 41-42, 49-51.)  As a result, this motion is DENIED as moot.

## VIII.  MOTION TO COMPEL DISCOVERY

Finally, Laurent moves to compel certain additional disclosures under Rule 16 and <u>Brady</u>

<u>v. Maryland</u>, 373 U.S. 83, 87 (1963).  (<u>See generally</u> Omnibus Mot. at 43-56.)  Since the parties

briefed this motion, however, Rule 16 and <u>Brady</u> disclosures have been the subject of numerous

letters exchanged between the parties.  (<u>See, e.g.</u>, Oct. 16, 2014, Gov't Ltr. (Dkt. 204); Oct. 23,

2014, Def. Ltr. (Dkt. 209); Nov. 11, 2014, Gov't Ltr. (Dkt. 224); Nov. 12, 2014, Gov't Ltr. (Dkt.

225); Dec. 10, 2014, Gov't Ltr. (Dkt. 240); Dec. 12, 2014, Gov't Ltr. (Dkt. 241); Dec. 16, 2014,

Gov't Expert Ltr. (Dkt. 242); Dec. 16, 2014, Gov't <u>Brady</u> Ltr. (Dkt. 243); Dec. 23, 2014, Def.

Ltr. (Dkt. 248); Dec. 23, 2014, Gov't Ltr. (Dkt. 249); Dec. 29, 2014, Gov't Ltr. (Dkt. 251).)

Moreover, subsequent to his Omnibus Motion, Laurent also filed a separate Motion to Compel

Discovery (Mot. to Compel (Dkt. 217)), to which the Government has responded (Gov't Resp. in

Opp'n to Mot. to Compel (Dkt. 226)), and to which Laurent has replied (Def. Reply (Dkt. 231)).

Consequently, with the exception of Laurent's motion to compel disclosure of the October 20

and November 14, 2011, DNA search warrants and applications, the court decides to hold this

motion in abeyance pending Laurent's response to the Government's later disclosures.

As a result, Laurent is ORDERED by Monday, January 12, 2015, to submit a letter to the

court explaining the extent to which his Motion to Compel Discovery (Dkt. 217) and the present

motion to compel (Omnibus Mot. at 43-56), remain live. Accordingly, this motion is GRANTED in part, with respect to the DNA search and seizure materials, and STAYED in part, with respect to the remainder.

## IX. CONCLUSION

Accordingly, for the reasons set forth above:

- Laurent's Motion to Suppress Cell-Site Records is DENIED;

- Laurent's Motion to Suppress Text Messages is DENIED as moot;

- Laurent's Motion to Exclude Merritt's Statements (as modified, see supra note 24) is DENIED;

- Laurent's and Merritt's Motions to Sever are DENIED;

- Laurent's Motion to Suppress Statements to Law Enforcement is DENIED;

- Laurent's Motion to Suppress Statements and Conduct in Connection with His Refusal to Provide a DNA Sample is GRANTED in part and DENIED in part;

- Laurent's Motion to Exclude Alias is DENIED as moot;

- Laurent's Motion to Compel Discovery is GRANTED in part and STAYED in part. The Government is ORDERED to disclose the 2011 DNA search and seizure warrants. It is further ORDERED by Friday, January 9, 2015, to show cause why the underlying applications should not also be disclosed. Laurent is also ORDERED by Monday, January 12, 2015, to file a letter explaining the extent to which his two motions to compel discovery remain live.

SO ORDERED.

s/ Nicholas G. Garaufis

NICHOLAS G. GARAUFIS
United States District Judge

Dated: Brooklyn, New York
December 30, 2014