UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

UNITED STATES OF AMERICA

       -against-

YASSER ASHBURN, JAMAL LAURENT, and
TREVELLE MERRITT,

                        Defendants.
------------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**11-CR-0303 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

## I.    INTRODUCTION

This Memorandum and Order addresses the Government's Motion in Limine to Admit Evidence of Other Acts. (Mem. in Supp. of Gov't's Mot. to Admit Evid. of Other Acts ("Mot.") (Dkt. 197).) It further addresses a number of motions Defendants have subsequently made in response. For reasons that follow, the Government's motion is GRANTED in part and DENIED in part; Defendants' motions are DENIED, with the exception of Defendant Laurent's motion to further amend a statement that Defendant Merritt made to law enforcement regarding a January 12, 2011, cell phone robbery, which is GRANTED in part and DENIED in part.

### A.    Background and Indictment

Defendants Yasser Ashburn, Jamal Laurent, and Trevelle Merritt are charged by a fourteen count indictment with numerous racketeering crimes committed in connection with their membership in the Six Tre Outlaw Gangsta Disciples Folk Nation ("Six Tre Folk Nation" or "Six Tre"), which was allegedly responsible for numerous acts of gang-related violence, including homicides, non-fatal shootings, and commercial robberies in Brooklyn and elsewhere beginning in 2007 through 2011. (Superseding Indictment (S-5)[1] (the "Indictment") (Dkt. 271);

---

[1] This indictment, which was filed on January 14, 2015, replaces the Fourth Superseding Indictment. (See Jan. 14, 2015, Gov't Ltr. (Dkt. 268); Superseding Indictment (S-4) (Dkt. 237).) Both indictments were filed after the

Mot. at 3.)  According to the Government, Six Tre is part of the Folk Nation, a nationwide gang founded in Chicago, Illinois in the early 1990s.  (Id. at 2.)  The Government also claims that Six Tre has approximately 20 to 25 identified members, and has been operating in and around the Ebbets Field housing projects ("Ebbets Field") in the Flatbush section of Brooklyn, New York for several years.  (Id. at 3.)

The Indictment alleges that during those years, members and associates of Six Tre engaged in several acts of violence, including murder, attempted murder, robbery, and assault. (Indictment ¶ 1.)  It further alleges that Six Tre constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4), and functioned as a continuing unit for a common purpose of achieving certain objectives.  (See id. ¶ 2.)  These objectives allegedly included: (a) promoting and enhancing its reputation with respect to rival criminal organizations; (b) preserving and protecting its power, territory, and criminal ventures; and (c) enriching its members and associates through criminal activity.  (Id. ¶ 3.)  According to the Indictment, among the means and methods by which the members and associates of Six Tre conducted its affairs were: (1) using and threating to use physical violence to keep victims and rivals in fear of its members and associates; (2) committing, attempting to commit, and threatening to commit acts of violence, including murder, robbery, and assault, to enhance its prestige and expand its criminal operations; and (3) using, attempting to use, and conspiring to use robbery and narcotics trafficking as a means of obtaining money.  (Id. ¶ 4.)

Defendants, in particular, are charged with being directly responsible for—among other crimes—three separate murders and two attempted murders, as well as several robberies of

---

Government's motion to admit other acts was fully briefed.  (See Superseding Indictment (S-5) (the "Indictment") (Dkt. 271); Superseding Indictment (S-4).)  At that time, Defendants had been arraigned pursuant to the Third Superseding Indictment, which was filed on November 15, 2012, and named six additional defendants, each of whom has since pleaded guilty.  (See Superseding Indictment (S-3) (Dkt. 71); see also Dec. 5, 2014, Gov't Ltr. (Dkt. 238) (outlining differences between Third and Fourth Superseding Indictments).)

jewelry stores and robberies of individuals solicited via internet marketplaces, between April 2008 and October 2011. (See generally Indictment.) The Indictment charges each Defendant with racketeering (Count One) and racketeering conspiracy (Count Two), on the basis of twelve predicate racketeering acts ("RAs"), and charges each Defendant with the unlawful use of firearms (Count Three) in connection with Counts One and Two. (Id. ¶¶ 7-35.) Defendants are also charged in Counts Four through Fourteen with multiple federal crimes predicated on the same or similar conduct at issue in the racketeering acts.[2] (Id. ¶¶ 36-50.) Both the alleged racketeering acts and the substantive charges arise from eight primary allegations, which the Indictment sets forth as follows.

First, the Indictment alleges that members of Six Tre, including all three Defendants, conspired to murder members of the rival Crips gang in Brooklyn. (Id. ¶ 9 (RA 1: conspiracy to murder).) Second, Defendant Ashburn is charged with shooting and killing Courtney Robinson on April 20, 2008, when a fight broke out between a Six Tre member and another individual during a party held at an apartment in Ebbets Field, which several Six Tre members attended. (Id. ¶¶ 10 (RA 2: murder), 36-37 (Count Four: murder in-aid-of racketeering).) Third, the Indictment alleges that on June 19, 2010, Defendant Laurent shot and killed Brent Duncan because—according to the Government—he thought that Duncan displayed a Crips hand sign at a party the two attended, although none of Duncan's family or friends knew him to have any association with the Crips. (Id. ¶¶ 12 (RA 4: murder), 39-40 (Count Five: murder in-aid-of racketeering); Mot. at 4-5.)

---

[2] Ashburn is named in connection with two individual RAs; Laurent is named in connection with eight individual RAs; and Merritt is named in connection with four individual RAs.

Fourth, on July 7, 2010, after walking by a Crips member (referred to in the Indictment as John Doe #2)[3] on the street, Laurent is alleged to have shot him in the back twice, but the Crips member later recovered from his injuries. (Id. ¶¶ 19 (RA 7: attempted murder), 41-42 (Count Six: assault with a dangerous weapon in-aid-of racketeering), 43 (Count Seven: unlawful use of a firearm); Mot. at 5.) Fifth, the Indictment alleges that Laurent and Merritt conspired to rob Dasta James (also known as "Topes"), who was shot and killed during the course of the robbery on January 28, 2011. (Mot. at 5-6.) According to the Government, after Merritt purchased marijuana from James and stepped away, Laurent pulled out a firearm and demanded that James give him everything in his possession; after James refused and the two fought, Laurent shot James while James was running away and calling for help. (Id.) Only Merritt, however, is explicitly named in the charges associated with James's death.[4] (Indictment ¶¶ 28-31 (RA 12: robbery conspiracy/attempted robbery/murder), 47 (Count Eleven: Hobbs Act robbery conspiracy), 48 (Count Twelve: attempted Hobbs Act robbery), 49 (Count Thirteen: unlawful use of a firearm), 50 (Count Fourteen: causing death through use of a firearm).)

Sixth, Laurent is charged with committing and conspiring to commit "smash-and-grab" robberies of high-end jewelry stores in Manhattan, New Jersey, Connecticut, and Massachusetts between January 2009 and August 2010, during which he and other Six Tre members smashed display cases with a sledgehammer and then grabbed merchandise from the cases. (See Indictment ¶¶ 11 (RA 3: Hobbs Act robbery conspiracy), 44 (Count Eight: Hobbs Act robbery

---

[3] In its motion, the Government refers to this individual as John Doe #3, which the court believes to be in error. (Compare Indictment ¶ 19, with Mot. at 5.)

[4] Nevertheless, as the court pointed out in its December 30, 2014, Memorandum and Order (Dkt. 252 at 25 n.21), all three Defendants are charged in Count Two with racketeering conspiracy, which requires the Government to prove that each Defendant, including Laurent, agreed that he or a co-conspirator would commit at least two acts of racketeering in the conduct of the affairs of the enterprise. (See Indictment ¶ 34.) As the Government has previously acknowledged, one such act could be the attempted robbery and murder of Dasta James. (See Gov't Mem. in Opp'n to Def. Laurent's Omnibus Pre-Trial Mots. (Dkt. 180) at 21.)

conspiracy); Mot. at 6.)  Seventh, the Indictment charges Laurent with committing and

conspiring with other members of Six Tre to commit (see Mot. at 6), a series of robberies of

individuals solicited over the internet via marketplace websites between June and October 2010.

(Indictment ¶¶ 13-15 (RA 5: Hobbs Act robbery conspiracy/state law robbery conspiracy), 16-18

(RA 6: Hobbs Act robbery/state law robbery solicited through Craigslist.com), 20-22 (RA 8:

Hobbs Act robbery/state law robbery solicited through website solecollector.com), 23-25 (RA 9:

Hobbs Act robbery/state law robbery solicited through Craigslist.com).)  Eighth, and finally,[5] the

Indictment alleges that Merritt forcibly stole property, including cellphones, a jacket, and United

States currency from two unnamed individuals (referred to in the Indictment as John Doe #5 and

John Doe #6) on January 12 and January 14, 2011.  (Indictment ¶¶ 26 (RA 10: state law

robbery), 27 (RA 11: state law robbery).)

### B.   Motion to Admit Other Acts

On October 3, 2014, the Government filed the instant motion, seeking to introduce

evidence of certain crimes and bad acts ("other acts" or "uncharged acts") not detailed in the

---

[5] The Government's motion also describes another allegation charged in the Third Superseding Indictment.  In particular, the Government alleges that on September 13, 2008, Six Tre member Devon Rodney dispatched Ralik Odom and another Six Tre member to shoot a member of a rival gang who went by the street name "Wrinkles," and who had been spotted at a block party near Ebbets Field.  (Mot. at 4.)  In attempting to do so—according to the Government—the Six Tre member with Odom fired several shots into a group of people; one of those bullets hit the neck of a 10-year-old girl, who was taken to the hospital and ultimately recovered from her injuries.  (Id.)

In connection with this conduct, Odom was charged in various counts of the Third Superseding Indictment.  (See Superseding Indictment (S-3) ¶¶ 6-8 (Count One: racketeering), 11 (RA 4: attempted murder), 26-28 (Count Two: racketeering conspiracy), 43-44 (Count Twelve: assault with a dangerous weapon in-aid-of racketeering), 45 (Count Thirteen: unlawful use of a firearm); see also ¶ 49 (charging Odom in Count Sixteen with Hobbs Act robbery conspiracy in connection with the aforementioned jewelry store robberies).)  After the Government filed the present motion, Odom pleaded guilty to Counts Twelve and Sixteen of the Third Superseding Indictment.  (See Nov. 3, 2014, Min. Entry (Dkt. 219).)  Consequently, Odom was not named as a defendant when the Government subsequently filed the Fourth Superseding Indictment on December 5, 2014, and the Fifth Superseding Indictment on January 14, 2015, neither of which charged any conduct related to this shooting.  (See generally Indictment; Superseding Indictment (S-4); see also Dec. 5, 2014, Gov't Ltr.)  While the Government has not expressly stated its continued intent to introduce evidence related to this shooting, out of an abundance of caution, the court will proceed to evaluate the admissibility of this evidence as an additional "other act."  See infra Part II.A.2.c.

Indictment ("other acts").  (See Mot.)  The Government's proffered evidence of other acts falls into six broad categories.

1.     Six Tre Founding and Prior Gang Affiliations

The first category relates to the founding of Six Tre and Defendants' prior gang affiliations.  In this respect, the Government submits that a former Six Tre member who is now a cooperating witness (referred to by the Government as "CW-1") will provide testimony regarding the founding of Six Tre by Ashburn and another individual, as well as Ashburn's prior involvement in a local gang referred to as "2 – 1st."  (Id. at 7.)  CW-1 is also expected to testify that several younger members of Six Tre began their involvement in criminal conduct as members of other gangs, and that in particular, he and Merritt were both members of a gang referred to as "Tre Six."  (Id. at 7-8.)  The Government further expects that two additional cooperating witnesses (referred to by the Government as "CW-2" and "CW-3"), who were former criminal associates of Laurent, will testify that Laurent was a member of the Crips gang before becoming a Six Tre member.  (Id. at 8.)

2.     Assaults

The second category of other acts includes a number of assaults allegedly committed by Defendants and other Six Tre members.  The Government indicates that CW-1 will testify that assaults were commonly committed by both Six Tre members and other young men seeking membership in the gang.  (Id.)  CW-1 is expected to testify, for example, that when Ashburn was 18 years old, and already a Six Tre member, Ashburn assaulted a boy (who was approximately 13 or 14 years old) who had spit on him.  (Id.)  According to CW-1, in the course of the assault—which allegedly took place in front of multiple Ebbets Field residents—Ashburn repeatedly thrust an umbrella into the boy's mouth, causing him to bleed profusely as well as

breaking his teeth.  (Id. at 8-9.)  In addition, the Government expects CW-1 to testify that on another occasion, he witnessed Ashburn, who had been the "clear leader" of the gang, fighting with Devon Rodney,[6] who was ascending within the Six Tre ranks.  (Id. at 10.)

CW-1 is also expected to testify that Merritt committed a number of assaults against members of rival gangs as well as members of the public not affiliated with any gang.  In particular, CW-1 will testify that when Merritt was 15 years old, he punched and knocked out a member of the Bloods gang at a skating rink.  (Id. at 9.)  According to CW-1, over the next few years, he and Merritt would sometimes pick out innocent passersby and beat them without provocation.  (Id.)  CW-1 further maintains that during the summer of 2008, CW-1, Merritt, and other Six Tre members fought with members of a rival Crips set that used the name "Eight Tre." (Id.)  CW-1 also alleges that later that year, on approximately October 31, 2008, Merritt and another Six Tre member punched two innocent people on the street, again, without provocation. (Id.)

Furthermore, the Government expects CW-1 to testify about assaults committed by other members of Six Tre against innocent members of the public, in addition to fellow gang members. For example, CW-1 claims that on April 20, 2008, he—along with other Six Tre members— violently assaulted Courtney Robinson shortly before he was shot and killed by Ashburn, as alleged in racketeering act 2 and Count Four of the Indictment.  (Id.)  CW-1 is also expected to testify that when Six Tre members engaged in conduct disfavored by the gang, they would be beaten by other members of the gang.  (Id.)

---

[6] Rodney was named as a defendant in the Third Superseding Indictment.  (See Superseding Indictment (S-3).)  He subsequently pleaded guilty to racketeering and brandishing a firearm in connection with a crime of violence (Nov. 11, 2013, Min. Entry (Dkt. 104)), and was sentenced on March 12, 2014, (Mar. 12, 2014, Min. Entry (Dkt. 132)), to 240 months imprisonment in total.  (See Mar. 21, 2014, J. (Dkt. 134).)

3.        Shootings, Murders, and Murder Conspiracies

The third category of other acts involves evidence of shootings, murders, and murder

conspiracies that relate to charged conduct[7] as well as conduct not alleged in the Indictment.  For

example, although Laurent is not named in racketeering act 12 or Counts Eleven through

Fourteen, the Government seeks to introduce evidence of his participation in the robbery and

murder of Dasta James through surveillance video, cellphone records, and historical cell-site

data.  (Id. at 11.)  In addition, the Government expects CW-1 to testify regarding a murder

committed by an unnamed Six Tre member on August 23, 2008.  (Id.)  According to CW-1, he

was present when a member of the gang reported that he had been robbed, at which point a large

group of Six Tre members, which included then-leader Devon Rodney as well as Merritt, set off

looking for the perpetrator.  (Id.)  Later that day, on a rooftop of the Flatbush Gardens

apartments, the Six Tre member who had been robbed shot and killed a person referred to by the

Government as "KO."  (Id.)  To corroborate CW-1's testimony, the Government seeks to

introduce other evidence related to this murder, including ballistics evidence,[8] photographs, and

other records.  (Id.)

The Government also expects cooperating witnesses to testify to numerous other

shootings by Six Tre members challenging rival gangs.  (Id.)  The targets of these shootings,

which the witnesses either saw themselves or were informed of by other Six Tre members,

included an individual known as "Gemini" in August 2008, an individual known as "Windel" in

September 2008, and an individual known as "Lorenzo" in December 2008.  (Id.)  CW-1, in

_____

[7] Through this motion, the Government seeks to introduce evidence—as one of the shooting acts related to charged conduct—that Laurent fired a 9 mm Smith & Wesson semi-automatic handgun on June 21, 2010.  (Mot. at 10.)  The court has already held that evidence related to this firearm discharge, as well as the subsequent police response, may be admitted at trial.  (See Jan. 9, 2015, Mem. & Order (Dkt. 257).)

[8] It appears that the Government is no longer seeking to introduce ballistics evidence with respect to this shooting. (See Gov't's Resp. in Opp'n to Laurent's Mot. in Limine to Preclude Ballistics Evidence (Dkt. 310) at 3 n.3.)  The Government is DIRECTED to clarify whether it intends to introduce this evidence.

particular, is also expected to testify that Six Tre member Geraldo Elainor[9] shot at members of the Bloods gang at a basement party in the Canarsie section of Brooklyn.  (Id.)  The Government further expects CW-2 to testify that after the shooting of John Doe #2[10] on July 7, 2010—an act Laurent is charged with committing (see Indictment ¶¶ 19 (RA 7), 41-42 (Count Six), 43 (Count Seven))—Laurent and fellow Six Tre member Ricky Hollenquest[11] later shot at a member of the Crips, "simply because he was a Crip."  (Mot. at 11-12.)

4.    <u>Sales, Purchases, and Possession of Firearms</u>

According to the Government, the violence committed by Six Tre members was facilitated by the gang's purchase of guns, which are the subject of the fourth category of evidence of other acts.  (Id. at 12.)  In its motion, the Government explains that it anticipates proving at trial that Six Tre members were often in possession of guns purchased by the gang or by the members themselves.  (Id.)  Accordingly, the Government expects CW-1 to testify that Six Tre members informed him that fellow Six Tre member Anthony "Coog" Williams would purchase guns "somewhere in the southern United States" and bring them back to New York for use by Six Tre.  (Id.)  The Government alleges that other guns were purchased for Six Tre from a member of the Crips known as "Nori."  It further alleges that these guns were stored in communal locations "where Six Tre members could gain easy access to them when necessary." (Id.)  One such location is alleged to be a storage room on the eighth floor of 11 McKeever Place, next to Merritt's apartment; another was in the building at 1700 Bedford Avenue, near the

---

[9] Elainor was also named as a defendant in the Third Superseding Indictment.  (See Superseding Indictment (S-3).) He subsequently pleaded guilty to racketeering and unlawful use of a firearm in connection with a crime of violence (Apr. 3, 2014, Min. Entry (Dkt. 136)), and was sentenced on July 18, 2014, (July 18, 2014, Min. Entry (Dkt. 159)), to 300 months imprisonment in total.  (See Aug. 5, 2014, J. (Dkt. 165).)

[10] See supra note 3.

[11] Hollenquest, too, was named as a defendant in the Third Superseding Indictment.  (See Superseding Indictment (S-3).)  He subsequently pleaded guilty to two counts charging Hobbs Act robbery conspiracy, and one count charging the unlawful use of a firearm.  (See Apr. 16, 2014, Min. Entry (Dkt. 140).)

apartment where Courtney Robinson was murdered on April 20, 2008, (id.), a homicide Ashburn is charged with committing.  (See Indictment ¶¶ 10, 36-37.)

With respect to individually possessed weapons, the Government expects CW-1 to testify that Ralik Odom kept his own gun, which he stole from a member of a different Folk Nation set. (Mot. at 12.)  CW-1 is also expected to testify that Six Tre member "Coog" sold crack cocaine and carried a gun, and that Six Tre member Daniel Harrison[12] kept a gun in his apartment, in addition to selling marijuana and crack cocaine.  (Id.)  CW-2 is further expected to testify that he observed Laurent store marijuana and guns for Devon Rodney, that Laurent once asked CW-2 to hold a gun for him after the police had visited Laurent's home, and that Laurent told CW-2 that he had given a gun to Ricky Hollenquest when Laurent was incarcerated.  (Id. at 12-13.)  The Government also expects CW-3 to testify that Laurent "always" carried a gun in his waistband and would sell guns to people in the neighborhood.  (Id. at 13.)  According to the Government, however, on one occasion an individual named "KB" gave Laurent $300 to purchase a .32 caliber handgun, but Laurent never provided the gun.  (Id.)

### 5.  Thefts and Robberies

The fifth category of evidence pertains to thefts and robberies, which the Government expects CW-1 to testify were common among Six Tre members, and "an important way in which gang members 'earned' money for themselves and the enterprise."  (Id.)  For example, the Government alleges that Six Tre members robbed jewelry stores and stole credit card numbers. (Id.)  CW-1 is also expected to testify that he, Merritt, and other Six Tre members would steal cell phones from people walking down the street and resell them for cash.[13]  (Id.)  In addition,

---

[12] Harrison was named as a defendant in the Third Superseding Indictment as well.  (See Superseding Indictment (S-3).)  He subsequently pleaded guilty to racketeering.  (July 18, 2014, Min. Entry (Dkt. 158).)

[13] In this section of its motion, the Government had sought to introduce witness testimony that on or about January 12, 2011, Merritt and another individual robbed a victim of his cellphone "while indicating that they had a gun."

the Government expects CW-3 to testify that Laurent told him about his involvement in jewelry store robberies, and that Laurent was upset that people were talking about those robberies.[14]  (Id.)

### 6.    Narcotics Possession and Sales

Sixth, and finally, the Government seeks to admit evidence that Six Tre members frequently bought and sold drugs to earn money for themselves and for the gang.[15]  (Id. at 13-14.)  Specifically, the Government expects CW-1 to testify that he and Merritt sold marijuana and sometimes contributed a portion of the proceeds to Six Tre coffers, as did other Six Tre members.  (Id. at 14.)  CW-2 is also expected to testify that Laurent sold marijuana and was sometimes in possession of large quantities of the drug.  As an example, the Government expects CW-2 to testify that sometime in 2010, he observed Devon Rodney and Laurent with multiple pounds of marijuana, two or three firearms, and "a couple thousand dollars" in cash at Laurent's mother's home.  (Id.)  CW-2 will further testify that Laurent reported to him that the money and marijuana belonged to Laurent.  (Id.)

---

(Mot. at 13.)  After the Government filed the instant motion, however, a grand jury returned the Fourth Superseding Indictment, in which the same underlying conduct was alleged as state law robbery in racketeering act 10, as described above.  (See Superseding Indictment (S-4) ¶ 26; see also Dec. 5, 2014, Gov't Ltr. at 1.)  Because the proffered testimony now immediately relates to charged conduct (see Indictment ¶ 26), it is admissible as direct evidence.  See also Fed. R. Evid. 401.  Accordingly, the court does not proceed to consider whether this testimony is admissible as an uncharged act.  In addition, this renders the argument Merritt makes in his letter in opposition—that "[n]one of the activity set forth in the motion," which is "the stuff of rumor and innuendo," is contained in the Indictment—moot with respect to this crime.  (Nov. 5, 2014, Def. Merritt's Ltr. (Dkt. 216).)

[14] In addition, the Government originally indicated that it sought to introduce both physical and testimonial evidence of Laurent's commission of an armed robbery on March 21, 2011.  (See Mot. at 13.)  The Government has subsequently notified the court that it no longer anticipates introducing this evidence.  (See Jan. 28, 2015, Gov't Ltr. (Dkt. 307) at 2 n.1.)  As a result, its motion to admit evidence of this act is DENIED as moot.

[15] In its motion, the Government had also indicated that it intended to introduce evidence of each Defendant's use of narcotics.  (See Mot. at 13-14.)  In response to specific objections, however, the Government indicates in its reply that it will not elicit proffered testimony that Ashburn (Gov't Reply (Dkt. 230) at 1 n.1), or Laurent (id. at 5 n.6), smoked marijuana.  Therefore, the Government's motion to introduce this evidence against Defendants Ashburn and Laurent is DENIED as moot.  Nevertheless, the court notes that Merritt has not specifically objected to the introduction of this evidence, nor has the Government conceded its intention to introduce it.  As a result, the court will proceed to evaluate the admissibility of Merritt's use of marijuana.  See infra Part II.A.2.c.

### C.     Parties' Arguments

The Government argues that evidence regarding the other acts described above is admissible as direct proof of the racketeering enterprise alleged in the Indictment.  (Mot. at 15-19.)  It submits that this evidence may also be admitted on the grounds that it is "inextricably intertwined" with evidence of charged crimes, insofar as it provides "evidentiary richness" and "narrative integrity" critical in enabling the Government to prove how Six Tre established a presence in Flatbush, how Six Tre operated as an enterprise to achieve its objectives, and how each defendant came to be member of the enterprise.  (Id. at 19-21.)  As a result, the Government contends, this evidence does not constitute "crime[s], wrong[s], or other act[s]" within the meaning of Federal Rule of Evidence 404(b).  (Id. at 14.)  In the alternative, the Government maintains that even if the court determines that this evidence is not admissible as direct proof or "inextricably intertwined" with such proof, these other acts are admissible under Rule 404(b) to show knowledge, intent, and the absence of mistake.  (Id. at 21-28.)  Finally, the Government asserts that the probative value of this evidence, on any basis by which it is admitted, is not substantially outweighed by its prejudicial effect under Federal Rule of Evidence 403.  (Id. at 28-29.)

Merritt responded to the Government's motion on November 5, 2014, in a brief letter asserting that this evidence is "the stuff of rumor and innuendo," none of which was contained in the Third Superseding Indictment, and which constitutes only proof of propensity.  (Nov. 5, 2014, Def. Merritt's Ltr. (Dkt. 216).)  On November 7, 2014, Ashburn filed a separate response in opposition to the Government's motion, arguing that the evidence to be introduced against him, in particular (his alleged prior gang membership and umbrella assault), is "too old to be relevant," propensity evidence, or sensational and disturbing and thus unduly prejudicial under Rule 403.  (See Aff. of Jeremy F. Orden in Opp'n to Mot. in Limine Under Fed. R. Evid. Rule

404(b) ("Orden Aff.") (Dkt. 220) at 4, 11, 16.)  Merritt and Ashburn also join their co-

defendants' responses, to the extent those responses apply.  (See Def. Merritt's Ltr.; Orden Aff.

at 17.)

Laurent also filed a response in opposition to the Government's motion on November 7,

2014.[16]  (Def. Laurent's Mem. of Law in Resp. and in Opp'n to Gov't's Mot. to Intro. Prior Bad

Acts Under Fed. R. Evid. 404(b) ("Def.'s Resp.") (Dkt. 222).)  In general, Laurent disputes the

Government's contention that evidence related to these other acts is relevant for a proper purpose

other than his bad character.  (See id. at 12-18.)  Laurent also argues that the probative value of

this evidence is substantially outweighed by its cumulative, prejudicial, and confusing nature.

(See id.)  In support, Laurent points out that several of the other acts took place before he is

alleged to have joined the conspiracy, "in or about" 2010.  (See id. at 21-23; Indictment ¶ 6.)  As

a result, if the court grants the Government's motion, Laurent insists that his trial should be

severed.  (Id. at 20-21.)  Notably, Ashburn also requests that he be permitted to make an

application for severance in the event this evidence is admitted.  (Orden Aff. at 17.)

The Government replied to Defendants' responses on November 21, 2014.  (Gov't Reply

(Dkt. 230).)  On December 1, 2014, Laurent filed a sur-reply in further opposition to the

Government's motion.  (Sur-Reply in Further Opp'n to the Gov't Reply ("Def.'s Sur-Reply")

(Dkt. 233).)  In his sur-reply, Laurent emphasizes his objection to the admission of evidence

related to the armed robbery the Government alleges he committed on March 21, 2011, (id. at 4-

5), his possession of narcotics (id. at 5), and a statement made by Merritt concerning the

---

[16] Laurent supplemented this response through a letter filed on November 11, 2014.  (Nov. 11, 2014, Ltr. (Dkt. 223).)  The court has previously addressed the contents of this letter in a separate Memorandum and Order.  (See Jan. 9, 2015, Mem. & Order (Dkt. 257).)

cellphone robbery Merritt is charged with committing on January 12, 2011, (id. at 5-9). Laurent also renews his motion for a severance.[17] (Id. at 9-10.)

On January 13, 2015, Laurent supplemented his sur-reply with a letter that further emphasizes his severance motion and argues that the Government's proposed redactions to Merritt's statement regarding the January 12, 2011, cellphone robbery should be further amended, if admitted at all. (Jan. 13, 2015, Def.'s Ltr. (Dkt. 266).) The Government filed a response (Jan. 14, 2015, Gov't's Resp. Ltr. (Dkt. 267)), to which Laurent replied (Jan. 16, 2015, Def.'s Reply Ltr. (275)).

In the discussion that follows, the court first considers the admissibility of the Government's other acts evidence. Next, the court addresses Defendants' other motions with respect to Merritt's statement regarding the January 12, 2011, robbery.

## II.    GOVERNMENT'S MOTION TO ADMIT EVIDENCE OF OTHER ACTS

As the court explained above, the Government moves to admit other acts that it contends constitute evidence of: (1) the founding of Six Tre; (2) assaults committed by Six Tre members; (3) shootings, murders, and murder conspiracies; (4) Six Tre members' sales, purchases, and possession of firearms; (5) thefts and robberies committed by Six Tre members; and (6) Six Tre members' narcotics possession and sales. The court proceeds by first evaluating whether any of these other acts may be admitted as direct evidence on grounds other than Rule 404(b). Next, after considering the relevant basis for admitting each specific uncharged act, the court then discusses the extent to which any other acts evidence—while admissible at trial—should nonetheless be excluded under Federal Rules of Evidence 401 and 402, or 403. Lastly, the court

---

[17] In his sur-reply, Laurent also discusses in further detail his objection to the introduction of evidence related to the discharge of a firearm from his bedroom on June 21, 2010. (Def.'s Sur-Reply at 2-4.) The court addressed this issue in a separate Memorandum and Order. (See Jan. 9, 2015, Mem. & Order.)

addresses Defendants' renewed joint motion for severance in the event these other acts are admitted.

## A. Other Acts Admissible as Direct Evidence

The Government contends that evidence with respect to the other acts is admissible on three possible grounds: (1) as direct evidence of an illegal enterprise under the Racketeering Influenced Corrupt Organizations ("RICO") Act; (2) as evidence that is inextricably intertwined with direct evidence of the charged crimes; and (3) as evidence admissible pursuant to Federal Rule of Evidence 404(b). Since the court ultimately concludes that any evidence admissible at trial may be introduced as either direct evidence or as "inextricably intertwined" evidence, the court declines to address whether these acts are also admissible under Rule 404(b).

### 1. Legal Standards

As the following discussion illustrates, other acts within a given category of evidence may be admissible as either direct or inextricably intertwined evidence, or as both. Consequently, the court outlines the legal standards governing the admission of evidence on both grounds before applying these principles to the Government's proffered evidence, by category.

#### a. RICO Cases Generally

The Indictment charges each defendant with racketeering and racketeering conspiracy, in violation of 18 U.S.C. § 1962(c) and (d). Under this section of the RICO Act, it is a substantive criminal offense "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). The statute also makes it unlawful "for any person to conspire to violate any of the provisions of subsection . . . (c) of this section." Id. § 1962(d); see United States v. Pizzonia, 577 F.3d 455, 462 (2d Cir. 2009). To establish a defendant's liability for

substantive racketeering under § 1962(c), the Government is required to prove beyond a reasonable doubt: (1) the existence of an enterprise; (2) that the enterprise affects interstate commerce; (3) the defendant associated with the enterprise; and (4) the defendant conducted or participated, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity. 18 U.S.C. § 1962(c). To obtain a conviction for RICO conspiracy under § 1962(d), the Government must prove that the defendant (1) agreed with others (2) to conduct the affairs of the enterprise (3) through a pattern of racketeering activity. See, e.g., United States v. Basciano, 599 F.3d 184, 199 (2d Cir. 2010) (citing Pizzonia, 577 F.3d at 462).

A RICO conspiracy, however, "is never simply an agreement to commit specified predicate acts that allegedly form a pattern of racketeering. Nor is it merely an agreement to join a particular enterprise. Rather, it is an agreement to conduct or to participate in the conduct of a charged enterprise's affairs through a pattern of racketeering." Pizzonia, 577 F.3d at 464 (emphasis in original). For substantive racketeering as well, "[a]lthough no less than two predicate acts must be committed—or, in the case of RICO conspiracy, agreed to—to demonstrate a pattern of racketeering, in the end, it is not the number of predicates proved but, rather, the relationship that they bear to each other or to some external organizing principle that indicates whether they manifest the continuity required to prove a pattern." Id. at 465 (citation and internal quotation marks omitted). This is because "'it is neither the enterprise standing alone nor the pattern of racketeering activity by itself which RICO criminalizes,' but '[r]ather, the combination of these two elements.'" Id. at 463 (quoting United States v. Russotti, 717 F.2d 27, 33 (2d Cir. 1983)).

Thus, the Second Circuit has explained that "proof of the enterprise and pattern elements of racketeering 'may well entail evidence of numerous criminal acts by a variety of persons.'"

Basciano, 599 F.3d at 207 (quoting United States v. DiNome, 954 F.2d 839, 843 (2d Cir. 1992)). In particular, where a single pattern of racketeering is alleged to be common to a number of defendants, "even though individual defendants 'may reasonably claim no direct participation' in the acts of others, 'evidence of those acts is relevant to the RICO charges against each defendant.'" Id. at 207 (quoting DiNome, 954 F.2d at 843). "Specifically, the 'various criminal activities' of racketeering confederates are admissible against each defendant 'to prove: (i) the existence and nature of the RICO enterprise and (ii) a pattern of racketeering activity on the part of each defendant by providing the requisite relationship and continuity of illegal activities.'" Id. at 207 (quoting DiNome, 954 F.2d at 844). As the Second Circuit has pointed out, "[c]ommon sense suggests that the existence of an association-in-fact is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure." United States v. Coonan, 938 F.2d 1553, 1559 (2d Cir. 1991) (emphasis in original) (internal quotation marks omitted).

b. *Enterprise Evidence*

Not only are the acts of others relevant to the RICO charges against each defendant, but these acts need not be charged in the indictment to be admissible. In fact, "it is well settled that in prosecutions for racketeering offenses, the government may introduce evidence of uncharged offenses to establish the existence of the criminal enterprise." United States v. Baez, 349 F.3d 90, 93 (2d Cir. 2003) (per curiam); see also United States v. Mejia, 545 F.3d 179, 206 (2d Cir. 2008) ("Where, as here, the existence of a racketeering enterprise is at issue, evidence of uncharged crimes committed by members of that enterprise, including evidence of uncharged crimes committed by the defendants themselves, is admissible 'to prove an essential element of the RICO crimes charged—the existence of a criminal enterprise in which the defendants participated.'" (quoting United States v. Matera, 489 F.3d 115, 120 (2d Cir. 2007))). Moreover, where defendants are charged with racketeering conspiracy, "'uncharged acts may be admissible

17

as direct evidence of the conspiracy itself.'" Baez, 349 F.3d at 93 (quoting United States v. Thai, 29 F.3d 785, 812 (2d Cir. 1994)). Under these circumstances, "the admission of evidence of uncharged criminal activity is not considered other-crimes evidence subject to Federal Rule of Evidence 404(b)." Id. at 93-94. In other words, "[a]n act that is alleged to have been done in furtherance of the alleged conspiracy . . . is not an 'other act' within the meaning of Rule 404(b); rather, it is part of the very act charged." Thai, 29 F.3d at 812 (quoting United States v. Concepcion, 983 F.2d 369, 392 (2d Cir. 1992) (internal quotation marks omitted)).

Accordingly, in Matera, where defendants were tried on charges of racketeering and racketeering conspiracy in connection with their alleged participation in the Gambino organized crime family, the Second Circuit affirmed the district court's admission of various crimes committed by Gambino family members, including a non-defendant's participation in three uncharged murders. See 489 F.3d at 120 (finding no abuse of discretion under Rule 403). The court reasoned that this evidence was offered "to prove an essential element of the RICO crimes charged—the existence of a criminal enterprise in which the defendants participated." Id. Moreover, the court found the district judge's decision to be "consistent with numerous prior rulings of this court in which criminal acts of non-defendants, including killings, were received to prove the existence of the criminal RICO enterprise in which the defendant participated." Id. (citing United States v. Miller, 116 F.3d 641, 682 (2d Cir. 1997) (evidence of "numerous killings" by defendant and other gang members of victims considered to be threats to the gang's operations admissible as proof of the existence of the RICO enterprise alleged to have used such acts of violence in furtherance of its narcotics conspiracy); Thai, 29 F.3d at 812-13 (uncharged acts, including beating, attempted extortion, and robbery, committed by defendants were

admissible as evidence of existence and structure of the criminal enterprise, roles played by leadership, and discipline imposed on rank-and-file members)).

Likewise, in <u>DiNome</u>, defendants were charged with multiple racketeering and other crimes based on their participation in the DeMeo Crew, a component of the Gambino organized crime family that was engaged in a "vast array of illegal activities," which included "brutal murders of various persons viewed as a threat to their business." 954 F.2d at 841-42. There, the Second Circuit upheld the admission of evidence of "numerous crimes, including the routine resort to vicious and deadly force to eliminate human obstacles," engaged in by other members and associates of the DeMeo Crew, on the basis that it was relevant to the charges against each defendant "because it tended to prove the existence and nature of the RICO enterprise," as well as a pattern of racketeering activity by each defendant. <u>Id.</u> at 843 (upholding the admission of this evidence under Rule 403).

Similarly, in <u>United States v. Diaz</u>, 176 F.3d 52 (2d Cir. 1999), the Second Circuit affirmed the admission of prior uncharged crimes and other bad acts committed by both government witnesses and defendants, who were charged with racketeering and RICO conspiracy based on their alleged membership in the Latin Kings street gang, "whose primary business was the distribution of narcotics by means of a racketeering enterprise conducted through a campaign of violent enforcement and retribution." <u>Id.</u> at 79. This included evidence that: a defendant trafficked drugs and stockpiled weapons to protect the gang's drug trade; a defendant ordered gang members to assault individuals selling drugs on his block; a defendant committed a robbery using a gun that was later found to have been used the murder of another gang member; and cooperating witnesses sold drugs and committed other acts of violence on behalf of the gang. <u>Id.</u> The court agreed with the district judge that this evidence was relevant to

proving the existence, nature, and operations of the RICO enterprise, as well as informing the jury "how the Latin Kings' racketeering and drug conspiracies evolved, and how illegal relationships and mutual trust developed between co-conspirators." Id. at 79-80 (further concluding the evidence was not unduly prejudicial under Rule 403).

In Mejia as well, defendants were charged with multiple assault and firearms crimes related to racketeering activity, and alleged to be members of a violent street gang, MS-13, which was engaged in narcotics trafficking and violence against members of rival gangs. See 545 F.3d at 183. At trial, the district court admitted evidence related to an uncharged shooting and evidence that MS-13 engaged in narcotics trafficking. Id. at 206. In affirming the district court, the Second Circuit held that because MS-13's involvement in narcotics trafficking was an element of the charged offenses, "evidence of narcotics trafficking is not prior act evidence, but rather direct evidence of the charged offense." Id. Although it acknowledged the "significant risk of prejudice" generated by admission of the uncharged shooting, the court pointed out that when defendants engage in a criminal enterprise that involves very serious crimes, while "there is a likelihood that evidence proving the existence of the enterprise through its acts will involve a considerable degree of prejudice," this evidence was nonetheless of sufficient probative value in proving the enterprise to remain admissible under Rule 403. Id. at 207; see also United States v. Wong, 40 F.3d 1347, 1354-55, 1378 (2d Cir. 1994) (evidence of uncharged shooting targeting members of rival gang was admissible against defendants charged with racketeering and racketeering conspiracy in connection with their participation in a violent gang known as the Green Dragons, which amassed "a sizeable arsenal of firearms" and employed violence to defend and expand its operations extorting Chinese-run businesses).

Finally, in Baez, the Second Circuit held the district court had not abused its discretion by admitting evidence of sixteen uncharged robberies at a trial in which the defendant was charged with racketeering, racketeering conspiracy, and two counts of murder in-aid-of racketeering. See 349 F.3d at 91, 93-94. Instead, it found that evidence of the uncharged robberies was relevant to the existence and nature of the racketeering enterprise and the conspiracy. Id. While the defendant argued that this was also cumulative and prejudicial, the court affirmed the district judge's determination that admission of this evidence complied with Rule 403, pointing out that the uncharged acts involved criminal conduct "less inflammatory than the murder charged in the indictment." Id. at 94 (citing United States v. Livoti, 196 F.3d 322, 326 (2d Cir. 1999)).

### c. Inextricably Intertwined with Direct Evidence

In addition to establishing the existence and nature of a racketeering enterprise, uncharged acts are also admissible as evidence that is inextricably intertwined with proof of the enterprise, or proof of other crimes charged in the indictment. See, e.g., United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) ("[E]vidence of uncharged criminal activity is not considered other crimes evidence under Rule 404(b) 'if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial.'" (quoting United States v. Gonzalez, 110 F.3d 936, 942 (2d Cir. 1997))). On this basis, "the trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment. Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." Gonzalez, 110 F.3d at 941 (2d Cir. 1997) (quoting United States v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991) (quoting United States v. Daly, 842 F.2d 1380, 1388 (2d Cir. 1988))); see also United

States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994) (evidence of other bad acts may be admitted "to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense").  As the Supreme Court explained in Old Chief v. United States, 519 U.S. 172 (1997), the prosecution—the party with the burden of proof—has a "need for evidentiary richness and narrative integrity in presenting a case." Id. at 183.  "Thus, the prosecution may fairly seek to place its evidence before the jurors, as much to tell a story of guiltiness as to support an inference of guilt, to convince the jurors that a guilty verdict would be morally reasonable as much as to point to the discrete elements of a defendant's legal fault." Id. at 188.

Thus, in Gonzalez, the Second Circuit affirmed a district court decision admitting evidence regarding an uncharged burglary as "relevant both to a possible motive for the defendants' possession of firearms and to provide crucial background evidence that gave coherence to the basic sequence of events that occurred on the night of [the charged crime]." 110 F.3d at 942.  As the Government points out, the court further held that "[r]elevant evidence is not confined to that which directly establishes an element of the crime." Id. at 941.  Instead, to be relevant, "evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." Id. For the same reason, in United States v. Towne, 870 F.2d 880 (2d Cir. 1989), the district court allowed the government to present evidence that the defendant, charged with receiving and possessing firearms after a prior felony conviction, possessed a Smith & Wesson pistol on days other than the single date charged in the indictment.  See id. at 885-86.  The Second Circuit held that the court did not err in refusing to give a limiting instruction, even if evidence regarding the defendant's possession of the pistol were deemed uncharged criminal activity.  See id.

("[E]vidence of uncharged criminal activity is not considered 'other crimes' evidence under Fed. R. Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it [is] inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime [on] trial." (alterations in original) (internal quotation marks omitted)).

In RICO and RICO conspiracy cases in particular, this rule has been applied repeatedly to admit evidence of prior acts "to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators." Diaz, 176 F.3d at 79. In Diaz, for example, testimony regarding one defendant's drug dealing on behalf of another defendant was properly admitted "because it informed the jury how the Latin Kings' racketeering and drug conspiracies evolved, and how illegal relationships and mutual trust developed between co-conspirators." Id. at 79-80. Likewise, in United States v. Guerrero, prior dealings among defendants and their co-conspirators, including shootings of drug rivals, possession of guns belonging collectively to the gang, and robberies of drug customers, were "plainly admissible to explain the development of the illegal relationship between the defendants and their co-conspirators," and "provided the explanation for the murders that were the subject of the Indictment." 882 F. Supp. 2d 463, 492-93 (S.D.N.Y. 2011), aff'd, 560 F. App'x 110 (2d Cir. 2014).

## 2. Application

In light of these cases, it is clear that almost all of the other acts the Government seeks to introduce are admissible as either direct evidence of crimes charged in the Indictment, or as evidence that is inextricably intertwined with such direct evidence. Although the court is struck

by the amount of uncharged conduct the Government has proffered, most is relevant evidence with respect to the central issues at Defendants' trial on racketeering and racketeering conspiracy charges: whether the Government has proved (1) the existence, nature, and operations of the alleged enterprise, and (2) the pattern of racketeering activity in which Defendants are alleged to have engaged in participating in that enterprise.  See Basciano, 599 F.3d at 207.[18]  Some of the Government's other acts evidence is also admissible because it arises out of the same transactions as the charged crimes, it is "inextricably intertwined" with the evidence regarding the charged offenses, and it is necessary to "complete the story" of the crimes on trial.  See Carboni, 204 F.3d at 44.  Since—unlike evidence admitted pursuant to Rule 404(b)—the court is not required to issue a limiting instruction for evidence admitted on any of these grounds, the following section describes the other acts that may be admitted as either enterprise or racketeering evidence, or as "inextricably intertwined" with other direct evidence of charged crimes.

### a.    Founding of Six Tre and Prior Gang Affiliations

Evidence regarding the founding of Six Tre is classic enterprise evidence, and is relevant and admissible "to prove the existence of the alleged conspiracy as well as to show its background and history."  United States v. Langford, 990 F.2d 65, 70 (2d Cir. 1993).  Thus, testimony that in the early days of Six Tre the dominant gang in Flatbush was another Folk Nation set known as "Seven Four" (Mot. at 11), is admissible.  See Langford, 990 F.2d at 70.  So too, is CW-2's testimony that Six Tre assumed dominance after an individual known as "Ra Ra," the leader of Seven Four, was murdered.  (Mot. at 11.)  Similarly, CW-1's testimony explaining

---

[18] Evidence may be admitted as proof of both the enterprise and pattern of racketeering activity.  See, e.g., Coonan, 938 F.2d at 1559-60 ("[W]e have previously indicated that proof of various racketeering acts may be relied on to establish the existence of the charged enterprise." (citing United States v. Ferguson, 758 F.2d 843, 853 (2d Cir. 1985) (noting proof used to establish predicate acts and enterprise may coalesce); United States v. Indelicato, 865 F.2d 1370, 1383-84 (2d Cir. 1989) (en banc) ("[T]he difference in the nature of the [pattern and enterprise] elements does not mean that the same piece of evidence may not help to establish both."))).

how Ashburn co-founded Six Tre (id.), is probative of the gang's background and history, see Langford, 990 F.2d at 70, and also informs the jury how Ashburn came to be the initial leader of the criminal enterprise, see, e.g., United States v. Pipola, 83 F.3d 556, 566 (2d Cir. 1996) (evidence of prior illicit activities involving defendant and his co-conspirators "explained to the jury how the relationship between [the defendant] and his underlings evolved").

Furthermore, Ashburn's prior gang affiliation with 2 – 1st is admissible as background evidence in light of the Government's contention that Ashburn brought many of the 2 – 1st members with him to become members of Six Tre. See, e.g., United States v. Amato, 31 F. App'x 21, 25 (2d Cir. 2002) (summary order) (evidence of defendant's pre-existing relationship with members of the Gambino family helped explain how the defendant came to participate and ultimately lead the conspiracy). Ashburn argues that evidence of his prior gang membership is inadmissible because it is "clear[ly] designed to establish a propensity" to join and engage in gang-related activity. (See Orden Aff. at 15-17 (citing Federal Rule of Evidence 404(b)).) The purpose of this testimony, however, is not to establish that Ashburn's membership in Six Tre is in accordance with a certain character trait. Cf. Fed. R. Evid. 404(b)(1) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.").

Rather, the purpose of CW-1's testimony is to establish the background and structure of the conspiracy charged in this case, and to explain Ashburn's leadership role and the basis for mutual trust among conspirators. See Diaz, 176 F.3d at 79-80 (evidence of prior acts admissible "to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between co-conspirators"); see also United States v. Hanna, 198 F. Supp. 2d 236,

247 (E.D.N.Y. 2002) ("Evidence of Classie's employment with Stratton Oakmont is relevant to show the background of the conspiracy in this case. Here, the Government argues that M. Hanna, Classie, Finkle, Pollicino and Saulon worked at Stratton Oakmont before moving to HGI. The Government further contends that the evidence will show that the many relationships which developed at Stratton Oakmont explain[] how many brokers came to work at HGI. Evidence of Classie's employment with Stratton Oakmont appears relevant to the background and history of the alleged conspiracy." (citing United States v. Rosa, 11 F.3d 315, 334 (2d Cir. 1993); Langford, 990 F.2d at 70)). As a result, the court finds this evidence is relevant, probative, and admissible.[19]

Testimony from CW-1 that Merritt was previously a member of a gang referred to as "Tre Six" (Mot. at 8), is also admissible on this basis. The Government alleges that "[i]t was not uncommon for young boys to join or form a gang to attract the attention of, and establish a reputation among, Six Tre members," such that "[o]nce the boys reached a certain age many graduated to become full members of the Six Tre Folk Nation." (Id. at 7-8.) Thus, both CW-1 and Merritt joined Tre Six, whose members "sought to develop a reputation among the older inducted members of Six Tre." (Id. at 8.) Because this testimony provides background to the charged conspiracy, and helps to explain how the illegal relationship and mutual trust between participants in the crime—specifically, Merritt and CW-1—developed, it is relevant and admissible at trial. See Diaz, 176 F.3d at 79-80; United States v. Everett, 825 F.2d 658, 660 (2d Cir. 1987) (noting other crimes evidence "has been consistently held admissible" to corroborate testimony of cooperating witnesses who testify of their own involvement in these crimes).

---

[19] In making this determination, the court emphasizes the Government's indication that it will make "only brief mention" of Ashburn's prior gang membership, and will not offer evidence of any particular crimes committed by the 2 – 1st gang. (Gov't Reply at 2.)

By contrast, evidence that Laurent was a member of the Crips gang before becoming a Six Tre member (Mot. at 8), is not admissible. The Government has not provided any basis for finding that Laurent's prior membership in the Crips is relevant either to the existence of the enterprise charged in this case, or as background evidence of the criminal conspiracy. See Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."). For instance, the Government has not asserted that Laurent's prior membership in the Crips facilitated the development of mutual trust between Laurent and other members of Six Tre. Cf. Diaz, 176 F.3d at 79-80. In fact, given Six Tre's goal of enhancing its position relative to rival criminal organizations by threatening to use or using violence against rival gang members (see Indictment ¶ 3), Laurent's prior membership in the Crips only makes the development of his illegal relationships with Six Tre members more surprising. The Government has also not suggested that Laurent brought other Crips members with him to Six Tre. Cf. Hanna, 198 F. Supp. 2d at 247. Nor does it maintain that while a member of the Crips, Laurent established a particular reputation that led to any increased status within Six Tre. Cf. Pipola, 83 F.3d at 566. Finally, the Government has not suggested that the basis for Laurent's relationship with CW-2 or CW-3 derives from the duration of Laurent's membership in the Crips. Cf. Rosa, 11 F.3d at 334. As a result, these two witnesses' proffered testimony on this point is not relevant and therefore inadmissible. See Fed. R. Evid. 402.

> b.      *Assaults*

The various assaults the Government has proffered are relevant in several ways. One way is as evidence of Six Tre's hierarchy and structure, which is direct proof of the enterprise itself. See, e.g., Coonan, 938 F.2d at 1560. For example, in Thai, the district court admitted testimony that two defendants—Thai and LV Hong—had beaten another member of the gang on

the suspicion that he retained robbery proceeds instead of turning them over to Thai. 29 F.3d at 812-13. The Second Circuit held that this was relevant and admissible evidence "as to the existence and structure of the [] enterprise, as to the leadership roles played by Thai and LV Hong, and as to the discipline imposed by the [gang] leaders on the rank-and-file members." Id. at 813. Thus here, where the Government contends that members of Six Tre were beaten by other Six Tre members when they engaged in disfavored conduct, such testimony is admissible as evidence of the existence and structure of the criminal organization. See id.

Thai also illustrates that assaults can serve as proof of leadership positions, which also constitute enterprise evidence. See id. Accordingly, since the Government alleges that Ashburn was a co-founder of Six Tre, evidence that explains his leadership role in the organization is also direct proof of the enterprise. See, e.g., Diaz, 176 F.3d at 79. Consequently, evidence that Ashburn assaulted a young boy by shoving an umbrella into his mouth in front of multiple Ebbets Field residents is admissible at trial. This is because CW-1 is expected to testify that committing assaults was a way to establish a street reputation that would lead to increased status within the gang (Mot. at 8), and the umbrella assault "enhanced Ashburn's reputation as a dominant force in the neighborhood and someone capable of committing violence" (id. at 9). Thus, proof of this assault tends to make it more likely that Ashburn served as a co-founder and leader of the Six Tre Folk Nation. See Thai, 29 F.3d at 813; see also Fed. R. Evid. 401.

Ashburn argues, however, that this testimony involves conduct that is both too old to be relevant and would also result in undue prejudice, given the details of the assault. (Orden Aff. at 4.) In particular, he points out that Ashburn is 31 years old, and is alleged to have committed the assault when he was 18, which is 13 years ago, and 7 years before the Indictment alleges the criminal enterprise began operating in 2008. (Id. at 11.) Moreover, because the details of the

assault are "extremely disturbing," Ashburn contends that introducing this evidence would result in unfair prejudice because it would appeal to the jurors' emotions.[20] (Id. at 10.)  While this is certainly among the oldest evidence the Government has proffered, and the assault does involve somewhat graphic details, the court does not agree that its probative value is substantially outweighed by the risk of unfair prejudice.  See Fed. R. Evid. 403.

First, it is well established that a district court may admit evidence of acts committed prior to the time charged in an indictment "to prove the existence of the alleged conspiracy as well as to show its background and history."  See Langford, 990 F.2d at 70.  Specifically, the Second Circuit has long held that evidence of uncharged acts committed prior to the date the conspiracy is alleged to have begun may be relevant as background evidence to explain how a defendant assumed a leadership role in the criminal organization.  See, e.g., United States v. Rosa, 11 F.3d 315, 333-34 (2d Cir. 1993).  For example, in Rosa, a cooperating witness testified that he and the defendant—who was convicted of various narcotics, racketeering, and weapons offenses—first met 13 or 14 years earlier, when the two stole cars together.  Id. at 333.  On appeal, the Second Circuit held that despite this passage of time, the evidence was properly admitted to explain "how the illegal relationship between the two had developed and to explain why [the cooperating witness] had appointed [the defendant] to a leading position in the organization."  Id. at 334.[21]  Although it is possible, as a general matter, that an uncharged act

<hr>

[20] Ashburn further requests, in the event the court determines that this evidence is admissible, that CW-1 only be permitted to testify as to the assault, and not the details of the umbrella, the victim's age, or the victim's injuries.  (Orden Aff. at 11.)  In light of the fact that the Government will not present photographs or other graphic evidence of the assault, this request is DENIED.

[21] While the court in Rosa evaluated the admissibility of these uncharged acts under Rule 404(b), its reasoning applies equally to this case.  This is because the analysis of evidence that is "inextricably intertwined" and evidence that constitutes other acts under Rule 404(b) both require a court "to balance probative value and prejudice under Rules 402 and 403."  United States v. Nektalov, 325 F. Supp. 2d 367, 372 (S.D.N.Y. 2004) ("Furthermore, evidence of an intrinsic act offered as direct proof of the crime charged will, by definition, satisfy Rule 404(b), which prohibits bad acts evidence only where offered solely to 'prove the character of a person in order to show action in conformity therewith.'" (quoting United States v. Bowie, 232 F.3d 923, 927 (D.C. Cir. 2000))).

could be so remote in time as to lose any probative value, this is not the case here.  See Rosa, 11

F.3d at 334; see also United States v. Johnson, No. 10-CR-431 (CM), 2013 WL 6091601, at *5-8

(S.D.N.Y. Nov. 15, 2013) (permitting the introduction of several violent acts that took place as

many as six years before the indictment alleged the conspiracy began); United States v.

Morrison, No. 04-CR-699 (DRH), 2007 WL 1100447, at *3-4 (E.D.N.Y. Apr. 5, 2007) (evidence

regarding defendant's involvement in narcotics distribution business during "early 1990s" was

admissible at trial even though RICO conspiracy was alleged to have begun in October 1996).

Second, the court finds that the graphic nature of this testimony does not justify exclusion

under Federal Rule of Evidence 403.  In the Second Circuit, other acts evidence is not unfairly

prejudicial when the evidence does not involve conduct "more inflammatory than the charged

crime."  Livoti, 196 F.3d at 326.  Here, the court agrees with the Government that where

Ashburn is charged with murdering victim Courtney Robinson "by shooting him in the back at

close range" (Gov't Reply at 2), the details of the umbrella assault are not so unfairly prejudicial

as to substantially outweigh the probative value of this testimony.  See Fed. R. Evid. 403; see

also Thai, 29 F.3d at 813 (testimony as to beating that was 30 minutes long and involved "the

copious flow of blood," which "still stained the walls of the room several months later," was

admissible under Rule 403).  The court's conclusion is further strengthened by the Government's

indication that it does not expect to present photographs or other graphic physical evidence of

this assault.  (See Gov't Reply at 2.)

As is the umbrella assault, evidence related to the fight between Ashburn and Devon

Rodney is also relevant evidence of Six Tre's hierarchy and structure, and is thus direct proof of

the enterprise itself.  See, e.g., Coonan, 938 F.2d at 1560.  According to testimony the

Government expects to elicit from CW-1, Rodney was ascending within the Six Tre ranks; after

Rodney "got the better of the fight," Ashburn—who had been the clear leader of the gang—received less respect, and his authority diminished. (Mot. at 10.) As a result, this testimony is admissible as proof of the structure and nature of the organization, see Thai, 29 F.3d at 813, and also completes the story regarding Ashburn's rise and fall within the organization. See Old Chief, 519 U.S. at 187-88; see also United States v. Pipola, 83 F.3d 556, 566 (2d Cir. 1996) (affirming district court's admission of evidence of uncharged crimes under Rule 404(b) as relevant background information "to make the story of the crimes charged complete," including the defendant's leadership role).

Several other assaults are also admissible as evidence of the nature and structure of Six Tre. See, e.g., Guerrero, 882 F. Supp. 2d at 492 (citing Thai, 29 F.3d at 812-13). For example, the Government alleges that Merritt, like Ashburn, committed assaults as "a way to establish a street reputation that would lead to respect and Six Tre membership." (Mot. at 8.) Thus, CW-1's testimony that Merritt, when he was fifteen years old, punched and knocked out a member of the Bloods gang at a skating rink is relevant and admissible,[22] as is CW-1's testimony that over the next few years, he and Merritt would sometimes pick out and assault innocent people passing by.[23] (Id. at 9.) That these assaults—including against innocent people (see id. (describing October 31, 2008, assault committed by Merritt and another Six Tre member))—continued after Merritt was formally inducted into the gang further serves as evidence that the purposes of Six Tre included enhancing the prestige and reputation of the gang relative to rival criminal organizations, and preserving and protecting its power and territory, by committing acts of

---

[22] Merritt has not suggested that this evidence is inadmissible on the basis of his relatively young age, nor is the court aware of any case excluding uncharged acts on these grounds.

[23] Testimony regarding these uncharged assaults is also admissible as a result of CW-1's involvement in the crimes. See United States v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991) ("[S]ince the witnesses were participants in the events about which they testified, it was appropriate for the prosecution to elicit testimony during direct examination that exposed details damaging to their credibility. In this manner, the prosecution was able to avoid the appearance that it was concealing impeachment evidence from the jury.").

violence to keep victims and rivals in fear of the gang and its members.  (See Indictment ¶ 3(a)-(c).)  Consequently, testimony that during the summer of 2008, CW-1, Merritt, and other Six Tre members fought with members of a rival Crips set that used the name "Eight Tre" (Mot. at 9), constitutes proof of the existence of the enterprise.  See, e.g., Wong, 40 F.3d at 1378 (evidence of shooting admissible as evidence of "ongoing war between rival gangs").  For the same reason, testimony that other Six Tre members beat up an individual whom they believed belonged to a "fake" Folk Nation set (Mot. at 9), is relevant and admissible.

Lastly, the assault committed by Six Tre members against Courtney Robinson on April 20, 2008, is admissible not only because the victim was an "innocent civilian" (id.), but also because the assault is inextricably intertwined with a crime charged in the Indictment.  See Carboni, 204 F.3d at 44.  The Government alleges that CW-1, along with other Six Tre members, violently assaulted Robinson shortly before he was shot and killed by Ashburn.  (Mot. at 9.)  Since Ashburn is charged with committing this murder in racketeering act 2 (murder) and Count Four (murder in-aid-of racketeering), evidence of an assault committed by other Six Tre members shortly before the murder is admissible because it "provides coherence to the basic sequence of events that occurred" on the night of the charged crime.  Gonzalez, 110 F.3d at 942.

<em>c.      Shootings, Murders, and Murder Conspiracies</em>

The various shootings, murders, and murder conspiracies proffered by the Government are admissible as direct evidence of the enterprise and the pattern of racketeering in which Six Tre allegedly engaged.  See Basciano, 599 F.3d at 207.  In the Indictment, the Government alleges that Six Tre existed to achieve multiple common purposes, including: promoting and enhancing its reputation with respect to rival criminal organizations; preserving and protecting its power, territory, and criminal ventures through the use of threats and acts of violence to keep victims and rivals in fear; and enriching its members through criminal activity, including robbery

and narcotics trafficking.  (See Indictment ¶¶ 3-4.)  Thus, the Government's proffered testimony with respect to Six Tre's ongoing conspiracy to attack and kill members of rival gangs— including the attempted murder of "Wrinkles" on September 13, 2008—is relevant evidence of Six Tre's objectives of promoting and enhancing its reputation with respect to rivals, as well as keeping members of rival criminal organizations in fear of Six Tre and its members and associates.  (See id.)  See, e.g., Wong, 40 F.3d at 1378.

These acts also illustrate how Six Tre preserved and protected its power through the use of violence.  (See Indictment ¶ 3(b).)  One example is the murder of "KO" on August 23, 2008, as CW-1 is expected to testify that "KO" was shot and killed by a Six Tre member who was robbed and who subsequently enlisted a group of Six Tre members, including Six Tre's leader Devon Rodney and Merritt, to set off looking for the perpetrator.  (See Mot. at 11.)  Thus, insofar as these uncharged crimes demonstrate the primary objectives of the organization, this evidence is central to the Government's ability to prove the nature of the Six Tre gang.  See, e.g., Mejia, 545 F.3d at 206; Miller, 116 F.3d at 682.  Moreover, the relationship between these shootings and Six Tre's objectives, see Pizzonia, 577 F.3d at 465, as well as the temporal proximity of these shootings in August, September, and December 2008, see United States v. Indelicato, 865 F.2d 1370, 1382 (2d Cir. 1989), supports a finding of the type of continuity required to prove a pattern of racketeering.

Additionally, to the extent that the Government can prove that the targets of these shootings were members of the Crips gang located in Brooklyn, this evidence constitutes direct proof of the conspiracy to commit murder charged against each defendant through racketeering act 1 in Count One.  (See Indictment ¶ 9.)  For example, the Government alleges that on July 7, 2010, Laurent, Ricky Hollenquest, and another Six Tre member shot at a member of the Crips

"simply because he was a Crip."  (Mot. at 12.)  Evidence with respect to this incident is thus admissible as direct evidence of a charged crime.  See also Baez, 349 F.3d at 93 (noting that where a conspiracy is charged, uncharged acts may be admissible as direct evidence of the conspiracy itself (quoting Thai, 29 F.3d at 812)).

d.    <em>Narcotics Sales and Possession</em>

The Indictment also alleges that another one of Six Tre's objectives was to enrich its members and associates through criminal activity, including through the use of robbery and narcotics trafficking to obtain money.  (See Indictment ¶¶ 3(d), 4(d).)  Consequently, that Defendants and their associates sold narcotics to earn money for themselves and Six Tre constitutes relevant evidence with respect to the existence of the illegal enterprise alleged in the Indictment.[24]  See United States v. Payne, 591 F.3d 46, 60-61 (2d Cir. 2010); Diaz, 176 F.3d at 79-80.  For example, proffered testimony from CW-1 that Six Tre members often sold drugs to earn money for themselves and the gang (Mot. at 14), is admissible insofar as it tends to prove Six Tre's objectives and operations.  Similarly, CW-1's expected testimony that he and Merritt sold marijuana and sometimes contributed a portion of the proceeds to Six Tre coffers is admissible,[25] as is proffered testimony from CW-2 that Laurent sold marijuana and sometimes possessed large quantities of it.  (See id.)  Testimony from CW-1 that Six Tre member Anthony "Coog" Williams sold crack cocaine and that Six Tre member Daniel Harrison sold marijuana and crack cocaine (id. at 12) is also admissible on this basis.

---

[24] Evidence that Six Tre members engaged in narcotics trafficking is also relevant and admissible with respect to the Government's obligation to prove the effect of the enterprise on interstate or foreign commerce.  See 18 U.S.C. § 1962(c); Miller, 116 F.3d at 674 ("[W]here, as here, the RICO enterprise's business is narcotics trafficking, that enterprise must be viewed as substantially affecting interstate commerce, even if individual predicate acts occur solely within a state.").

[25] See also supra note 23.

The Government also expects CW-1 to testify that he and Merritt smoked marijuana together (id. at 13-14), but the court finds that this testimony is not admissible.[26] While the Government did not originally indicate the purpose of introducing this evidence, the court perceives two possible grounds for admission. First, it could help establish Merritt's motive with respect to the Dasta James robbery and murder. See, e.g., United States v. LaFlam, 369 F.3d 153, 156-57 (2d Cir. 2004) (evidence of drug use admissible to demonstrate motive for robbery). Second, it might explain the development of the relationship between Merritt and CW-1. See Diaz, 176 F.3d at 79; Guerrero, 882 F. Supp. 2d at 492. While Merritt's marijuana use may be of some relevance with respect to these elements of the Government's case, its probative value "is undercut by the availability of other, less prejudicial evidence that makes the same point." United States v. Nachamie, 101 F. Supp. 2d 134, 142 (S.D.N.Y. 2000) (citing Old Chief, 519 U.S. at 182-83); see also United States v. McCallum, 584 F.3d 471, 477 (2d Cir. 2009) ("[T]he availability of other, less prejudicial, evidence on the same point ordinarily reduces the probative value of a given item of extrinsic evidence." (internal quotation marks omitted)). In particular, evidence that Merritt sold marijuana and contributed a portion of the proceeds to Six Tre coffers is far more probative of Merritt's participation in the operations of the illegal enterprise. Accord Matera, 489 F.3d at 120 (admitting evidence offered to prove "the existence of a criminal enterprise in which the defendants participated"). Furthermore, evidence that CW-1 and Merritt sold marijuana together is far more probative of their illegal relationship than is evidence that they smoked marijuana together. See Nachamie, 101 F. Supp. 2d at 142 ("This far less prejudicial evidence will give the jury a solid understanding of the background of the conspiracy and the role of the accomplice witness in that conspiracy, without exposing [the defendant] to

---

[26] The Government has not provided any explanation for why it will elicit testimony that Merritt smoked marijuana but will not elicit similar testimony about Ashburn and Laurent. (See generally Gov't Reply.)

unfair prejudice.").  Accordingly, the court exercises its discretion to exclude this evidence under

Federal Rule of Evidence 403.

<em>e.      Thefts and Robberies</em>

Next, that Six Tre members and associates engaged in thefts and robberies as a means of

obtaining money is relevant evidence of the enterprise, including its nature and operations.  See

Baez, 349 F.3d at 93-94.  Thus, proffered testimony from CW-1 that thefts and robberies were

common—and an important way in which gang members "earned" money for themselves and

the enterprise—is admissible, including testimony that Six Tre members stole credit card

numbers.  (See Mot. at 13.)  Similarly, CW-1's testimony that he, Merritt, and other Six Tre

members would steal cell phones from people walking down the street and resell them for cash

(id.), constitutes evidence of the nature and operations of the criminal enterprise.  It also explains

how the illegal relationships among participants in the crime developed, as well as the basis for

the mutual trust that existed between co-conspirators, including the Government's cooperating

witnesses.  See Diaz, 176 F.3d at 79; Guerrero, 882 F. Supp. 2d at 492.  Furthermore, this

testimony is admissible as inextricably intertwined with evidence of a charged crime—

specifically, racketeering act 10, which charges Merritt with the commission of a cell phone

robbery on January 12, 2011.  (See Indictment ¶ 26.)  See Gonzalez, 110 F.3d at 942.

The Government has also proffered other thefts and robberies constituting evidence that

is inextricably intertwined with proof of charged crimes.  For example, testimony from CW-1

that Six Tre members robbed jewelry stores (Mot. at 13), is relevant evidence of whether

Laurent, along with others, conspired to rob jewelry stores, with which he is charged in Count

One, racketeering act 3, and Count Eight.  (See Indictment ¶¶ 11, 44.)  Similarly, testimony that

Laurent told CW-3 about his involvement in jewelry store robberies, and that Laurent was upset

people were talking about the robberies (Mot. at 13), makes it more likely that Laurent in fact

36

conspired to commit such robberies, and is therefore direct proof of a charged crime. See

Carboni, 204 F.3d at 44. CW-3's testimony in this regard is also admissible as evidence of the

development of his illegal relationship with Laurent, as well as the mutual trust that existed

between the two co-conspirators. See Diaz, 176 F.3d at 79; Guerrero, 882 F. Supp. 2d at 492.

The Government further seeks to introduce evidence of Laurent's participation in the

robbery and murder of Dasta James on January 28, 2011. (Mot. at 11.) Laurent argues,

however, that because the crimes with which he is charged "are shocking enough . . . the

Government should be precluded from unduly prejudicing the jury [by] introducing additional

bad acts against him." (Def.'s Resp. at 20.) Under Federal Rule of Evidence 403, the court may

exclude relevant evidence if its probative value is substantially outweighed by the danger of

unfair prejudice. Here, evidence regarding Laurent's participation in this robbery and murder is

relevant and probative for several reasons. First, as the Indictment alleges that members of Six

Tre used, attempted to use, and conspired to use robbery as a means of enriching its members

and associates (see Indictment ¶¶ 3(d), 4(c)), evidence that Laurent—while he was a member of

Six Tre—participated in the robbery of Dasta James is direct proof of the nature and operations

of the enterprise. See Baez, 349 F.3d at 93-94. Second, evidence that Laurent and Merritt

conspired together to commit the robbery is admissible insofar as it explains how the illegal

relationships between co-conspirators developed. See Diaz, 176 F.3d at 79-80. Third, since

Merritt is specifically charged in connection with this robbery and murder in Count One,

racketeering act 12, and Counts Eleven through Fourteen, evidence of Laurent's participation in

the crime is inextricably intertwined with the Government's proof of a charged crime, and is

necessary to complete the story of the events of January 28, 2011. See Gonzalez, 110 F.3d at

942.

On the other hand, the danger of unfair prejudice is minimal. As the court has previously explained, evidence of uncharged acts is not unfairly prejudicial when that evidence does not involve conduct "more inflammatory than the charged crime." Livoti, 196 F.3d at 326. Among other crimes, Laurent is charged with committing multiple armed robberies (see, e.g., Indictment ¶¶ 44 (Count Eight: Hobbs Act robbery conspiracy), 45 (Count Nine: Hobbs Act robbery conspiracy)), as well as the murder of Brent Duncan (see, e.g., Indictment ¶¶ 39-40 (Count Five: murder in-aid-of racketeering)), whom Laurent is alleged to have shot because he believed Duncan to be a member of the Crips gang (see Mot. at 4-5). As a result, the court finds that any risk of prejudice generated by introducing evidence of Laurent's participation in an uncharged robbery and murder would not substantially outweigh its probative value under Rule 403. See Matera, 489 F.3d at 120 (evidence of defendant's participation in three uncharged murders admissible to prove the existence of the criminal RICO enterprise in which defendant participated); Miller, 116 F.3d at 682 (district court did not abuse discretion in admitting evidence of "numerous killings" committed by members of violent gang, including one murder committed by defendant).

### f.    Purchase and Sale, Possession, and Storage of Firearms

Finally, testimony that Six Tre members sold, purchased, and stockpiled weapons to facilitate these acts of violence is also admissible as enterprise evidence. The Government alleges that Six Tre purchased guns for use by its members, "who were often in possession of these Six Tre guns or their own individually purchased guns" for the purpose of committing violence, in order to preserve the gang's power and territory and to carry out its criminal ventures. (See Mot. at 12; Indictment ¶ 3.) As a result, testimony that guns were purchased by certain gang members on behalf of Six Tre, and then stored in communal locations "where Six Tre members could gain easy access to them when necessary" (Mot. at 12 (proffering testimony

that guns were stored next to Merritt's apartment as well as the apartment of murder victim Courtney Robinson)), tends to prove the existence and nature of the enterprise. See, e.g., Diaz, 176 F.3d at 79 (affirming admission of testimony regarding uncharged crimes, including the stockpiling of weapons to btoh protect the gang's drug trade and carry out related acts of violence).

That the possession of firearms facilitated the enterprise's narcotics trafficking operations in particular is illustrated by evidence that Six Tre members Anthony "Coog" Williams and Daniel Harrison, who the Government alleges also sold narcotics, carried firearms. (See Mot. at 12.) Testimony from CW-1 that Six Tre member Ralik Odom also possessed a gun, which he had stolen from a member of a different sect of the Folk Nation gang (see id.), also constitutes direct evidence of the nature and structure of the conspiracy, since it tends to prove that members of the gang carried firearms in furtherance of Six Tre's goals, including promoting its reputation relative to rival criminal organizations, and protecting its territory and criminal ventures (see Indictment ¶¶ 3-4). See, e.g., Johnson, 2013 WL 6091601, at *10 (admitting evidence that defendants and co-conspirators possessed firearms during existence of RICO murder conspiracy; noting "[f]irearms are 'tools of the trade' where murder and conspiracy to commit murder are concerned" (citing United States v. Marmolejas, 112 F. App'x 779, 783 (2d Cir. 2004) (summary order))). Similar testimony from CW-3—that Laurent "always" possessed a gun—is also admissible on this basis. (See Mot. at 13.)

In addition, the Government has proffered testimony that Laurent himself was involved in storing narcotics and firearms on behalf of other Six Tre members. (See id. at 12-13.) Not only does this evidence tend to prove the nature and operations of the enterprise, but it is also probative—as the Government points out—of Laurent's relationship with the enterprise,

including with its leader, Devon Rodney.  (See Gov't Reply at 4.)  As a result, testimony from CW-2 regarding Laurent's storage of marijuana, guns, and cash is admissible as both enterprise evidence and relevant background that is inextricably intertwined with the Government's proof of the enterprise.  See Diaz, 176 F.3d at 79.  Furthermore, evidence that Laurent sold guns to people in the neighborhood (see Mot. at 13), is inextricably intertwined with proof of his storage of guns and cash.  See Gonzalez, 110 F.3d at 941-42.  And evidence related to Laurent's fake sale of a .32 caliber handgun (see Mot. at 13), both corroborates CW-3's testimony regarding Laurent's firearms sales, see Everett, 825 F.2d at 660, and also serves as evidence in support of Government's allegation that Six Tre members used robbery to enrich themselves and the criminal enterprise (see Indictment ¶ 3(d)).

### B.      Exclusion on Other Grounds

In addition to the specific objections discussed above, Laurent advances three general arguments against the introduction of this evidence.[27]  First, he contends that the Government "has failed to demonstrate a need to offer additional evidence" to prove the existence of the enterprise.  (Def.'s Resp. at 1.)  Second, Laurent disputes the admissibility of any such evidence that occurred prior to his joining the conspiracy in 2010.  (See id. at 2.)  Third, he maintains that the admission of the Government's other acts evidence is unduly prejudicial and cumulative, and

---

[27] The court need not consider a fourth argument Laurent has advanced—that the Government's motion has not provided sufficient notice under Federal Rule of Evidence 404(b), which requires the Government to "provide reasonable notice of the general nature of any such [404(b)] evidence that the prosecutor intends to offer at trial." (See Def.'s Resp. at 1.)  This is because Rule 404(b) does not apply where the challenged evidence constitutes proof of—or is "inextricably intertwined" with proof of—the crimes charged in the indictment.  See, e.g., United States v. Nektalov, 325 F. Supp. 2d 367, 372 (S.D.N.Y. 2004) ("Indeed, the only practical result of admitting evidence as intrinsic to the charged crime rather than under Rule 404(b) is that the Government escapes 404(b)'s notice requirement and the Court need not give a limiting instruction cautioning the jury against making an improper inference of criminal propensity.").  Even if Rule 404(b) did apply, the Government appears to have satisfied the requirement that it disclose the "general nature" of such evidence.  See, e.g., United States v. Richardson, 837 F. Supp. 570, 575-76 (S.D.N.Y. 1993).

should therefore be excluded under Federal Rule of Evidence 403.  (See id.)  The court rejects each of these arguments, in turn.

Laurent first maintains there is no "need" for this additional evidence "given the numerous violent acts charged in the Indictment," and because the Government "has not alleged that any particular aspect of [the] alleged background is 'in dispute' in a manner that would make additional evidence of uncharged violent acts relevant and properly admissible."  (See id. at 13.) The Second Circuit, however, has already considered and dismissed an even more plausible version of this same argument in United States v. Diaz, 176 F.3d 52, 79-80 (2d Cir. 1999).  At trial, the district judge admitted a wide range of uncharged acts, finding they were relevant because they "tended to prove the existence, organization[,] and nature of the RICO enterprise, and a pattern of racketeering activity" by each defendant.  Id. at 79.  On appeal, defendants argued that "since most of them had conceded to being associated with the Latin Kings enterprise, there was no need for such bad acts evidence," and that it was therefore irrelevant within the meaning of Federal Rule of Evidence 401.  Id.

Although defendants had conceded their association with the criminal organization, the Second Circuit held that "several issues still remained in dispute, including the existence, nature[,] and operations of the RICO enterprise, and the related racketeering and drug conspiracies."  Id. at 80 (further holding that since the evidence "had significant probative value as to these disputed matters, its admission was not 'substantially outweighed by the danger of unfair prejudice'" (citing Fed. R. Evid. 403)).  Not only has Laurent not conceded the existence of—or his membership in—Six Tre, but even if he had, Diaz clearly forecloses the argument that enterprise evidence is inadmissible in a racketeering and racketeering conspiracy case because the existence of, and defendants' membership in, a gang is not in dispute.  See id. at 79-80; cf.

United States v. DiNome, 954 F.2d 839, 844 (2d Cir. 1992) ("Presumably, a RICO defendant could stipulate that the charged RICO enterprise existed and that the predicate acts, if proven, constituted the requisite pattern of racketeering activity. The evidence of crimes by others might then be excluded, and the defense would stand or fall on the proof concerning the predicate acts charged against the particular defendant.").

His second argument is also unavailing. According to Laurent, because the Government's motion "contains no indication that [he] was involved with the Six Tre Folk Nation in 2008 or 2009," none of the other acts alleged to have taken place before he joined the conspiracy are admissible at his trial. (Def.'s Resp. at 21, 22 ("Proof of the requisite elements to establish [his] guilt or innocence of the charges in the Indictment, including his participation in the charged conspiracy, cannot be based on uncharged acts prior to his joining the conspiracy.").) This is simply incorrect as a matter of black-letter law. The Second Circuit has explained on numerous occasions:

> [P]roof of the enterprise and pattern elements of racketeering "may well entail evidence of numerous criminal acts by a variety of persons." A single pattern of racketeering may be common to a number of defendants and, in such circumstances, even though individual defendants "may reasonably claim no direct participation" in the acts of others, "evidence of those acts is relevant to the RICO charges against each defendant." Specifically, the "various criminal activities" of racketeering confederates are admissible against each defendant "to prove: (i) the existence and nature of the RICO enterprise and (ii) a pattern of racketeering activity on the part of each defendant by providing the requisite relationship and continuity of illegal activities."

United States v. Basciano, 599 F.3d 184, 207 (2d Cir. 2010) (quoting DiNome, 954 F.2d at 843, 844). Consequently, as this court has already pointed out, evidence that tends to prove the history, nature, structure, and operations of the criminal enterprise, Six Tre, is relevant to Laurent's guilt with respect to racketeering and racketeering conspiracy charges. See supra Part

II.A.2.  Thus, to the extent that uncharged acts committed in 2008 and 2009 are probative of the RICO enterprise—and the court has already concluded they are—these acts are clearly admissible against Laurent, regardless of precisely when he is alleged to have joined the enterprise.  See Basciano, 599 F.3d at 207 n.17 ("[W]here racketeering is the charge, the jury is entitled to rely not only on evidence of the defendant's own crimes, but also on evidence of the crimes of those with whom he is alleged to have thrown in his lot because the judgment required is not simply what acts the defendant committed at particular moments, but whether those acts were parts of a pattern, i.e., committed as part of defendant's association with a subculture of crime." (citation and internal quotation marks omitted)); see also United States v. Badalamenti, 794 F.2d 821, 828 (2d Cir. 1986) ("It is reasonable to expect that a new recruit can be thought to have joined with an implied adoption of what had gone on before to enhance the enterprise of which he is taking advantage, where, as here, there is sound reason to believe that he joined when he was generally aware of what his new partners had been doing and saying on behalf of the enterprise." (citation and internal quotation marks omitted)).

Finally, Laurent contends that the Government's proffered evidence is inadmissible under Federal Rule of Evidence 403 because the probative value of the uncharged acts is substantially outweighed by the danger of unfair prejudice, confusing the jury, and needlessly presenting cumulative evidence.  (See Def.'s Resp. at 14-18.)  In particular, Laurent maintains that the proffered evidence of uncharged violence "will tend to inflame the jury unnecessarily where there is sufficient evidence of violence including murders, assaults, and robberies charged in the Indictment," which provide "ample opportunity for the Government to prove the racketeering enterprise and conspiracy."  (Id. at 15.)  He further argues that "[i]n considering the number of actual crimes charged as compared to the number of alleged uncharged crimes the Government

seeks to introduce, it is evident that here is the case of the 'tail wagging the dog.'" (Id. at 16.) While the number of other acts the Government has proffered is indeed significant, the court does not agree that the dangers that Laurent has identified <u>substantially</u> outweigh the probative value, particularly where, as here, each of these acts is relevant and admissible as proof of the enterprise or is inextricably intertwined with other direct evidence. <u>See</u> Fed. R. Evid. 403.

Under Rule 403, whether to exclude evidence that is otherwise relevant and admissible is a matter committed to the discretion of the district court. <u>See, e.g.</u>, <u>Diaz</u>, 176 F.3d at 79 (citing <u>United States v. Wong</u>, 40 F.3d 1347, 1378 (2d Cir. 1994)). In exercising that discretion in criminal racketeering trials, district courts have admitted numerous uncharged acts as evidence of the nature, structure, and operations of illegal enterprises, and have been affirmed by the Second Circuit. <u>See, e.g.</u>, <u>United States v. Baez</u>, 349 F.3d 90, 94 (2d Cir. 2003) (evidence of sixteen uncharged robberies was admissible under Rule 403 at trial of defendant charged with racketeering, racketeering conspiracy, and murder in-aid-of racketeering); <u>Diaz</u>, 176 F.3d at 79 (no abuse of discretion under Rule 403 when district court admitted: testimony related to defendant's drug trafficking, stockpiling of weapons to protect the gang's drug trade, and related acts of violence; testimony that co-defendant ordered Latin King members to assault individuals selling drugs within his drug block; testimony that another co-defendant used a gun to rob someone; and testimony of cooperating Latin King members about drug sales and acts of violence they committed on behalf of the gang). This has been no less true when the uncharged acts evidence includes especially violent crimes, such as murder. <u>See, e.g.</u>, <u>United States v. Miller</u>, 116 F.3d 641, 682 (2d Cir. 1997) (district court did not abuse discretion permitting government to introduce "evidence of numerous killings by the Supreme Team security force, including evidence that [defendant] had killed a person named 'Dre' and that various others had

killed several other persons who were considered to be threats to the Team's operations");

DiNome, 954 F.2d 839, 843 (affirming admission of "numerous crimes, including the routine

resort to vicious and deadly force to eliminate human obstacles").

These decisions are not surprising, since the traditional test for unfair prejudice under

Rule 403 is whether the evidence of uncharged acts involves criminal conduct that is more

inflammatory than the crimes charged in the indictment.  See Baez, 349 F.3d at 94 (citing United

States v. Livoti, 196 F.3d 322, 326 (2d Cir. 1999)).  As this court has already pointed out,

Laurent is charged with murder, attempted murder, conspiracy to murder, multiple armed

robberies, and other related crimes.  (See generally Indictment.)  Thus, none of the uncharged

crimes are more inflammatory than the crimes with which Laurent is charged.  See, e.g., Matera,

489 F.3d at 120 (evidence of defendant's participation in three uncharged murders admissible to

prove the existence of the criminal RICO enterprise in which defendant participated).  Of course,

this does not mean there is absolutely no risk of prejudice in this case.  But as the Second Circuit

has pointed out, "'[w]hen a defendant engages in a criminal enterprise which involves very

serious crimes, there is a likelihood that evidence proving the existence of the enterprise through

its acts will involve a considerable degree of prejudice.  Nonetheless, the evidence may be of

important probative value in proving the enterprise.'"  United States v. Mejia, 545 F.3d 179, 207

(2d Cir. 2008) (quoting United States v. Matera, 489 F.3d 115, 121 (2d Cir. 2007)).  And in the

preceding discussion, see supra Part II.A.2, this court has already determined that the probative

value of the other acts is significant, particularly because they constitute direct proof of the

illegal enterprise and the related racketeering conspiracy, which are essential elements of the

Government's case.  See Mejia, 545 F.3d at 206 (quoting Matera, 489 F.3d at 120).

The limited risk of unfair prejudice notwithstanding, there does exist some non-trivial risk that the Government's evidence becomes needlessly cumulative, given the number of other acts it has proffered. See Fed. R. Evid. 403. Still, "[t]he sheer amount of evidence against a defendant does not determine whether the evidence itself is more prejudicial than probative." See, e.g., United States v. Stoecker, 920 F. Supp. 876, 881 (N.D. Ill. 1996). Moreover, none of the Government's other acts on their own appear to generate unfair prejudice under the Second Circuit's case law. See, e.g., Baez, 349 F.3d at 94. As a result, the court is unable to conclude at this time that the danger of unfair prejudice or needlessly presenting cumulative evidence substantially outweighs the probative value of the uncharged acts. See Fed. R. Evid. 403. Nevertheless, the court reserves the right to decide, in the context of other evidence introduced at trial, that testimony related to certain other acts may eventually become needlessly cumulative or otherwise prejudicial, and may thus be excluded under Rule 403. See also United States v. McCallum, 584 F.3d 471, 477 (2d Cir. 2009) ("[A] trial judge applying the Rule 403 balancing test to certain evidence must reject any method that treats each item of evidence as an island, and must instead evaluate all the pieces of evidence going to the same point." (citation and internal quotation marks omitted)). Furthermore, the court will appropriately instruct the jury—both when the evidence is introduced and at the end of trial—that Defendants are "not on trial for any crimes except for those that [are] charged in the indictment." United States v. Clemente, 22 F.3d 477, 483 (2d Cir. 1994).

### C. Defendants' Motion for Severance

Given the admission of the Government's proffered other acts evidence, Laurent moves to sever his and his co-defendants' trials. (See Def.'s Resp. at 20-21.) The arguments Laurent makes in support of his motion to sever, however, simply reiterate claims he made with respect to the admissibility of the other acts in the first instance. First, Laurent argues that his specific

trial rights are compromised by the introduction "the numerous bad acts that the Government intends to prove were committed by [his] co-defendants in 2008." (Id. at 20 (quoting Zafiro v. United States, 506 U.S. 534, 539 (1993)).) Second, Laurent maintains that the introduction of these bad acts would also confuse the jury, which would be unable to keep separate the evidence that is relevant to each Defendant. (Id. at 21.) For essentially the same reasons the court finds the Government's other acts to be admissible at trial, Laurent's application for severance, in which the court deems Ashburn and Merritt to have joined,[28] is DENIED.

In order to obtain a severance under Federal Rule of Criminal Procedure 14, Defendants bear the "heavy burden" of demonstrating that the introduction of other acts evidence would generate "substantial prejudice" that was "sufficiently severe to outweigh the judicial economy that would be realized by avoiding multiple lengthy trials." See United States v. Sampson, 385 F.3d 183, 190 (2d Cir. 2004); United States v. Walker, 142 F.3d 103, 110 (2d Cir. 1998) (holding that a severance "should only be granted if there is a serious risk that a joint trial would either compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence"). Here, however, Defendants have failed to demonstrate the presence of "substantial prejudice," or that separate trials would even remedy such prejudice, were it found to exist. First, with respect to charged conduct alone, this court has already considered and rejected Defendants' motion to sever on the basis of "spillover prejudice." (See May 6, 2014, Mem. & Order (Dkt. 141) at 22-23 ("In racketeering cases . . . evidence of other defendants' criminal activity is relevant to the charges against each defendant because it tends to prove the existence and nature of the racketeering enterprise in which they were all members.").) Defendants have suggested no basis for finding this decision was an abuse

---

[28] Merritt "incorporates by reference the legal arguments" made by co-defendants. (Nov. 5, 2014, Def. Merritt's Ltr.) Ashburn has requested that he be permitted to make an application for severance. (Orden Aff. at 17.) As is Laurent's substantive motion, Ashburn's request is DENIED.

of the court's "virtually unreviewable" discretion under Rule 14. See United States v. James, 712 F.3d 79, 104 (2d Cir. 2013).

Second, and most importantly, the court has made clear that because the uncharged acts also constitute direct proof of the racketeering and racketeering conspiracy crimes charged against each Defendant, this evidence is relevant to and admissible against each Defendant, whether Defendants are tried jointly or separately. See, e.g., United States v. Miller, 116 F.3d 641, 679 (2d Cir. 1997) ("All seven were indicted on the conspiracy and racketeering counts, and thus, the evidence of the workings of the Supreme Team and its violent acts would have been admissible against all of these defendants even if each had been tried separately."). As the Second Circuit has long held:

> [T]he government must prove an enterprise and a pattern of racketeering activity as elements of a RICO violation. 18 U.S.C. § 1962(c). Proof of these elements may well entail evidence of numerous criminal acts by a variety of persons, and each defendant in a RICO case may reasonably claim no direct participation in some of those acts. Nevertheless, evidence of those acts is relevant to the RICO charges against each defendant, and the claim that separate trials would eliminate the so-called spillover prejudice is at least overstated if not entirely meritless.

United States v. DiNome, 954 F.2d 839, 843 (2d Cir. 1992). Similarly, here, where the uncharged acts demonstrate the history, nature, structure, and operations of Six Tre, which the Government must establish as proof of the RICO charges against each Defendant, this evidence would be admitted against all three Defendants even if they were tried separately. See United States v. Diaz, 176 F.3d 52, 103 (2d Cir. 1999). Moreover, these acts are admissible against Laurent, in particular, regardless of precisely when he is alleged to have joined Six Tre. See United States v. Basciano, 599 F.3d 184, 207 n.17 (2d Cir. 2010). To be sure, Defendants are not to be held accountable for the racketeering acts of others, and the court will instruct the jury accordingly. See DiNome, 954 F.2d at 844 (quoting United States v. Indelicato, 865 F.2d 1370,

1383-84 (2d Cir. 1989) (en banc)).  Nonetheless, Defendants have failed to meet their heavy

burden of demonstrating that admission of the other acts evidence at a joint trial, as opposed to

separate trials, would result in substantial prejudice.  See Miller, 116 F.3d at 679.

## III.    DEFENDANTS' MOTIONS RELATED TO MERRITT'S STATEMENT

In the course of briefing the Government's Motion to Admit Evidence of Other Acts,

Defendants made additional, related motions, which the court addresses in the following

discussion.  These motions relate to the Government's introduction of a statement made by

Merritt implicating Laurent in a robbery committed on January 12, 2011.  Laurent has moved to

exclude or further amend this statement, or to sever his trial.  Merritt moves to introduce the

original statement.

### A.      Background

In its initial moving papers, the Government indicated that it sought to introduce evidence

that Merritt and another individual—whom the Government apparently believes to be Laurent—

committed a robbery on January 12, 2011.  (See Mot. at 13; Gov't Reply at 6-7 & n.8.)  The

Government subsequently filed Superseding Indictment (S-4), which alleged this robbery as a

predicate act.  (See Dec. 5, 2014, Gov't Ltr. (Dkt. 238) at 1.)  The January 12, 2011, robbery

remains a predicate act in the present Indictment, which names only Merritt in connection with

the crime.  (See Indictment ¶ 26 (Count One, racketeering act 10: state law robbery).)  In support

of this charge, the Government plans to introduce a handwritten statement Merritt provided to

law enforcement regarding the robbery.  (See Gov't Reply at 6-7.)  Merritt provided this

statement while he was interviewed by law enforcement officers during the evening of April 6,

2011, and the early morning of April 7, 2011, regarding the robbery and murder of Dasta James.

(See Jan. 14, 2015, Gov't Ltr. at 1.)  During this interview, Merritt made a series of

statements[29]—the last of which[30] was made at approximately 12:45 a.m. on April 7, 2011—in which Merritt described how "Tails" (Laurent) shot "Topes" (Dasta James).  (See id.)

Immediately following this statement, Merritt was questioned about the January 12, 2011, robbery.  (See id.)  In his handwritten statement, which Merritt signed on April 7, 2011, at 1:55 a.m., Merritt claimed that he was merely present at the scene of the robbery, and that Laurent was the one who stole the victim's money and cell phone.  (See Gov't Reply, Ex. A, Proposed Amendments to Statements by Trevelle Merritt Regarding the Cell Phone Robbery on January 12, 2011 ("Proposed Amended Statement") (Dkt. 230-1).)  Since Merritt and Laurent are co-defendants at the upcoming trial, the Government has offered certain amendments to Merritt's statement in order to comply with Bruton v. United States, 391 U.S. 123 (1968), and its progeny.[31]  (See id.)  In particular, the Government proposes amending Merritt's statement in the following manner:

> I had left my house to go to KFC to get something to eat.  I had seen this light skin kid and asked him for the time.  At the same time I had seen ~~Tails~~ **the guy who shot Topes** by 77.  The same kid I had asked for the time was robbed by ~~Tails~~ **the guy who shot Topes**.  He told the kid to give him everything or he was gonna hurt him.  I was there in the mix of all of this.  It looks like me and ~~tails~~ **the guy** ~~were~~ [crossed out in original] had planned it but I was simply going to get something to eat so I could go back home.  The kid then gave ~~Tails~~ **the guy** the phone, but tried to buy it back.

---

[29] The admissibility of amended versions of these statements was the subject of the court's December 30, 2014, Memorandum and Order.  (See Dkt. 252 at 22-40.)

[30] Merritt subsequently provided a recorded statement to an Assistant District Attorney at approximately 1:19 p.m. on April 7, 2011, and made statements to a special agent of the Federal Bureau of Investigation on April 19, 2011. (See Jan. 14, 2015, Gov't Ltr. at 1 n.1.)

[31] The court presumes—although the parties have not explicitly stated—that if the jury were permitted to consider Merritt's statement against Laurent, Merritt's statement could be offered as evidence tending to prove that Laurent and Merritt conspired to commit the January 12, 2011, robbery.  (See, e.g., Dec. 30, 2014, Mem. & Order at 25.) This evidence, if admissible, could be used in establishing the guilt of both Merritt and Laurent with respect to the crime of racketeering conspiracy, with which they are both charged in Count Two.  (See Indictment ¶¶ 33-34 ("Each defendant agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the enterprise.").)  Notably, however, the Government has not indicated that it will introduce other evidence of Laurent's participation in the January 12, 2011, robbery.  (Cf. Gov't Reply at 6-7 & n.8; see Def.'s Sur-Reply at 8 ("As far as the Defense is aware, the Government has no other evidence with which to prove this uncharged act.").)

> ~~Tails~~ **The guy** took his money and his phone.  Then I left to go to
> KFC, and ~~Tails~~ **the guy** left to wherever he was going.

(Id.)

Laurent has moved to exclude this statement under Bruton, or alternatively, for a severance of his and Merritt's trials.  (See Def.'s Sur-Reply at 5-10.)  In the event the court declines to exclude the statement or sever his trial, Laurent also moves to further amend the statement to remove both references to the shooting.  (See Jan. 13, 2015, Def.'s Ltr.; Jan. 16, 2015, Def.'s Reply Ltr.)  Specifically, Laurent requests that the court further amend Merritt's statement to replace the two references to "the guy who shot Topes," with "someone I know," or "a guy."  (See Jan. 13, 2015, Def's Ltr. at 2.)  The Government opposes any further amendment. (See Jan. 14, 2015, Gov't's Resp. Ltr.)

## B.      Laurent's Motion to Exclude

 "The crux of [the Confrontation Clause] is that the government cannot introduce at trial statements containing accusations against the defendant unless the accuser takes the stand against the defendant and is available for cross examination."  United States v. Taylor, 745 F.3d 15, 28 (2d Cir. 2014) (quoting United States v. Jass, 569 F.3d 47, 55 (2d Cir. 2009) (internal quotation marks omitted)).  As a result, "[w]hen the confession of one defendant implicates his co-defendants, Bruton demands a redaction and substitution adequate to remove the overwhelming probability that a jury will not follow a limiting instruction that precludes its consideration of a redacted confession against a defendant other than the declarant."  Id. (quoting Jass, 569 F.3d at 60) (internal quotation marks omitted).  Where "the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence," "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction."  Richardson v. Marsh, 481 U.S. 200, 211 (1987).

But where complete redaction "would distort the confession, for example, by exclud[ing] substantially exculpatory information, or chang[ing] the tenor of the utterance as a whole," see Jass, 569 F.3d at 56 n.5 (alterations in original) (internal quotation marks omitted), district courts are permitted to replace the declarant's reference to a co-defendant with neutral pronouns, such as "another person," id. at 59, "my neighbor," United States v. Yousef, 327 F.3d 56, 149 (2d Cir. 2003), "this guy," United States v. Williams, 936 F.2d 698, 701 (2d Cir. 1991), "friend," United States v. Benitez, 920 F.2d 1080, 1087 (2d Cir. 1990), and similar language.  Ultimately, redactions or substitutions are consistent with Bruton "if the altered statement uses words 'that might actually have been said by a person admitting his own culpability in the charged conspiracy while shielding the specific identity of his confederate.'" Taylor, 745 F.3d at 28 (quoting Jass, 569 F.3d at 62); see also United States v. Tutino, 883 F.2d 1125, 1135 (2d Cir. 1989) (upholding redacted statement where "the jury never knew that [the declarant's] original statement named names").

In moving to exclude Merritt's statement under Bruton, Laurent raises the same arguments he made in support of his omnibus pre-trial motions (see Mem. of Law in Supp. of Def. Laurent's Omnibus Pre-Trial Mots. (Dkt. 172) at 25-30; Reply Mem. of Law in Further Supp. of Def. Laurent's Omnibus Mots. (Dkt. 199) at 8-13), which this court has already considered and rejected (see Dec. 30, 2014, Mem. & Order (Dkt. 252) at 22-40).  In sum, unless he is able to cross-examine Merritt on the witness stand, Laurent argues that his Confrontation Clause right would be violated, since the frequent mention of his name in Merritt's statement "render[s] redaction impracticable, awkward, and ultimately prejudicial . . . because of the obviousness of the redactions," and because Merritt's statement "denies all responsibility . . . and places full culpability on Mr. Laurent."  (Def.'s Sur-Reply at 8.)  Laurent's motion to exclude is

DENIED for the same reasons the court rejected these arguments in its December 30, 2014, Memorandum and Order.  (See Dec. 30, 2014, Mem. & Order at 22-40.)

### C.     Laurent's Motion to Further Amend

The court GRANTS in part and DENIES in part Laurent's motion to further amend Merritt's statement, for similar reasons, which follow.  As an initial matter, it is clear that complete redaction would change the tenor of Merritt's statement as a whole.  See Jass, 569 F.3d at 56 n.5.  Merritt's statement cannot be redacted so as to eliminate any reference to "Tails," because—as Laurent points out—Merritt's statement implies that it was Laurent, not Merritt, who committed the January 12, 2011, robbery, and that Merritt was just a bystander.  (See Proposed Amended Statement.)  Thus, as with Merritt's statements related to the Dasta James murder, neutral pronoun substitution is appropriate.  (See Dec. 30, 2014, Mem. & Order at 30-31.)

The next step is to determine whether the neutral pronoun substitutions are consistent with Bruton.  As the Second Circuit explained in Tutino, and confirmed in Jass, "a Bruton challenge to a redacted confession [is] properly analyzed by reference to two questions:  (1) did the redacted statement give any 'indication to the jury that the original statement contained actual names,' and (2) did the 'statement standing alone . . . otherwise connect co-defendants to the crimes.'"  Jass, 569 F.3d at 58 (emphasis added) (quoting Tutino, 883 F.2d at 1135).  In other words, "[t]he critical inquiry is . . . not whether a jury might infer from other facts (whether evidence admitted at trial or circumstances such as the number of defendants on trial) that a declarant's neutral allusion to a confederate might have referenced the defendant."  Id. at 61.  Instead, the question is "whether the neutral allusion sufficiently conceals the fact of explicit identification to eliminate the overwhelming probability that a jury hearing the confession at a joint trial will not be able to follow an appropriate limiting instruction."  Id.

1.     <u>Adequacy of Proposed Redactions</u>

With respect to the first inquiry, the amended statement does not contain "'obvious indications of alteration' or otherwise signal to the jury that the original statement 'contained actual names.'" <u>Jass</u>, 569 F.3d at 62 (quoting <u>Gray</u>, 523 U.S. at 192; <u>Tutino</u>, 883 F.2d at 1135). For example, the Proposed Amended Statement does not name some conspirators and not others, nor does it suffer from any awkward phrasing, or "stilted circumlocutions." <u>Cf.</u> <u>Taylor</u>, 745 F.3d at 29.  Nor are the substitutions obvious.  <u>Cf.</u> <u>Gray v. Maryland</u>, 523 U.S. 185, 195 (1998) (redactions that replace a proper name with an obvious blank or the words "deleted" or "redacted," "are similar enough to <u>Bruton</u>'s unredacted confessions as to warrant the same legal results").  More generally, the court finds that with one modification, the statement "uses words 'that might actually have been said by a person admitting his own culpability in the charged conspiracy while shielding the specific identity of his confederate.'" <u>Taylor</u>, 745 F.3d at 28 (quoting <u>Jass</u>, 569 F.3d at 62 (internal quotation marks omitted)).  While Merritt might have actually referred to the January 12, 2011, robber as "the guy who shot Topes" the first time he identified him, it seems less likely that he would identify him again as "the guy who shot Topes" the very next sentence, just 15 words later.  Therefore, in the exercise of its "good sense" to redact the statement more plausibly, <u>Jass</u>, 569 F.3d at 62 n.7, the court hereby DIRECTS the Government to substitute "that guy" for the second reference to "the guy who shot Topes."[32]  In so ordering, the court notes the Second Circuit has explicitly sanctioned modified statements in which the declarant's references to a co-defendant are replaced by "this guy," and "that guy," and "that same guy."  <u>See</u> <u>Williams</u>, 936 F.2d at 701.  Moreover, this modification does not render the statement any less clear with respect to whom Merritt is describing.

---

[32] The second and third sentences of Merritt's amended statement should now state as follows:  "At the same time I had seen the guy who shot Topes by 77.  The same kid I had asked for the time was robbed by that guy."

2.     Redacted Statement's Connection to Laurent

The second question—whether the statement, "standing alone," otherwise connects Laurent to the robbery—is more complicated.  See Jass, 569 F.3d at 58 (quoting Tutino, 883 F.2d at 1135).  In conducting this inquiry, "the appropriate analysis to be used when applying the Bruton rule requires that [the court] view the redacted confession in isolation from the other evidence introduced at trial."  Williams, 936 F.2d at 700-01 ("If the confession, when so viewed, does not incriminate the defendant, then it may be admitted with a proper limiting instruction even though other evidence in the case indicates that the neutral pronoun is in fact a reference to the defendant.").  Consequently, there is no Bruton violation where a confession becomes incriminating "only when linked with evidence introduced later at trial."  Richardson, 481 U.S. at 208; see also Williams, 936 F.2d at 701 ("Where linkage to other evidence is necessary to connect the defendant to the crime described in a codefendant's confession, the likelihood that a jury will disregard such a limiting instruction is less than in a case such as Bruton, in which the codefendant's confession directly and expressly implicated the defendant."); cf. Gray, 523 U.S. at 196 (defendant's Confrontation Clause right was violated when, despite the redactions, the jury could "immediately" infer that the declarant had inculpated the co-defendant, "even were the confession the very first item introduced at trial").

While "the line between testimony that falls within Bruton's scope and that which does not is often difficult to discern," United States v. Lung Fong Chen, 393 F.3d 139, 149 (2d Cir. 2004), the relevant case law does provide some guidance in determining when a modified statement, standing alone, otherwise connects the non-declarant to the crime.  For example, in Jass, the Second Circuit observed:

> Gray explained that redactions "that use shortened first names, nicknames, [or] descriptions as unique as the 'red-haired, bearded,

55

one-eyed man-with-a-limp'" would fall within <u>Bruton</u>'s protection. [523 U.S.] at 195. So too would a description of a defendant as "this white guy" when coupled with particulars as to "age, height, and weight." <u>Harrington v. California</u>, 395 U.S. 250, 253 (1969); <u>see also</u> <u>United States v. Hoover</u>, 246 F.3d 1054, 1059 (7th Cir. 2001) (holding that replacement of defendants' names with terms "incarcerated leader" and "unincarcerated leader" provided jury with "aliases based on their occupations" that "no more concealed their identities" than would "the substitution of 'Mark Twain' for 'Samuel Clemens'"). A simple gender reference, however, lacks the specificity necessary to permit a jury to draw an immediate inference that the defendant is the person identified in the confession.

569 F.3d at 63. Read together, these cases appear to stand for the proposition that even when a co-conspirator's name or nickname has been removed from a confession, substitutions that nonetheless refer to <u>personal</u> characteristics that identify the declarant's co-conspirator—even absent other evidence at trial—run afoul of <u>Bruton</u>. See <u>Gray</u>, 523 U.S. at 195; <u>Harrington</u>, 395 U.S. at 253.

By contrast, the introduction of a modified statement that refers to a co-conspirator through <u>conduct</u> characteristics alone would not appear to violate the co-conspirator's confrontation right, at least when those characteristics derive from the context of the declarant's statement. In other words, where the substituted language references the unnamed co-conspirator only by conduct described in the statement itself, it is no less true that the declarant has "shielded the <u>specific identity</u> of his confederate." <u>Taylor</u>, 745 F.3d at 28 (emphasis added). A recent summary order from the Second Circuit, decided just under three months after <u>Taylor</u>, is a clear example of this point. See <u>United States v. Akefe</u>, 568 F. App'x 1 (2d Cir.) (summary order), <u>cert. denied</u>, 135 S. Ct. 315 (2014). At trial in <u>Akefe</u>, a federal agent testified that the declarant, Alade, while being transported for processing, had stated, "[O]h man, I didn't know you guys got him too, man, I can help you out, I can help you out." <u>Id.</u> at 4. The district court permitted the agent to further testify that this statement referred to "[a]nother person arrested in

this case." Id. (alteration in original). On appeal, the declarant's co-defendant, Akefe, argued

that the jury would have inferred that this statement referred to him, since Akefe was the only

other person arrested that day in that location. See id. "After careful review," the Second Circuit

concluded that Akefe's right to confrontation was not jeopardized. Id. The court reasoned that

"[i]n order to make the rather attenuated inference that Alade's statement referred to Akefe, the

jury would have had to rely on other trial evidence rather than the statement itself." Id. ("[W]e

view the redacted statement in isolation to evaluate its likely impact on a jury." (quoting Jass,

569 F.3d at 62)).

Thus, even though other evidence indicated that "another person arrested in this case"

obviously referred to the declarant's co-defendant, when the statement was considered in

isolation, "another person arrested in this case," Akefe, 568 F. App'x at 4, "could have been

anyone." Jass, 569 F.3d at 63. Similarly, here, even when evaluated simultaneously with

Merritt's statements regarding the Dasta James murder, "the guy who shot Topes," could have

referred to any member of Six Tre.[33] It is only through other evidence at trial that the jury might

infer that Laurent shot Dasta James.[34] Since Merritt's (amended) statement regarding the

January 12, 2011, robbery, standing alone, does not otherwise identify his co-conspirator,

Laurent's Bruton challenge fails. See Jass, 569 F.3d at 58.

---

[33] As the court has already pointed out, Merritt's redacted statements regarding the Dasta James murder indicate that "the guy who shot Topes is a FOLK street gang member." (See Dec. 30, 2014, Mem. & Order at 35 (citing Proposed Amended Statements at 10).) That Merritt's statements identify his co-conspirator as another Six Tre member does not itself present a Bruton issue. See, e.g., United States v. Hernandez, 330 F.3d 964, 974 (7th Cir. 2003) (noting that the Latin Kings "is an extremely large gang that has components in many parts of Chicago and indeed all over the country," and that "[i]n the jury's mind, the reference to 'Latin Kings' could well refer to any number of other Latin Kings"); United States v. Stockheimer, 157 F.3d 1082, 1086-87 (7th Cir. 1998) (altered statement referring to member of "inner circle" did not result in Bruton violation). In this respect, the court notes the Government's allegation that the Six Tre Folk Nation set in Brooklyn has approximately 20 to 25 identified members. (See Mot. at 3.)

[34] The Government's proffered evidence includes cell phone records and video surveillance allegedly tying Laurent to Dasta James and the scene of the crime. (See, e.g., Dec. 30, 2014, Mem. & Order at 34.)

Laurent nonetheless argues that the court should replace "the guy who shot Topes" with "someone I know," or "a guy," because the Government's proposed redaction "ties both the homicide and the robbery back to Mr. Laurent." (Jan. 16, 2015, Def.'s Reply Ltr. at 2.) The Government contends, however, that if Laurent's proposed revisions were accepted, "it would wrongly suggest to the jury that Merritt had described two different people when questioned about the two incidents, when in fact he had been very clear that the same person was involved in both crimes." (Jan. 14, 2015, Gov't's Resp. Ltr. at 1-2.) This suggestion must be avoided, according to the Government, because it anticipates that the issue of Merritt's intent during the Dasta James robbery "will be hotly disputed at trial," and "Merritt's admission that, two weeks earlier, he was present at a robbery perpetrated by the same individual is highly probative evidence that he was not 'merely present' at the Dasta James robbery," (id. at 2 n.2), which Merritt has suggested will be his defense (see Oct. 2, 2014, Def. Merritt's Ltr. (Dkt. 191)).

This court is not aware of—and Laurent has not identified—any case law suggesting that a declarant may only connect a co-conspirator to one crime on one date in a given confession, and the court declines to make that determination here. The Second Circuit's Bruton jurisprudence does not imply that the Government is required by the Sixth Amendment to render an amended statement artificially ambiguous with respect to the number of co-conspirators involved in a particular confession, at least when the declarant consistently indicated that only one other person participated in multiple crimes. In fact, it suggests the opposite. For example, in Jass itself, the court affirmed the admission of testimony stating, in part, that "Mr. Leight told me that he and another person had taken [Victim 2] to the Rockaway Mall in New Jersey. Mr. Leight told me that . . . after shopping at the mall, he and the other person and [Victim 2] returned back to the hotel. . . . Mr. Leight told me that the other person took pictures of he and

[Victim 2] in various sexual poses with the digital camera." 569 F.3d at 53 (alterations in original) (emphasis added). Rather than obscuring the number of co-conspirators, this statement made it clear that the same co-conspirator who helped transport the minor victim to the mall was also present at the hotel, and that this same co-conspirator also produced a visual depiction of the minor victim engaged in sexual activity. See id. at 59-63 (rejecting Bruton challenge where "a confession, even as redacted, implicates only one person other than the declarant, and only the declarant and one other person are on trial"). Nonetheless, on appeal the court affirmed the co-conspirator's conviction on multiple counts, including: (1) conspiracy to transport minors in interstate commerce with the intent of (i) having a minor engage in illegal sexual activity and (ii) producing a visual depiction of a minor engaged in such activity; (2) actual transportation of a minor in interstate commerce with the intent to engage in criminal sexual activity; and (3) sexual exploitation of a child. See id. 569 F.3d at 49-50.

Williams similarly illustrates that a confession may be modified to make clear when neutral pronoun references are meant to describe the same underlying co-conspirator. See 936 F.2d at 701. In that case, the district court permitted an agent to testify regarding the declarant's confession as follows:

> What he said was that he met a guy named Freddy on the 14th, that Freddy had shown him a lot of money, that he never had the two and a half kilograms that Freddy wanted for $21,000, that he had gone to look for another guy and that he couldn't find this guy. He had gone to look for the other guy in order to rip this guy Freddy off. He couldn't find that guy. When he had returned to where he left Freddy, Freddy was gone.
>
> He said that on the day, the 15th, he had discussions with this guy Freddy again. Freddy said that he still had the money [for] the two and a half kilograms and did he still want it. He said that—let me think—that he met Freddy again and this other guy that he didn't know was with Freddy.

> At this point he was looking for <u>that same guy that he couldn't find the night before</u> again in order to rip this guy Freddy off of his money.  <u>He found that guy</u>.  He explained that he wanted to rob this guy Freddy of his money.  This guy said that he agreed and he said he would go for the ride.

<u>Id.</u> (alterations in original) (emphasis added).  In amending the declarant's statement in this manner, the agent's testimony obviously indicated that the declarant was looking for the same co-conspirator on the 14th and the 15th, when the declarant eventually found him and convinced him to help commit the robbery.  <u>See</u> <u>id.</u>  Thus, the Second Circuit's <u>Bruton</u> case law clearly permits the use of an amended confession in which the substitutions preserve the fact that the declarant repeatedly referred to his involvement with the same co-conspirator in different circumstances on multiple days.  <u>See</u> <u>id.</u>

These decisions also make sense from a pragmatic standpoint.  Specifically, the court discerns no principled basis for distinguishing between cross-references to a particular co-conspirator within a paragraph, and cross-references that extend beyond a paragraph in the same confession.  Thus, for the same reason that the Government may replace Merritt's reference to Laurent with (for example) "the guy who had called him," (Dec. 30, 2014, Mem. & Order at 32), to explain that "a guy he knows" and "the guy" are the same person described in a particular paragraph (<u>see</u> Gov't Mem. in Opp'n to Def. Laurent's Omnibus Pre-Trial Mots., Ex. C, Proposed Amendments to Statements by Trevelle Merritt ("Proposed Amended Statements") (Dkt. 180-3) at 1), the Government is not required to suggest that the perpetrator of the January 12, 2011, robbery and the Dasta James murder are different people, when Merritt's confession regarding the robbery was made during the same interview with law enforcement.  Accordingly, there is no constitutional significance to the fact that Merritt signed a handwritten statement regarding the robbery one hour and ten minutes after he signed his statement regarding the Dasta James murder.

Thus, the amended statement (1) in no way suggests to the jury that Merritt provided law enforcement with the actual name of his accomplice, and (2) standing alone, does not otherwise connect Laurent to the crimes.  See Jass, 569 F.3d at 61-62.  The court therefore determines that the Government's proposed amended statement sufficiently "conceals the fact of explicit identification to eliminate an overwhelming probability" that the jury hearing Merritt's confession will not be able to follow an appropriate limiting instruction, id. at 60, particularly where the Government does not seek to introduce any extrinsic evidence of Laurent's association with the January 12, 2011, robbery.  As a result, introduction of the amended statement, including the reference to "the guy who shot Topes," would not violate Laurent's Sixth Amendment right to confrontation, provided the court issues a limiting instruction.  Accordingly, the court will instruct the jury that this statement, along with the others, may only be considered as evidence against Merritt.  See also Defreitas, 701 F. Supp. 2d at 315 (indicating that the court would further instruct the jury that the statements may not be considered to prove the non-declarant's membership in any of the conspiracies or the non-declarant's intent to achieve any of the conspiracies' objectives).  The court will so instruct the jury both contemporaneously with the introduction of the statements, and again at the conclusion of trial.[35]  See id.  Thus, Laurent's motion to further amend Merritt's statement is GRANTED in part and DENIED in part.

### D.    Laurent's Motion to Sever

Having denied Laurent's motion to exclude and having denied in part Laurent's motion to further amend Merritt's statement regarding the January 12, 2011, robbery, the court next considers Laurent's renewed motion to sever his trial.  (See Def.'s Sur-Reply at 9-10; Jan. 16, 2015, Def.'s Ltr. at 2; Jan. 20, 2015, Def.'s Ltr. (Dkt. 287) at 1-2.)  In his numerous moving papers, however, Laurent simply advances the same arguments that this court previously

---

[35] The parties are DIRECTED to submit proposed limiting instructions for this purpose.

considered and rejected in response to his prior motion for severance on the basis of Merritt's statements to law enforcement.  (See Dec. 30, 2014, Mem. & Order at 40-45.)  In exercising its "virtually unreviewable" discretion, United States v. James, 712 F.3d 79, 104 (2d Cir. 2013), the court found that Laurent had failed to meet his "heavy burden" of demonstrating that introduction of the amended statements would generate "substantial prejudice" that was "sufficiently severe to outweigh the judicial economy that would be realized by avoiding multiple lengthy trials."  (Id. at 41 (quoting United States v. Sampson, 385 F.3d 183, 190 (2d Cir. 2004); United States v. Walker, 142 F.3d 103, 110 (2d Cir. 1998) (holding that a severance "should only be granted if there is a serious risk that a joint trial would either compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence")).)  The court acknowledged that while a defendant may be entitled to a severance on grounds of mutually antagonistic defenses, it pointed out that "mutually antagonistic defense are not prejudicial per se."  (Id. at 42 (quoting Zafiro v. United States, 506 U.S. 534, 538 (1993)).)  Instead, the court noted that "[t]o obtain a severance on the ground of antagonistic defenses, a defendant must show that the conflict is so irreconcilable that acceptance of one defendant's defense requires that the testimony offered on behalf of a codefendant be disbelieved."  (Id. (quoting James, 712 F.3d at 105 (2d Cir. 2013) (alteration in original).)

Laurent did not then, and has not now, persuaded the court that acceptance of his defense requires that Merritt's testimony be disbelieved.  See James, 712 F.3d at 105.  As with the Dasta James robbery and murder, nothing prohibits the jury from accepting Laurent's argument that he did not commit the January 12, 2011, robbery and simultaneously crediting Merritt's statement that someone else committed the crime.  (See Dec. 30, 2014, Mem. & Order at 44-45.)  The only new contention supporting Laurent's motion relates to Merritt's attorney's threat to ignore the

court's <u>Bruton</u> decision admitting only amended versions of Merritt's statements. (<u>See</u> Jan. 20,

2015, Def. Merritt's Ltr. at 1.) Laurent argues that because Merritt's counsel plans to introduce

the original statement "one way or another," the violation of Laurent's Sixth Amendment right is

inevitable. (<u>Id.</u>) In a recent decision, however, this court formally warned Merritt's counsel—in

writing—against suggesting to the jury that Merritt actually named Laurent in any of his

statements to law enforcement, and this court will closely monitor counsel's conduct at trial to

ensure this prohibition is enforced.[36] (<u>See</u> Jan. 21, 2015, Mem. & Order (Dkt. 288) at 5-7

(advising counsel that disregard of this court's rulings may subject him to sanctions and/or

disciplinary proceedings).) Since Laurent's arguments in support of severance are therefore

without merit, his renewed motion for severance based on the admission of Merritt's statement

regarding the January 12, 2011, robbery is DENIED.

### E.  Merritt's Motion to Introduce His Original Statement

On January 20, 2015, counsel for Merritt filed a letter demanding that the court—

notwithstanding its December 30, 2014, Memorandum and Order—permit Merritt to introduce

unmodified versions of his statements to law enforcement. (<u>See</u> Jan. 20, 2015, Def. Merritt's

Ltr. at 1.) According to Merritt's attorney, because the substitutions make it appear as though

Merritt refused to name his co-conspirator, "[t]he proposed changes . . . will result in the

conviction of [Merritt] because it will appear that he is holding out or being coy with law

enforcement when he was, rather, entirely forthcoming." (<u>Id.</u>) In its prior decision, the court

rejected this argument and denied counsel's motion to introduce Merritt's original statements

with respect to the Dasta James robbery and murder, but not Merritt's statement regarding the

January 12, 2011, robbery, since the court had not yet determined the admissibility of that

---

[36] <u>See also</u> <u>infra</u> Part III.E (applying the court's January 21, 2015, Memorandum & Order to Merritt's statement
regarding the January 12, 2011, robbery).

statement.  (See Jan. 21, 2015, Mem. & Order at 4 n.3, 5.)  Nevertheless, having now decided to admit the amended version of Merritt's statement regarding the January 12, 2011, robbery, see supra Part III.B, Merritt's motion to admit the original version of this statement is hereby DENIED for the same reasons.  (See Jan. 21, 2015, Mem. & Order at 3-4 (noting the so-called "rule of completeness" is violated only where admission of the statement in amended form "unfairly distort[s] the original" or "exclude[s] substantially exculpatory information" (quoting United States v. Mussaleen, 35 F.3d 692, 696-97 (2d Cir. 1994))).)

In denying Merritt's motion, the court notes that the Second Circuit has previously considered and rejected his exact argument.  See United States v. Yousef, 327 F.3d 56, 152-54 (2d Cir. 2003).  In Yousef, the district court admitted a redacted version of the declarant's written statement, and—consistent with the Bruton rule—denied his request that he be permitted to argue that he named his co-defendant in making the statement.  See id. at 152-53.[37]  On appeal, the declarant, Ismoil, argued that the redacted version of his statement "violated the rule of completeness embodied in [Federal Rule of Evidence] 106 because the redaction distorted the meaning of [his] statement by conveying the impression that [he] had omitted [codefendant]'s name from his statement in order to protect him."  Id. at 153-54.  The Second Circuit observed:

> We have held that the rule of completeness is violated "only where admission of the statement in redacted form distorts its meaning or excludes information substantially exculpatory of the declarant." United States v. Benitez, 920 F.2d 1080, 1086-87 (2d Cir. 1990). In Benitez we found "it clear that neither of these defects [was] present" where the redaction involved substituting the word "friend" for the codefendant's name.  Benitez, 920 F.2d at 1087-88; see also United States v. Alvarado, 882 F.2d [645,] 651 [2d

---

[37] The Second Circuit noted that the district judge further advised counsel against "attempting to inject any 'incident [at trial] which is intended to result in a mistrial,'" and "'warn[ed] everyone now, that if that incident does occur, it will be considered a direct contempt of court and will be dealt with then and there.'"  United States v. Yousef, 327 F.3d 56, 152 (2d Cir. 2003).  The judge added, "'The mistrial will not benefit the client of the person seeking it . . . [and] I want to warn everybody I will do my best to make sure that the perpetrator is disbarred for life.'"  Id. (alteration in original).

Cir. 1989] (holding that redacting statement by substituting words "another person" for codefendant's name did not violate rule of completeness). The redactions in [declarant's] statement are no different.

This case is indistinguishable from the numerous cases in which we have upheld similar redactions on <u>Bruton</u> grounds.

<u>Id.</u> at 154. The same is true in Merritt's case. (<u>See</u> Jan. 21, 2015, Mem. & Order at 3-5.)

The court notes, however, that Merritt is not prohibited from arguing at trial that Laurent duped him into committing both robberies. <u>See</u> <u>Yousef</u>, 327 F.3d at 152-53. Rather, Merritt is only precluded from arguing that he <u>named</u> Laurent in providing his multiple statements to law enforcement. <u>See id.</u> at 152-53 ("Nothing in the holding of the District Court precluded Ismoil from arguing that he was duped by Yousef or making any related argument apart from asserting that he had actually named Yousef in his written statement. . . . Rather, as Ismoil's counsel acknowledged in his letter to the court, he was free to argue that Yousef was the one who duped Ismoil . . . . The only argument the District Court actually precluded Ismoil from making was that Ismoil had named Yousef in his statement . . . ."). The court expects that experienced counsel will assiduously respect this distinction at trial. (<u>See also</u> Jan. 21, 2015, Mem. & Order at 8 n.6 ("[C]ounsel is further warned that at trial, he may not suggest to the jury or intimate in any way that "the guy" or "the other guy" mentioned in Merritt's statements is, in fact, Laurent. To do so would violate Laurent's Sixth Amendment right to confrontation under <u>Bruton</u>, and potentially even serve as grounds for a mistrial.").)

## IV. CONCLUSION

Accordingly, for the reasons set forth above:

- The Government's motion to introduce evidence of the founding of Six Tre and Defendants' prior gang affiliation is GRANTED in part and DENIED in part;

- The Government's motion to introduce evidence of assaults is GRANTED;

- The Government's motion to introduce evidence of shootings, murders, and murder conspiracies is GRANTED;

- The Government's motion to introduce evidence of narcotics use and sales is GRANTED in part and DENIED in part;

- The Government's motion to introduce evidence of thefts and robberies is GRANTED;

- The Government's motion to introduce evidence of purchases, sales, and possession of firearms is GRANTED;

- Defendants' joint motion to sever is DENIED;

- Laurent's motion to exclude Merritt's statement is DENIED;

- Laurent's motion to further amend Merritt's statement is GRANTED in part and DENIED in part;

- Laurent's individual motion to sever is DENIED; and

- Merritt's motion to introduce his original statement is DENIED.

SO ORDERED.

s/ Nicholas G. Garaufis

Dated: Brooklyn, New York       NICHOLAS G. GARAUFIS
February 11, 2015       United States District Judge