P/F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
UNITED STATES OF AMERICA

-against-

YASSER ASHBURN, JAMAL LAURENT, and
TREVELLE MERRITT,

                       Defendants.
------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**11-CR-0303 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

By letter dated December 16, 2014, the Government notified Defendants Jamal Laurent, Yasser Ashburn, and Trevelle Martin pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G) that it expects to call Detective Salvatore LaCova to provide expert testimony at trial in the field of firearms identification and microscopic analysis. (Ltr. Providing Notice of Expert Testimony (Dkt. 242).) Counsel for Defendant Jamal Laurent has moved in limine to preclude LaCova from testifying, arguing that the field fails to meet the standard for admission of expert testimony under Federal Rule of Evidence 702, Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1998). (Jan. 25, 2015, Mot. in Limine to Preclude Ballistics Expert or Limit Expert Testimony ("Mot.") (Dkt. 303).) As an alternative to complete exclusion, Laurent moves for an order limiting LaCova's testimony in certain respects. (Id. at 1.) In addition, Laurent seeks a hearing "in which the Government would be required to provide a proper foundation for the Government's proposed expert's testimony." (Id.) In response, the Government argues that LaCova's field qualifies for expert testimony under Rule 702, that the testimony should not be limited in any respect, and that a hearing is not necessary. (Feb. 3, 2015, Resp. in Opp'n to Mot. ("Opp'n") (Dkt. 310).) Laurent

1

filed a reply in further support of his motion. (Feb. 6, 2015, Reply to Resp. to Mot. ("Reply") (Dkt. 325).)

For the reasons that follow, Laurent's motion is GRANTED in part and DENIED in part.

## I. THE PROFFERED EXPERT TESTIMONY

Although Laurent moved to exclude expert ballistics evidence in connection with four racketeering acts (Mot. at 1), the Government apparently intends to introduce expert ballistics evidence with respect to only one of those acts, the June 19, 2010, shooting death of Brent Duncan (Opp'n at 2-3).[1] According to the Government, the shooter left at the scene of the crime numerous cartridge casings and bullets, which were recovered by the New York Police Department ("NYPD"); the NYPD also recovered three deformed bullets during a subsequent autopsy of Duncan. (Id. at 1.) On June 21, 2010, in connection with the reported firing of a weapon inside of Laurent's apartment, the NYPD recovered from Laurent a 9 mm Smith & Wesson gun, thirteen rounds of ammunition, and a deformed bullet that had been discharged inside the apartment. (Id. at 2.)

On January 6, 2015, the Government provided to Laurent a microscopic analysis report prepared by LaCova. (See Ltr. Providing Expert Report (Dkt. 256).) Consistent with the report, which has also been provided to the court, the Government anticipates that LaCova's testimony will include his conclusions that all of the cartridge casings and deformed bullets recovered in connection with the Duncan murder that were suitable for analysis were fired from the gun recovered from Laurent's bedroom. (Opp'n at 2.) In the report, LaCova reached the following conclusions regarding the "microscopic examination and comparison" that he performed:

---

[1] The Government represents that it does not intend to introduce expert ballistics testimony in connection with Racketeering Acts One, Seven, or Twelve. (Opp'n at 3 n.3.) However, the Government's letter brief references expert conclusions concerning both the murder of Brent Duncan and the June 20, 2010, murder of Shaheed Curry. (Id. at 2.) This Memorandum and Order shall govern with respect to any expert ballistics testimony that the Government seeks to introduce at trial.

2

> (1) all ten cartridge casings recovered in connection with the Duncan murder were fired from the gun from Laurent's bedroom 'based on sufficient agreement of Firing Pin and Breechface Impressions'; and (2) all of the deformed bullets recovered in connection with the Duncan murder that were suitable for analysis were fired from the gun from Laurent's bedroom 'based on sufficient agreement of class and individual characteristics in Land and Groove Impressions.'

(Id. at 3 (quoting LaCova Report).)

The Government has also disclosed LaCova's qualifications to Defendants. (See Ltr. Providing Notice of Expert Testimony.) While the Government has yet to make such a showing to the court, the Government characterizes Laurent's challenge as unrelated to LaCova's qualifications to testify, but rather as related to "the principles and methods of the entire NYPD Firearms Analysis Section and any other laboratory that follows the principles and methods of firearm identification and microscopic ballistic analysis adopted by the AFTE [Association of Firearms and Toolmark Examiners]." (Opp'n at 3 n.4.) Thus, the question is not whether LaCova properly qualifies as an expert in his field, but whether the field of firearm identification and microscopic ballistic analysis, also known as toolmark and firearms identification, is a proper topic for expert testimony in this case.

## II. LEGAL STANDARD

Federal Rule of Evidence 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

3

Fed. R. Evid. 702. In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the United States Supreme Court held that prior to admitting expert evidence under Rule 702, the district court must make a preliminary assessment of "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Id. at 593-94. The Court referred to a non-exhaustive list of factors that a trial court may consider in reviewing the reliability of proffered expert testimony: (1) whether the theory or technique used by the expert can be, or has been, tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) the known or potential rate of error of the method used; (4) whether there are standards controlling the technique's operation; and (5) whether the theory or method has been generally accepted within the relevant community. Id. In Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1998), the Supreme Court clarified that the Daubert analysis applies to every type of knowledge included in Rule 702, whether scientific, technical, or other specialized knowledge. In other words, the trial court exercises its gatekeeping role for all experts under Rule 702, not just "scientific experts." Whether to hold a separate Daubert hearing in advance of admitting expert testimony is within the trial court's discretion. See United States v. Williams, 506 F.3d 151, 161 (2d Cir. 2007).

## III. DISCUSSION

### A. Toolmark and Firearms Identification

This court is neither the first in the nation nor the first in this district to encounter a motion to exclude expert ballistics[2] testimony. See generally United States v. Sebbern, No. 10-CR-87 (SLT), 2012 WL 5989813 (E.D.N.Y. Nov. 30, 2012) (collecting cases and describing numerous Daubert hearings); see also, e.g, United States v. Otero, 849 F. Supp. 2d 425, 427

---

[2] The court uses the terms "toolmark and firearms identification" and "ballistics" interchangeably.

4

(D.N.J. 2012); United States v. Willock, 696 F. Supp. 2d 536, 546 (D. Md. 2010); United States v. Taylor, 663 F. Supp. 2d 1170, 1179 (D.N.M. 2009); United States v. Glynn, 578 F. Supp. 2d 567 (S.D.N.Y. 2008); United States v. Diaz, No. 05-CR-167 (WHA), 2007 WL 485967 (N.D. Cal. Feb. 12, 2007); United States v. Green, 405 F. Supp. 2d 104 (D. Mass. 2006); United States v. Monteiro, 407 F. Supp. 2d 351 (D. Mass. 2006). Before turning to the Daubert analysis, some background is in order.

"Toolmark identification is based on the theory that tools used in the manufacture of a firearm leave distinct marks on various firearm components, such as the barrel, breech face or firing pin." Otero, 849 F. Supp. 2d at 427. "The theory further posits that the marks are individualized to a particular firearm through changes the tool undergoes each time it cuts and scrapes metal to create an item in the production of the weapon." Id. "Toolmark identification thus rests on the premise that any two manufactured products, even those produced consecutively off the same production line, will bear microscopically different marks." Id. Comparing a test bullet or cartridge fired from a recovered firearm to recovered bullets and casings allows the examiner to determine whether there is, in fact, a match between the items.

Under the theory of identification adopted by the AFTE, which LaCova utilized during his examination (see Opp'n at 2-3), the examiner determines whether there is "sufficient agreement," meaning "that the agreement [between the two items] is of a quantity and quality that the likelihood another tool could have made the mark is so remote as to be considered a practical impossibility." Otero, 849 F. Supp. 2d at 431 (quoting AFTE methodology). The AFTE methodology, for its part, "acknowledges that there is a subjective component to the determination of 'sufficient agreement,' which must necessarily be based on the examiner's training and experience." Id.

In 2009, the National Academy of Sciences published a comprehensive report on the various fields of forensic science. National Research Council of the National Academies, Strengthening Forensic Science in the United States: A Path Forward (2009) [hereinafter "NAS Report"]. With respect to toolmark and firearms identification, the NAS Report found that the field suffers from certain "limitations," including the lack of sufficient studies to understand the reliability and repeatability of examiners' methods and the inability "to specify how many points of similarity are necessary for a given level of confidence in the result." Id. at 154. According to the NAS Report, "[a] fundamental problem with toolmark and firearms analysis is the lack of a precisely defined process." Id. at 155. Still, the NAS Report concluded that "[i]ndividual patterns from manufacture or from wear might, in some cases, be distinctive enough to suggest one particular source, but additional studies should be performed to make the process of individualization more precise and repeatable." Id. at 154.

**B.     A Daubert Hearing Is Not Necessary**

Findings made in numerous other federal cases provide the court with a well-documented record regarding the proffered testimony and the methodology at issue. Accordingly, Laurent's request for a separate Daubert hearing is DENIED.

Nothing requires a district court to hold a formal Daubert hearing in advance of qualifying an expert witness. See United States v. Williams, 506 F.3d 151, 161 (2d Cir. 2007) ("While the gatekeeping function requires the district court to ascertain the reliability of [the expert's] methodology, it does not necessarily require that a separate hearing be held in order to do so."); id. at 162 ("Because the district court's inquiry here did not stop when the separate hearing was denied, but went on with an extensive consideration of the expert's credentials and methods, the jury could, if it chose to do so, rely on her testimony which was relevant to the issues in the case."); In re Elec. Books Antitrust Litig., No. 11-MD-2293 (DLC), 2014 WL

6

1282293, at *32 (S.D.N.Y. Mar. 28, 2014) ("[N]othing in Daubert, or any other Supreme Court or Second Circuit case, mandates that the district court hold a Daubert hearing before ruling on the admissibility of expert testimony . . . ."); cf. Kumho Tire, 526 U.S. at 152 ("[A trial court has] discretionary authority needed both to avoid unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises.").

Indeed, the Second Circuit in Williams affirmed a district court's decision not to hold a separate Daubert hearing concerning the reliability of expert ballistics testimony quite similar to the testimony proffered by the Government in this case. See 506 F.3d at 161-62.[3] At least one court within this district has relied on Williams and the lengthy Daubert hearings held in other recent district court cases to conclude that a separate Daubert hearing is not required. See Sebbern, 2012 WL 5989813, at *8 ("This Court, like the district court in Williams, sees no need to hold a separate Daubert hearing. This Court has reviewed the opinions in Otero, Taylor, Diaz, and Montiero, and is persuaded by those thorough and well-reasoned decisions that ballistics testimony of the sort proffered in this case is admissible under Daubert."). This court too "sees no need to duplicate the considerable efforts of those courts." Id. Of course, as in Williams and Sebbern, the absence of a hearing does not relieve the Government of its obligation under Rule 702 to provide foundation at trial for LaCova's qualifications to testify concerning this field. See Williams, 506 F.3d at 161-62; Sebbern, 2012 WL 5989813, at *8-9.

---

[3] The Second Circuit also warned in Williams that its opinion should not "be taken as saying that any proffered ballistic expert should be routinely admitted." Id. at 161. As discussed in this Memorandum and Order, the court is not engaging in the routine admission of LaCova's testimony under Rule 702. Rather, the court has engaged in a thorough review of the field and methodology in question, and, as discussed below, and consistent with its gatekeeping role, is limiting LaCova's testimony so that it does not risk misleading the jury.

7

## C. The Subject Matter of LaCova's Testimony Meets Rule 702's Standards

As an initial matter, although Laurent moves for the complete exclusion of LaCova's testimony, he cites no case that finds that toolmark and firearms identification is an inappropriate topic of expert testimony. Cf. Sebbern, 2012 WL 5989813, at *6 ("[Defendant's] first argument [for total preclusion of the expert] is unsupported by any legal authority."). Indeed, every one of the cases on which Laurent relies admitted expert ballistics testimony under Rule 702, although certain cases also limited the scope of the expert's testimony. (See, e.g., Reply at 1-2 (listing cases and limitations to scope of expert testimony).) Even the NAS Report, which criticized the lack of scientifically defined standards in the field, concluded that "[i]ndividual patterns from manufacture or from wear might, in some cases, be distinctive enough to suggest one particular source, but additional studies should be performed to make the process of individualization more precise and repeatable." NAS Report at 154. Thus, the difficult question is not whether ballistics qualifies for expert testimony under Rule 702, but whether LaCova's testimony should be limited in certain respects. However, in order properly to execute its gatekeeping role, particularly in the absence of a separate Daubert hearing, the court briefly analyzes each of the Daubert factors.

### 1. Whether the particular theory has been tested

"Ordinarily, a key question to be answered in determining whether a theory or technique is [expert] knowledge that will assist the trier of fact will be whether it can be (and has been) tested." Daubert, 504 U.S. at 593.

The AFTE methodology has been repeatedly tested. See Otero, 849 F. Supp. 2d at 433 ("The literature in the field of firearms and toolmark identification documents that the theory has been repeatedly tested."); Taylor, 663 F. Supp. 2d at 1175-76 (noting studies "demonstrating that the methods underlying firearms identification can, at least to some degree, be tested and

8

reproduced"); Diaz, 2007 WL 485967, at *6 (holding that "the theory of firearms identification, though based on examiners' subjective assessment of individual characteristics, has been and can be tested"). For example, researchers have performed "validation studies" seeking to validate the underlying theory that marks left even by consecutively manufactured firearms can be differentiated by examiners. See Otero, 849 F. Supp. 2d at 432; see also Glynn, 578 F. Supp. 2d at 574 (finding that the AFTE methodology "has garnered sufficient empirical support as to warrant its admissibility," subject to certain limitations).

The court finds that the AFTE methodology has been subjected to testing, weighing in favor of admission of the expert testimony.

2. Whether the theory has been subjected to peer review and publication

Publication "in a peer reviewed journal [is] a relevant, though not dispositive, consideration in assessing the validity of a particular technique or methodology on which an opinion is premised." Daubert, 509 U.S. at 594.

The AFTE itself publishes within the field of toolmark and firearms identification. See Diaz, 2007 WL 485967, at *8 ("The fact that articles submitted to the AFTE Journal are subject to peer review weighs strongly in favor of admission."); see also Otero, 849 F. Supp. 2d at 433 (noting AFTE Journal's formal process for the submission of articles); Taylor, 663 F. Supp. 2d at 1176 (finding the peer review factor "clearly weighs in favor of admissibility").

The court finds that the AFTE methodology has been published and subject to peer review, weighing in favor of admission of LaCova's testimony.

3. The known or potential error rate

Ordinarily, a court should consider a methodology's known or potential error rate. See Daubert, 504 U.S. at 594.

Studies have shown that the error rate among trained toolmark and firearms examiners is quite low. See Otero, 849 F. Supp. 2d at 433-34 (referencing studies finding error rates between 0.9% and 1.5%). While the NAS Report concluded that the lack of objective standards prevents a "statistical foundation for estimation of error rates," NAS Report at 154, "information derived from [] proficiency testing is indicative of a low error rate," Otero, 848 F. Supp. 2d at 434. See also Taylor, 663 F. Supp. 2d at 1177 (concluding that the error rate is "quite low"); Diaz, 2007 WL 485967, at *8 (concluding that due to the subjective nature of the methodology, "it is not possible to calculate an absolute error rate for firearms identification," but that "the government has provided enough data to show that the error rates among trained firearms examiners are sufficiently low to counsel in favor of admitting the evidence").

The court finds that due to the subjective nature of the inquiry, a definite error rate is impossible to calculate, but also finds that the error rate, to the extent it can be measured, appears to be low, weighing in favor of admission of the expert testimony.

### 4. The existence and maintenance of standards controlling the technique's operation

The existence of standards controlling a technique's operation is also relevant to the court's gatekeeping inquiry. See Daubert, 504 U.S. at 594.

As discussed above, the AFTE's "sufficient agreement" standard is the field's established standard. See Otero, 849 F. Supp. 2d at 435 ("[T]he AFTE standard of 'sufficient agreement' is the established standard controlling firearms and toolmark identification."). But the fact that a standard exists does not necessarily bolster the AFTE methodology's reliability or validity, as it remains a subjective inquiry. See, e.g., Taylor, 663 F. Supp. 2d at 1177-78 (referencing the maintenance of AFTE standards, but noting that "[t]he AFTE Theory [] does not provide any

uniform numerical standard examiners can use to determine whether or not there is a match"); NAS Report at 155 (criticizing AFTE methodology).

Notably, however, the subjectivity of a methodology is not fatal under Rule 702 and Daubert, as "a court may admit well-founded testimony based on specialized training and experience." Monteiro, 704 F. Supp. 2d at 371 (admitting expert ballistics testimony); see also United States v. Llera Plaza, 188 F. Supp. 2d 549, 571 (E.D. Pa. 2002) (noting, with respect to a specific type of fingerprint analysis, that "[i]n each instance the expert is operating within a vocational framework that may have numerous objective components, but the expert's ultimate opining is likely to depend in some measure on experiential factors that transcend precise measurement and quantification"). In short, the AFTE standards seek to ensure a uniformity of analytical framework from one laboratory to the next, but they do not free the methodology from either its baseline assumptions or fundamentally subjective nature.

The lack of clearly defined, objective standards in the field does not render LaCova's testimony inadmissible, but it is relevant with respect to the limitations of LaCova's testimony. See infra Part.III.D.

5. Whether the technique has achieved general acceptance in the relevant community

"Widespread acceptance can be an important factor in ruling particular evidence admissible, and a known technique which has been able to attract only minimal support within the community, may properly be viewed with skepticism." Daubert, 50 9U.S. at 594 (citation and internal quotation marks omitted).

The AFTE theory utilized by LaCova has been widely accepted in the forensic science community. See Otero, 849 F. Supp. 2d at 435 ("Courts have observed that the AFTE theory of firearms and toolmark identification is widely accepted in the forensic community and,

11

specifically, in the community of firearm and toolmark examiners."); Monteiro, 407 F. Supp. 2d at 372 ("It is clear that the community of firearm and toolmark examiners accepts the current identification methodology as reliable."). Although some commentators have questioned the assumptions and subjectivity inherent in toolmark and firearms identification, see, e.g., NAS Report at 153-55, the AFTE methodology remains a primary approach in the field, and even after the publication of the NAS Report, courts have viewed the methodology as accepted by the field. See Taylor, 663 F. Supp. 2d at 1178 (holding that the general method of "pattern matching"—of which the AFTE methodology is a type—is generally accepted in the field, even as new methodologies emerge); see also Monteiro, 407 F. Supp. 2d at 372 ("Certainly, some authors have argued that the technique might be better performed through the use of improved technology or the application of statistical methods. . . . Although these authors have suggested possible improvements, the community of toolmark examiners seems virtually united in their acceptance of the current technique."). In sum, nothing indicates that the AFTE methodology has been able to garner "only minimal support within the community." Daubert, 509 U.S. at 594.

The court finds that the AFTE methodology is generally accepted within the field of toolmark and firearms identification, weighing in favor of admission of the expert testimony.

\* \* \*

The court thus concludes that the AFTE methodology utilized within the field of toolmark and firearms identification is a proper subject of expert testimony under Rule 702 and Daubert, subject to the limitations discussed below. Accordingly, Laurent's motion to exclude LaCova's testimony in full is DENIED.

### D. LaCova's Testimony Must Be Limited in Certain Respects

Although the court is confident that LaCova's proffered testimony qualifies as expert testimony under Rule 702, the testimony must be limited in certain respects in order to remain within Rule 702's boundaries. The Government argues that vigorous cross-examination and presentation of contrary evidence would protect Laurent at trial. (Opp'n at 8.) However, "[a]lthough effective cross-examination may mitigate some of these dangers, the explicit premise of Daubert and Kumho Tire is that, when it comes to expert testimony, cross-examination is inherently handicapped by the jury's own lack of background knowledge, so that the Court must play a greater role . . . ." Glynn, 578 F. Supp. 2d at 574.

First, Laurent requests that LaCova not be allowed to testify that his opinion is based on any degree of "certainty," and that he limit his opinion to conclusions that are "more likely than not." (Mot. at 1; Reply at 1-2.) The Government acknowledges that certain courts have limited ballistics experts' testimony in this respect, but argues that "it is not the opinion of the government's expert that the matches he identifies are only correct slightly more often than if he simply flipped a coin." (Opp'n at 6.) The Government further proffers that LaCova will testify that he is regularly tested on comparing ballistics evidence from known sources (i.e., in controlled environments in order to test his accuracy), "and he has been correct 100% of the time in identifying matches." (Id.)

Based on the court's review of the field of toolmark and firearms identification, including the NAS Report upon which Laurent relies, and on this court's review of Daubert proceedings performed in other cases, an instruction limiting LaCova's testimony is appropriate. See, e.g., Willock, 696 F. Supp. 2d at 549 (precluding expert from stating opinions and conclusions with any degree of certainty and precluding expert from stating that it was a "practical impossibility" that any other firearm fired the cartridges in question); Taylor, 663 F. Supp. 2d at 1179 (limiting

13

expert to an opinion that his conclusion was "to a reasonable degree of ballistic certainty"); Glynn, 578 F. Supp. 2d at 574 (limiting expert ballistics opinion to statement that match was "more likely than not"); Diaz, 2007 WL 485967, at *14 (precluding experts from testifying that their conclusions were "to the exclusion of all other firearms in the world" and limiting description of certainty to a "reasonable degree of certainty in the ballistics field"); Monteiro, 407 F. Supp. 2d at 372 (limiting testimony to a "reasonable degree of ballistic certainty"); Green, 405 F. Supp. 2d at 124 (precluding expert from testifying that his methodology permitted "the exclusion of all other guns").

Unlike certain other fields of forensic science, such as DNA analysis—which relies on scientifically evaluated methodologies—toolmark and firearms identification is at bottom a subjective inquiry. See NAS Report at 155 (contrasting toolmark and firearms analysis with DNA analysis). "Although some studies have been performed on the degree of similarity that can be found between marks made by different tools and the variability in marks made by an individual tool, the scientific knowledge base for toolmark and firearms analysis is fairly limited." Id. For example, the AFTE methodology utilized by LaCova defines the "sufficient agreement" between two items as significant "when it exceeds the best agreement demonstrated between tool marks known to have been produced by different tools and is consistent with the agreement demonstrated by tool marks known to have been produced by the same tool." Id. at 155 (quoting AFTE standards); see also Taylor, 663 F. Supp. 2d. at 1177 (referring to AFTE methodology as "circular," since "[a]n examiner may make an identification when there is sufficient agreement, and sufficient agreement is defined as enough agreement for an identification"). But determining whether a match demonstrates "sufficient agreement" is dependent on the training and experience of the examiner, not any specific scientific protocol,

nor does the methodology "consider, let alone address, questions regarding variability, reliability, repeatability, or the number of correlations needed to achieve a given degree of confidence." Id.

Assuming the Government establishes LaCova's qualifications at trial—and Laurent has not challenged those qualifications to date—his training and experience certainly allow him to offer an expert opinion regarding a potential ballistics match. See Taylor, 663 F. Supp. 2d at 1180 ("The evidence further indicates that an experienced firearms examiner can make observations of those markings, using a method that has been peer-reviewed, that allow him, in some cases, to form an opinion that a particular bullet was or was not fired from a particular gun."); Monteiro, 407 F. Supp. 2d at 372 ("The opinion of a qualified firearms examiner who has followed industry guidelines goes far beyond the type of 'unsupported speculation' barred by Daubert."). However, given the extensive record presented in other cases, the court joins in precluding this expert witness from testifying that he is "certain" or "100%" sure of his conclusions that certain items match. Nor can LaCova testify that a match he identified is to "the exclusion of all other firearms in the world," or that there is a "practical impossibility" that any other gun could have fired the recovered materials.[4] Therefore, the court will limit LaCova to stating that his conclusions were reached to a "reasonable degree of ballistics certainty" or a "reasonable degree of certainty in the ballistics field."

---

[4] The Government is correct that an experienced ballistics expert is qualified to say more than "it is more likely than not" that there is a match. (See Opp'n at 6 (distinguishing Glynn, 578 F. Supp. 2d at 571).) But the fact that LaCova may perform extremely well during controlled testing—and the Government has not disclosed the breadth of that testing—does not cure the deficiencies in the AFTE methodology identified above. Because it is relevant to LaCova's qualifications and the methodology that he used to reach his conclusions, the Government may introduce testimony at trial concerning controlled testing of LaCova. But the Government may not imply that LaCova's performance on such testing, whatever that may be, renders his actual conclusions in this case any more definite than to a "reasonable degree of ballistics certainty."

Second, Laurent requests that LaCova be precluded from testifying that ballistics is a "science" or from stating his conclusions in "scientific-sounding" terms. (Mot. at 1, 5.) To the court's knowledge, the Government has not claimed that toolmark and firearms identification is a field of "science." As an initial matter, whether forensic science is a true "science" or rather, a technical field, does not affect whether it is the proper subject of expert testimony. See Fed. R. Evid. 702; Kumho, 526 U.S. 137; see also Glynn, 578 F. Supp. 2d at 570 (holding that ballistics identification lacks "sufficient rigor to be received as science" but nevertheless analyzing the field under Rule 702 and Daubert). Thus, the issue is not whether the expert testimony should be admitted as a "science," but instead whether LaCova should be permitted to describe it as one. The Government does not specifically proffer that LaCova will testify that his field is a "science," but does request that the court refrain from limiting LaCova's expert opinions in any way. (Opp'n at 6, 9.) Without the benefit of knowing LaCova's background and qualifications, and whether the Government actually intends to introduce evidence at trial that LaCova's methods are "scientific," the court declines to address this request at this time. If the Government intends to introduce evidence that LaCova's methods are "scientific," it shall inform the court by February 23, 2015, at 12:00 p.m. (noon).

## IV. CONCLUSION

Accordingly, for the reasons set forth above:

- Laurent's request for a pre-trial hearing is DENIED; however, during its case-in-chief, the Government shall move at the appropriate time to qualify LaCova as an expert witness pursuant to Federal Rule of Evidence 702.

- Laurent's request to exclude LaCova's expert testimony in full is DENIED; and

- Laurent's request to limit LaCova's expert testimony is GRANTED in part and DENIED in part. LaCova may not testify that he is "certain" or "100%" sure of his conclusions that two items match, that a match is to "the exclusion of all other firearms in the world," or that there is a "practical impossibility" that any other gun could have fired the recovered materials. LaCova shall instead limit any testimony concerning his degree of certainty to a description that the conclusion was reached to a "reasonable degree of ballistics certainty" or a "reasonable degree of certainty in the ballistics field."

SO ORDERED.

Dated: Brooklyn, New York
February 20, 2015

s/ Nicholas G. Garaufis
NICHOLAS G. GARAUFIS
United States District Judge