UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

UNITED STATES OF AMERICA

        -against-

YASSER ASHBURN, JAMAL LAURENT, and
TREVELLE MERRITT,

                        Defendants.
------------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**11-CR-0303 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

On March 21, 2015, counsel to Defendant Jamal Laurent filed a letter motion seeking to

withdraw from their representation of Mr. Laurent in advance of briefing post-trial motions in

this criminal action.  (Motion to Withdraw ("Mot.") (Dkt. 463).)  In an Order dated

March 24, 2015, the court denied counsel's motion.  (Dkt. 465.)  This Memorandum sets forth

the reasons for that Order.

I.      **BACKGROUND**

      A.      **Relevant Facts**

Laurent, along with his co-defendants Yasser Ashburn and Trevelle Merritt, was charged

in a fourteen count indictment with numerous racketeering crimes committed in connection with

their membership in the Six Tre Outlaw Gangsta Disciples Folk Nation, which the Government

alleged was responsible for numerous acts of gang-related violence, including homicides, non-

fatal shootings, and commercial robberies in Brooklyn and elsewhere between 2008 and 2011.

(See Superseding Indictment (S-5) (Dkt. 271).)  Laurent, specifically, was charged with

racketeering, racketeering conspiracy, murder in-aid-of racketeering, assault with a dangerous

weapon in-aid-of racketeering, and Hobbs Act robbery conspiracy, among other crimes.  (Id.)

The process of selecting the jury in this case began with a proceeding on

January 29, 2015, during which the court made a brief statement to the first roughly 250

members of the venire.[1]  Although Laurent was present for this initial proceeding, Laurent

subsequently waived his right to be present the following day, when the court conducted an

identical proceeding with the next roughly 250 members of the venire.  (See Feb. 4, 2015, Min.

Entry.)  For reasons the court will discuss below, see infra Part II.B, Laurent did not attend the

remainder of jury selection, and was not present during the subsequent trial.[2]

However, pursuant to a force order issued on Friday, March 6, 2015 (Dkt. 422), Laurent

did appear in court—shortly before the close of the Government's case—to address whether he

wished to testify on his own behalf.  During that appearance, the following colloquy took place:

> THE COURT:  Mr. Laurent, have you consulted with your attorneys as to whether you wish to testify in your own defense in this criminal trial?
>
> THE DEFENDANT:  Yes.
>
> THE COURT:  All right.  And Mr. Goltzer, have you provided counsel to the defendant, Mr. Laurent, as to his options in terms of testifying or not testifying in his own defense?
>
> MR. GOLTZER:  We all have.  Most recently, it was Ms. Kalhous at the MDC.[3]
>
> MS. NEWMAN:  I just went downstairs and had that conversation with him with Ms. Kalhous.
>
> THE COURT:  Mr. Laurent, you understand that you have the right to testify in your own defense if you wished to do so.  Do you understand that?
>
> THE DEFENDANT:  Yes.
>
> THE COURT:  And you also understand that you have the right to decline to testify under the constitution of the United States

---

[1] The court introduced the parties to the venire and provided instructions on completing the jury questionnaire.  (See Preliminary Instructions to the Venire (Dkt. 308).)

[2] Jury selection began on February 9, 2015 (Feb. 9, 2015, Min. Entry (Dkt. 401); opening statements began on February 23, 2015 (Feb. 23, 2015, Min. Entry (Dkt. 405)); and the Government rested on March 9, 2015 (Mar. 9, 2015, Min. Entry (Dkt. 447)).

[3] Prior to and during the trial in this case, Laurent was detained in federal custody at the Metropolitan Detention Center ("MDC") in Brooklyn.

because you're under no obligation to testify in a criminal trial where you are accused of a crime. Do you understand that as well?

THE DEFENDANT: Yes.

THE COURT: Having consulted with your attorneys as to your rights and your options, have you reached a decision as to whether you wish to testify in this case?

THE DEFENDANT: Sir, because I wasn't able to properly assist or allow them to properly assist me in preparing a proper defense, I haven't reviewed anything of my § 3500 material, and nor have I any knowledge of the case whatsoever I have so I'm not sure if I need to testify on own my behalf.

THE COURT: You're not sure?

THE DEFENDANT: I'm not sure.

THE COURT: Well, let me put it in the positive. Do you desire to testify in your behalf.

THE DEFENDANT: I'm not sure at this moment, sir.

THE COURT: You're unsure? Well, the trial has been going on for two weeks you've consulted with your attorneys. I'll ask you again. Do you wish to testify in your own behalf?

THE DEFENDANT: Sir, like I said, I'm unsure at the moment.

THE COURT: Do you wish to exercise your constitutional right not to testify in your own behalf?

THE DEFENDANT: (Pause).

THE COURT: Do you have an answer?

THE DEFENDANT: Sir, I said I'm unsure at the moment, sir.

THE COURT: Well, the Court determines that the defendant, not having indicated his desire to testify, the Court rules that the defendant has thereby waived his right to testify in his own behalf in this criminal trial and we're adjourned. Thank you very much.

(Trial Tr. ("Tr.") (Dkt. 438-4) at 2280:3-2282:7.)

After Laurent left the courtroom (id. at 2282:8), the court questioned his lawyers regarding Laurent's assertion that he had no knowledge of the case and was unable to properly assist in his defense:

> THE COURT:  I mean, you didn't show him?  He's saying that you didn't show him any § 3500 material, you haven't consulted with him.  You know, I'd like to have a representation as to what you've done for a complete record in case he's convicted of something for the Second Circuit.  This is just the latest of a long list of statements, nonstatements, activities on the part of this defendant during this case.  So I'd like to know.
>
> MR. GOLTZER:  That's why we're standing up.
>
> THE COURT:  Okay.  So tell me.
>
> MS. NEWMAN:  Your Honor, we should begin by saying that all the discovery that we've received has been directly given to Mr. Laurent over the course of two plus, three years.  So every piece that's, number one, I think that's important to set forth.  And reviewed it the best our ability with Mr. Laurent when he was able to review it.  But we have gone through everything if not once, some of it, you know, more than once depending on its applicability.  Subsequent to that, prior to trial, whatever information we had I did review with him and we had summaries of various testimony as well as summaries of the § 3500 that we had prepared for ourselves as well as for Mr. Laurent, although we could not leave it with him.  And, in fact, we had actually read portions of it that we thought was most pertinent, obviously, to Mr. Laurent.  There were witnesses, as we all know, that were not applicable to Mr. Laurent or this case and the allegations are here.  So we centered it on those witnesses that were appropriate.  Every day of the trial, either the day or the next day, Ms. Kalhous has visited Mr. Laurent.  As the Court is well aware, she has taken with her the transcript of the proceedings, any applicable § 3500 that, you know, to answer any questions that he might have with respect to what was being answered and questioned about and the answers.  So, as far as we know, there is a record not only of Ms. Kalhous going in of what happened.  So I would respectfully say there has been more than sufficient communication with Mr. Laurent.
>
> THE COURT:  Yes.
>
> MR. GOLTZER:  Unless it be considered that we're somehow turning against our client, I want to dispel that notion.

THE COURT:  I asked you a question to make clear what your activities had been so that we have a record.  You're not doing anything other than answering the Court's question.

MR. GOLTZER:  I just wanted to note—

THE COURT:  Irrespective of how it may look to a third-party.

MR. GOLTZER:  I just want the record to reflect that to the extent that his remarks could have been construed as a criticism of counsel, we are entitled to answer honestly to defend ourselves against such.  That's all.

THE COURT:  Well, it's been answered to my question, that's all.

MR. GOLTZER:  Assertion of privilege, that's all.

THE COURT:  Now, well, I think he waived his privilege by discussing that particular subject as to that narrow subject.  I didn't ask him questions about conversations you had.  I had only one question and, well, several but one that, the critical question, that he failed to answer.  And I'd like one of you to go downstairs and advise him that the case is expected to—the testimony in the case is expected to be completed by Monday and that should he wish to change his mind and reach a conclusion about whether he wants to testify; that is, a conclusion that he want to testify we need to know that by Monday morning.

MS. NEWMAN:  Yes, your Honor.  I did advise him about that when I went downstairs but we can do that again.

THE COURT:  You should do it again because he told me, you know, he hadn't reached a decision.

MS. NEWMAN:  I understand.

THE COURT:  And so, the fact that I was not going to prolong the discussion with him today.  He refused to answer in effect and I just want to made clear to him from you his counsel, that if he wishes to change his mind and testify in his own behalf that he would have to advise the Court would have to be advised by Monday morning at 9:00 a.m. and that's it.

MS. NEWMAN:  I understand, your Honor.  I will try to go down during the break because I think one of us should go down.

THE COURT: One of you should go . . . down now so he can be sent back to the MDC.

MS. NEWMAN:  Ms. Kalhous will go now.

THE COURT:  All right.

(Id. at 2284:1-2287:12.)

The following Monday, March 9, 2015, counsel informed the court that when she visited Laurent over the weekend and reiterated the court's warning, Laurent indicated that he did not wish to testify.  (See Tr. (Dkt. 439) at 2403:18-2404:11.)  Ultimately, on March 17, 2015, Laurent was convicted of each count with which he was charged.  (See Jury Verdict (Dkt. 454).) After the jury announced its verdict, the court scheduled sentencing for July 20, 2015 (Mar. 17, 2015, Min. Entry (Dkt. 453)), and indicated that Defendants would have 60 days to file post-trial motions (Tr. (Dkt. 445) at 3134:20-23).

**B.      Counsel's Motion to Withdraw**

Just four days after the jury reached its verdict, all three members of Laurent's defense team, who were appointed by the court under the Criminal Justice Act, moved to be relieved as counsel.  (See Mot.)  Laurent's lawyers argue that in light of his assertion on March 6, 2015—that he had no knowledge of the case and had not been able to properly consult with his attorneys—new counsel "could assert as a basis for a new trial that trial counsel was ineffective for failing to keep Mr. Laurent informed during (or before) the trial and/or for acquiescing to the trial proceeding in his absence."  (Id. at 1 (citing N.Y. Rules of Prof'l Conduct R. 1.4).)  As a result, according to his attorneys, the defense team is in a "position of conflict with Mr. Laurent as [they] are witnesses to the factual predicate to such a claim of ineffective assistance."  (Id. at 1-2.)  Consequently, they claim withdrawal is proper, in order to ensure that "all claims that could be asserted to protect Mr. Laurent's rights are asserted on his behalf."  (Id. at 2 (citing N.Y. Rules of Prof'l Conduct R. 1.7(a); 1.16(b)-(c); 3.7).)

Laurent's attorneys further indicate that "Mr. Laurent has been informed of the defense team's belief that appointment of new counsel is in his best interests." (Id.) His defense team also contends that the immediate appointment of new counsel would not prejudice Laurent or his co-defendants because the deadlines for post-trial motions have not yet been set. (Id.) Finally, Laurent's attorneys represent that they stand "ready to transfer the case file to new counsel immediately and would assist new counsel in any way necessary." (Id.) On March 24, 2015, the court denied counsel's motion to withdraw and indicated that a memorandum explaining the court's decision would follow. That same day, the court confirmed the briefing schedule with respect to post-trial motions; pursuant to that schedule, Defendants' motions are to be filed by 5 p.m. on Friday, May 15, 2015. (Mar. 24, 2015, Order.)

## II.   DISCUSSION

### A.   Legal Standards

#### 1.   Motion to Withdraw[4]

The Second Circuit grants "'considerable deference'" to a district court's decision denying a motion to withdraw "'especially when the prosecution of the suit is likely to be disrupted by the withdrawal of counsel.'" United States v. O'Connor, 650 F.3d 839, 851 (2d Cir. 2011) (quoting United States v. Oberoi, 331 F.3d 44, 47 (2d Cir. 2003)). Nonetheless, "'if

---

[4] Significantly, it is only Laurent's attorneys who move to withdraw. (See Mot.) Laurent has not filed a motion seeking substitution of counsel. Had he done so, a different legal standard would have applied. See United States v. John Doe No. 1, 272 F.3d 116, 122-25 (2d Cir. 2001). In John Doe, the Second Circuit explained that it would apply a four-factor test to determine whether a district court had abused its discretion in denying a defendant's motion to substitute counsel. Id. at 122-23. The four factors consist of: (1) whether the defendant made a timely motion to request new counsel; (2) whether the trial court adequately inquired into the matter; (3) whether the conflict between the defendant and his attorney was "so great that it resulted in a 'total lack of communication preventing an adequate defense,'" id. at 122 (quoting United States v. Simeonov, 252 F.3d 238, 241 (2d Cir. 2001)); and (4) whether the defendant's own conduct contributed to the communication breakdown, id. at 123 (citing McKee v. Harris, 649 F.2d 927, 932 (2d Cir. 1981)). See also Lopez v. Graham, No. 10-CV-0468 (NGG), 2012 WL 1865502, at *6 (E.D.N.Y. May 22, 2012) ("'Therefore, in order to warrant a substitution of counsel during trial, the defendant must show good cause, such as a conflict of interest, a complete breakdown of communication or an irreconcilable conflict which leads to an apparently unjust verdict.'" (quoting McKee, 649 F.2d at 931)), aff'd, 519 F. App'x 52 (2d Cir. 2013) (summary order).

forcing an attorney to continue [a] representation will cause a violation of the Code of

Professional Responsibility and possibly subject the attorney to sanctions, it [is] an abuse of

discretion not to grant the motion to withdraw.'" Id. (quoting Oberoi, 331 F.3d at 47-48).  For

example, in Oberoi, the district court abused its discretion in denying a motion to withdraw

where there was a "significant possibility" that effective representation of his client would

require counsel to cross-examine another client (who was awaiting sentencing), which—in light

of the "combined circumstances"—created a "substantial danger that the proceedings in both

cases would not 'appear to be fair to all who observe them,'" even though both clients purported

to consent to this conflict.[5]  331 F.3d at 52 (quoting Wheat v. United States, 486 U.S. 153, 160

(1988)).  In O'Connor, however, it was not an abuse of discretion for the district court to deny

the motion based on the intensity of counsel's personal feelings against his client, where the

district court's expectation that counsel would represent his client "zealously" within the

meaning of the disciplinary rules was "entirely reasonable."  650 F.3d 849-52; see also United

States v. Gonzalez, 820 F.2d 575, 577, 580 (2d Cir. 1987) (district court did not abuse its

discretion in denying attorney's motion to withdraw prior to sentencing in light of dispute with

client regarding counsel's advice concerning effect of guilty plea).

Thus, Laurent's attorneys argue that the court should grant the motion to withdraw

because their continued representation of Laurent will cause them to violate Rules 1.7(a) and 3.7,

and therefore Rules 1.16(b)-(c), of the New York Rules of Professional Conduct.  (See Mot.

at 2.)  Rule 1.7 provides that a lawyer "shall not represent a client if a reasonable lawyer would

conclude that . . . the representation will involve the lawyer in representing differing interests."

N.Y. Rules of Prof'l Conduct R. 1.7(a)(1); see also id. R. 1.0(f) (defining "differing interests" as

---

[5] Notably, the court acknowledged that although the relevant authorities would likely permit this conflict to be
waived by both clients, counsel's contrary interpretation of this rule was not unreasonable.  Oberoi, 331 F.3d at 51.

"every interest that will adversely affect either the judgment or the loyalty of a lawyer to a client, whether it be a conflicting, inconsistent, diverse, or other interest").

In addition, under Rule 3.7, the so-called "advocate-witness" rule, a lawyer "may not act as advocate before a tribunal if . . . the lawyer is precluded from doing so by Rule 1.7." <u>Id.</u> R. 3.7(b)(2); <u>see also</u> <u>id.</u> cmt. [6] ("In determining whether it is permissible to act as advocate before a tribunal in which the lawyer will be a witness, the lawyer must also consider that the dual role may give rise to a conflict of interest that will require compliance with Rule 1.7 . . . . For example, if there is likely to be substantial conflict between the testimony of the client and that of the lawyer, the representation involves a conflict of interest that requires compliance with Rule 1.7."). Rule 1.16(b), in turn, requires that a lawyer withdraw from the representation of a client when the lawyer "knows or reasonably should know that the representation will result in a violation of [the] Rules or of law." <u>Id.</u> R. 1.16(b)(1). Rule 1.16(c) further provides that a lawyer may withdraw if the lawyer "believes in good faith . . . that the tribunal will find the existence of other good cause for withdrawal." <u>Id.</u> R. 1.16(c)(12).

Thus, Laurent's attorneys appear to make the following argument. In light of Laurent's suggestion that his lawyers did not sufficiently communicate and consult with him regarding his trial, a reasonable lawyer would conclude that they have "differing interests" with respect to whether a claim for ineffective assistance of counsel should be included in Laurent's post-trial motion pursuant to Federal Rule of Criminal Procedure 33. <u>See</u> N.Y. Rules of Prof'l Conduct R. 1.7(a)(1); 1.0(f); <u>see also, e.g.,</u> <u>id.</u> R. 1.4(a)(3) (requiring that lawyers "keep the client reasonably informed about the status of the matter"); <u>id.</u> R. 1.4(b) (requiring that lawyers "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation"). In addition, if Laurent were to pursue an ineffective

assistance claim on this basis, his attorneys would become potential fact witnesses whose testimony would be offered ostensibly for the purpose of contradicting Laurent's claim, in violation of Rule 1.7.  Cf. id. R. 3.7(b).  Since their representation of Laurent would result in a violation of either Rule 1.7 or Rule 3.7, or both, counsel is thus required to withdraw from the representation under Rule 1.16(b)(1).  At the very least, counsel believes in good faith that this court will find these circumstances constitute "good cause" for permissive withdrawal pursuant to Rule 1.16(c)(12).

### 2.  Ineffective Assistance of Counsel

A fundamental premise of counsel's motion, however, is the possibility that Laurent may raise an ineffective assistance claim at this stage of the prosecution.  Under the standard set forth by the Supreme Court in Strickland v. Washington—which would apply to Laurent's claim that his counsel provided ineffective assistance by failing to keep him informed or acquiescing to the trial proceeding in his absence—Laurent must (1) show that his attorneys' conduct "fell below an objective standard of reasonableness," and (2) "affirmatively prove prejudice" by showing that there is a "reasonable probability" that but for counsel's deficient performance, the result of the trial would have been different.  Strickland, 466 U.S. 668, 688, 693-94 (1984); see also id. at 694 ("A reasonable probability is a probability sufficient to undermine confidence in the outcome"); United States v. John Doe No. 1, 272 F.3d 116, 126 (2d Cir. 2001) (citing Strickland, 466 U.S. at 688).  "The standard for evaluating the adequacy of counsel's representation is 'a most deferential one,' Harrington v. Richter, 562 U.S. 86, 105 (2011), since 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment,' Strickland, 466 U.S. at 690."  United States v. Thomas, No. 14-1271, --- F. App'x ---, 2015 WL 2054429, at *1 (2d Cir. May 5, 2015) (summary order).

Ineffective assistance claims regarding a representation in federal court are usually more properly asserted in a collateral proceeding challenging the legality of the conviction under 18 U.S.C. § 2255.  See Massaro v. United States, 538 U.S. 500, 504 (2003) ("A § 2255 motion is preferable to direct appeal for deciding an ineffective assistance claim.").  Such claims are typically not even considered on direct appeal.  See, e.g., United States v. Brown, 623 F.3d 104, 112 (2d Cir. 2010) ("When ineffective assistance of counsel is first raised in a court of appeals on direct review of a conviction, it is often preferable for the court to decline to consider the claim, awaiting its presentation in a collateral proceeding."); United States v. Fleurimont, 401 F. App'x 580, 582 (2d Cir. 2010) (summary order) (noting the Second Circuit's "'baseline aversion to resolving ineffectiveness claims on direct review'" (quoting United States v. Salameh, 152 F.3d 88, 161 (2d Cir. 1998)); United States v. Oladimeji, 463 F.3d 152, 154 (2d Cir. 2006) ("As the Supreme Court has noted, collateral review typically provides a far better opportunity for an evaluation of an ineffective-assistance claim than direct review, because a factual record focused on the defendant's claim can be developed in the district court, including by taking testimony from witnesses for the defendant and the prosecution and from the counsel alleged to have rendered the deficient performance." (alterations and internal quotation marks omitted)).  But see Massaro, 538 U.S. at 508 ("We do not hold that ineffective-assistance claims must be reserved for collateral review.  There may be cases in which trial counsel's ineffectiveness is so apparent from the record that appellate counsel will consider it advisable to raise the issue on direct appeal.").

In Brown, the Second Circuit held that "when a claim of ineffective assistance of counsel is first raised in the district court prior to the judgment of conviction, the district court may, and at times should, consider the claim at that point in the proceeding."  623 F.3d at 113; see also id.

at 113 n.5 (further holding that "the proper procedural avenue for defendants who wish to raise ineffective assistance claims after conviction but prior to sentencing is a motion for a new trial" pursuant to Rule 33). There, prior to sentencing, the defendant filed a pro se motion arguing that his attorney failed to convey a plea offer from the government, in violation of his constitutional right to the effective assistance of counsel. Id. at 111. The district court refused to consider the defendant's claim at that point, determining that sentencing was a prerequisite. Id. On appeal, the Second Circuit reversed, concluding that the district court should have considered the claim prior to sentencing for several reasons. Id. at 113-14. Most importantly, the district court had already relieved the defendant's lawyer prior to sentencing, and "at that point had no good reason to postpone inquiry into the merits of [the defendant]'s claim." Id. at 113. Furthermore, Brown noted, (1) the prosecutor attested that he extended the plea offer to the defendant's attorney; (2) the attorney "equivocated" as to whether he ever communicated the plea offer to the defendant; (3) there was a "significant sentencing disparity" between the sentence contemplated by the plea and the sentence to which the defendant was exposed; and (4) the defendant "stated consistently that he would have accepted a plea and was persistent in his efforts to secure one." Id. at 114. The Second Circuit concluded that these factors "indicate the facial plausibility of [the defendant]'s ineffective assistance claim and militate against the district court's decision to postpone addressing [his] claims until after it had imposed sentence." Id.

Nevertheless, Brown does not require district courts to consider every ineffective assistance claim asserted prior to the final judgment of conviction. See Thomas, 2015 WL 2054429, at *2 (noting that "[a] hearing on a Rule 33 motion is not always required" (citing Brown, 623 F.3d at 114-15)); Fleurimont, 401 F. App'x at 582 (noting that Brown "does not require as a categorical matter that district courts grant a full-blown testimonial hearing in

response to all such claims").  In fact, the Second Circuit specifically dismissed the Government's argument in <u>Brown</u> that future defendants would assert non-meritorious ineffective assistance claims between the time of conviction and sentencing, noting that it decided "only that a district court <u>may</u>, and in [those] specific circumstances should, consider the ineffective assistance claim prior to judgment."  <u>Brown</u>, 623 F.3d at 114 (emphasis added).  The <u>Brown</u> court expressly noted that "district courts face competing considerations in deciding whether it is appropriate to inquire into the merits of such claims prior to judgment, including principally the potential disruption of the proceedings, especially if the attorney against whom the complaint is directed continues at the time to represent the defendant."  <u>Id.</u> at 113.  Furthermore, it explained that the decision "to interrupt the pre-judgment proceedings to inquire into the merits of an ineffective assistance of counsel claim may depend on, among other things, whether the court would need to relieve the defendant's attorney, or in any event, to appoint new counsel in order to properly adjudicate the merits of the claim."  <u>Id.</u>

The summary order issued by the Second Circuit in <u>Fleurimont</u> further illustrates this point.  In that case, the defendant claimed the district court erred by refusing to hold a hearing on his post-conviction, pre-sentencing claim that he received ineffective assistance of counsel as a result of his trial counsel's failure to permit him to testify in his own defense.  401 F. App'x at 582.  Distinguishing <u>Brown</u>, the Second Circuit affirmed, pointing out that the defendant was still represented by the purportedly ineffective counsel at the time the district court considered his claim, and "relieving that counsel would have caused unnecessary hardship, delay, and expense."  <u>Id.</u>  It further noted that while "the trial counsel in <u>Brown</u> 'equivocated' as to the allegations of ineffectiveness when questioned by the court," counsel in <u>Fleurimont</u> "expressly denied any ineffectiveness, confirmed that he had informed [the defendant] of his right to testify,

and articulated clear, sensible, strategic reasons for his decision to advise [the defendant] against testifying." Id. (internal citation omitted). The court concluded that in contrast to Brown, the defendant's claim "was implausible on its face and comprised solely conclusory allegations contradicted by the court's questioning of him, his trial counsel, and [an] interpreter who had been present at his meetings with counsel." Id. Under these circumstances, the district court did not err in refusing to hold a testimonial hearing; rather, the Fleurimont court held that it was within the district court's discretion to proceed in a manner "'that avoided the delay, the needless expenditure of judicial resources, the burden on trial counsel and the government, and perhaps the encouragement of other . . . baseless claims that would have resulted from a full testimonial hearing.'" Id. at 582-83 (alteration in original) (quoting Chang v. United States, 250 F.3d 79, 86 (2d Cir. 2001)).

**B.      Application**

Laurent's attorneys identify two grounds upon which Laurent might argue they provided ineffective assistance: first, by failing to keep him informed before or during the trial; and second, by acquiescing to the trial proceeding in his absence. (Mot. at 1.) While the court does not take lightly the significance of dismissing a claim before it is briefed, as the following discussion illustrates, Laurent's putative ineffectiveness claim is facially implausible. See Brown, 623 F.3d at 114. Thus, although the court would need to relieve Laurent's counsel in order to properly adjudicate the merits of his claim, see id. at 113, the court would decline to conduct a hearing or even consider any such claim if it were raised in his anticipated Rule 33 motion.[6] See Chang, 250 F.3d at 86 (noting hearing "would not offer any reasonable chance of altering [the court's] view of the facts"). Accordingly, counsel's continued representation of

---

[6] Of course, if the jury verdict withstands any post-trial motions, Laurent would not be precluded from asserting a claim of ineffective assistance of counsel on direct appeal or in a proceeding pursuant to 18 U.S.C. § 2255.

Laurent will not cause them to violate the Rules of Professional Conduct, nor will it expose them to the possibility of sanctions. See O'Connor, 650 F.3d at 851. The prosecution of this suit would, however, be disrupted by counsel's withdrawal. See id.

1. Failure to Keep Laurent Informed

Laurent's assertions with respect to whether his lawyers kept him informed are "so inconsistent with the facts of record in this case" as to make any such claim "patently meritless" and evidentiary proceedings involving his lawyers' testimony "clearly unnecessary." United States v. Avendano, No. 02-CR-1059 (LTS), 2005 WL 1265860, at *2 (S.D.N.Y. May 26, 2005). Most importantly, not only were Laurent's assertions flatly contradicted by his counsel's representations on the record, but as a result of his behavior throughout the trial, Laurent's credibility before this court has been significantly diminished. In response to Laurent's claims regarding his knowledge, his attorneys explained that they provided Laurent with all of the discovery they had received over the course of more than two years of litigating this action. (See Tr. at 2284:11-13.) Moreover, depending on the applicability of certain discovery, his lawyers reviewed certain documents with Laurent multiple times. (Id. at 2284:15-18.) Counsel also explained that prior to trial, they reviewed summaries of the prospective witnesses' § 3500 material with Laurent, and even read through portions of the underlying materials that they considered to be most relevant to their client. (Id. at 2284:19-25.) Furthermore, a member of his defense team—Clara Kalhous[7]—visited Laurent every day during the trial, and on each occasion, Ms. Kalhous brought the trial transcript and any applicable § 3500 material to provide context for the questions asked during the proceedings. (Id. at 2285:4-9.) Ultimately, counsel

---

[7] Ms. Kalhous is an attorney admitted to practice law in New York State and the Eastern District of New York, but was compensated for this representation at the paralegal rate under the Criminal Justice Act ("CJA"), given that Laurent was also represented by Ms. Donna Newman and Mr. George Goltzer pursuant to CJA funding.

concluded, "there has been more than sufficient communication with Mr. Laurent."  (Id. at 2285:11-13.)

This is consistent with the court's expectations, the court's impression of counsel's conduct, and the trial record itself.  The trial record, for instance, makes clear that Laurent's lawyers had been visiting him at the MDC before the trial began.  (See Feb. 20, 2015, Ltr. (Dkt. 367); Tr. (Dkt. 414) at 5:2-4.)  After the court had ruled at the beginning of the trial that Laurent would not be permitted in the courtroom, the court notified defense counsel that it would provide them with direct access to the MDC's only staff attorney to arrange for meetings with Laurent on evenings after trial and on weekends.  (See Tr. at 11:1-6.)  The record also indicates that counsel promised to send Ms. Kalhous to visit him at the MDC on a daily basis "so he can confer with a member of his defense team on the upcoming testimony and the past testimony." (Tr. (Dkt. 415) at 410:1-6.)

Consistent with these expectations, the record reflects multiple discussions regarding Laurent's consultations with his attorneys throughout the rest of the trial.  (See, e.g., Tr. (Dkt. 416) at 422:12-20, 554:21-555:1 (reflecting on February 25, 2015, that Laurent's attorneys had consulted with him the night before, and would again the following morning); Tr. (Dkt. 417) at 813:13-20 (indicating on February 26, 2015, that "Ms. Kalhous spent a fair amount of time this morning with Mr. Laurent going over the transcript," and that she would "continue to go and confer with him"); Tr. (Dkt. 418) at 1208:1-2, 1208:16-19 (discussing Ms. Kalhous's trip to the MDC on February 27, 2015, and reflecting her promise to visit Laurent the following two days of trial); Tr. (Dkt. 438-1) at 1315:9-15 (referencing Ms. Kalhous's "daily trek"); 1416:7-12, 1418:6-7, 1419:21-23 (reporting outcome of consultation with Laurent on March 2, 2015, and indicating that Ms. Kalhous would visit Laurent the next morning); Tr. (Dkt. 438-2) at 1428:3-7,

1508:4-16 (discussing meeting between Ms. Kalhous and Laurent on the morning of March 3, 2015); Mar. 4, 2015, Sealed Ex Parte Hr'g Tr. at 3:9-10 (describing Ms. Kalhous's visit with Laurent on March 4, 2015); Tr. (Dkt. 439) at 2403:21-2404:11 (indicating that counsel spent a few hours with Laurent on March 7, 2015, a Saturday); Tr. (Dkt. 441) at 3043:8-12 (reflecting counsel's intention to visit Laurent on March 11, 2015).)  Thus, the record plainly shows that Laurent's attorneys undertook extensive efforts to both keep him informed of developments during the trial and also consult with him regarding trial strategy, which is consistent with the court's own recollection as well.

Moreover, to the extent Laurent actually lacked knowledge of his case, Laurent has only himself to blame.  See United States v. Green, No. 12-CR-193 (VLB), 2013 WL 6230091, at *2 (D. Conn. Dec. 2, 2013) ("To the extent that there has been any breakdown in communication, it appears to be the Defendant's own fault.").  After Laurent had been excluded from the courtroom for the remainder of trial, the court went to great lengths to ensure that he could view the proceedings from a cell in the special housing unit at MDC, in the very hallway where he was detained.  At a significant cost to the MDC, the court arranged for a video and audio feed from the courtroom to be made available through the prison's only videoconference channel (see Tr. at 10:23-11:1, 974:7-12), each day of trial.  (See id. at 10:8-20.)  In addition, at the beginning and end of the proceedings each day, the court required a member of the MDC staff to confirm through the videoconference that the courtroom audio and video feeds were functioning on Laurent's end.[8]  (See, e.g., id. at 10:10-14.)  According to prison officials, this arrangement was without precedent in the history of the institution.  (Id. at 10:21-23.)

---

[8] On the bench, the court itself had access to a video feed showing exactly what Laurent was able to see, enabling the court to confirm for itself that the transmission was functioning properly.  (See Tr. (Dkt. 414) at 10:15-18.)

The record makes clear, however, that despite being made aware of this option (id. at 32:20-33:6), and initially representing that he would take advantage of it (id. at 36:10-18), ultimately, Laurent knowingly and voluntarily refused several times to avail himself of this unprecedented accommodation. (See, e.g., id. at 422:20-22; 554:21-23; 813:18-20; 1508:6-10 (indicating that Laurent "does not want to watch any of the trial"); 2155:21-23, 2158:11-19 (noting that despite Laurent's request that he be permitted to do so, Laurent refused to appear by videoconference to inform the court whether he wished to testify).) Accordingly, the court finds Laurent's assertions regarding his lack of knowledge of the case to be especially disingenuous, and—ultimately—utterly insufficient to give rise to a facially plausible claim of ineffective assistance of counsel. See Brown, 623 F.3d at 114; Avendano, 2005 WL 1265860, at *3 (finding defendant's assertions to be "so patently inconsistent with the documented discussions at the relevant time as to make it clear that no evidentiary proceedings involving testimony on the subject by his current counsel are necessary or appropriate").

2. Acquiescence to Laurent's Absence

In contrast to Laurent's potential ineffectiveness claim based on counsel's alleged failure to consult and inform—for which there is no factual basis—a potential ineffectiveness claim based on counsel's acquiescence to the trial proceeding in his absence is without any legal foundation and, in truth, borders on frivolous. First, as the court has already determined on the record, Laurent initially waived his right to be present at trial. See Fed. R. Crim. P. 43(c)(1)(A). Indeed, on January 30, 2015, after the court explained the importance of his right to be present at trial, and the possibility that any further violent outbursts or disruptions would result in constructive waiver of that right, Laurent stated that he did not want to be there, and walked out of the courtroom in the middle of a status conference. (See Tr. at 155:9-16.) Consequently, jury

selection commenced in Laurent's absence because he knowingly and voluntarily chose to be absent (see also id. at 1508:6-10); to the extent this situation compromised his Sixth Amendment right to be present, it is Laurent's own fault. Cf. Green, 2013 WL 6230091, at *2.

Second, after Laurent's eleventh-hour request to attend his trial, the court ultimately determined that Laurent had constructively waived his right to be present. See Fed. R. Crim. P. 43(c)(1)(C). Despite counsel's advocacy on Laurent's behalf (see, e.g., Feb. 20, 2015, Ltr.), the court explained that in light of his disruptive behavior in the courtroom, his disrespectful and violent conduct in connection with his travel to and from the courtroom, and his quixotic attitude with respect to his desire to attend his trial, the court could not be assured that Laurent would conduct himself appropriately in the future—whether in transit or in front of a jury.[9] (See Tr. at 154:9-158:18 (citing Illinois v. Allen, 397 U.S. 337, 347 (1970); Jones v. Murphy, 694 F.3d 225, 240 (2d Cir. 2012)).) Given the existence of a court order barring him from the courtroom, having objected to the court's ruling, Laurent's counsel was not in a position to either endorse or oppose the continuation of the trial in Laurent's absence. If his attorneys had ignored or refused to comply with the court's order, they could have been subject to sanctions, or even criminal contempt. See 18 U.S.C. § 401 (establishing power of a federal court to impose fines, imprisonment, or both, at its discretion, for contempt of its authority); Fed. R. Crim. P. 42 (outlining procedures for criminal contempt proceedings). Laurent's attorneys would also face possible disciplinary proceedings. See N.Y. Rules of Prof'l Conduct R. 8.4 cmt [4] ("[A] lawyer may not disregard a specific ruling or standing rule of a tribunal, but can take appropriate steps to test the validity of such a rule or ruling."). Accordingly, any argument that it was objectively unreasonable for his lawyers to comply with a court order that barred Laurent from attending his

---

[9] The court refrains from discussing in further detail either Laurent's behavior during the trial or the legal basis for the court's decision to exclude him from the courtroom, so as not to prejudice any argument counsel might make as a part of Laurent's post-trial motions.

trial, or that there is a reasonable probability the outcome at trial would have been different had his counsel not done so, see Strickland, 466 U.S. at 688, is facially implausible, see Brown, 623 F.3d at 114.

### 3.    Additional Considerations

Beyond the facial implausibility of the potential ineffectiveness claims that counsel has identified, there are a number of additional considerations that strengthen the court's decision to deny counsel's motion to withdraw.  Most significantly, the court notes that Laurent himself has not applied for substitution of counsel.  In fact, counsel does not even suggest that Laurent, their client, consents to the motion to withdraw.[10]  Instead, their letter indicates only that Laurent "has been informed of the defense team's belief that appointment of new counsel is in his best interests."  (Mot. at 2.)  That Laurent has neither endorsed his lawyers' motion nor filed his own motion pro se, however, makes their case for withdrawal even weaker than it was in similar cases in this circuit in which courts denied motions to withdraw.

Specifically, in Fleurimont, Green, and Avendano, the defendants themselves had sought to replace their attorneys following trial, but prior to sentencing, by claiming they had received ineffective assistance of counsel.  See Fleurimont, 401 F. App'x at 582; Green, 2013 WL 6230091, at *1; Avendano, 2005 WL 1265860, at *1.  Yet even in those cases, when the apparent need to protect the defendants' interests was much stronger than it is here, those courts denied the lawyers' motions to withdraw where the underlying ineffectiveness claims were facially implausible.  See Fleurimont, 401 F. App'x at 582 (noting the defendant's claim "was implausible on its face and comprised solely conclusory allegations contradicted by the court's questioning of him [and] his trial counsel"); Green, 2013 WL 6230091, at *1 ("Merely

---

[10] Had Laurent expressed any support for counsel's motion, this fact could have required the court to apply a different legal standard to its analysis.  See supra note 4.

complaining about one's counsel does not create a conflict; nor has Defendant offered any evidence to support an allegation that there is a conflict."); <u>Avendano</u>, 2005 WL 1265860, at *1 ("[Defendant]'s assertion that he was not adequately informed of the consequences of not accepting the plea agreement . . . is simply contradicted by the facts of record."). As a result, the notion that Laurent's attorneys must withdraw from this representation rests on even more precarious grounds than it did in cases where similar motions have been rejected. Moreover, that Laurent himself has not sought to replace his attorneys suggests not only that doing so would not best serve his interests, but—more disconcertingly—that his counsel simply seeks to avoid what is undoubtedly an extraordinarily difficult assignment. This, of course, is not enough for the court to grant counsel's motion.

Furthermore, relieving counsel would cause "unnecessary hardship, delay, and expense." <u>Fleurimont</u>, 401 F. App'x at 582. Indeed, "at this point the trial has already occurred, and any new counsel would have a large record to review in order to become familiar with the case, which would unnecessarily delay the proceedings and add significant expense to be borne by the public." <u>Green</u>, 2013 WL 6230091, at *2. Thus far, providing for Laurent's defense has already cost the public over a quarter of a million dollars. Not only would this necessarily substantial delay generate an even greater monetary cost for the public to bear, but it would also have significant personal effects on Laurent's two co-defendants, whose post-trial proceedings would be set back as a result of his patently unfounded representations before this court. <u>See, e.g.</u>, <u>United States v. Herbawi</u>, 913 F. Supp. 170, 171-72 (W.D.N.Y. 1996) ("The substitution of counsel in a complicated, multiple defendant criminal case not only exacerbates the delay but also adversely impacts the speedy trial rights of defendants who are properly joined for trial but whose lawyers are not moving to withdraw."). Counsel argues that immediate appointment of

new counsel would not result in any prejudice to Laurent or his co-defendants because the deadlines for post-trial motions had not yet been set. (See Mot. at 2.) This contention, however, misrepresents the record in this case. While—at the time counsel filed their motion—the court had not yet issued an order setting forth specific due dates, after the jury announced its verdict the court notified Defendants that they would have 60 days to file post-trial motions (Tr. (Dkt. 445) at 3134:20-23), and scheduled sentencing for July 20, 2015 (Mar. 17, 2015, Min. Entry).

Finally, where the absence of any justification for a client's claims with regard to his representation is so obvious, there are pragmatic reasons for refusing to entertain such baseless accusations at this point in the prosecution. As the Second Circuit has explained:

> If the mere making of such an accusation, regardless of lack of justification, ipso facto resulted in a conflict of interest because the attorney cannot defend himself without contradicting his client, district courts would lose control of the criminal cases before them. Defendants represented by appointed attorneys would effectively be able to change attorneys at will. Judges could be prevented from starting trials, and trials conducted by an attorney who had been previously accused of such dereliction would be subject to subsequent invalidation on the theory that the defendant was represented at trial by an attorney who had an actual conflict of interest.

United States v. Moree, 220 F.3d 65, 71-72 (2d Cir. 2000). These concerns are no less applicable here. Accordingly, the court will not countenance Laurent's latest attempt to manipulate the administration of justice through blatant misrepresentations as to his counsel's performance, which—to this point—has been quite laudable in light of their client's behavior.

## III.  CONCLUSION

For the reasons described above, the court finds that both of Laurent's potential ineffective assistance claims—advanced not by Laurent himself but hypothetically by his attorneys, who still represent him—are facially implausible in light of the clear record in this

case. See Brown, 623 F.3d at 114. Accordingly, relieving Laurent's counsel from their representation would cause unnecessary hardship (for Laurent as well as his co-defendants), delay, and expense. See Fleurimont, 401 F. App'x at 582. As a result, the court would refuse to conduct a hearing or even consider such claims if Laurent were to raise them in his anticipated Rule 33 motion. See Chang, 250 F.3d at 86. Consequently, continuing to represent Laurent will not cause his attorneys to violate the Rules of Professional Conduct, nor will it expose them to the possibility of sanctions. See O'Connor, 650 F.3d at 851. Counsel's motion to withdraw from representing Laurent is therefore DENIED.

      SO ORDERED.

s/ Nicholas G. Garaufis

Dated: Brooklyn, New York
      May 8, 2015

NICHOLAS G. GARAUFIS
United States District Judge