UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X

UNITED STATES OF AMERICA

-against-

YASSER ASHBURN, JAMAL LAURENT, and
TREVELLE MERRITT,

Defendants.
---------------------------------------------------------------------X

NICHOLAS G. GARAUFIS, United States District Judge.

**MEMORANDUM & ORDER**

**11-CR-303 (NGG)**

## TABLE OF CONTENTS

I. BACKGROUND .................................................................................................. 2

  A. The Indictment ......................................................................................... 2

  B. The Evidence ............................................................................................ 5

    1. Conspiracy to Murder Crips ............................................................ 6

    2. Murder of Courtney Robinson.......................................................... 7

    3. Murder of Brent Duncan................................................................. 10

    4. Conspiracy to Rob Jewelry Stores................................................. 11

    5. Marketplace Website Robbery Conspiracy ................................... 17

    6. Attempted Murder of Louis Ivies .................................................. 21

    7. Cellphone Robberies and Conspiracy to Rob and Murder of Dasta James................ 23

  C. Defense Case .......................................................................................... 26

  D. Verdict and Post-Trial Motions............................................................. 26

II. RULE 29 MOTIONS FOR ACQUITTAL.................................................... 27

  A. Rule 29 Legal Standard .......................................................................... 27

  B. Ashburn's Rule 29 Motion ..................................................................... 29

    1. Governing Law ............................................................................... 30

    2. Application ..................................................................................... 31

  C. Laurent's Rule 29 Motion ...................................................................... 33

    1. Governing Law ............................................................................... 34

    2. Application ..................................................................................... 35

  D. Merritt's Rule 29 Motion ....................................................................... 39

III. RULE 33 MOTIONS FOR A NEW TRIAL ........................................................ 40

   A.   Rule 33 Legal Standard ............................................................ 40

   B.   Ashburn's Rule 33 Motion ........................................................ 42

      1.   Exclusion of Impeachment Evidence ........................................ 42

      2.   Admission of Testimony Regarding Protective Order .............................. 54

      3.   Denial of Request for Self-Defense Instruction ........................................ 60

      4.   Exclusion of Children from Jury Deliberation and Verdict ...................................... 65

   C.   Laurent's Rule 33 Motion ........................................................ 73

      1.   Exclusion of Unavailable Witness Statements and Denial of Request for Missing Witness Instruction ........................................................ 73

      2.   Prejudicial Misjoinder ........................................................ 89

   D.   Merritt's Rule 33 Motion ........................................................ 94

      1.   Admission of Modified Statements to Law Enforcement ........................................ 95

      2.   Consistency of Jury Verdict ........................................................ 97

      3.   Effect of Media Coverage ........................................................ 99

      4.   Treatment of Counsel ........................................................ 104

IV. CONCLUSION ........................................................ 111

On March 17, 2015, Defendants Yasser Ashburn, Jamal Laurent, and Trevelle Merritt were convicted by a jury of multiple offenses charged in the Fifth Superseding Indictment. Each Defendant now moves under Federal Rule of Criminal Procedure 29 for a judgment of acquittal with respect to certain counts, and under Rule 33 for a new trial in the interests of justice. For reasons that follow, Defendants' motions are DENIED in their entirety.

## I.    BACKGROUND

### A.    The Indictment

On January 4, 2015, Defendants were charged in a Fifth Superseding Indictment (the "Indictment") with racketeering, racketeering conspiracy, and several related crimes. (Dkt. 271.) The Indictment charged Defendants, as members of an association-in-fact enterprise, the Six Tre Outlaw Gangsta Disciples Folk Nation ("Six Tre" or "Folk Nation"), with conducting and

conspiring to conduct the affairs of that enterprise through a pattern of racketeering activity from April 2008 through October 2011. (Indictment ¶ 8.) The Indictment alleged that the purposes of Six Tre included: "Promoting and enhancing the prestige, reputation and position of the enterprise with respect to rival criminal organizations"; "Preserving and protecting the power, territory and criminal ventures of the enterprise through the use of intimidation, threats of violence and acts of violence, including assault and murder"; "Keeping victims and rivals in fear of the enterprise and its members and associates"; and "Enriching the members and associates of the enterprise through criminal activity, including robbery and narcotics trafficking." (Id. ¶ 3.)

Defendants were each charged with racketeering (Count One) and racketeering conspiracy (Count Two), on the basis of the following twelve predicate racketeering acts:

> Racketeering Act 1: conspiracy to murder members of the Crips gang in or about and between April 2008 and October 2011 (Defendants Ashburn, Laurent, and Merritt);
>
> Racketeering Act 2: murder of Courtney Robinson on or about April 20, 2008 (Defendant Ashburn);
>
> Racketeering Act 3: conspiracy to rob employees of jewelry stores in or about and between January 2009 and August 2010 (Defendant Laurent);
>
> Racketeering Act 4: murder of Brent Duncan on or about June 19, 2010 (Defendant Laurent);
>
> Racketeering Acts 5(A) and (B): conspiracy to rob individuals solicited over the Internet via marketplace websites in or about and between June 2010 and October 2010 (Defendant Laurent);
>
> Racketeering Acts 6(A) and (B): conspiracy to rob Sarah McNeil on or about June 30, 2010 (Defendant Laurent);
>
> Racketeering Act 7: attempted murder of Louis Ivies on or about July 7, 2010 (Defendant Laurent);
>
> Racketeering Acts 8(A) and (B): conspiracy to rob Cameron Mo on or about July 7, 2010 (Defendant Laurent);

Racketeering Acts 9(A) and (B):  conspiracy to rob Paul Senzamici on or about July 25, 2010 (Defendant Laurent);

Racketeering Act 10:  robbery of Keith Benjamin on or about January 12, 2011 (Defendant Merritt);

Racketeering Act 11:  robbery of Kareem Clarke on or about January 14, 2011 (Defendant Merritt);

Racketeering Acts 12(A) and (B):  conspiracy to rob and felony murder of Dasta James on or about January 28, 2011 (Defendant Merritt).

(Id. ¶¶ 9-31.)[1]

In addition to the racketeering counts, Defendants were also charged in twelve additional counts predicated on the same conduct underlying the racketeering acts, as follows:

Count Three:  unlawful use of firearms in or about and between April 2008 and October 2011 (Defendants Ashburn, Laurent, and Merritt);

Count Four:  murder in-aid-of racketeering of Courtney Robinson on or about April 20, 2008 (Defendant Ashburn);

Count Five:  murder in-aid-of racketeering of Brent Duncan on or about June 19, 2010 (Defendant Laurent);

Count Six:  assault with a dangerous weapon in-aid-of racketeering of Louis Ivies on or about July 7, 2010 (Defendant Laurent);

Count Seven:  unlawful use of a firearm on or about July 7, 2010 (Defendant Laurent);

Count Eight:  Hobbs Act robbery conspiracy (employees of jewelry stores) in or about and between January 2009 and August 2010 (Defendant Laurent);

Count Nine:  Hobbs Act robbery conspiracy (marketplace websites) in or about and between June 2010 and October 2010 (Defendant Laurent);

Count Ten:  unlawful use of a firearm in or about and between June 2010 and October 2010 (Defendant Laurent);

---

[1] The Indictment identified the individual victims of the crimes charged in Racketeering Acts 6 through 11 as "John Does."

> Count Eleven:  Hobbs Act robbery conspiracy (Dasta James) on or
> about January 28, 2011 (Defendant Merritt);
>
> Count Twelve:  attempted Hobbs Act robbery (Dasta James) on or
> about January 28, 2011 (Defendant Merritt);
>
> Count Thirteen:  unlawful use of a firearm on or about
> January 28, 2011 (Defendant Merritt);
>
> Count Fourteen:  causing death through use of a firearm on or
> about January 28, 2011 (Defendant Merritt).

(Id. ¶¶ 35-50.)

### B.    The Evidence[2]

The Government's evidence at trial included the testimony of more than 35 witnesses,

including three cooperating witnesses: Kevin Bell, Keegan Estrada, and Joelle Mitchell.  Bell is a

former member of Six Tre.  Estrada was a close associate of Defendant Laurent.  Mitchell was an

acquaintance of Laurent's who lived in Laurent's neighborhood and witnessed one of the

shootings with which Laurent was charged.  To corroborate the testimony of these witnesses, the

Government introduced testimony from other witnesses, forensic evidence, cell-site records, and

other evidence.  As an initial matter, there was overwhelming evidence that each Defendant was

a member of Six Tre.[3]  (See, e.g., Trial Tr. ("Tr.") at 320-21 (Kevin Bell testimony); id.

at 794-96, 800-04 (Matthew Patcher testimony).)  Moreover, the Government presented

extensive evidence of Defendants' underlying conduct, which fell within seven primary subject

areas, outlined as follows.

---

[2] This trial involved eleven days of testimony, which comprises nearly 2,500 pages of the transcript.  In this section, the court outlines only those facts relevant to adjudication of Defendants' post-trial motions.

[3] The evidence also established that Six Tre existed and affected interstate and foreign commerce.  (See, e.g., Trial Tr. ("Tr.") at 486-89, 493-94 (Kevin Bell testimony).)

1.    <u>Conspiracy to Murder Crips</u>

First, the jury found that the Government proved that Defendants participated in a conspiracy to murder members of the Crips gang, as a part of the pattern of racketeering activity alleged in the Indictment.  Cooperating witness Kevin Bell testified that when he was initiated into Six Tre, he understood that he was agreeing to take on the rivalries of the gang's members, and that included doing "[e]verything up to killing" the gang's rivals.  (<u>Id.</u> at 517-18.)  The initiation ceremony and pledge was led by Defendant Ashburn, who was one of the three "Big Homies," or leaders of the gang.  (<u>Id.</u> at 328, 459.)  According to Bell, the Big Homies had "all the power and all the authority" in the gang, and could "call the shots."  (<u>Id.</u> at 376-77.)  Among the three Big Homies, Ashburn was at the top.  (<u>Id.</u> at 381.)  Ashburn and "D-Bloc" (one of the other Big Homies) had to keep each other informed of what they were doing and of anything going on in the gang.  (<u>Id.</u> at 459.)

Bell further testified that Six Tre was initially allied with a set of the Crips gang known as "Eight Tre Crips," but that in August 2008, the two gangs became rivals.  According to Bell, the rivalry began after "Duls," a member of the Six Tre leadership, was robbed while he was in the Vanderveer housing projects, an area in Brooklyn where the Eight Tre Crips were based.  (<u>Id.</u> at 536-38, 607-10.)  That day, Bell, Duls, Defendant Merritt, D-Bloc, "Rahleek," "Gunny," and others went to the Vanderveer projects looking for Crips.  Bell testified that the plan was "violence."  (<u>Id.</u> at 538.)  After looking around and failing to find their target, Bell and some of the others left, but Duls stayed with another group.  The next day, Duls told Bell that he found

the Crips member who robbed him, known as "KO," and shot him in the head.[4]  (Id. at 542-43, 609-10.)

Bell testified that the violent rivalry between Six Tre and the Crips continued after that date.  (Id. at 543-45.)  Although Bell was arrested and incarcerated in 2009, the Government presented evidence that the gangs remained rivals through 2010, when Defendant Laurent, as a member of Six Tre, killed and attempted to kill individuals whom he believed to be Crips. Cooperating witness Keegan Estrada testified that he was present when Laurent learned that the leader of the Eight Tre Crips had attempted to shoot Six Tre member Ricky Hollenquest. According to Estrada, Laurent stated, "All Crips must die."  Laurent subsequently told Estrada that he and Hollenquest had shot at two Crips members in the Vanderveer projects.  He also told Estrada that he believed Brent Duncan (whom the jury found Laurent shot and killed on June 19, 2010) and Louis Ivies (whom—the evidence showed—Laurent shot five times on July 7, 2010) were Crips members.  (Id. at 1626-31, 1686-88.)

2.    Murder of Courtney Robinson

Second, the Government presented evidence that Defendant Ashburn murdered Courtney Robinson during the early morning hours of April 20, 2008, in the hallway outside of witness Coretta Thompson's apartment.  This evidence included the testimony of two witnesses who were present at the time of the murder: Thompson and cooperating witness Kevin Bell. Thompson testified that she knew Ashburn as "Indio."  (Id. at 194-96, 234.)  She had previously seen him at the Ebbets Field Apartments—in the patio area in front of the building, hanging out with individuals she knew as "D-Bloc" and "Cooj," and down the hall from her apartment, where Ashburn's girlfriend lived.  On the night of April 19, 2008, Thompson hosted a birthday party

---

[4] The Government offered into evidence the death certificate of Jameel Butler, also known as "KO," who was found murdered on the rooftop of 1413 New York Avenue, a building in the Vanderveer projects, in the early morning of August 23, 2008.  Butler had been shot at close range in the forehead.  (Tr. at 791-93.)

for her niece Melissa Davis at her apartment, number 7O. During the party, Ashburn and D-Bloc showed up. (Id. at 205-07.) Thompson observed that Ashburn was filming with a video camera. (Id. at 207-08.) Ashburn asked Thompson for food and then left. (Id.)

Thompson testified that later that evening, her boyfriend's nephew (known as "Omar") arrived at the party, along with her boyfriend's brother, Courtney Robinson (known as "Kirkie"). (Id. at 209.) Shortly thereafter, Omar argued with Thompson's boyfriend in one of the bedrooms, and then went into the hallway inside the apartment. (Id. at 210.) Thompson observed Omar hug "Dewan," who was the boyfriend of Thompson's daughter. According to Thompson, a friend of Omar's then punched Dewan. (Id. at 210-11, 248.) A fight ensued. Thompson testified that Cooj broke a bottle and chased Omar around the kitchen. (Id. at 212.) The fight spilled out into the hallway outside Thompson's apartment, where a group of individuals were "stomping," "beating," and "kicking" Omar, who was on the floor. (Id. at 212-13.) As Omar was being beaten, Thompson and her daughter attempted to pull Omar back into the apartment. At the same time, Courtney Robinson, wielding a bottle, went into the hallway to try to defend Omar, his nephew. (Id. at 213-14, 235-36.) Omar managed to get back into the apartment. However, the individuals who had been assaulting Omar took the bottle from Robinson and began beating Robinson with it. (Id. at 215.)

Thompson testified that as Robinson went into the hallway and Omar scrambled into the apartment, she saw Ashburn, D-Bloc, Cooj, and others run down the hallway toward an incinerator on the floor.[5] Soon thereafter, they ran back into the crowd where Robinson was being beaten. Second later, Thompson then heard a gunshot and went back into her apartment. When Thompson looked back out into the hallway, she saw Robinson sliding down the wall in

---

[5] The incinerator was near a stairwell that was also down the hallway from Thompson's apartment. (Tr. at 183-85.) Bell testified that Six Tre stored firearms in that stairwell. (Id. at 523.)

the hallway and observed that he had been shot.  (Id. at 213-18.)  Robinson was eventually lying face down in the hallway.  (Id. at 218.)  The man Thompson knew as Cooj then walked back into her apartment to retrieve his jacket.  As he left, he looked at Robinson, and then remarked, "it's the wrong somebody we shot."  (Id. at 219.)

Bell testified that he attended the party at Thompson's apartment that night.  In particular, he testified that Ashburn, who Bell knew as "Swerve," among other names, was at the party.  At some point during the party, Ashburn told Bell and a group of others who were hoping to become members of Six Tre to go into one of the back bedrooms of Thompson's apartment.  (Id. at 513-14.)  In the bedroom, Ashburn led the initiates—including Bell—in a pledge, and inducted them into the gang.  After the initiation, Bell rejoined the party.  (Id. at 518.)  He then saw Dewan (who subsequently became a Six Tre member) fighting with another "kid."  The fight died down, but then started again when the kid broke a bottle in the kitchen.  Bell attacked the kid, and D-Bloc and others joined in to help him.  The fight spilled out of the apartment, and "numerous" people were jumping on, and punching and kicking the kid, who was on the floor in the doorway to the apartment.  (Id. at 519-22.)  As Bell was walking out of the apartment and down the hallway, he passed Ashburn, who was going in the other direction, toward the apartment.  As Ashburn passed, Bell observed the nose of a gun sticking out from the sleeve of Ashburn's sweatshirt.  (Id. at 521-23.)  Moments later, Bell heard a gunshot.  Bell took the stairwell to his girlfriend's apartment, where he stayed the rest of the night.  (Id. at 523-24.)

The Government also presented expert testimony from medical examiner Dr. Rachel Lange regarding the results of the autopsy conducted on Robinson.  Lange testified that Robinson had been killed by a bullet fired into the left side of his lower back at close range.  According to Dr. Lange, the autopsy found black residue, or soot, outside and within the gunshot

wound, which was consistent with a "contact entrance wound." (Id. at 993-96.) She explained that a contact entrance wound is one where the muzzle of the gun is very close to the skin at the time it is fired. (Id. at 996.) Lange testified that after the bullet entered the body, it went through the muscles of the back, the body cavity, major arteries delivering blood to the legs, a major vein draining the body of blood, the small intestine, and the mesentery (which is the tissue that attaches the intestine to the body). (Id.) She testified that the autopsy also revealed a contusion, or blunt injury, to Robinson's scalp. (Id. at 997-98.)

        3.     <u>Murder of Brent Duncan</u>

Third, the jury found that Defendant Laurent murdered Brent Duncan on June 19, 2010. Duncan's cousin, Antoinique Bedward, testified that on the night Duncan was murdered, she, Duncan, and a group of friends attended a party on Schenectady Avenue and Avenue D. (Id. at 891-93.) Toward the end of the party, they began to leave. As they got to the car, Bedward heard gunshots and got into the car. (Id. at 897-98.) When the shooting stopped, she got out of the car, tried to get help, and then saw that Duncan had been shot. Sometime thereafter, an ambulance came and took Duncan away. (Id. at 899-900.)

Cooperating witness Joelle Mitchell testified that Laurent shot Duncan that night. Mitchell explained that he first met Laurent in approximately 2006, while playing basketball in the East Flatbush neighborhood where they both lived. (Id. at 1010.) Mitchell did not see Laurent for a period beginning in 2009. In 2010, Laurent returned to the neighborhood. Mitchell observed that Laurent had joined Six Tre. (Id. at 1013-16.) One night during the summer of 2010, Mitchell went to his friend's home on Schenectady Avenue with a group of friends. (Id. at 1033.) After leaving his friend's home, Mitchell and his friends walked toward a party taking place outside a home further up Schenectady Avenue, between Foster Avenue and Avenue D. (Id. at 1034-35.) At the party, Mitchell saw Laurent with a group of other people he

recognized. (Id. at 1035.) Soon after arriving at the party, Mitchell saw "a little commotion between [Laurent] and this other guy," and then watched as the other individual walked toward a Maxima parked on Schenectady Avenue facing toward Foster Avenue. (Id. at 1037-38.) The individual got into the driver's seat. Then Mitchell saw Laurent run out into the middle of the street and start firing shots at the individual. (Id. at 1037.) Laurent and four other men with him then ran off toward Foster Avenue. (Id. at 1039.) Mitchell looked into the car and saw that blood was dripping out of the victim's mouth. (Id.)

The Government also presented evidence that on June 21, 2010—two days after Duncan was murdered—police responded to a shots-fired call at 1445 Schenectady Avenue, a block away from the scene of the Duncan murder, and the address where Laurent was living at the time. (Id. at 1134-35, 1151.) After arriving on the scene, police discovered that a shot had been fired from Laurent's room—through an adjoining wall—into the room of another tenant. (Id. at 1136-37.) After entering Laurent's room, police recovered a handgun and ammunition that had been stored within the box spring of the bed. (Id. at 1139, 1153-56.) The gun was subsequently sent to the New York City Police Department ("NYPD") firearm analysis section, where it was tested. Expert witness Salvatore LaCova testified that test fires from the gun matched ballistics recovered from the scene of the Duncan murder "to a reasonable degree of ballistic certainty." (See generally id. at 1156-1206.)

Furthermore, cooperating witness Keegan Estrada testified that the day after Duncan was murdered, Laurent told Estrada that he had shot someone the previous night on Schenectady Avenue, after the victim had gotten into his car. (Id. at 1629-31.)

### 4. Conspiracy to Rob Jewelry Stores

Fourth, the jury found that members of Six Tre—and, specifically, Laurent—were involved in a conspiracy to rob jewelry stores from January 2009 to August 2010. The

Government presented evidence of five different jewelry store robberies either committed or attempted by members of Six Tre during that time period. Bell testified that these robberies were organized by Devon Rodney (known as "D-Bloc"), who would also determine how much money each participant received if the robbery were successful. (Id. at 486-89.) Bell stated that he first learned about the jewelry store robberies in late 2008 or early 2009, when Rodney came to Bell's home after committing a robbery. (Id. at 487.) Rodney told Bell that that he had committed a robbery with Six Tre member Rahleek Odom, but Odom had run out of the store early, and Rodney was trying to decide how much money Odom would receive. (Id. at 487-88.)

Bell testified that he was personally involved in two attempted robberies. The first occurred when he went with Rodney, Six Tre member Haile Cummings (known to Bell as "Ruga"), and a driver—known as "Shake," who was not a Six Tre member—to rob a jewelry store in Manhattan. (Id. at 488-89.) Shake drove them to the jewelry store and Rodney, Bell, and Cummings entered the store. (Id. at 490.) Bell testified that he had a sledgehammer under his sleeve when he entered the store. (Id.) However, upon entering the store, Bell observed a large number of people, including armed officers, in the store. (Id.) He described looking at Rodney, who shook his head "no," and they all left the store without attempting the robbery. (Id.)

Bell testified that he next attempted a jewelry store robbery on May 18, 2009—an attempt that ultimately led to his arrest. (Id. at 491.) The night before the robbery, Rodney went to Bell's home and told Bell that they were going to rob a jewelry store the next day, and instructed Bell to go to Cummings's apartment in the morning. (Id.) The next morning, May 18, 2009, Bell went to Cummings's apartment, which was in Ebbets Field. (Id.) Rodney arrived later and told them, "let's go." (Id. at 492.) Bell and Cummings went with Rodney to a

green caravan, which was waiting outside. (Id.) Bell, Cummings, Ricky Hollenquest, and Darius King—all members of Six Tre—went into the van. (Id.) The van was driven by an individual known as "Trinni," who was not a member of Six Tre. (Id.) Rodney got into a separate car with Shake. (Id. at 492-93.) Shake had selected the store for the robbery, which was a Lee Perla jewelry store located in New Jersey. (Id. at 493.) Bell testified that they were instructed to walk into the store, go to the second showcase, and take the Rolex and Cartier watches. (Id. at 493-94.) If the robbery was successful, they were supposed to give the watches to Rodney, who would then determine their cut. (Id. at 494.) Bell, Cummings, Hollenquest, and King then entered the store. (Id. at 495.) Bell had a sledgehammer and started to smash the glass in the display case. (Id.) Police came to the scene and Bell was arrested in the parking lot, where he was trying to catch a ride back to New York City to evade the police. (Id. at 495-96.)

The Government presented testimony from other witnesses who were present for the Lee Perla robbery that Bell described. David Goo, an employee at the jewelry store, described observing four men enter the store and start smashing the glass cases where the Rolex watches were kept. (Id. at 1318-24; Gov't Ex. 251.) The jury was also shown surveillance videos from the day of the robbery, photographs of the crime scene, and the sledgehammers used to smash the glass cases. (Tr. at 1318-24; 1336-42; Gov't Exs. 251, 252, 254.) Sergeant Gerard Dargan of the Bergen County Prosecutor's Office testified that he was present at the Riverside Square Mall on May 18, 2009. (Tr. at 1329-30.) He observed three men exiting the Lee Perla jewelry store and he began to chase them. (Id. at 1331.) As he was chasing them, he observed a blue minivan on the curb waiting with a black male driver. (Id.) He continued to chase one of the individuals, who he ultimately detained and arrested. (Id. at 1331-32.) The individual he arrested was Haile Cummings. (Id. at 1333.)

Keegan Estrada provided additional testimony concerning the jewelry store robberies committed by members of Six Tre. Specifically, Estrada testified that Laurent was involved in two jewelry store robberies in the summer of 2010. (Id. at 1633.) At that time, Laurent told Estrada that Laurent "had to go out-of-state to put some work in" for Rodney. (Id. at 1634.) Laurent told Estrada that he was going with Rodney. (Id.) The next day, Estrada spoke with Laurent again about this robbery. Laurent told Estrada that he went to Connecticut either to a jewelry store or a pawn shop, smashed cases, and stole jewelry, including watches. (Id. at 1634-35.) Laurent told Estrada that Rodney determined the amount of money that Laurent received for participating in the robbery. (Id. at 1635.) In July or August 2010, Laurent also told Estrada about another robbery that he committed. (Id.) Laurent told Estrada that he—along with Ricky Hollenquest and other individuals—committed a robbery of a jewelry store in Manhattan. (Id. at 1636.) Laurent had received a watch as a part of his cut, and asked Estrada to help him sell the watch, which Estrada did. (Id. at 1636-37.)

The Government presented extensive evidence to corroborate Laurent's involvement in the first jewelry store robbery that Estrada described. The evidence showed that this robbery occurred on July 25, 2010, at Lux, Bond & Green in West Hartford, Connecticut. On the day of the robbery, Jane Dowling was standing outside when she observed two men rush out of Lux, Bond & Green and enter a waiting car. (Id. at 1359-60.) She wrote down the car's license plate number and provided it to a police officer who had responded to the scene of the robbery. (Id.) West Hartford Police Department ("WHPD") Officer William Norton testified that he responded to a radio call on July 25, 2010, regarding a robbery at Lux, Bond & Green. (Id. at 1357-58.) After he entered the store, he was approached by Dowling, who provided him with license plate

number EYD-2881, as the license plate of the car she had observed outside of the store.  (Id. at 1359-60.)

Steven Lumb, an employee of Lux, Bond & Green, testified that he observed two individuals enter the store and begin smashing the glass cases.  (Id. at 1347-50.)  Mark Puglielli, a retired WHPD detective, testified that he responded to the scene on July 25, 2010.  (Id. at 1362-63.)  He took photographs of the scene, as well as the sledgehammer that was dropped outside of the store.  (Id. at 1364-65.)  The photographs showed, among other things, the smashed display cases where the high-end watches were kept in the store.  (E.g., id. at 1368.)  Detective Puglielli also testified that he recovered surveillance video of the robbery, which was entered into evidence and shown to the jury.  (Id. at 1371-75.)  The video showed two individuals dressed in dark clothes enter the store.  (Gov't Ex. 507.)  One of the individuals had a sledgehammer and smashed the display cases, and then appeared to yell at the individuals in the store.  (Id.)  The other individual had a bag, and was putting watches from the smashed display cases into the bag.  (Id.)

Detective Puglielli testified that he recovered a ten-pound sledgehammer from outside of the store, which appeared to be same sledgehammer depicted in the surveillance video.  (Tr. at 1374-77.)  He testified that he then submitted the sledgehammer to a laboratory for DNA and fingerprint testing.  (Id. at 1377.)  Steven Bryant, a forensic science examiner from the Connecticut Division of Scientific Services Forensic Laboratory, testified as an expert in the field of DNA comparison analysis.  (Id. at 1430-32.)  Bryant testified that he conducted a comparison of DNA recovered from two spots on the sledgehammer and a DNA swab sample obtained directly from Laurent.  (Id. at 1447-49.)  He testified that Laurent was determined to be a contributor to both of the DNA profiles recovered from the sledgehammer.  (Id.)

Detective Puglielli also testified that less than a week after the robbery at Lux, Bond & Green, he learned that a 1998 Nissan Maxima with the license plate number EYD-2881, which had been reported stolen, was recovered from 25 Elm Place in Brooklyn, and was moved to an NYPD impound lot in Brooklyn.  (Id. at 1380.)  On July 1, 2010, Detective Puglielli went to the impound lot with the owners of the vehicle, Bertha and Euclid Boyce.  (Id.)  After receiving their consent, Detective Puglielli photographed the vehicle and swabbed it for DNA,[6] and recovered a number of items, including a piece of paper with the phone number (917) 214-4017 written on it.  (Id. at 1380-85, 1393-95.)  Records obtained from T-Mobile showed that this telephone number was subscribed to the name Peter Laurent, Defendant Laurent's father, and that the account had been opened on June 24, 2010, the day before the Lux, Bond & Green robbery.  (Gov't Ex. 555; see also Tr. at 1395.)

Detective Puglielli further testified that he interviewed Laurent, while he was incarcerated at Riker's Island, and Laurent claimed that he was working at Brooklyn College on the day of the robbery.  (Tr. at 1395-98.)  Detective Puglielli subsequently obtained employment records from Brooklyn College, which indicated that in fact, Laurent had called in sick on July 25, 2010.  (Id. at 1406-10.)  In addition, the jury listened to a voicemail recording dated July 25, 2010, at 5:02 a.m., during which Laurent called Brooklyn College and stated that he was sick and would not be coming to work that day.  (Gov't Ex. 506; see also Tr. at 1410-11.)  Telephone records associated with the number (917) 214-4017 also reflected that a call was made to Brooklyn College at 5:02 a.m. that day.  (Tr. at 1412-13.)  Cell site records for that number further established that it traveled from Brooklyn to the vicinity of West Hartford, Connecticut the same day.  (See id. at 2260-70; Gov't Ex. 818.)

---

[6] Expert witness Steven Bryant also conducted a comparison between DNA recovered from the handle of the right rear car door and a DNA sample obtained directly from Laurent, and found that Laurent could not be eliminated as a contributor to that DNA profile.  (Id. at 1449-50.)

Finally, the Government presented an inventory of items stolen during the robbery. (Id. at 1377-78.) Laurent, along with his co-conspirators, stole approximately 20 watches, worth a total value of $583,000. (Id. at 1379-80.)

5. Marketplace Website Robbery Conspiracy

Fifth, the Government presented evidence of eight robberies or attempted robberies that occurred between June and October 2010. The Government's evidence reflected that Laurent participated in four armed robberies and one attempted robbery between June and August 2010.

Keegan Estrada testified that in June 2010, Laurent suggested that they use Craigslist to rob people. (Id. at 1646.) They would contact their victims through Craigslist—or a similar website, Sole Collector—pretending to be legitimate buyers to lure them to their neighborhood in Brooklyn. (Id. at 1638, 1649.) Specifically, they would attempt to have the buyers come to a location on 42nd Street between Foster and Farragut, near an alleyway where they could hide prior to the robbery. (Id. at 1650.) When the sellers arrived, Estrada would pretend to be the buyer, and then Laurent or Six Tre member Ricky Hollenquest would approach with a weapon and rob the sellers. (Id. at 1638.) A weapon—either a knife or a gun—was used in every robbery. (See id. at 1638.) Estrada and Laurent created an email address, "stormwatch1985@gmail.com," to use for the robberies. (Id. at 1648.) Estrada would use the name "Mike Martinez" in conversing with victims. (Id. at 1649.)

The first attempted robbery occurred in June 2010. (Id. at 1651-52.) Estrada and Laurent contacted an individual who was selling an iPhone through Craigslist. (See id. at 1638, 1652.) The seller agreed to meet at the location on 42nd Street, but when they approached the car and both attempted to enter the car, the seller would not let Laurent into the car. (Id. at 1652.) Estrada ended up giving the seller the money for the phone and taking the phone. (Id. at 1652-53.) Laurent had a knife with him on that occasion. (Id. at 1652.)

On June 30, 2010, Laurent—along with Estrada and Hollenquest—robbed Sarah McNeil and her then-boyfriend, Nicholas Goddard, at knifepoint outside of 668 East 42nd Street in Brooklyn.  (<u>Id.</u> at 1559.)  McNeil testified that she placed an advertisement on Craigslist in order to sell an iPhone that she had recently purchased.  (<u>Id.</u> at 1490-91.)  An individual using the name Michael Martinez with the email address "stormwatch1985@gmail.com" responded to her advertisement, and they agreed to meet at 668 East 42nd Street.  (<u>Id.</u> at 1491-92, 1494.)  After McNeil and Goddard arrived at the location, McNeil called the individual she knew as "Mike" and told him that they were at the location.  (<u>Id.</u> at 1495-96.)  McNeil testified that she then observed a thin, African-American male approach.  (<u>Id.</u> at 1496.)  They began speaking about the phone, and then two individuals came across the street.  (<u>Id.</u>)  Both of these individuals were African-American men.  (<u>Id.</u> at 1497.)  One of the individuals had a large knife, and they took the new phone as well as McNeil's personal phone.  (<u>Id.</u>)  McNeil described the individual with the knife as larger than the other two individuals; she stated that he was built more like a football player.  (<u>Id.</u> at 1497-98.)  McNeil testified that the entire interaction with these individuals was less than two minutes, and she was focused on the knife almost the entire time.  (<u>Id.</u> at 1497-99.)  Estrada testified that he pretended to be the buyer during this robbery, and that Laurent had a knife and robbed McNeil and her boyfriend.  (<u>Id.</u> at 1655-56.)  After the robbery, Laurent gave Estrada the phone to sell, which he did.  (<u>Id.</u> at 1656.)  Estrada then gave Laurent all of the money from the sale, and Laurent determined Estrada's cut, which was one-third of the total proceeds.  (<u>Id.</u>)  Estrada testified that it was understood that Laurent would determine the distribution of proceeds because the robbery scheme was Laurent's idea.  (<u>Id.</u>)

The next robbery took place on July 7, 2010, when Laurent—along with Estrada—robbed Cameron Mo, Brandon Mo, and Emily Wong at gun point at a gas station located at the corner of

East 42nd Street and Farragut Road in Brooklyn.  (Id. at 1562.)  Cameron Mo testified that he and his brother, Brandon, had advertised two iPhones for sale on a sneaker forum, known as an ISS forum or Sole Collector.  (Id. at 1511-12.)  Mo was contacted by an individual with the user name "Marcc," who said he was interested in purchasing the phones.  (Id. at 1512-13.)  They arranged to meet on July 7, 2010, at a gas station in Brooklyn.  (Id. at 1524.)  Mo went to the gas station with his brother and Wong.  (Id. at 1524-25.)  Mo testified that he and his brother were waiting by the trunk of the car when "Marcc" approached.  (Id. at 1525-26.)  Mo described "Marcc" as an African-American, in his late teens or early twenties, with medium skin tone and a build on the slimmer side.  (Id. at 1526.)  Soon after, Mo saw another individual running up to them, pointing a gun.  (Id.)  Mo testified that the individual with the gun appeared older than "Marcc" and had a stockier build and darker skin, but was about the same height.  (Id.)  He remembered that the individual with the gun was wearing black track pants.  (Id.)  The individual with the gun took the phones, and Brandon's phone (which was in the car), and ran away with "Marcc."  (Id. at 1527.)  Estrada testified that he had pretended to be the buyer, approaching the Mo brothers by their car at the gas station.  (Id. at 1681-82.)  Estrada also testified that Laurent had the gun during this robbery.  (Id. at 1681.)

On July 25, 2010, Laurent—along with Estrada—robbed Paul Senzamici at gunpoint outside of 668 East 42nd Street in Brooklyn.  (Id. at 1563-64.)  Senzamici testified that he posted an advertisement on Craigslist to sell two pairs of Louis Vuitton sunglasses.  (Id. at 1539-40.)  He received an email from "stormwatch1985" in response, and agreed to meet him in Brooklyn.  (Id. at 1540.)  Senzamici arrived at the intended meeting spot, a residential area in Brooklyn, in a black Cadillac.  (Id. at 1541.)  He testified that after he arrived, he was approached by two African-American males.  (Id. at 1541-42.)  One of the individuals—the shorter of the two—had

a gun.  (Id. at 1542.)  They took his sunglasses, his cellphone, his jacket, and the black diamond earrings he was wearing.  (Id. at 1542-43.)  Estrada testified that he and Laurent committed this robbery.  (Id. at 1688-89.)  Estrada approached the car pretending to be the buyer, and Laurent approached with a gun and robbed the victim.  (Id. at 1689-90.)  Estrada explained that Laurent had borrowed the gun that he used in the robbery from someone in Ebbets Field.  (Id. at 1689.)  Estrada testified that Laurent took the man's earrings and that Laurent would frequently wear the earrings.  (Id. at 1690-91.)

Estrada further testified that he and Laurent committed one more robbery together in August 2010.  (Id. at 1691.)  During this robbery, Estrada and Laurent pretended that they were selling items on Craigslist, and met their victims at a restaurant on McDonald Avenue near Church Avenue.  (Id.)  After Estrada and the victims entered the restaurant, Laurent came running in with a gun and Estrada ran out.  (Id. at 1691-92.)  Laurent later told Estrada that he had hit one of the victims in the face with the butt of his gun.  (Id. at 1692.)  They stole approximately $2,000 that day, and Laurent kept $1,500.  (Id. at 1692-93.)  After this robbery, Laurent was no longer in the neighborhood, but Estrada committed two more attempted robberies and one successful robbery with Hollenquest.  (Id. at 1693-97.)

The final attempted robbery occurred on October 17, 2010.  After the July 25, 2010, robbery, Senzamici posted a similar advertisement on Craigslist in the hopes of finding the individuals who had robbed him.  (Id. at 1543-44.)  Once again, he received a response from the "stormwatch1985" email address.  (Id. at 1544.)  He contacted the NYPD, who arranged for an undercover operation in order to arrest the individuals involved.  (Id.)  Senzamici was present for the operation, during which Estrada and Hollenquest were arrested.  (Id. at 1544, 1572.)  Senzamici recognized Estrada as the individual without the gun during the previous robbery.  (Id.

at 1545, 1572-73.)  He did not recognize Hollenquest.  (Id.)  After the arrest, NYPD Detective

Michael Hardman recovered a firearm that Hollenquest had thrown away as he attempted to flee.

(Id. at 1569-71.)

        6.      Attempted Murder of Louis Ivies

Sixth, the jury found that on July 7, 2010, Laurent attempted to murder Louis Ivies.  Ivies

was shot five times at the corner of Avenue D and Nostrand Avenue in Brooklyn.  (Id.

at 1970-71.)  The Government presented evidence of SPRINT reports reflecting 911 calls from

July 7, 2010.  (See id. at 1774-78.)  At approximately 10:25 p.m., a caller reported that a male

had been shot in the vicinity of Avenue D and Nostrand Avenue in Brooklyn.  (Id. at 1776-77.)

At approximately 10:28 p.m., another caller reported that the shooter had been wearing orange

shorts and a white top.  (Id. at 1778.)  Estrada testified that on the day he and Laurent robbed

"two young Asian males" and "an Asian female"—July 7, 2010—Estrada had seen Laurent

earlier in the day headed to either Brighton Beach or Coney Island Beach, wearing orange shorts

and a white t-shirt.  (Id. at 1679-81.)  Although Laurent put on dark pants for the robbery, when

he and Estrada parted ways that evening after the robbery, Laurent had removed his pants and

was wearing his orange shorts.  (Id. at 1680.)

Estrada further testified that after the robbery on July 7, 2010, he went to his mother's

apartment, which was located near the corner of Nostrand and Avenue D.  (Id. at 1683.)

Sometime between 10:00 p.m. and midnight, Estrada's stepfather picked Estrada up and drove

them to his stepfather's apartment on Albany Avenue.  (Id.)  At the corner of Avenue D and

Nostrand Avenue, Estrada observed flashing lights and a police presence near the Taste of the

Tropics ice cream store.  (Id. at 1684.)  Estrada testified that he then called Laurent to see if

Laurent was okay, and Laurent told Estrada that he was okay and on his way home.  (Id.

at 1684-85.)  The next day, Estrada visited Laurent at Brooklyn College in order to give Laurent

the money that he had received for selling the phones they had stolen the previous night.  (Id. at 1685-86.)  Estrada and Laurent spoke about the shooting the night before, and Laurent told Estrada that Laurent had shot "Fifty."  (Id. at 1686-87.)  Specifically, Laurent said that he saw Fifty, whom he recognized as a Crip, and greeted Fifty with a Crip handshake, pretending to be a Crip.  (Id. at 1687.)  After speaking to Fifty for a minute or so, Laurent took out his gun and shot Fifty multiple times.  (Id. at 1687-88.)

NYPD Detective Kenneth Fung testified that on July 7, 2010, he responded to a report that a man had been shot at the corner of Avenue D and Nostrand Avenue.  (Id. at 1768.)  He arrived at the scene at approximately 10:45 p.m. and conducted a canvass for witnesses and video surveillance.  (Id. at 1768, 1778.)  Detective Fung found surveillance video in a nearby store and recorded the surveillance footage on his phone.  (Id. at 1779-80.)  Corroborating Estrada's testimony, the video depicted a man—wearing a t-shirt and shorts—consistent in appearance with Laurent, who greeted Ivies and spoke to him in what appeared to be a friendly manner.  (See Gov't Ex. 604.)  The video showed the two parting ways, at which point the man removed a gun from his waistband and ran after Ivies holding the gun in front of him.  (See id.; Tr. at 1787.)  NYPD Officer Daniel Smith testified that he recovered eight shell casings from the crime scene.  (Tr. at 1804-05.)

The Government also presented cell site records corroborating Estrada's testimony that Laurent told Estrada he was at the beach earlier on the day of the shooting, and demonstrating that the phone used by Laurent was in the vicinity of the crime scene at the time the shooting took place.  (See Gov't Ex. 819(a)-(c).)  The jury also heard evidence regarding the nature and extent of Ivies's wounds from Dr. Patricia O'Neill, who treated Ivies at Kings County Hospital that night.  (Tr. at 1968-75.)

7.      Cellphone Robberies and Conspiracy to Rob and Murder of Dasta James

Seventh, the jury found that during January 2011, Defendant Merritt committed a string

of three robberies in and around Ebbets Field, the last of which ended in the death of Dasta

James.  First, Merritt robbed Keith Benjamin of his cellphone on January 12, 2011, as alleged in

Racketeering Act 10.  Second, Merritt robbed Kareem Clarke of his cellphone on

January 14, 2011, as alleged in Racketeering Act 11.  Third, Merritt, along with two co-

conspirators, conspired and attempted to rob Dasta James on January 28, 2011—a robbery

during which James was shot in the back of the head and killed, as alleged in Racketeering

Acts 12 and Counts Eleven and Twelve.

With respect to the first robbery, the victim, Keith Benjamin, testified that he had known

Merritt since he was roughly seven to nine years old, and had known him by the name "Tiger."

(Id. at 1813-14, 1823.)  On January 12, 2011, Benjamin was walking back from a Rite Aid near

Ebbets Field when Merritt passed him in the crosswalk, walking in the opposite direction.  (Id.

at 1818-21.)  Merritt then doubled back with another man, and came up behind Benjamin,

laughing.  (Id. at 1821.)  As Benjamin tried to cross the street, Merritt and the other man cut him

off and demanded his phone, saying "give me your phone or I'm going to shoot you."  (Id.)

After Merritt was arrested, he was questioned by police and acknowledged that he had been

present for the robbery, but claimed that he had nothing to do with it and that he "was simply

going to get something to eat so [he] could go back home."  (Id. at 1906.)  When Benjamin was

asked at trial if he had any doubt about whether Merritt was one of the two men who robbed him,

he responded, "I have no doubt about that."  (Id. at 1829.)

The second robbery victim, Kareem Clarke, also made an in-court identification of

Merritt as one of two men who robbed him of his cellphone on January 14, 2011.  (Id.

at 2252-53.)  Clarke testified that he was going to the Rite Aid to get a prescription filled when

he passed Merritt and another man walking toward the Rite Aid together. (<u>Id.</u> at 2238-40.)
When Clarke came out of the store, both men—together—followed him, until one asked Clarke
for the time. (<u>Id.</u> at 2244-49.) Merritt and the other man then blocked his path; Merritt
demanded Clarke's cellphone. (<u>Id.</u> at 2244-50.) Merritt gestured as if he had a gun in his pocket
and added, "take off your coat before you die." (<u>Id.</u> at 2251-52.) Clarke gave the men his coat,
and they fled through a nearby gas station. (<u>Id.</u> at 2252) Clarke's testimony was corroborated by
a video from the gas station's security cameras, which showed the perpetrators following Clarke
before the robbery, and then fleeing from the scene after the robbery. (<u>Id.</u> at 1915, 1917-23;
Gov't Ex. 704(a).)

The jury also found that two weeks later, on January 28, 2011, Merritt and two other men
robbed and killed Dasta James. The Government presented evidence that included telephone
records showing that Laurent began calling Merritt in the early afternoon that day. (Gov't
Ex. 770.) According to cell site records, Laurent was not at Ebbets Field at the time, but met
Merritt there later that day. (Gov't Ex. 820.) The call logs indicated that Merritt and Laurent
spoke several times that afternoon. (Gov't Ex. 770.) The call logs and cell site records together
showed that after the first few calls, Merritt (who lived in 11 McKeever Place) went to 47
McKeever Place and waited there for Laurent, who arrived shortly after 4:30 p.m. (Gov't
Exs. 770, 820.)

Video surveillance from the lobby of 47 McKeever, which was in Ebbets Field, showed
that when Laurent arrived with another person, Merritt went downstairs to meet them in the
lobby, and then the three rode up together in the elevator. (Gov't Exs. 760, 771(a).) The three
stopped on the sixteenth floor, where Dasta James lived, and then continued on the elevator to
the twentieth floor. (<u>Id.</u>) Around this time, call logs show that Laurent called James multiple

times.  (Gov't Ex. 770.)  Just before 5:00 p.m., James arrived at 47 McKeever and rode the elevator to the sixteenth floor.  After he arrived, James called Laurent.  (Gov't Ex. 760.)

Witness Corey Lao testified that he was in his apartment on the sixteenth floor of 47 McKeever around that time, when he heard a violent struggle in the sixteenth floor hallway.  (Tr. at 1831-32.)  Lao testified that he heard someone say, "Niggers want to die," or, "Niggers want to rob me," before hearing multiple gunshots and then footsteps running down the hallway toward the staircase.  (Id. at 1832-34.)  Medical records and autopsy results showed that James had been punched several times in the face and had received a heavy blow to the back of the head, before being shot in the back of the head and the back of the chest.  (Id. at 1875-83; Gov't Exs. 751, 765.)  James was found in the sixteenth floor hallway with his pocket torn and small bags of marijuana on the floor.  (Tr. at 1243, 1834-35.)  Immediately after the murder, Merritt and two other men were captured on video by a surveillance camera as they fled through the stairway of 47 McKeever and out of the building.  (Gov't Ex. 760.)

After the murder, Merritt was questioned by law enforcement and made multiple statements.  NYPD Detective Steven Orski testified that when Merritt was first asked to describe what happened, he seemed to be trying to implicate two people named "Lincoln" and "Anthony." Only then did Detective Orski show Merritt telephone records detailing the calls between Merritt and Laurent, and Laurent's calls with Dasta James immediately prior to the murder.  Detective Orski also showed Merritt surveillance video stills in which Merritt and another man can be seen fleeing from 47 McKeever.  At that point, Merritt admitted that he was one of the people shown in the video stills.  (Tr. at 2034-37.)

Thereafter, Merritt made a series of statements indicating that he was simply buying marijuana when another man robbed and killed Dasta James.  (Id. at 2037-39, 2054-66.)  In his

final statement, he acknowledged that he knew in advance that the other man was going to rob James, and that the man who shot and killed James was a member of Six Tre. (Id. at 2322-25.) Thus, despite his earlier denials, Merritt ultimately admitted that he was present for the robbery, that he knew in advance that the robbery would occur, and that he saw the other man shoot James. Nonetheless, the evidence also showed that Merritt misrepresented several facts, including his claim that only two individuals were involved, when the video clearly illustrated that there were three men involved in the robbery. (Id. at 2217-24.)

### C. Defense Case

Defendant Ashburn called Linda Jeffries, who testified that beginning in 2006, she lived with her daughter, Niesha, and Ashburn, who was in a relationship with Niesha. (Id. at 2250-52.) Jeffries further testified that Niesha's daughter, Heaven, as well as a baby, Mallory, lived with them at the time. (Id. at 2252-53.) According to Jeffries, while she and Niesha were working, Ashburn took care of the children. (Id. at 2555.)

Ashburn also called Federal Bureau of Investigation ("FBI") Special Agent Christopher Campbell to testify regarding certain prior statements made by Kevin Bell during proffer sessions with the Government. (Id. at 2562-67.) Defendant Merritt called NYPD Detective Raymond Weng to testify regarding certain prior statements that Kareem Clarke—a robbery victim who testified at trial—had made to Weng during an interview. (Id. at 2540-48.)

Laurent did not call any witnesses.

### D. Verdict and Post-Trial Motions

On March 17, 2015, the jury convicted Defendants on all counts of the Indictment, with the exception of Counts Thirteen and Fourteen, which, respectively, charged Merritt with use of a firearm during a crime of violence, and causing death through the use of a firearm in

connection with that crime.  (Id. at 3127-32.)  In convicting Defendants of Counts One and Two, the jury found all twelve racketeering acts to have been proved.  (Id. at 3124-27.)

In a one-page letter "in lieu of formal motions" dated March 24, 2015, Defendant Merritt moved for a judgment of acquittal and a new trial.  (Def. Merritt's Mar. 24, 2015, Ltr. ("Merritt Ltr.") (Dkt. 464).)  Merritt subsequently filed another letter "in lieu of formal motion" dated May 13, 2015, and expanded upon the arguments made in his March 24, 2015, letter.  (See Def. Merritt's May 13, 2015, Ltr. ("Merritt Supp. Ltr.") (Dkt. 482).)

On May 15, 2015, Laurent filed a motion in which he seeks both a new trial under Federal Rule of Criminal Procedure 33 and also to set aside the verdict as to Racketeering Acts 5, 6, 8, and 9, pursuant to Rule 29.  (See Mem. of Law in Supp. of Jamal Laurent's Mot. for New Trial and for J. of Acquittal Pursuant to Fed. R. Crim. P. 33 & 29 ("Laurent Mem.") (Dkt. 483-1).)  The same day, Ashburn also filed a motion seeking relief under Rule 33.[7]  (See Mem. of Law in Supp. of Def.'s Mot. Pursuant to R. 33, Fed. R. Crim. P. ("Ashburn Mem.") (Dkt. 484-2).)

On June 26, 2015, the Government opposed Defendants' motions in their entirety.  (See Gov't's Mem. of Law in Opp'n to Defs.' Mots. For Acquittal or New Trial ("Gov't Opp'n") (Dkt. 496).)

## II.    RULE 29 MOTIONS FOR ACQUITTAL

### A.    Rule 29 Legal Standard

Under Rule 29, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a); see also Fed. R. Crim. P. 29(c)(2) ("If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal.").

---

[7] But see infra Part II.B.

In challenging the sufficiency of the evidence, defendants face "an uphill battle," and bear "a very heavy burden." United States v. Crowley, 318 F.3d 401, 407 (2d Cir. 2003) (quoting United States v. Jones, 30 F.3d 276, 281 (2d Cir. 1994); United States v. Rivera, 971 F.2d 876, 890 (2d Cir. 1992)). A judgment of acquittal may be granted only if "no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." United States v. Cassese, 428 F.3d 92, 98 (2d Cir. 2005) (quoting United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003)). Therefore, the question is not whether this court believes that the evidence at trial established guilt beyond a reasonable doubt. Crowley, 318 F.3d at 407 (quoting United States v. Brown, 937 F.2d 32, 35 (2d Cir. 1991)). Rather, it is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Cassese, 428 F.3d at 98 (quoting United States v. Espaillet, 380 F.3d 713, 718 (2d Cir. 2004) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979))). Thus, where the court concludes that "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter." United States v. Temple, 447 F.3d 130, 137 (2d Cir. 2006) (quoting United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000)); see also id. ("Put another way, '[a] court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" (quoting United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999))).

Moreover, in deciding a Rule 29 motion, the court must evaluate the evidence "in the light most favorable to the Government, with all reasonable inferences drawn in favor of the verdict." Crowley, 318 F.3d at 407. The court must also "resolve all issues of credibility in the government's favor." United States v. Canady, 126 F.3d 352, 356 (2d Cir. 1997); see also United States v. Desena, 260 F.3d 150, 154 (2d Cir. 2001). Thus, "[m]atters of the choice

between competing inferences, the credibility of witnesses, and the weight of the evidence are within the province of the jury," and the court is "not entitled to second-guess the jury's assessments." United States v. Rea, 958 F.2d 1206, 1221-22 (2d Cir. 1992). In other words, Rule 29 does not provide the court "with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." Temple, 447 F.3d at 136 (quoting Guadagna, 183 F.3d at 129). The court "must affirm the conviction so long as, from the inferences reasonably drawn, the fact finder might fairly have found guilt beyond a reasonable doubt." Canady, 126 F.3d at 356.

"This deferential standard is 'especially important when reviewing a conviction of conspiracy . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'" United States v. Lombardozzi, 491 F.3d 61, 67 (2d Cir. 2007) (quoting United States v. Pitre, 960 F.2d 1112, 1121 (2d Cir. 1992)). Thus, "[t]hese principles apply whether the evidence being reviewed is direct or circumstantial." Canady, 126 F.3d at 356 (citing Glasser v. United States, 315 U.S. 60, 80 (1942)). And the court must review the pieces of evidence "as a whole, 'not in isolation.'" Id. (quoting United States v. Podlog, 35 F.3d 699, 705 (2d Cir. 1994)).

### B. Ashburn's Rule 29 Motion

As a threshold matter, the court notes that Ashburn has raised a challenge to the sufficiency of the evidence in his motion for a new trial pursuant to Rule 33. (See generally Ashburn Mem.) Sufficiency challenges raised in a new trial motion are reviewed "in the same fashion as those brought in motions for a judgment of acquittal." United States v. Leslie, 103 F.3d 1093, 1101 (2d Cir. 1997). Therefore, the court evaluates Ashburn's sufficiency challenge

under the Rule 29 standard.  See United States v. Allen, 127 F.3d 260, 264 (2d Cir. 1997)

(finding "no case that requires the defendant to make both motions" to preserve the issue).

Ashburn thus challenges the sufficiency of the evidence with regard to his conviction of

Racketeering Act 2, which charged that Ashburn, "with the intent to cause the death of another

person, to wit: Courtney Robinson, did cause his death, in violation of New York Penal Law

Sections 125.25(1) and 20.00."  (Indictment ¶ 10.)  Ashburn does not dispute that the evidence

shows he possessed the murder weapon and that he fired the gun into Robinson's lower back.

(See Ashburn Mem. at 40.)  Nonetheless, Ashburn argues that the Government failed to prove

beyond a reasonable doubt that Ashburn possessed the necessary mens rea to have committed

intentional murder under New York law.  (See id. at 36-41.)

    1.  Governing Law

New York Penal Law section 125.25(1) provides that a person is guilty of murder in the

second degree when "with intent to cause the death of another person, he causes the death of

such person or of a third person."[8]  Under section 15.05, a person acts with intent "when his

conscious objective is to cause such result or to engage in such conduct."  N.Y. Penal Law

§ 15.05(1).  "[I]t is well-settled that, as a general matter, criminal intent may be proven by

circumstantial evidence."  United States v. Nelson, 277 F.3d 164, 197 (2002); see also

Crowley, 318 F.3d at 409 ("The state of a person's mind is rarely susceptible to proof by direct

evidence, and usually must be inferred from evidence of his or her acts . . . .").  In addition, juries

are permitted—but not required—to infer that a person intends the ordinary consequences of his

own voluntary acts.  Nelson, 277 F.3d at 197 (citing Sandstrom v. Montana, 442 U.S. 510

(1979); Francis v. Franklin, 471 U.S. 307, 315 (1985)).  Nonetheless, a finding of liability under

---

[8] New York Penal Law section 20.00 governs accessory liability.  While the court also charged Racketeering Act 2 under an aiding and abetting theory (see Final Jury Instructions (Dkt. 425) at 53), the Government does not pursue this theory in response to Ashburn's motion (see Gov't Opp'n at 31-32).

section 125.25(1) requires proof of "a specific design to effect death—not merely an intent to shoot." People v. Sullivan, 503 N.E.2d 74, 78 (N.Y. 1986) (per curiam). But see People v. Payne, 819 N.E.2d 634, 636 (N.Y. 2004) (noting "intentional murder does not require planning or contrivance"), overruled on other grounds, as recognized by Rodriguez v. Smith, No. 07-CV-9272 (RJH) (PED), 2011 WL 1842850, at *2 n.8 (S.D.N.Y. Apr. 13, 2011) (report and recommendation).

                    2.    Application

Ashburn contends there was insufficient proof that it was his conscious objective to cause Robinson's death. In support of this argument, Ashburn emphasizes that Robinson was not the intended target,[9] and highlights the absence of evidence that he verbalized the intent to kill Robinson. (Ashburn Mem. at 38.) He also points out that the evidence showed only that: he had a firearm, he fired one shot, and the shot was fired into Robinson's lower back. (See id. at 38, 40.) Ashburn thereby seeks to distinguish these facts from state court decisions affirming convictions for second-degree murder where, for example, the defendant shot the victim five times "inches" from the victim's back, see People v. Breedlove, 809 N.Y.S.2d 291 (App. Div. 2006), or stabbed the victim eight times, see People v. Rodriguez, 842 N.Y.S.2d 631 (App. Div. 2007), or "plunged a knife three to four inches deep into the victim's chest," see People v. Tigner, 860 N.Y.S.2d 542 (App. Div. 2002). (Ashburn Mem. at 39-40.) In this

_____

[9] That Ashburn may have misidentified his victim is irrelevant. Indeed, the statute expressly permits a defendant to be convicted of murder on a theory of transferred intent. See N.Y. Penal Law § 125.25(1) (establishing liability when defendant, "[w]ith intent to cause the death of another person, . . . causes the death of such person or of a third person" (emphasis added)); see also Stone v. Stinson, 121 F. Supp. 2d 226, 247 (W.D.N.Y. 2000) (citing People v. Fernandez, 673 N.E.2d 910, 913 (N.Y. 1996)); People v. Hamilton, 6 N.Y.S.3d 707, 710-11 (App. Div. 2015) (affirming murder conviction when actual victim shot while trying to mediate dispute between intended victim and defendant).

context, Ashburn maintains that the evidence established, at most, his guilt of depraved indifference murder,[10] not intentional murder.  (Id. at 40-41.)

As the Government's memorandum suggests, however, the cases Ashburn cites do not fully reflect the scope of New York case law regarding second-degree murder.  In fact, shooting a firearm at close range generally evidences the intent to kill, not seriously injure.  (Gov't Opp'n at 32.)  See People v. Colon, 493 N.Y.S.2d 614, 615 (App. Div. 1985) (record demonstrated intent to cause death, "not merely to inflict serious physical injury," where defendant fired his gun at victims at close range (citing People v. Burke, 422 N.Y.2d 469, 471 (App. Div. 1979) (defendant demonstrated intent to perpetrate death "rather than simply serious physical injury" by firing gun at victims at short range))).  Moreover, despite Ashburn's unsupported claim that firing a shot into a victim's back is "not ordinarily associated with causing a fatal injury," (Ashburn Mem. at 38), a New York court has specifically held that a jury may infer an intent to kill where the defendant has fired a gun at a victim's back at close range.  See People v. Woods, 511 N.Y.S.2d 344, 345 (App. Div. 1987) (holding evidence supported jury's finding that defendant intended to kill when he shot victim in back at close range when victim tried to flee).

In light of this case law, there was more than sufficient evidence to sustain the jury's verdict under Rule 29.  As a general matter, the Government presented evidence that Ashburn was the leader of the Six Tre Folk Nation (Tr. at 459), and that members of Six Tre gained respect and built their reputations by committing acts of violence (id. at 508).  The jury also heard evidence that sometime before Robinson's death, Ashburn lost a fight to another member of the gang, Devon Rodney, which caused Ashburn to lose stature in Six Tre.  (Id. at 506, 507.) Furthermore, the Government presented evidence from two witnesses who independently

---

[10] Under New York Penal Law § 125.25(2), a defendant is guilty of second-degree murder when, "[u]nder circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person."

confirmed that Ashburn was present at the party in Thompson's apartment on the night of April 20, 2008. (Id. at 207, 513.) The jury heard testimony that during the party, despite having lost stature in the gang, Ashburn led a pledge in which he inducted new members into Six Tre.[11] (Id. at 518.) Later, when a fight broke out between Omar and Dewan (who later became a Six Tre member), Ashburn left the scrum, ran to the opposite end of the hallway (id. at 522), and retrieved a firearm hidden in the stairwell (id. at 523). Moments after Ashburn returned to the fight with the gun, a single shot was fired (id. at 521, 523), at very close range into Robinson's back, perforating major blood vessels delivering blood to and from Robinson's legs, as well as his small intestine and mesentery (id. at 996).

Thus, the jury could have reasonably inferred that Ashburn's actions were "deliberate and calculated" (Gov't Opp'n at 32), and that Ashburn's conscious objective—especially given how close the muzzle of the gun was to Robinson's back at the time it was fired—was to cause his death. See Woods, 511 N.Y.S.2d at 345. Viewing the facts, as the court must, in the light most favorable to the Government, there was sufficient evidence that Ashburn intended to kill Robinson. As a result, Ashburn's motion under Rule 29 is DENIED.

### C. Laurent's Rule 29 Motion

Laurent, in turn, challenges the sufficiency of the evidence with regard to his convictions for the marketplace website robbery conspiracy and related robberies charged in Racketeering Acts 5, 6, 8, and 9. (See Laurent Mem. at 19-24; see also Indictment ¶¶ 13-18, 20-25.) Specifically, Laurent contends that the evidence was insufficient to prove these crimes were "related" to each other or to the enterprise within the meaning of the racketeering statutes. (Laurent Mem. at 24.)

---

[11] That pledge reflected that by joining the gang, members of Six Tre also agreed to kill members of rival gangs. (See Tr. at 518.)

1.      Governing Law

Counts One and Two of the Indictment charged Laurent with racketeering and

racketeering conspiracy, in violation of 18 U.S.C. § 1962(c) and (d), which require proof that—

among other things—a defendant conducted or conspired to conduct an "enterprise's affairs

through a pattern of racketeering activity."  The "pattern" requirement "is designed 'to prevent

the application of RICO to the perpetrators of isolated or sporadic criminal acts.'"  United States

v. Payne, 591 F.3d 46, 64 (2d Cir. 2010) (quoting United States v. Indelicato, 865

F.2d 1370, 1383 (2d Cir. 1989)).  Thus, to prove that a set of racketeering acts constitute a

pattern, the Government "must show that the racketeering predicates are related, and that they

amount to or pose a threat of continued criminal activity."  H.J. Inc. v. Nw. Bell Tel. Co., 492

U.S. 229, 239 (1989) (emphasis in original).  Racketeering predicates are "related" when they

have "the same or similar purposes, results, participants, victims, or methods of commission, or

otherwise are interrelated by distinguishing characteristics and are not isolated events."

Payne, 591 F.3d at 64 (quoting H.J. Inc., 492 U.S. at 240).  This list, however, is "merely a

guidepost, a starting point for the relatedness inquiry as a whole, not a list of elements, each of

which must be proven in order to establish a pattern of racketeering activity."  United States v.

Daidone, 471 F.3d 371, 375 (2d Cir. 2006) (per curiam).

The Second Circuit has further developed the requirement of "relatedness" in holding that

"predicate acts 'must be related to each other ("horizontal" relatedness), and they must be related

to the enterprise ("vertical" relatedness).'"  Id. (quoting United States v. Minicone, 960

F.2d 1099, 1106 (2d Cir. 1992)).  To show that predicate acts are vertically related to the

enterprise, the Government must establish "(1) that the defendant 'was enabled to commit the

predicate offenses solely by virtue of his position in the enterprise or involvement in or control

over the affairs of the enterprise,' or (2) that 'the predicate offenses are related to the activities of

34

that enterprise.'" Id. (emphasis added) (quoting Minicone, 960 F.2d at 1106). One way of showing that predicate acts are horizontally related to each other is "to show that each predicate act is related to the RICO enterprise." Id. (quoting United States v. Polanco, 145 F.3d 536, 541 (2d Cir. 1998)). Thus, "both the vertical and horizontal relationships are generally satisfied by linking each predicate act to the enterprise." Id. at 376. "This is because predicate crimes will share common goals . . . and common victims . . . and will draw their participants from the same pool of associates." Id.

The relatedness requirement does not, however, obligate the Government to prove that a particular racketeering act was committed in furtherance of the enterprise's activities. United States v. Bruno, 383 F.3d 65, 84 (2d Cir. 2004); see also United States v. Miller, 116 F.3d 641, 676 (2d Cir. 1997) (noting relatedness requirement "is satisfied if the offense was related to the enterprise's activities, whether or not it was in furtherance of those activities, or if the defendant was enabled to commit the offense solely by virtue of his position in the enterprise" (quoting United States v. Thai, 29 F.3d 785, 815 (2d Cir. 1994))). In addition, "[e]vidence of relatedness . . . may arise from facts external to the [charged] predicate acts, including the nature of the RICO enterprise itself." United States v. Price, 443 F. App'x 576, 581 (2d Cir. 2011) (summary order) (second alteration in original) (quoting Minicone, 960 F.2d at 1106). As a result, "'[e]vidence of prior uncharged crimes and other bad acts that were committed by defendants[]' may be 'relevant . . . to prove the existence, organization and nature of the RICO enterprise, and a pattern of racketeering activity by each defendant . . . .'" Payne, 591 F.3d at 64 (quoting United States v. Diaz, 176 F.3d 52, 79 (2d Cir. 1999)).

2.    Application

Laurent argues that the Government failed to meet its burden of proving that the marketplace website robbery conspiracy and associated robberies were vertically related to Six

35

Tre, the charged enterprise. (Laurent Mem. at 24.) According to Laurent, other than the fact that two of the participants—Laurent and Ricky Hollenquest—were Six Tre members, there was no other evidence of a relationship between the robberies and the enterprise. (See id.) In support of this argument, Laurent emphasizes that Keegan Estrada, the "main witness" concerning the robberies, testified that no one from Six Tre asked him to commit these crimes, and that he had no information the robberies were connected to Laurent or Hollenquest's membership in the gang. (Id. (citing Tr. at 1713).) Laurent also highlight Estrada's testimony that he agreed to commit the robberies because "it was profitable and [Laurent] was a friend, so [he] had no problem helping [Laurent] out." (Tr. at 1647.)

However, the Government correctly points out that this was not the only evidence of vertical relatedness between the robberies and the enterprise. As a general matter, the jury heard evidence that it was important for Six Tre members to maintain their reputation in the gang, and that the way Six Tre members developed their reputation was by making money or committing acts of violence. (Tr. at 437-38.) Kevin Bell explained that making money and committing violent acts were central to the gang's purposes, which were to instill fear in the general community and to glorify the lifestyle of Six Tre membership. (See id. at 444-45; see also id. at 446 ("[T]he gang had a reputation to protect, and the reputation was . . . the lifestyle that we portrayed.").) As Bell testified, one of the gang's basic rules was "you gotta be getting money. You gotta be doing something. You gotta—your image has to be kept up to par." (Id. at 446.) Thus, the speed at which a Six Tre member could rise in the ranks of the gang depended on the type of "work" that member was "putting in." (Id. at 438-39; see also id. at 439 (explaining that "putting in work" meant "making a lot of money or acts of violence").)

More specifically, the Government introduced evidence establishing that one of the ways a member of Six Tre would develop a reputation was through committing cellphone robberies. (See Tr. at 476.)  Bell testified that when he was a Six Tre member, he committed approximately five cellphone robberies, one of which he committed with Trevelle Merritt, one of Laurent's co-defendants.  (Id. at 476-77.)  The jury also found that Merritt, on his part, committed at least two other cellphone robberies as a member of Six Tre.  See supra Part I.B.7.  The overlap in participants, purpose, and results of these crimes therefore supports finding the cellphone robberies Laurent committed were vertically related to his membership in Six Tre.  See Payne, 591 F.3d at 64 (noting racketeering acts are "related" when they have "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events" (quoting H.J. Inc., 492 U.S. at 240)).

The jury was also entitled to draw an inference of vertical relatedness from the timing of Laurent's membership in Six Tre.  Both Estrada and Joel Mitchell testified that Laurent had become a member of Six Tre by the spring of 2010.  (See Tr. at 1016-17, 1025-26 (Mitchell); 1606-07 (Estrada).)  Estrada testified that it was shortly after this time that Laurent first proposed robbing customers of Estrada's business selling fake refurbished cellphones on Craigslist.  (Id. at 1646 (testifying this conversation took place in "late spring, early summer of 2010").)  Estrada explained how Laurent stated that he wanted to commit these robberies "to get money" (id. at 1646), even though Laurent had a job working at Brooklyn College (see id. at 1685).  Furthermore, Estrada testified that he started seeing Laurent carrying a gun in the summer of 2010, and that until he purchased his own gun, Laurent would obtain guns from Ebbets Field.  (Id. at 1611-12.)

Significantly, Laurent used one of the guns he borrowed from "someone" in Ebbets Field to rob Paul Senzamici (id. at 1689), a robbery for which the jury convicted Laurent in Racketeering Act 9.  In addition, Estrada testified that Laurent once asked Estrada to store a gun, which Hollenquest, another Six Tre member, ultimately picked up.  (Id. at 1612-13.) Hollenquest was arrested later in 2010 with Estrada in connection with a sting operation set up to catch perpetrators of robberies conducted via Craigslist (Id. at 1566, 1573.)  While he was fleeing police during this operation, Hollenquest discarded a gun.  (Id. at 1569-70.)  In light of testimony that:  (a) Six Tre members earned status by making money and committing violent acts, which included cellphone robberies, (b) Six Tre members kept guns at Ebbets Field, and (c) Laurent began committing armed cellphone robberies—including with another Six Tre member—after he joined Six Tre, the jury could reasonably infer that the Internet marketplace robberies (and associated conspiracy) were related to the enterprise.  Accordingly, there was sufficient evidence to support Laurent's convictions for Racketeering Acts 5, 6, 8, and 9.  See Payne, 591 F.3d at 64.

To the extent that Laurent suggests these racketeering acts were not vertically related to the enterprise because Estrada was not a member of Six Tre, and only agreed to commit the crimes because he was Laurent's friend and wanted to make money, this argument fails.  As the court has already observed, the Government's obligation to prove vertical relatedness does not require evidence that a particular racketeering act was committed in furtherance of the enterprise's activities.  See Bruno, 383 F.3d at 84.  Consequently, Estrada's testimony that no one from Six Tre instructed him to commit these crimes did not render unreasonable the jury's finding that Laurent's participation in these robberies was related to Laurent's position in Six Tre.  Similarly, that Laurent conspired and participated in these robberies with Estrada, who was

not a member of Six Tre, does not change whether any rational trier of fact could have found the marketplace robberies to be vertically related to Laurent's membership in the gang.

Furthermore, Laurent has not identified—and the court is unable to find—any support for the proposition that participation in a racketeering act with an accomplice who is not a formal member of the enterprise undermines otherwise substantial evidence of vertical relatedness. See also Daidone, 471 F.3d at 375 (noting Supreme Court's list in H.J. Inc. was "not a list of elements, each of which must be proven in order to establish a pattern of racketeering activity"). Estrada's non-membership in Six Tre is even less significant in this case, where the evidence showed that Hollenquest, a Six Tre member, also participated in these crimes, and that Laurent used a firearm obtained from a Six Tre supply of guns during at least one of the charged robberies. Having viewed all of the facts in the light most favorable to the Government, the court finds that Laurent has failed to overcome his "heavy burden" of showing the evidence was insufficient to sustain his conviction of Racketeering Acts 5, 6, 8, and 9. His motion under Rule 29 is therefore DENIED.

### D.     Merritt's Rule 29 Motion

Finally, Merritt argues that the evidence was insufficient to sustain his conviction for Racketeering Act 11, which charged Merritt with the January 14, 2011, robbery of Kareem Clarke, in violation of New York Penal Law sections 160.05 and 20.00.[12]  Merritt insists that this conviction "flies in the face of" proof that while Merritt is six feet tall, the officer who

---

[12] Merritt has also moved for a judgment of acquittal "by virtue of a whole [] total lack of proof of guilt beyond a reasonable doubt" as to each count of conviction.  (Merritt Ltr. at 1.)  With the exception of his claim regarding the robbery of Kareem Clarke, however, Merritt has failed to identify a single purported deficiency in the evidence underlying his other convictions.  Because Merritt is represented by counsel, the court addresses in detail only the specific argument he has made with respect to Racketeering Act 11.  Cf. Pabon v. Wright, 459 F.3d 241, 248 (2d Cir. 2006) (citing Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994) (reading pro se litigant's supporting papers liberally, interpreting them "to raise the strongest arguments that they suggest")).  In any event, there was more than sufficient evidence to support Merritt's convictions on each of the other counts.  See generally supra Part I.B.

investigated the robbery testified that Clarke told him the assailants were both five feet, six inches tall.  (Merritt Supp. Ltr. at 3; see also Tr. at 2547.)[13]  As the Government points out, however, Clarke specifically identified Merritt in court as one of the two men who robbed him.  (Gov't Opp'n at 33 (citing Tr. at 2253).)  Especially where the credibility of this witness was within the province of the jury to decide, see Rea, 958 F.2d at 1221-22, it cannot be said that the evidence was so meager that no reasonable jury could find Merritt guilty of this robbery beyond a reasonable doubt, see Temple, 447 F.3d at 137.  Merritt's Rule 29 motion is therefore DENIED.

## III.    RULE 33 MOTIONS FOR A NEW TRIAL

### A.    Rule 33 Legal Standard

Rule 33 provides that, "[u]pon a defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "The rule by its terms gives the trial court 'broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice.'"  United States v. Ferguson, 246 F.3d 129, 133 (2d Cir. 2001) (quoting United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992)).  Thus, a court may properly grant a motion under Rule 33 when it "is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice."  United States v. Landau, 155 F.3d 93, 104 (2d Cir. 1998); see also United States v. Coté, 544 F.3d 88, 101 (2d Cir. 2008) (Sotomayor, J.).

"In the exercise of its discretion, the court may weigh the evidence and credibility of witnesses."  Coté, 544 F.3d at 101 (citing Sanchez, 969 F.2d at 1413).  However, because "courts generally must defer to the jury's resolution of conflicting evidence and the assessment of

---

[13] At trial, Merritt's counsel elicited testimony that Merritt was five feet, eleven inches tall at the time he was interviewed by the investigating officer.  (Tr. at 2547.)

witness credibility, <u>Ferguson</u>, 246 F.3d at 133, "[i]t is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment," <u>id.</u> (quoting <u>Sanchez</u>, 969 F.2d at 1414); <u>see also</u> <u>id.</u> ("An example of exceptional circumstances is where testimony is 'patently incredible or defies physical realities,' although the district court's rejection of trial testimony by itself does not automatically permit Rule 33 relief." (quoting <u>Sanchez</u>, 969 F2d at 1414)). Accordingly, the court "must strike a balance between weighing the evidence and credibility of witnesses and not 'wholly usurp[ing]' the role of the jury." <u>Ferguson</u>, 246 F.3d at 133 (quoting <u>United States v. Autuori</u>, 212 F.3d 105, 120 (2d Cir. 2000)).

"The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." <u>Id.</u> at 134 (quoting <u>Sanchez</u>, 969 F.2d at 1414). A "manifest injustice" occurs when, having examined the entire case—taking into account all facts and circumstances—and having conducted an objective evaluation, there exists "a real concern that an innocent person may have been convicted." <u>Id.</u> (quoting <u>Sanchez</u>, 969 F.2d at 1414). In other words, the court "must be satisfied that 'competent, satisfactory and sufficient evidence' in the record supports the jury verdict." <u>Id.</u> (quoting <u>Sanchez</u>, 969 F.2d at 1414).

Generally, the court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29. <u>Coté</u>, 544 F.3d at 101. Nonetheless, the Second Circuit has held that courts must exercise Rule 33 authority "sparingly," and only in "the most extraordinary circumstances." <u>Id.</u> (quoting <u>Sanchez</u>, 969 F.2d at 1414). Defendants bear the burden of proving they are entitled to new trials under Rule 33. <u>United States v. McCourty</u>, 562 F.3d 458, 475 (2d Cir. 2009).

**B.     Ashburn's Rule 33 Motion**

Pursuant to Rule 33, Ashburn argues that the court erroneously: (1) excluded proffered impeachment evidence, (2) admitted testimony regarding a protective order, (3) denied his request for a self-defense instruction, and (4) excluded his children from the courtroom during the jury deliberations and verdict.

### 1.     Exclusion of Impeachment Evidence

Ashburn challenges the court's exclusion of certain impeachment evidence in connection with the testimony of two Government witnesses.  First, Ashburn claims the court erred in precluding cross-examination of Corretta Thompson regarding her prior criminal convictions under Federal Rule of Evidence 609.  (Ashburn Mem. at 32-36.)  Second, he claims the court erroneously excluded extrinsic evidence of prior statements made by both Thompson and Kevin Bell pursuant to Rule 613.  (Id. at 28-32.)  Ashburn fails, however, to show that any of the court's evidentiary rulings represented an abuse of its discretion, much less, to meet his burden under Federal Rule of Criminal Procedure 33.

#### a.     *Rule 609*

Shortly before trial, the Government moved to preclude a number of Thompson's prior criminal convictions, arguing that they were inadmissible under Federal Rule of Evidence 609. Thompson's criminal history reflected the following convictions:

    i.    A March 17, 1998, conviction for attempted criminal sale of a controlled substance in the third degree, in violation of New York Penal Law section 220.39, a Class C felony;

    ii.    A May 21, 1997, conviction for shoplifting, in violation of New Jersey Statute section 2C:20-11b(2), a felony offense;

    iii.    A May 21, 1997, conviction for possession of burglar's tools, in violation of New Jersey Statute section 2C:5-5A, a misdemeanor offense; and

    iv.  A September 9, 1996, conviction for criminal possession of stolen property in the fifth degree, in violation of New York Penal Law section 165.40, a Class A misdemeanor.

(Gov't's Feb. 18, 2015, Ltr. (Dkt. 351).)

  The court granted the Government's motion to preclude as to each of Thompson's prior convictions.  (Feb. 25, 2015, Order.)  The court found that Thompson's misdemeanor convictions—possession of burglar's tools and criminal possession of stolen property—were not admissible under Rule 609(a)(1) because they were not punishable by imprisonment of more than one year, and were not admissible under Rule 609(a)(2) because they did not require proof of a "dishonest act or false statement" within the meaning of the Rule.  (Id. (citing United States v. Hayes, 553 F.2d 824, 827 (2d Cir. 1977) ("Congress emphasized that [Rule 609(a)(2)] was meant to refer to convictions 'peculiarly probative of credibility,' such as those for 'perjury or subornation of perjury, false statement, criminal fraud, embezzlement, or false pretense, or any other offense in the nature of crimen falsi, the commission of which involves some element of deceit, untruthfulness, or falsification bearing on the accused's propensity to testify truthfully.'" (citation and footnote omitted)); see also Tr. at 168.)  The court further precluded cross-examination with respect to all four of Thompson's prior convictions—both misdemeanors and felonies—under Rule 609(b)(1) because each conviction was more than ten years old, and the probative value of each did not substantially outweigh its prejudicial effect.  (Feb. 25, 2015 Order; see also Tr. at 168.)

  In his motion for a new trial, Ashburn concedes that the court properly excluded Thompson's shoplifting conviction.  (Ashburn Mem. at 33.)  Nonetheless, Ashburn argues that the other three crimes "involve some level of moral turpitude," for which the court should have permitted cross-examination of Thompson.  (Id. at 34.)  In support of his argument, Ashburn cites a number of cases for the propositions that:  (i) with the exception of shoplifting, there is no

per se rule against finding Thompson's crimes involved dishonest acts or statements under Rule 609(a); and (ii) convictions over ten years old are not automatically inadmissible under Rule 609(b). (Id. at 34-36.) As the Government points out, however, the cases Ashburn cites are easily distinguishable, and fail to establish that this court's exclusion of Thompson's convictions was erroneous.

For example, Ashburn cites Jones v. City of New York, No. 98-CV-6493 (LBS), 2002 WL 207008 (S.D.N.Y. Feb. 11, 2011), as support for admitting evidence of Thompson's nearly eighteen-year-old misdemeanor conviction for possession of burglar's tools under Rule 609(b). (Ashburn Mem. at 34.) In Jones, however, the court permitted cross-examination under Rule 609(a) with respect to plaintiff's prior felony convictions for criminal mischief, burglary, and possession of stolen property—each of which was less than ten years old. 2002 WL 207008, at *2-3. Thus, Jones is inapposite, as is Maize v. Nassau Health Care Corp., No. 05-CV-4920 (ETB), 2012 WL 139261, at *2 (E.D.N.Y. Jan. 18, 2012), in which the court permitted cross-examination regarding plaintiff's two year-old felony conviction for burglary under Rule 609(a). Cf. also Lewis v. Sheriffs Dep't for City of St. Louis, 817 F.2d 465, 467 (8th Cir. 1987) (no abuse of discretion in permitting cross-examination of plaintiff regarding less than ten year-old conviction for felonious possession of burglary tools); United States v. Portillo, 633 F.2d 1313, 1322-23 (9th Cir. 1980) (no abuse of discretion in permitting cross-examination regarding defendant's felony burglary conviction that was less than ten years old). Ashburn's argument regarding Thompson's eighteen year-old misdemeanor conviction for possession of stolen property also lacks support in the cases he cites. See United States v. Hourihan, 66 F.3d 458, 462, 464 (2d Cir. 1995) (district court did not abuse discretion in permitting cross-examination concerning defendant's eight year-old felony conviction for possession of stolen

property); <u>United States v. Maisonneuve</u>, 954 F. Supp. 114, 117 (D. Vt. 1997) (permitting cross-examination regarding defendant's nine year-old felony conviction for possession of stolen property).

Nonetheless, Ashburn insists that although Thompson's convictions were more than ten years old, "under the right circumstances they are admissible for purposes of impeachment." (Ashburn Mem. at 35.)  While this is correct as a general rule, Ashburn fails to demonstrate that "the right circumstances" are present here.  Under Rule 609(b), evidence of a conviction that is more than ten years old is admissible only if "its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect."  Fed. R. Evid. 609(b)(1).  Other than arguing that it would not be cumulative of other attacks on her credibility, however, Ashburn does not bother to provide the court with "specific facts and circumstances" to explain why Thompson's eighteen year-old misdemeanor conviction for possession of stolen property, nearly eighteen year-old misdemeanor conviction for possession of burglar's tools, or nearly seventeen year-old felony conviction for attempted criminal sale of a controlled substance remain probative of her propensity to testify truthfully.  (<u>See</u> Ashburn Mem. at 36.)  Moreover, the decisions on which Ashburn relies fail to compensate for this shortcoming.  <u>See</u> <u>Farganis v. Town of Montgomery</u>, 397 F. App'x 666, 669-70 (2d Cir. 2010) (summary order) (assuming but not deciding that admission of plaintiff's thirteen year-old conviction for misdemeanor petit larceny based on falsification of records was proper because the act involved a false statement; and finding that failure to make on-the-record finding was harmless error); <u>United States v. Mahler</u>, 579 F.2d 730, 733-36 (2d Cir. 1978) (admission of defendant's more than ten year-old convictions for providing false testimony and committing stock fraud, absent on-the-record finding, was harmless error where the convictions were already admitted under Rule 404(b)).

In this context, the court notes that the Second Circuit has "repeatedly 'recognized that Congress intended that convictions over ten years old be admitted very rarely and only in exceptional circumstances.'"  Farganis, 397 F. App'x at 669 (quoting Zinman v. Black & Decker (U.S.), Inc., 983 F.2d 431, 434 (2d Cir. 1993)).  Yet Ashburn makes no attempt to explain why evidence of Thompson's prior convictions represents one of the exceptional circumstances in which the probative value substantially outweighs its prejudicial effect.  Accordingly, the court's decision to exclude cross-examination on this topic was neither erroneous nor a miscarriage of justice that warrants a new trial.

> *b.*     *Rule 613*

Rule 613 provides that "[e]xtrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires." Fed. R. Evid. 613(b).  Shortly before the Government rested, counsel for Ashburn sought permission under Rule 613 to call law enforcement witnesses to testify regarding what Ashburn claimed were prior inconsistent statements by Kevin Bell and Coretta Thompson.  (See Tr. at 2132-45.)  As outlined by the Government's letter in opposition, Ashburn identified three allegedly inconsistent statements made by Thompson during her testimony, and fourteen allegedly inconsistent statements made by Bell during his testimony.  (See Gov't's Mar. 5, 2015, Ltr. (Dkt. 388).)  With the exception of testimony by FBI Special Agent Christopher Campbell regarding two of Bell's prior statements (about gambling, and the frequency of Six Tre meetings and who ran those meetings), the Government opposed Ashburn's motion to introduce testimony about Thompson's and Bell's prior statements.  (See id. at 2.)

Consequently, the court proceeded to analyze Thompson's and Bell's testimony with respect to their prior statements to determine whether an impeachment witness was warranted

under Rule 613.  The court found that none of the testimony by Thompson that Ashburn identified was inconsistent with her prior statements, and the court denied Ashburn's motion on that basis.  (Tr. at 2401.)  Regarding Bell's testimony, the court found that six of the twelve purported inconsistencies were not inconsistent with his prior statements.  (See id. at 2402-03.) Of the remaining six allegedly inconsistent statements, the court determined that five were based on Bell's claimed failure to recall.[14]  (Id. at 2402.)  With respect to two of these five potential inconsistencies, however, the court found that Bell was not given an opportunity to explain or deny his prior statements.  (Id. at 2402 (noting Bell was not provided this opportunity with respect to his statements about handguns or travel to Binghamton); see also id. at 2403.)

Of the three remaining alleged inconsistencies, the court found that impeachment testimony was potentially appropriate based on Bell's failure to recall two of his prior statements.[15]  (Id. at 2403.)  The court reasoned that Bell's testimony regarding whether his then-girlfriend ("Eboni") (1) threw a bottle at a police officer, and (2) carried a gun in her bag was "inconsistent" with his prior statements within the meaning of Rule 613 because Bell's failure to recall suggested a desire to protect her reputation, which could have affected Bell's credibility in testimony related to the Robinson murder.[16]  (See id.)  However, because Ashburn failed to

---

[14] The sixth alleged inconsistency, which did not involve Bell's failure to recall, was his testimony that he was sixteen years old when he moved to Georgia; he had previously stated that he was fifteen at the time.  (See Gov't's Mar. 5, 2015, Ltr. at 5.)  The court determined, however, that not only was Bell not given an opportunity to explain or deny his prior statement, cf. Fed. R. Evid. 613(b), but also that this inconsistency was plainly collateral and lacked any probative value with respect to Bell's credibility.  (See Tr. at 2402 (noting inconsistency was "de minimis").)

[15] The court found that impeachment testimony was not warranted with respect to the third alleged inconsistency: Bell's failure to recall whether he had stolen money from his sister.  (See Tr. at 2402.)  Specifically, the court observed that on cross-examination, Bell was asked whether he "took money from [his] sister's dresser drawer." (See id.; see also id. at 706.)  The court determined that his failure to recall whether he told law enforcement agents that he stole money from his sister's dresser drawer was not inconsistent with his prior statement that he "has stolen money from his sister in the past."  (Id. at 2402.)

[16] Specifically, Bell denied seeing Eboni hit anyone with a bottle during the fight that preceded Robinson's death. (See Tr. at 622.)  Contrary to the suggestion made by counsel in his memorandum, however, the court has never previously determined that "there was no inconsistency" regarding Bell's testimony about Eboni's involvement in

identify specifically which law enforcement witness he would call to testify regarding Bell's prior statements on these two subjects, the court denied Ashburn's motion to introduce impeachment evidence under Rule 613.  (Id.)  Ashburn did not subsequently identify the witnesses whom he sought to call.

In his motion for a new trial under Rule 33, Ashburn appears to reiterate the argument he previously made to this court at trial: that Bell's "numerous" failures to recall his prior statements regarding collateral matters amounted to "inconsistencies" within the meaning of Rule 613.  (See Ashburn Mem. at 28-29, 31.)  In the alternative, the court also construes Ashburn's brief as arguing that each of Thompson's and Bell's failures to recall represent separate and independent inconsistencies under Rule 613.  (See id.)[17]  Ultimately, Ashburn argues that had he been permitted to introduce impeachment evidence, the jury would have accepted and rejected parts of Thompson's and Bell's testimony, and thus reasonably could have found that Omar and Robinson were the initial aggressors using deadly force.  (Id. at 31-32.)

i.    Governing Law

Except where the evidentiary question has "grave constitutional overtones," "the question whether evidence is sufficiently inconsistent to be sent to the jury on the issue of credibility is ordinarily in the discretion of the trial court."  United States v. Trzaska, 111 F.3d 1019, 1024 (2d Cir. 1997) (quoting United States v. Hale, 422 U.S. 171, 180 n.7 (1975); see also United States v. Ghailani, 761 F. Supp. 2d 114, 117 n.6 (S.D.N.Y. 2011).  As Ashburn points out, it is "well settled that for two statements to be inconsistent, they 'need not be diametrically opposed.'"  Trzaska, 111 F.3d at 1024 (quoting United States v. Agajanian, 852 F.2d 56, 58

---

that fight.  (Cf. Ashburn Mem. at 27.)  In fact, the court was never asked to address that question.  (See generally Gov't's Mar. 5, 2015, Ltr.)  Moreover, the court did find that Bell's failure to recall whether Eboni threw a bottle at a police officer on May 4, 2010, was inconsistent under Rule 613.  (See Tr. at 2403.)

[17] Although Ashburn is represented by counsel, this section of his memorandum is not a model of clarity, and the court addresses this alternative argument in the interest of justice.

(2d Cir. 1988).  (See also Ashburn Mem. at 30.)  "Nevertheless, the statements must be inconsistent."  Trzaska, 111 F.3d at 1025.  Statements are inconsistent "if there is '[a]ny variance between the statement and the testimony that has a reasonable bearing on credibility.'"  Id. (emphasis in original) (quoting 28 Charles Alan Wright & Victor J. Gold, Federal Practice and Procedure § 6203 (2d ed. 1993)); see also Ghailani, 761 F. Supp. 2d at 117-18.

Even when a court finds that a witness's testimony is inconsistent with his or her prior statements, the party seeking to impeach the witness through extrinsic evidence must satisfy at least four other requirements.  First, he must show that the witness had an opportunity to explain or deny the prior inconsistent statement.  Fed. R. Evid. 613(b).  Second, he must show the extrinsic evidence of the prior inconsistent statement "is competent and otherwise admissible." Ghailani, 761 F. Supp. 2d at 118; see also United States v. Leonardi, 623 F.2d 746, 757 (2d Cir. 1980) (FBI notes offered to impeach not attributable to witness because "a witness may not be charged with a third party's characterization of his statements unless the witness has subscribed to them" (quoting United States v. Rubin, 609 F.2d 51, 62 (2d Cir. 1979))).  Third, the party must show that the impeachment by prior inconsistent statement relates "to a material rather than a collateral matter."  Ghailani, 761 F. Supp. 2d at 118 (citing United States v. Rivera, 273 F. App'x 55, 58 (2d Cir. 2008) (summary order) ("A witness may be impeached by extrinsic proof of a prior inconsistent statement only as to matters which are not collateral, i.e., as to those matters which are relevant to the issues in the case and could be independently proven." (quoting United States v. Blackwood, 456 F.2d 526, 531 (2d Cir. 1972))).  Fourth, even where the other requirements are satisfied, the court may exclude the extrinsic evidence under Rule 403.  Id. (citing United States v. King, 560 F.2d 122, 128 n.2 (2d Cir. 1977) ("Rule 613 and

Rule 403 fulfill separate functions.  Although admissible under 613 the papers could be excluded under 403.")).

ii.        Application

In this context, the court has no difficulty dismissing Ashburn's arguments under Rule 613.  As an initial matter, Ashburn does not specifically challenge the court's conclusion that none of Thompson's testimony was inconsistent with her prior statements.  Nor does Ashburn challenge any of the court's individual findings regarding the portions of Bell's testimony that the court found were not inconsistent with his prior statements.  Regardless, having reviewed its prior determinations, the court discerns no error.  Therefore, it quickly rejects Ashburn's second (implied) argument—that each portion of Thompson's and Bell's testimony that Ashburn identified individually represented an inconsistent statement subject to impeachment under Rule 613.

Ashburn's first argument—that a witness's failure to recall multiple prior statements on collateral matters can amount to a "pattern" that establishes an "inconsistency"—is worth more attention, but ultimately has no support in the cases he cites.  While other courts of appeals have made clear that "inconsistencies can be found in changes in positions implied through silence or a claimed ability to recall," United States v. Causey, 834 F.2d 1277, 1282-83 (6th Cir. 1987) (citing United States v. Dennis, 25 F.2d 782, 795 (8th Cir. 1980)), these decisions do not extend as far as Ashburn would have this court construe them.  What these cases illustrate is that in certain circumstances, a witness's failure to recall a prior statement regarding a subject at issue in the trial is so incredible that it may be deemed inconsistent and thus subject to impeachment by extrinsic evidence.[18]  This is a straightforward application of the standard for determining

---

[18] For example, in Causey, the defendant relied upon alibi testimony to defend against a charge of robbery.  834 F.2d at 1280.  The day before the alibi witness testified, the witness's wife called the FBI, requesting that they remind her

whether testimony is inconsistent under Rule 613.  See Trzaska, 111 F.3d at 1025 (holding

testimony is inconsistent where there is any variance between the statement and the testimony

"that has a reasonable bearing on credibility" (citation omitted)).  What these cases do not stand

for, however, is the proposition that a witness's multiple failures to recall prior statements

regarding collateral matters may establish a "pattern" that in the aggregate becomes an

"inconsistency," thereby subjecting that witness's testimony to impeachment by extrinsic

evidence.  The only Second Circuit case Ashburn cites for this proposition, Xin Na Huang v.

Mukasey, 278 F. App'x 64 (2d Cir. 2008) (summary order), an unpublished, non-precedential

decision, is not to the contrary.[19]

The court cannot, and does not, foreclose the possibility that in an extreme case, a

witness's claimed inability to recall prior statements regarding collateral matters could be so

extensive and incredible that each individual failure to recall might reasonably bear on the

witness's credibility.  This finding is not compelled, however, by any prior decision Ashburn

identifies from this circuit or any other.  Nor do the facts of this case, in particular, justify such a

conclusion.  There were only five inconsistencies that derived from Bell's failure to recall certain

collateral matters.  This is significant in and of itself:  Bell testified across three days of trial, and

---

husband of the penalties for perjury, and informing the FBI that the alibi witness had been bribed in exchange for his testimony.  Id.  When the Government called the wife to testify, however, she claimed she did not remember her conversation with the FBI.  Id.

[19] In Xin Na Huang, the Second Circuit reviewed a Board of Immigration Appeals order denying applications for asylum and withholding of removal.  See 278 F. App'x at 65.  In concluding that the agency's adverse credibility determination was supported by substantial evidence, the court noted "multiple specific examples of discrepancies between [appellant]'s testimony and the record."  Id. at 66.  These discrepancies included her failure to mention during an initial interview "any of the allegations that would later serve as the basis for her asylum claim," and "the inconsistency between her testimony that she and her family were arrested in June 1999 and her written application, which stated that the arrest occurred in June 2001."  Id.  Thus, appellant's inconsistencies were "dramatic," contradicted by evidence that was already in the record, and involved issues that were central to the proceedings.  See id.  They were not based on the witness's failure to recall a number of collateral issues, or any failure to recall for that matter.  Moreover, the issue in Xin Na Huang was whether the immigration judge's credibility determination was supported by substantial evidence; it was not an analysis of whether a party could introduce extrinsic evidence for impeachment purposes under Rule 613.  See generally id. at 65-66.  For all of these reasons, Xin Na Huang is completely inapposite.

his testimony spans more than 450 pages of the transcript. (See generally Tr. at 318-782.)

Moreover, as the court observed at trial, Bell was not provided an opportunity to explain or deny

his prior statements regarding two of these five alleged inconsistencies. (See Tr. at 2403.) Nor

were these inconsistencies "sufficiently dramatic" that no such opportunity was required.[20] Cf.

Xin Na Huang, 278 F. App'x at 66 (citing Majidi v. Gonzales, 430 F.3d 77, 81 (2d Cir. 2005)).

Furthermore, each of the five inconsistencies that were based on Bell's failure to recall prior

statements involved collateral matters, for which extrinsic evidence was not admissible, see

Blackwood, 456 F.2d at 531, even if Ashburn had identified the law enforcement witnesses he

sought to call, which—even in his Rule 33 motion—Ashburn has not. Thus, Ashburn has failed

to demonstrate that he would be entitled to impeach Bell's testimony with prior inconsistent

statements under Rule 613. See Ghailani, 761 F. Supp. 2d at 117-18.

In addition, even if Bell's inconsistencies were not collateral, and Ashburn's proffered

impeachment evidence were admissible, and Ashburn had specifically identified the law

enforcement witnesses he sought to call, the danger of jury confusion and wasted time

substantially outweighed the probative value of any such cumulative evidence. See Fed. R.

Evid. 403; Ghailani, 761 F. Supp. 2d at 118. Significantly, Bell was subject to extensive cross-

examination by counsel for each Defendant, and that cross-examination provided more than

sufficient evidence for the jury to assess Bell's credibility. See, e.g., United States v. Dore,

No. 12-CR-45 (RJS), 2013 WL 3965281, at *6 (S.D.N.Y. July 31, 2013). For example, Bell

---

[20] The first inconsistency involved handgun identification. On cross-examination, Bell was asked what type of gun he possessed during the course of an uncharged murder conspiracy. Bell claimed he did not remember, testifying, "I'm not good with guns, I don't know the kind it was." (Tr. at 613.) In connection with this testimony, counsel for Ashburn sought to introduce extrinsic evidence of a prior statement in which Bell described how—in a different context—another Six Tre member purchased "handguns: 9mm, 38, 380, 45." (Gov't's Mar. 5, 2015, Ltr. at 4.)

The second inconsistency involved a plan to sell drugs. On cross-examination, Bell testified that he did not recall telling FBI agents that he intended to travel to Binghamton, New York to sell marijuana. (Tr. at 713.) In connection with this testimony, counsel for Ashburn sought to introduce extrinsic evidence of a prior statement in which Bell told FBI agents he was "supposed to go to Binghamton, New York to sell marijuana for Omar in the summer of 2009." (Gov't's Mar. 5, 2015, Ltr. at 7.)

testified quite extensively about his own involvement in several crimes, including narcotics trafficking, robbery, and conspiracy to murder. Bell further admitted that he was testifying pursuant to a cooperation agreement with the Government, which he hoped would result in leniency at his sentencing. (See, e.g., id. at 551-53.) On cross-examination, Bell even conceded that he previously lied to the Government earlier in its investigation of this case (see, e.g., id. at 571), and that he had previously lied to a judge during a guilty plea in Georgia (id. at 596). Bell also testified on direct and cross-examination regarding an incident in which he acted out while he was in custody at Rikers Island in order to convince corrections officers that he was "crazy," so that he would be transferred to a different section of the prison. (See, e.g., id. at 498, 587, 685-86.) The jury thus had ample opportunity to assess his credibility.

Finally, even if the court had not excluded Ashburn's desired impeachment evidence—in whatever form it might have taken—Ashburn's Rule 33 motion itself demonstrates the futility of his request. Ashburn claims that had the jury been permitted to accept and reject certain aspects of Thompson's and Bell's testimony, it reasonably could have found that he was justified in using deadly force in response to Robinson's initial aggression. (Ashburn Mem. at 31-32.) Even if the jury drew the inference that Omar (to whose aid Robinson came) was the initial aggressor, viewing the evidence in the light most favorable to Ashburn, Ashburn is not entitled to a self-defense instruction, as the court's analysis below concludes. See infra Part III.B.3.b. Thus, Ashburn has failed to establish not only that the court's exclusion of evidence under Rule 613 constituted an abuse of discretion, but also that this decision—even if it were an abuse of discretion—resulted in a "miscarriage of justice" that would justify ordering relief under Rule 33.

2.      <u>Admission of Testimony Regarding Protective Order</u>

Ashburn also claims that a new trial is warranted because the court erroneously permitted the Government to cross-examine defense witness Linda Jeffries regarding a protective order issued in 2010, barring Ashburn from contact with his girlfriend and her daughter.  (<u>See</u> Ashburn Mem. at 21-25.)  Ashburn argues this represented an abuse of the court's discretion under Federal Rule of Evidence 403 because the Government's reference to the order was misleading and caused Ashburn to suffer unfair prejudice.  The court finds Ashburn's argument to be meritless.

*a.      Governing Law*

District courts are given "broad discretion over the admission of evidence," including under Rule 403.  <u>United States v. Contorinis</u>, 692 F.3d 136, 144 (2d Cir. 2012) (quoting <u>United States v. McDermott</u>, 245 F.3d 133, 140 (2d Cir. 2001)).  Rule 403 permits a court to exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  Under Rule 403, "unfair prejudice" means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."  <u>Old Chief v. United States</u>, 519 U.S. 172, 180 (1997) (quoting Fed. R. Evid. 403 advisory committee's note to 1972 proposed rules); <u>see also</u> <u>United States v. McCallum</u>, 584 F.3d 471, 476 (2d Cir. 2009).  In considering whether the danger of unfair prejudice substantially outweighs the probative value of evidence, courts are instructed to account for "the availability of other means of proof."  <u>Old Chief</u>, 519 U.S. at 184 (quoting Fed. R. Evid. 403 advisory committee's note to 1972 proposed rules).

*b.    Application*

Racketeering Act 1 charged Ashburn with conspiring to murder members of the Crips gang between April 2008 and October 2011.  (Indictment ¶ 9.)  During his opening statement, however, counsel for Ashburn told the jury he expected the evidence would show that by April 2008 (the same month in which Ashburn was charged with the murder of Courtney Robinson in Racketeering Act 2 (Indictment ¶ 10)), Ashburn's life had changed:  he had become a father, was seeking legitimate work, and had grown up and moved on from Six Tre.  (See Tr. at 88-91.)  Counsel explained that in 2006, when Ashburn moved into an apartment with his girlfriend, Niesha Jeffries, and her mother, "he's entered into a serious relationship, and his life is changing."  (Id. at 88.)  Counsel further explained that in September 2007—seven months before April 2008—Ashburn's first child was born, and that his parental responsibilities further changed his life, especially because his girlfriend and her mother worked nights.  (Id. at 88-89.)  Ashburn's attorney conceded that Ashburn was present at the party on April 20, 2008 (the night Robinson was killed), because the following day was Ashburn's birthday and "he had a relationship for years with Folk members," so he was given permission "to go have a good time with his friends."  (Id. at 89-90.)  Nonetheless, he insisted that Ashburn's life was "moving forward and moving past Folk."  (Id. at 90.)

Counsel further argued that Ashburn's life continued to change after April 2008:

> He applies for a job with the United States Postal Service.  He applies for a job with the MTA, which is where his girlfriend and mother-in-law work.  He responds to a jury duty subpoena.  This is a man taking steps forward and away from Folk.  He obtains a driver's ID or a motor vehicle ID.  He takes the GED test at Borough of Manhattan Community College.  He applies for a job at Century 21.   His girlfriend, and his mother-in-law, and fatherhood are having a positive influence on him.
>
> Between that time and . . . the time he's arrested, he has three more children with his girlfriend.  He becomes a father of

55

> four, a responsible father. He has no interest in killing people. He does not enter into a conspiracy to kill members of the Crips gang, in the summer of 2008, while he's applying for all of these jobs, and his [girlfriend] is already pregnant with their second child. He's moving forward.

(Id. at 90-91.)

During the defense case, Ashburn called Linda Jeffries, his girlfriend's mother, as a witness. Jeffries testified that Ashburn began living with her and her daughter in the summer of 2006, and that by 2008, Ashburn was taking care of two children: Mallory, his daughter, and Heaven, his girlfriend's daughter from a different relationship. (Tr. at 2551-52, 2553, 2555.) On cross-examination, the following colloquy took place:

> Q: You testified on direct about Mr. Ashburn's relationship with his children, correct?
>
> A: Yes.
>
> Q: And with a child Heaven, is that correct?
>
> A: Yes.
>
> Q: And Heaven is a child of your daughter's from a different marriage or a different relationship?
>
> A: Yes.
>
> Q: Did there come a time that Mr. Ashburn was bared by a court from being with either Niesha or Heaven?
>
> MR. ORDEN: Objection, Judge.
>
> THE COURT: Overruled. You may answer.
>
> A: Yes.
>
> Q: And when was that?
>
> A: I don't know that approximate[] date. It probably was like in— it could have been 2011. I'm not sure.
>
> Q: Was it July 2010, maybe?

A:  Maybe.

Q:  And were there a series of protective orders that were issued by the court after that?

A:  I don't know.  That I don't know.

Q:  And was the protective order issued because Mr. Ashburn was fighting with Niesha?  Do you know why?

MR. ORDEN:  Objection, Judge.

A:  I wasn't there the day that happened.

Q:  What happened?

THE COURT:  Overruled.  You may answer.

THE WITNESS:  Okay.

A:  I wasn't there that day so I just went by what my daughter told me.

Q:  After—you spoke with your daughter about it?

A:  Yes.

Q:  And your understanding is there was some sort of disagreement between Mr. Ashburn and your daughter?

A:  They had a little disagreement, yes.

Q:  Do you know if it involved her daughter?

A:  She never told me that.

Q:  Did you know that the protective orders that were issued bared contact not simply with Niesha, but also with Heaven?

MR. ORDEN:  Objection to the whole line, Judge.

THE COURT:  Well, you can only object to one question at a time.

MR. ORDEN:  All right.  I object—

THE COURT:  And that's sustained.

(Id. at 2557-59.)

Ashburn appears to argue that the Government's questioning about the order of protection was of limited probative value in part because it was issued on the basis of unsworn allegations and did not involve findings of fact. (Ashburn Mem. at 21.) Ashburn also contends that the introduction of this evidence caused him to suffer unfair prejudice both because "an essential part of the Government's case was to show the violent nature of the Six Tre Nation," and also because it implied that "some sort of judicial imprimatur [had] established Mr. Ashburn's violent character." (Id. at 24.) Furthermore, Ashburn insists that there were less prejudicial means by which the Government could have elicited testimony that "there had been issues" between Ashburn and Niesha Jeffries. (Id.)

Notwithstanding Ashburn's characterization of the purpose for which the court admitted this evidence (he argues, as an attack on his character (id. at 21)), testimony regarding the protective order had probative value because an essential component of Ashburn's defense—and the primary reason he called Jeffries as a witness—was to establish that by April 2008, he "was spending time at home with family, and less time on the street, because his priorities were changing." (Id.) According to Ashburn, this made it less likely he was participating in the conspiracy to murder Crips, which the Indictment alleged took place between April 2008 and October 2011. (See Tr. at 91 ("He [became] a father of four, a responsible father. He has no interest in killing people. He does not enter into a conspiracy to kill members of the Crips gang, in the summer of 2008, while he's applying for all of these jobs, and his [girlfriend] is already pregnant with their second child. He's moving forward.").) In this context, evidence that Ashburn was barred from contacting his girlfriend and her daughter in 2010 tended to make it less likely that Ashburn was spending time at home to take care of his family, and thus undermined Ashburn's defense as to Racketeering Act 1. See also Fed. R. Evid. 401 ("Evidence

is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.").

Moreover, at a trial in which Ashburn was charged with committing murder and racketeering as the former leader of a violent street gang, the danger of unfair prejudice due to the admission of testimony regarding the protective order was minimal. As the Second Circuit has repeatedly held, the introduction of probative evidence usually does not generate undue prejudice under Rule 403 where the evidence does not involve "conduct more serious than the charged crime." United States v. Williams, 205 F.3d 23, 34 (2d Cir. 2000) (defendant charged with drug importation conspiracy not unfairly prejudiced by introduction of uncharged criminal conduct that included participation in marijuana deal and credit card fraud); see also United States v. Desposito, 704 F.3d 221, 234 (2d Cir. 2013) (defendant charged with robbery and obstruction of justice not unfairly prejudiced by admission of evidence of obstruction of justice in separate case that contradicted his affirmative defense). In addition, any unfair prejudice that might have resulted was further minimized when the court permitted only limited questioning regarding the protective order before sustaining Ashburn's objection to continued inquiry. (See Tr. at 2559.) Finally, Ashburn's argument regarding the "availability of other means of proof" misconstrues the purpose of this testimony. What the testimony regarding the protective order established—which testimony that Ashburn and his girlfriend had "issues" during their relationship could not have established—was that a court order prevented Ashburn from contacting his girlfriend or her daughter; thus, undermining Ashburn's argument that during the relevant period at issue, April 2008 through October 2011, he was spending more time at home to take care of his children.

As a result, the court finds that the probative value of testimony regarding the protective order was not substantially outweighed by the danger of unfair prejudice.  See Fed. R. Evid. 403. Ashburn has therefore failed to demonstrate the court's admission of this testimony was in error, much less that it resulted in the type of "manifest injustice" necessary to succeed in a Rule 33 motion.  See Ferguson, 246 F.3d at 134 (quoting Sanchez, 969 F.2d at 1414).

### 3.    Denial of Request for Self-Defense Instruction

Ashburn next argues that he is entitled to a new trial under Rule 33 because, he claims, the court erroneously denied his request to include a self-defense charge in its instructions to the jury regarding Racketeering Act 2, which charged Ashburn with the murder of Courtney Robinson.  (See Ashburn Mem. at 20.)  Ashburn insists this denial was erroneous—and that a self-defense instruction was warranted under New York law—because the evidence at trial could have been reasonably viewed by the jury to support a claim that Ashburn was entitled to use deadly force in defense of others in response to Robinson's initial aggression.  (See id. at 17.) Ashburn's argument fails.

### a.    Governing Law

"A defendant is entitled to a jury instruction on a defense theory 'for which there is any foundation in the evidence.'"  See United States v. Russo, 74 F.3d 1383, 1393 (2d Cir. 1996) (quoting United States v. Alfonso-Perez, 535 F.2d 1362, 1365 (2d Cir. 1976)); see also Hubrecht v. Artus, 457 F. App'x 29, 31 (2d Cir. 2012) (summary order) ("A justification charge is warranted 'if on any reasonable view of the evidence, the fact finder might have decided that defendant's actions were justified.'" (quoting People v. Padgett, 456 N.E.2d 795, 797 (N.Y. 1983))).  In determining whether the evidence warrants a justification charge, the court views the record in the light most favorable to the defendant.  Hubrecht, 457 F. App'x at 31 (quoting Jackson v. Edwards, 404 F.3d 612, 622 (2d Cir. 2005)).  However, the court "is not

required to adopt an artificial or irrational view of the evidence in deciding whether a justification charge is warranted." Id. (quoting Blazic v. Henderson, 900 F.2d 534, 540 (2d Cir. 1990)); see also People v. Butts, 533 N.E.2d 660, 663 (N.Y. 1988) ("The rule is that the jury must be instructed on all claimed defenses which are supported by a reasonable view of the evidence—not by any view of the evidence, however artificial or irrational."). In other words, a defendant is entitled to a self-defense instruction "if there is evidence upon which the jury could rationally sustain the defense"; but a "mere 'scintilla of evidence'" is insufficient to require the instruction. United States v. Taveras, 570 F. Supp. 2d 481, 493 (E.D.N.Y. 2008) (quoting United States v. Jackson, 726 F.2d 1466, 1468 (9th Cir. 1984)).

"Generally, a person may use self defense to justify the use of physical force against another when he or she 'reasonably' believes that at the time such force was used, he or she was in imminent danger of losing his [or her] life or suffering great bodily harm at the hands of another." Id. "Under New York law, a defendant can use deadly force to defend himself only if, among other things, (1) he subjectively believes that the use of deadly force is necessary, (2) a reasonable person in defendant's position would believe that the use of deadly force is necessary, and (3) the defendant does not 'know [] that he can with complete safety as to himself and others avoid the necessity of [using deadly force] by retreating.'" Brown v. Artuz, 124 F.3d 73, 81 (2d Cir. 1997) (emphasis added) (quoting N.Y. Penal Law § 35.15(1)-(2)).[21] A defendant is also entitled to use deadly force in defense of a third person under these circumstances. See, e.g., Bonilla v. Lee, 35 F. Supp. 3d 551, 564 n.5 (S.D.N.Y. 2014) (citing People v. Rivera, 530 N.Y.S.2d 802, 805-06 (App. Div. 1988)). However, New York law "limits an aggressor's use of

---

[21] "The term 'deadly physical force' is defined as 'physical force which, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury.'" DeLeon v. Lempke, 401 F. App'x 610, 612 (2d Cir. 2010) (summary order) (quoting N.Y. Penal Law § 10.00(11)). Ashburn does not challenge the court's determination that his use of a firearm constituted deadly physical force under the circumstances.

deadly physical force." Taveras, 570 F. Supp. 2d at 493 (citing N.Y. Penal Law § 35.15(2)(i)). Specifically, "a defendant who is the initial aggressor cannot claim the justification defense." DeLeon v. Lempke, 401 F. App'x 610, 612 (2d Cir. 2010) (summary order) (citing People v. Holden, 689 N.Y.S.2d 40, 40 (App. Div. 1999)). Furthermore, "it is well-settled under New York law that a 'defendant, . . . in order to avail himself of the justification defense, cannot be responding to the past use of deadly force, but only to its present or imminent use.'" Bonilla, 35 F. Supp. 3d at 564 (quoting People v. Roldan, 647 N.Y.S.2d 179, 183 (App. Div. 1996)).

b.    *Application*

Having reviewed all of the facts in the light most favorable to Ashburn, the court concludes that no reasonable view of the evidence supports a justification charge. The evidence at trial showed that the fight began when Omar or his friend punched Dewan, a Six Tre member, near the door inside Coretta Thompson's apartment. (See Tr. at 210-11.) As others joined and the fight continued,[22] Omar was dragged out of the apartment and into the hallway, where he was beaten on the floor by several Six Tre members, including Ashburn and Devon Rodney. (Id. at 213-14.) Ashburn, Rodney, and other Six Tre members then left the fight, and ran down the hallway toward the incinerator. (Id. at 214-15.) After they ran down the hallway, Robinson, Omar's uncle, came out of the apartment wielding a broken Hennessy liquor bottle to defend Omar. (Id. at 215, 266.) Robinson was immediately overwhelmed by members of the gang, who took the bottle away from him and began hitting Robinson on the head with that bottle and possibly others. (Id. at 215, 274.) After the gang began beating Robinson, Ashburn, Rodney, and the others ran back down the hallway toward the apartment; seconds after they entered the crowd, Robinson was shot. (Id. at 215, 217.)

---

[22] Thompson testified that Cooj, another Six Tre member, had broken a bottle and was chasing Omar around the kitchen. (Id. at 212.) Kevin Bell testified that the person with whom Dewan was fighting was the first to have broken a beer bottle. (Id. at 520.)

Given this record, there is no evidentiary basis on which Ashburn can satisfy any of the three elements necessary for sustaining a justification defense. First, there is no evidence that any member of Six Tre, including Ashburn, subjectively believed that the use of deadly force was necessary. As the Government points out, the evidence demonstrated the opposite: Kevin Bell testified that Six Tre members had outnumbered Robinson in the fight, in which "numerous people" were punching and kicking him, and eventually were jumping on Robinson as he was lying on the floor; Bell explained that "[e]verybody wanted a piece of the action." (Id. at 521-22.)

Second, nothing in the record suggests that a reasonable person in Ashburn's position would have believed that the use of deadly force was necessary. Thompson's testimony made clear that Robinson was shot after members of the gang had taken the Hennessy bottle away from him and were beating him with it. (Id. at 215, 246, 276.) Thus, even if—as Ashburn contends—Robinson's actions reasonably could be construed as imminently life-threatening (when he entered the hallway wielding the broken Hennessy bottle), this threat had been eliminated before Ashburn used deadly force against him.[23] See also Bonilla, 35 F. Supp. 3d at 564 (observing that New York law permits defendants to respond only to present or imminent—and not past—uses of deadly force). Furthermore, the evidence was unambiguous that Robinson was overwhelmed by the number of Six Tre members beating him throughout his participation in the fight. (See Tr. at 215, 274, 277, 521-22.)

Third, Ashburn identifies no evidence from which the jury could rationally find that he or anyone else fighting Robinson was unable to retreat with complete safety. To the contrary, Bell testified that he was able to safely walk away from the fight. (Id. at 521.) In fact, Bell testified that there were "numerous people . . . watching [Robinson] get jumped on." (Id.) Moreover, as

_____

[23] It is therefore irrelevant whether Omar or Cooj was the initial aggressor. (Cf. Ashburn Mem. at 17.)

the court already noted, Thompson testified that Ashburn, Rodney, and other Six Tre members safely retreated from the fight before retrieving the firearm and then returning to the fight. (Id. at 214.) Thompson also testified that the gang members fighting with Robinson took the bottle away from him as soon as he came out of the apartment. (Id. at 215.) There is thus no foundation in the record for the idea that Ashburn and the others he claims to have been defending were unable to safely retreat from the fight. See Jackson, 404 F.3d at 623 ("If a defendant who is confronted with deadly physical force knows he can retreat with complete safety but fails to do so, the justification defense is lost." (citing N.Y. Penal Law § 35.15(2)(a); In re Y.K., 663 N.E.2d 313, 315 (N.Y. 1996))).

Therefore, Ashburn was not entitled to a self-defense instruction, and the court's refusal to so instruct the jury was not erroneous, let alone a "manifest injustice." See, e.g., Brown, 124 F.3d at 81. Nonetheless, Ashburn insists that the court erred in relying on Thompson's testimony as to what transpired during the fight. In particular, he maintains that the jury reasonably could have questioned her credibility, "and that question could have led to a reasonable basis to believe that Ashburn acted in self-defense." (Ashburn Mem. at 20.) Ashburn argues that the jury could have questioned Thompson's credibility because parts of her testimony were contradicted by Bell's testimony, at least with respect "who was holding a bottle, where the fight began, [and whether] it spill[ed] into the hallway or another room in Thompson's apartment." (Id. at 17.) Not only does Ashburn fail to explain why these inconsistencies would have caused the jury to question Thompson's credibility—as opposed to Bell's—but he also fails to explain how this challenge would have enabled Ashburn to satisfy all three elements of a self-defense claim on any reasonable view of the evidence.[24] Most significantly, Ashburn does not—and cannot—

---

[24] Ashburn also argues that "had defense counsel been permitted to introduce evidence that went to the credibility of both Bell and Thompson . . . then there would have been further basis for a view of the evidence supporting the

argue that these inconsistencies give rise to the type of exceptional circumstances that permit a trial court to intrude upon the jury's role in credibility assessment. See Ferguson, 246 F.3d at 133 (explaining that "exceptional circumstances" exist where, for example, testimony is "patently incredible or defies physical realities" (quoting Sanchez, 969 F.2d at 1414)). Ashburn has thus failed to meet his burden of demonstrating that the court's refusal to instruct the jury on a self-defense justification entitles him to a new trial pursuant to Rule 33.

### 4.    Exclusion of Children from Jury Deliberation and Verdict

Finally, Ashburn argues that he should be granted relief under Rule 33 as a result of the exclusion of his children from the courtroom, which he insists violated his Sixth Amendment right to a public trial. Ashburn's claim fails.

On March 6, 2015, counsel for Ashburn indicated that he intended to introduce, among other things, photographs of Ashburn's children through the testimony of their grandmother, Linda Jeffries, the mother of Ashburn's girlfriend. (See Tr. at 2386.) Counsel sought to introduce this evidence not as proof of Ashburn's character, but to show "he is spending less time on the streets because he's got family responsibilities . . . that he's starting to take steps that he had not taken before when he was, arguably, a full-fledged member of the Folk Nation." (Id.) See also supra Part III.B.2.b (detailing Ashburn's argument in this respect). The Government opposed, arguing that in seeking to introduce these photographs, Ashburn was attempting to introduce improper evidence of specific acts of good character. (See id. at 2385.)

On March 9, 2015, the court granted the Government's motion to exclude the photographs of Ashburn's children. (See id. at 2407-09.) The court first held this evidence was inadmissible under Federal Rule of Evidence 405, which permits testimony in the form of an

---

defense request to charge." (Ashburn Mem. at 20.) However, Ashburn fails to explain how this supposed impeachment material would change the evidentiary record. More importantly, as the court explained above, he was not entitled to introduce his proffered impeachment material in the first place. See supra Part III.B.1.

opinion regarding a person's reputation, but—on direct examination—precludes evidence of specific instances of the person's conduct. Fed. R. Evid. 405(a). (Id. at 2407-08.) Alternatively, even if the photographs of his children constituted evidence not of Ashburn's good character, but rather, evidence tending to show that Ashburn was not as involved with Six Tre beginning in March or April 2008, the court determined that the probative value of this evidence was substantially outweighed by the danger of unfair prejudice. (Id. at 2408.) In particular, the court found that to the extent these photographs had any probative value, their introduction would only encourage the jury to make its decision on an emotional basis. (Id.) As a result, the court excluded the photographs of Ashburn's children under Rule 403. (Id.)

It was in this context that on Friday, March 13, 2015—at the conclusion of the second day of jury deliberations, and after the jury had retired for the day—the court addressed the newly present young children in the courtroom in the following exchange:

> THE COURT: I didn't want to make a point of it today, because I have not spoken about it before, but I have a general rule that small children are not permitted here in the courtroom during a criminal jury trial or during jury deliberations, because of the possibility that it could prejudice the jury in some way unknown to me, unknown to you. But I think it's inappropriate to use children as props. And so, I appreciate that there's a desire to have the children see their family members. Please don't bring children to the courtroom again during this trial. If you do, you'll be excluded from the courtroom and have to watch in a separate room. And that's just my general rule. I hadn't mentioned it before, and I was not about to impose it while there were children sitting in the courtroom.
>
> Any questions?
>
> MR. ORDEN: No, your Honor.

(Id. at 3109.) Trial was then adjourned until the following Monday, March 16, 2015, when the jury resumed deliberations. On Tuesday, March 17, 2015, the jury returned its verdict. (See id. at 3124-33.)

According to Ashburn, not only did the court's order prevent his children from attending the final two days of jury deliberations and the jury verdict, but it also resulted in the exclusion of Ashburn's girlfriend, who was taking care of his children.[25]  (Ashburn Mem. at 3.)  Although he acknowledges that he did not object to the court's order, Ashburn now argues that this exclusion violated his right to a public trial under the Sixth Amendment.  (Id. at 4, 16.) Moreover, Ashburn insists that because this error is "structural," no showing of prejudice is required in order to justify awarding him a new trial under Rule 33 in the interests of justice. (Id.)

                    a.      Governing Law

While the Sixth Amendment guarantees a defendant the right to a public trial, this right is not absolute.  Instead, the Supreme Court has held that closure of the entire courtroom is justified when (1) the party seeking closure advances "an overriding interest that is likely to be prejudiced," (2) the closure is "no broader than necessary to protect that interest," (3) the trial court considers "reasonable alternatives to closing the proceeding," and (4) the trial court makes findings "adequate to support the closure."  Waller v. Georgia, 467 U.S. 39, 48 (1984).  Where the courtroom is only partially closed, however, only a "substantial reason"—not an "overriding interest"—must be shown.  United States v. Ledee, 762 F.3d 224, 229 (2d Cir. 2014), cert. denied, 135 S. Ct. 1575 (2015); United States v. Smith, 426 F.3d 567, 571 (2d Cir. 2005).[26]

"The exclusion of only certain spectators constitutes a partial closure."  Davis v. Walsh, No. 08-

---

[25] Ashburn does not indicate exactly how many of his children were excluded, or what their ages were.  Nonetheless, the court recalls observing at least two young children present in the courtroom, and the record reflects that none of Ashburn's children could have been more than seven years old on March 13, 2015.  (See Tr. at 88-89 (explaining that Ashburn's first child was born in September 2007).)

[26] Citing to a recent decision in the Southern District of New York, Ashburn suggests that the lesser "substantial reason" test is no longer viable following the Supreme Court's decision in Presley v. Georgia, 558 U.S. 209 (2010) (per curiam).  (Ashburn Mem. at 12-13 (citing Mickens v. Larkin, No. 12-CV-7953 (KMW), 2014 WL 6632950, at *2 (S.D.N.Y. Nov. 24, 2014)).)  As the Government points out, however, the Second Circuit has continued to apply the more relaxed standard even after Pressley.  (Gov't Opp'n at 43 n.9 (citing Ledee, 762 F.3d at 229).) Ledee, of course, is binding on this court.

CV-4659 (PKC), 2015 WL 1809048, at *8 (E.D.N.Y. Apr. 21, 2015) (citing English v. Artuz, 164 F.3d 105, 109 (2d Cir. 1998)).

Moreover, as the Second Circuit has repeatedly observed, "a 'positive correlation' exists between the extensiveness of the closure requested, and the gravity of the interest asserted and the likelihood that the interest will be advanced by the closure." Smith, 426 F.3d at 573 (quoting Brown v. Kuhlmann, 142 F.3d 529, 538 (2d Cir. 1998)). Thus, although a party seeking a broad closure must demonstrate that the interest "is especially grave, and that the risk that would be posed . . . by not closing the courtroom is more than serious," when the closure at issue is relatively narrow in nature, "the burden it must carry is not a heavy one." Id. (quoting Bowden v. Keane, 237 F.3d 125, 129 (2d Cir. 2001)). In determining whether a closure is broad or narrow, the court considers a number of factors, including "its duration, whether the public can learn what transpired while the trial was closed (e.g. through transcripts), whether the evidence was essential, and whether selected members of the public were barred from the courtroom, or whether all spectators were excluded." Id. at 571 (quoting Carson v. Fischer, 421 F.3d 83, 89-90 (2d Cir. 2005)). If the court determines the closure is narrow, it "need not demand compelling record evidence" that the proffered goal is warranted by the exclusion. Id. at 573.

Furthermore, even when a court later determines that a closure was unjustified, the defendant is not automatically entitled to a new trial when the exclusion is trivial. See Gibbons v. Savage, 555 F.3d 112, 121 (2d Cir. 2009). In evaluating whether a closure is trivial, courts in this circuit "look to the values the Supreme Court explained were furthered by the public trial guarantee, focusing on (1) ensuring a fair trial, (2) reminding the prosecutor and judge of their responsibility to the accused and the importance of their functions, (3) encouraging witnesses to come forward, and (4) discouraging perjury." Id. (citing Peterson v. Williams, 85 F.3d 39, 43

(2d Cir. 1996)).  "Essentially, [the] analysis turns on whether the conduct at issue 'subverts the values the drafters of the Sixth Amendment sought to protect.'"  Id. (quoting Smith v. Hollins ("Hollins"), 448 F.3d 533, 540 (2d Cir. 2006)).

*b.*    *Application*

Ashburn does not contest that the closure in this case was partial.  (See Ashburn Mem. at 11, 14.)  Accordingly, "the prejudice asserted need only supply a 'substantial reason' for closure."  Ledee, 762 F.3d at 229 (quoting United States v. Doe, 63 F.3d 121, 129 (2d Cir. 1995)).  In addition, this partial closure was clearly narrow.  See Smith, 426 F.3d at 571. Only young children were excluded from the courtroom, and the court provided a live audio-video feed of the trial in a neighboring courtroom, thus providing any excluded children with complete, real-time access to the proceedings.  Because the closure was narrow, the court "need not demand compelling record evidence" of the "substantial reason" for that closure.  See Ledee, 762 F.3d at 229; Smith, 426 F.3d at 573.

Consequently, with respect to the first factor under Waller and Ledee, the court concludes that there was "substantial reason" for this narrow closure.  The court explained that it has a general rule of excluding children from criminal jury trials because of the possibility that it could prejudice the jury.  (Tr. at 3109.)  The court further advised that it was inappropriate for children to be used as "props" (id.), which was of particular concern in this case, where Ashburn sought to introduce evidence of his parenting responsibilities as a defense against murder and racketeering charges.  See supra Part III.B.2.[27]  In addition, courts in this district have repeatedly upheld the exclusion of children from criminal trials for similar reasons.  See Davis, 2015 WL 1809048, at *8 (finding "inappropriateness of exposing a young child to a criminal trial" to

---

[27] In fact, Ashburn's children had not been present throughout the trial until March 13, 2015, after the court granted the Government's motion to exclude the introduction of their photographs into evidence.  See supra Part III.B.4.

be a substantial reason supporting exclusion of defendant's four-year-old son); Downs v. Lape, No. 08-CV-92 (RJD), 2009 WL 3698134, at *1, 4 (E.D.N.Y. Oct. 30, 2009) (finding that "minimizing possible disruptiveness or to shield him from testimony about his family member's criminal activities" were appropriate reasons to exclude 12-year-old family member of defendant in light of court's minimum age requirement of 16 or 17 years); Covington v. Lord, 275 F. Supp. 2d 352, 358 (E.D.N.Y. 2003) (preventing defendant's six-year-old son from exposure to certain testimony in criminal trial was a substantial reason for removing him from courtroom), aff'd, 111 F. App'x 647 (2d Cir. 2004) (summary order). Thus, the court's "common sense conclusion" plainly satisfies this "undemanding" inquiry. See Ledee, 762 F.3d at 229.

The court also finds this narrow closure was "no broader than necessary," the second factor in this analysis. See Smith, 426 F.3d at 571 (citing Waller, 467 U.S. at 48). As the court already noted, only Ashburn's children were excluded. See Davis, 2015 WL 1809048, at *8 ("Only the child was excluded, so the closure was no broader than necessary."). While Ashburn argues that removal of the children "necessitated" that his girlfriend "also absent herself" because "she was the person taking care of these children" (Ashburn Mem. at 3), this does not affect the court's determination. As the Government points out, the court did not order the immediate exclusion of Ashburn's children from the courtroom; instead, it waited until the end of the day, and after the jury had been dismissed, before making its ruling. Moreover, because that day—March 13, 2015—was a Friday, and trial had been adjourned to the following Monday, Ashburn's girlfriend had over two full days to make alternative arrangements for childcare to ensure that she could attend trial when it resumed; and Ashburn does not even suggest now that she was unable to do so. Regardless, to the extent Ashburn's girlfriend decided not to attend the remainder of trial because of her children, the Government cannot be charged

with her exclusion, as a matter of law. See Covington, 275 F. Supp. 2d at 358-59 ("The fact that petitioner's mother chose to leave the courtroom with the child does not warrant a different conclusion. The state cannot be charged with excluding her.").

With respect to the third factor, the Government argues that the court had no obligation to consider reasonable alternatives to closing the proceeding "because no such alternatives were suggested." (Gov't Opp'n at 46 (citing Smith, 426 F.3d at 573).) That standard, however, no longer accurately reflects the law. Rather, a trial court is now obligated to consider reasonable alternatives "even when alternatives are not offered by the parties." Ledee, 762 F.3d at 230 (citing Presley v. Georgia, 558 U.S. 209, 214 (2010) (per curiam) (emphasizing that "trial courts are required to consider alternatives to closure even when they are not offered by the parties")); see also id. at 231 ("Because a district court has the duty to sua sponte consider reasonable alternatives to closure, we think it best practice for the district court to err on the side of caution by considering the widest possible array of alternatives." (citing Presley, 558 U.S. at 214)). Thus, although Ashburn's counsel failed to offer any suggestions—indeed, counsel declined to so much as object to the court's order (see Tr. at 3109)—that did not obviate the court's responsibility to consider reasonable alternatives. See Ledee, 762 F.3d at 230. Nonetheless, the record shows that the court did more than just consider reasonable alternatives; in fact, it implemented the most effective such alternative by making a real-time audio-video feed of the proceedings available in a neighboring courtroom. (See Tr. at 3109.)

Fourth, and finally, the court's findings were adequate to support the exclusion. The court clearly explained that it has a general rule prohibiting small children from attending criminal trials, and that the presence of these children in the courtroom was particularly inappropriate in this case. (See id.) This was plainly sufficient. See Davis, 2015 WL 1809048,

at *8 ("The court also made findings adequate to support the exclusion.  The court declared that 'this is no place for a young child to be sitting in on a criminal court case' and that 'it's inappropriate.'").

Having determined that all four elements of the Waller/Ledee test are satisfied, the court concludes that its exclusion of Ashburn's children from the courtroom during the jury verdict and less than two days of jury deliberations was justified.  Accordingly, this narrow partial closure did not violate Ashburn's right to a public trial under the Sixth Amendment.

Moreover, even if this exclusion had violated Ashburn's Sixth Amendment right, this violation would not entitle Ashburn to a new trial because the exclusion was trivial.  See Gibbons, 555 F.3d at 121.  Although Ashburn is correct that the triviality doctrine's application is "narrow," see United States v. Gupta, 699 F.3d 682, 688 (2d Cir. 2011), the exclusion in this case certainly falls within its scope.  The test is "whether the conduct at issue 'subverts the values the drafters of the Sixth Amendment sought to protect.'"  Gibbons, 555 F.3d at 121 (quoting Hollins, 448 F.3d at 540).  As other courts have previously concluded, the exclusion of small children from the courtroom does not subvert these values.  See, e.g., Davis, 2015 WL 1809048, at *8 (finding exclusion of defendant's four-year-old son was trivial (citing United States v. Perry, 479 F.3d 885, 890-91 (D.C. Cir. 2007) (concluding exclusion of defendant's eight-year-old son was trivial because "an eight-year-old's presence in the courtroom would neither 'ensure that judge and prosecutor carry out their duties responsibly' nor discourage[] perjury," nor would the child's attendance "encourage [a] witness[] to come forward" (quoting Waller, 467 U.S. at 46)))); see also Gupta, 699 F.3d at 688 (citing Perry with approval as reflecting the same reasoning).

Thus, because the exclusion of Ashburn's children was justified under the Sixth Amendment—and even if it were not, because the exclusion was trivial—Ashburn has failed to establish the type of "manifest injustice" that would warrant a new trial under Rule 33.

Accordingly, Ashburn's Rule 33 motion is DENIED in its entirety.

### C.     Laurent's Rule 33 Motion

Laurent advances two primary arguments in support of his motion for a new trial under Rule 33. First, Laurent argues that the court erred in denying his <u>Brady</u> motion and his related requests to admit prior statements by unavailable witnesses or to issue a missing witness instruction. Second, Laurent argues that his trial should have been severed from the trial of Defendant Merritt.

1.     <u>Exclusion of Unavailable Witness Statements and Denial of Request for Missing Witness Instruction</u>

On March 5, 2015, Laurent moved to introduce witness statements contained in police reports or otherwise made to law enforcement regarding the assault and attempted murder of Louis Ivies (charged in Racketeering Act 7 and Count Six), and the murder of Brent Duncan (charged in Racketeering Act 4 and Count Five). (Mot. in Limine (Dkt. 385).) Laurent argued that these statements should be admitted as a sanction against the Government for its failure to comply with its obligations under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). (<u>Id.</u> at 6-8.) According to Laurent, the Government's conduct amounted to a violation of <u>Brady</u> because the timing of its disclosures regarding the identity or current addresses of these witnesses made it impossible for Laurent to use the information contained in their statements. (<u>Id.</u> at 8.) In the alternative, Laurent requested that the court provide the jury with a missing witness instruction, on the basis that the Government's failure to maintain contact with these witnesses procured their unavailability. (<u>Id.</u> at 16-17.)

73

On March 9, 2015, the court denied Laurent's motion in its entirety. (See Tr. at 2413-16.) Laurent insists this decision was erroneous, and that this error warrants granting him relief under Rule 33. (See Laurent Mem. at 13-16.)

           *a.*     *Relevant Facts*

At trial, Laurent moved under <u>Brady</u> for the admission of statements made by three unavailable witnesses. In connection with Racketeering Act 7 and Count Six, Laurent sought to introduce statements made by Louis Ivies, the victim of the assault and attempted murder. With respect to the murder of Brent Duncan, Laurent sought to introduce statements made by two unavailable witnesses: Dwight St. Louis and Mark Johnson.

           i.     Assault and Attempted Murder of Louis Ivies

Racketeering Act 7 and Count Six charged Laurent with the assault and attempted murder of Louis Ivies on July 7, 2010. (Indictment ¶¶ 19, 41-42.) Pursuant to <u>Brady</u>, on March 30, 2013, the Government produced NYPD reports reflecting law enforcement interviews with Ivies. (Gov't's Mar. 20, 2013, Ltr. (Dkt. 85).) In one interview, Ivies advised that he was informed by a close friend that the person who shot him was nicknamed "TK," and was a member of the Bloods gang. (Mot. in Limine, Ex. A (Dkt. 385-1) at 2.) A later report indicated that the NYPD had identified an individual named Tyquan Hilliard, also known as "TK." (<u>Id.</u> at 3.) Ivies subsequently selected a photograph of Hilliard from the photographic array as the person who shot him. (<u>Id.</u> at 4-5.)

The Government subsequently learned—and informed Laurent's counsel—that after Hilliard was arrested, the Kings County District Attorney's Office declined to prosecute the case. (See Gov't's Sept. 5, 2014, Mem. (Dkt. 180) at 41.) The Government explained that an NYPD detective involved in the investigation advised that Ivies failed to cooperate in the case against Hilliard. (<u>Id.</u>) The Government further advised that during a subsequent interview with the FBI

and the U.S. Attorney's Office, Ivies recanted his prior identification of Hilliard, stating that "he had named Hilliard in order to mislead the detectives who interviewed him." (Id.)

On January 13, 2015, the Government also disclosed that during an interview with law enforcement, Ivies indicated that he did not know the identity of the individual who shot him, but Ivies had referred to him as "Little Brim," and that he was sometimes called "Ricky." (Gov't's Jan. 13, 2015, Ltr. (Dkt. 263) at 1.) The Government further disclosed Ivies's true name and last known address, along with an alias that Ivies used. (Id.) However, when Laurent's counsel attempted to interview Ivies, it found that he had moved and could not be located. (Laurent Mem. at 3.) Moreover, as the Government previously indicated, it had not met with Ivies since 2011, and had no information regarding his whereabouts. (Gov't Opp'n at 59; see also Gov't's Mar. 6, 2015, Ltr. (Dkt. 390) at 2.)

ii.       Murder of Brent Duncan

Racketeering Act 4 and Count Five charged Laurent with the murder of Brent Duncan on June 19, 2010. (Indictment ¶¶ 12, 39-40.) On March 11, 2012, the Government provided Laurent's counsel with NYPD reports indicating that Dwight St. Louis had identified an individual in a photograph as the person who shot Duncan. (Gov't's May 15, 2012, Ltr. (Dkt. 56); see also Mot. in Limine, Ex. C (Dkt. 385-3) at 2.) The reports further indicated that St. Louis subsequently selected that individual from a lineup, again identifying him as the shooter. (See Mot. in Limine, Ex. D (Dkt. 385-4) at 2.) The name of the individual, Blake Baldeo, was also noted in the reports. (Id.) On June 30, 2014, the Government produced copies of the lineup photographs viewed by St. Louis. (See Gov't's June 30, 2014, Ltr. (Dkt. 149) at 3.)

On February 10, 2015, the Government advised that it was not in touch with St. Louis, but provided his date of birth and last known address. (Gov't's Feb. 10, 2015, Ltr. (Dkt. 328)

at 2.)  As the Government also previously explained, it had not met with St. Louis since 2011, and had no further information regarding his whereabouts.  (Gov't Opp'n at 60; see also Gov't's Mar. 6, 2015, Ltr. at 3.)  Laurent's counsel was never able to locate St. Louis.  (Laurent Mem. at 5.)

Pursuant to Giglio v. United States, 405 U.S. 150 (1972), on January 22, 2015, the Government disclosed a prior statement made by Mark Johnson to the NYPD.[28]  (Gov't's Jan. 22, 2015, Ltr. (Dkt. 293) at 2.)  According to the Government, Johnson stated the following:

> About half an hour prior to the end of the party, Brent [Duncan] came up to Johnson and stated "I'm about to turn it up."  Johnson did not understand why Brent said that because Brent just went back to partying.  When the party ended, Johnson went outside and was standing on the sidewalk by the back of his car.  Johnson observed a dark skin, black male, approximately 19 to 20 years old, 5'7"- 5'8" or 5'9", thin build wearing a Polo Shirt with stripes in the center and green shorts shooting.  It looked like he was shooting everywhere.  He then observed that there was a 2000 to 2003, grey or silver Lexus stopped in the street that the shooter was running towards.  Johnson made a left at the corner and heard the car speed off after the shooting had stopped.  When he looked back, Johnson observed that the shooter was gone and that the car either went straight on Schenectady Avenue or made a left turn.

(Id.)  As Laurent points out, this statement contradicted photographs of Laurent at the party, which show that he was wearing a black shirt and white shorts, as well as the testimony of cooperating witness Joelle Mitchell, who described the perpetrators fleeing on foot.  (Laurent Mem. at 5.)

On February 10, 2015, the Government advised that it was not in touch with Johnson, but provided his date of birth and last known address.  (Gov't's Feb. 10, 2015, Ltr. at 1.)  As the Government also previously explained, it had never met with Johnson, and had no further information regarding his whereabouts.  (Gov't Opp'n at 61; see also Gov't's Mar. 6, 2015, Ltr.

---

[28] The record does not make clear when Johnson made this statement, to whom Johnson made this statement, or when the Government became aware of Johnson's statement.

at 3.)  According to Laurent, the address the Government provided for Johnson was incorrect, and Laurent's counsel was never able to locate him.  (Laurent Mem. at 5.)

      *b.*     *Government's Brady Obligation*

      i.     Governing Law

Under Brady and its progeny, "the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment."  United States v. Jackson, 345 F.3d 59, 70 (2d Cir. 2003) (quoting United States v. Coppa, 267 F.3d 132, 139 (2d Cir. 2001)).  "Favorable evidence includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness."  Id. (quoting Coppa, 267 F.3d at 139).  Favorable evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," Strickler v. Greene, 527 U.S. 263, 280 (1999) (quoting United States v. Bagley, 473 U.S. 667, 676 (1985)), or would have "put the whole case in such a different light as to undermine confidence in the verdict," Kyles v. Whitley, 514 U.S. 419, 435 (1995).

Material, favorable evidence must be disclosed "in a manner that gives the defendant a reasonable opportunity either to use the evidence in the trial or to use the information to obtain evidence for use in the trial."  United States v. Rittweger, 524 F.3d 171, 180 (2d Cir. 2008) (quoting United States v. Rodriguez, 496 F.3d 221, 226 (2d Cir. 2007)).  Thus, "'Brady material that is not disclos[ed] in sufficient time to afford the defense an opportunity for use' may be deemed suppressed within the meaning of the Brady doctrine."  United States v. Douglas, 525 F.3d 225, 245 (2d Cir. 2008) (quoting Leka v. Portuondo, 257 F.3d 89, 103 (2d Cir. 2001)).

Nevertheless:

> [A]s long as a defendant possesses <u>Brady</u> evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner. There is no <u>Brady</u> violation unless there is a reasonable probability that earlier disclosure of the evidence would have produced a different result at trial . . . .

<u>Id.</u> (quoting <u>Coppa</u>, 267 F.3d at 144).

Moreover, as the Second Circuit has repeatedly indicated, "[i]t is not feasible or desirable to specify the extent or timing of disclosure <u>Brady</u> and its progeny require, except in terms of the sufficiency, under the circumstances, of the defense's opportunity to use the evidence when disclosure is made." <u>Rittweger</u>, 524 F.3d at 180-81 (quoting <u>Leka</u>, 257 F.3d at 100). Thus, for example, "disclosure prior to trial is not mandated." <u>Id.</u> at 181 (quoting <u>Leka</u>, 257 F.3d at 100). At the same time, "the longer the prosecution withholds information, or (more particularly) the closer to trial the disclosure is made, the less opportunity there is for use." <u>Leka</u>, 257 F.3d at 100. "The opportunity for use under <u>Brady</u> is the opportunity for a responsible lawyer to use the information with some degree of calculation and forethought." <u>Id.</u> at 103.

ii.     Application

Laurent does not contend that the Government failed to disclose any material evidence. Rather, Laurent argues that the Government effectively "suppressed" <u>Brady</u> material by withholding the names and addresses of these three witnesses—Ivies, St. Louis, and Johnson— for so long that defense counsel was unable to find or interview them by the time this information was disclosed. (Laurent Mem. at 15.) Presumably, Laurent claims that if this information had been disclosed earlier, he would have been able to locate these witnesses. In other words, according to Laurent, the Government's delayed disclosure of their names and addresses prevented him from effectively using the information that the Government did

disclose.  (Id.)  Laurent insists that the Government's late disclosures warrant a new trial because Brady obligates the Government "to maintain the correct addresses and to facilitate production of those witnesses."  (Id. at 15.)  This conclusion is not supported by the record or the law.

With respect to Louis Ivies, the Government began disclosing Brady material on March 30, 2013—nearly two years before trial began.  In its initial disclosure, the Government provided NYPD reports containing detailed accounts of his statements, as well as the name of the individual whom Ivies had identified as the shooter.  The Government then provided the true name, alias, and last known address of Ivies on January 13, 2015—nearly four weeks before jury selection began (on February 9, 2015), over one month before opening statements took place (on February 23, 2015), and almost two months before the Government rested (on March 9, 2015).[29] The timing of the disclosure of Ivies's identity must also be evaluated in context:  Not only was Ivies a member of the Crips (Mot. in Limine, Ex. A at 2), and therefore a target of the murder conspiracy charged in Racketeering Act 1 (see Indictment ¶ 9), but Ivies was also specifically the victim of an attempted murder in which the evidence showed that Laurent shot Ivies five times (see Gov't Opp'n at 61 n.17).  Under these circumstances, the timing of the Government's disclosures regarding Louis Ivies provided a "reasonable opportunity" for Laurent to make use of this information.  See Rodriguez, 496 F.3d at 228 n.6 ("We recognize that in many instances the Government will have good reason to defer disclosure . . . . In some instances, earlier disclosure could put the witness's life in jeopardy, or risk the destruction of evidence.").  Accordingly, the Government did not "suppress" Brady material through the manner in which it made disclosures regarding Louis Ivies.

---

[29] Jury selection took place from February 9 to February 12, 2015, and resumed the morning of February 23, 2015. (Feb. 9, 2015, Min. Entry (Dkt. 401); Feb. 12, 2015, Min. Entry (Dkt. 404).)  There were no trial proceedings during the week of February 16, 2015.

The Government's disclosures regarding Dwight St. Louis and Mark Johnson, who are alleged to have been eyewitnesses to—not victims of—a crime allegedly committed by Laurent, merit separate discussion.

With respect to Dwight St. Louis, the Government disclosed NYPD reports containing his name and detailed accounts of his statements on March 11, 2012—nearly three years before trial. Thus, Laurent's assertion that St. Louis's name was not disclosed to the defense "until the eve of trial in 2015" (Laurent Mem. at 14-15), is patently contradicted by the record. But more significantly, Laurent was clearly in possession of the "essential facts" permitting him to take advantage of the Government's disclosure in March 2012. United States v. Payne, 63 F.3d 1200, 1208 (2d Cir. 1995) (noting evidence is not "suppressed" if the defendant or his attorney "either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence" (quoting United States v. Zackson, 6 F.3d 911, 918 (2d Cir. 1993))). Laurent has not offered a single reason why the Government's disclosure almost three years earlier provided defense counsel with insufficient time to locate St. Louis, whose name is quite unusual. Although it is unclear to the court why the Government did not provide St. Louis's last known address in connection with its Brady disclosures in March 2012, the fact that the Government did not do so until February 10, 2015, does not change the court's conclusion. Where the Government has disclosed a witness's identity—along with the statements by that witness that constitute possible Brady material—nearly three years before trial, the defendant has had a reasonable opportunity to make effective use of this information.

Laurent was also provided a reasonable opportunity to make effective use of the Government's disclosures regarding Mark Johnson. The Government disclosed Johnson's name, along with his detailed prior statement to the NYPD, on January 22, 2015—eighteen days before

jury selection began, thirty-two days before opening statements took place, and forty-six days before the Government rested.[30]  Laurent has not cited—nor has the court's research uncovered—any decision in the Second Circuit holding that disclosures made this far in advance of trial have been suppressed within the meaning of Brady.

The repeated references Laurent makes to Leka, 257 F.3d 89, do not change this analysis. In that case, the prosecution had indicated "early on" that a police officer had witnessed a shooting and could identify the defendant as the perpetrator.  Id. at 99.  The prosecution did not identify the officer by name, however, until nine days before opening arguments and twenty-three days before the defense began its case.  Id. at 100.  Even then, however, the Government never made specific disclosure of what the officer had seen.[31]  Id. at 99, 100.  As a result, the Second Circuit rejected the prosecution's argument that its disclosure had been "sufficient to permit the defense to learn all that it needed to know."  Id. at 100.  The court emphasized that it was "ridiculous to think that the prosecution did not know what a police officer saw as a witness to a shooting; yet the last-minute disclosure consisted of nothing but [his] name and perhaps his address."  Id. at 101-02.  In light of the prosecution's limited disclosure, the court underscored that "[a] responsible lawyer could not put [the officer] on the stand without essential groundwork," which, by that point, the defense had no opportunity to conduct.  Id. at 103.  The court concluded that the evidence had been suppressed under Brady because the prosecution's disclosure afforded the defendant an insufficient opportunity to use the information at trial.  Id. at 102, 103.

Thus, Laurent's reliance on Leka is misplaced.  First, while the prosecution in Leka "never disclosed at any time to the defense the true nature of [the officer]'s testimony," id. at 98,

---

[30] See also supra note 29.

[31] It turned out that the officer was not able to make an identification.  See Leka, 257 F.3d at 99 n.3.

the Government disclosed Johnson's identity as well as a detailed account of his prior statement. Second, the Government made its disclosures in this case exactly twice as far in advance of trial as did the prosecution in <u>Leka</u>. Third, even though the Government has never met with Johnson and has no information regarding his whereabouts, it disclosed his last known address thirteen days before opening statements, and twenty-seven days before the defense case began. In <u>Leka</u>, the witness was a police officer ostensibly under the prosecution's control, and the record was not clear whether the prosecution ever disclosed his address. <u>Compare</u> <u>id.</u> at 100 (presuming the prosecution disclosed the officer's address), <u>with</u> <u>id.</u> at 102 (noting "perhaps" his address was disclosed). Fourth, the prosecution in <u>Leka</u> had proffered the police officer's anticipated testimony "early on" in that case. <u>Id.</u> at 99. Here, there is no evidence that the Government was aware of Johnson's statement—let alone his name or address—in 2011, or for any meaningful length of time prior to its January 22, 2015, disclosure, notwithstanding Laurent's conclusory assertion to the contrary.

In this context, <u>Leka</u> is clearly inapposite.[32] Instead, where the Government disclosed Johnson's name and statement close to three weeks before jury selection, more than a month before opening statements, and over six weeks before the defense case began, the court concludes that under the circumstances, Laurent had a "reasonable opportunity" to make use of this information, even though the Government did not disclose Johnson's last known address until February 10, 2015.

---

[32] In passing, the court observed that "the longer the prosecution withholds information, or (more particularly) the closer to trial the disclosure is made, the less opportunity there is for use." <u>Leka</u>, 257 F.3d at 100. As an example, in dicta, the court noted the "last-minute identification" of another eyewitness who had subsequently moved away. <u>Id.</u> at 100-01. The court made clear, however, that it reached its decision "solely on the basis of . . . the non-disclosure of information concerning [the police officer]." <u>Id.</u> at 97. Indeed, although the other witness had moved to Florida by the time he was identified (a week before trial), the defense knew the town in which he lived, and chose not to seek his testimony notwithstanding that opportunity. <u>Id.</u> at 93, 96.

Nonetheless, Laurent argues that because it was "'particularly within [the] power' of the Government to maintain the correct addresses and facilitate the production of those witnesses," it was error for the court to reject his <u>Brady</u> claim at trial. (Laurent Mem. at 15 (citing <u>United States v. Torres</u>, 845 F.2d 1165, 1169 (2d Cir. 1988) (outlining inquiry for determining appropriateness of missing witness charge)).) The interpretation of <u>Brady</u> underlying this argument, however, stretches the rule to an unrecognizable and unjustifiable extent. Under Laurent's view of <u>Brady</u>, even after the Government discloses material, favorable evidence, it is obligated not just to locate potential defense witnesses, but also to continuously update that information to produce those witnesses for trial. As the court has previously determined, <u>Brady</u> does not impose this obligation on the Government. (Tr. at 2413.) Indeed, Laurent does not cite any authority for this proposition, and the court's research has not revealed any decision extending <u>Brady</u>'s reach in this fashion.

Moreover, the basic rule in the Second Circuit implicitly forecloses this conclusion. As <u>Rittweger</u> makes clear, <u>Brady</u> material must be disclosed "in a manner that gives the defendant a reasonable opportunity either to use the evidence in the trial <u>or to use the information to obtain evidence for use in the trial</u>." 524 F.3d at 180 (emphasis added). This standard thus explicitly contemplates that a defendant may have to conduct additional investigation in order to obtain evidence that is admissible at trial. <u>See id.</u> If the Government can satisfy its burden by disclosing information that a defendant can then use <u>in order to obtain evidence</u> for use at trial, a priori, once the Government has disclosed the entirety of its <u>Brady</u> material[33] in a manner that provides the defendant with a "reasonable opportunity" to obtain admissible evidence, the Government has satisfied its obligation. <u>Brady</u> does not then additionally require the

---

[33] <u>See</u> <u>Leka</u>, 257 F.3d at 102 (noting "it is the prosecutor's burden to make <u>full</u> disclosure of exculpatory material" (emphasis added)).

Government to provide that evidence in admissible form (unless the Government already possesses it); nor, as relevant here, does Brady require the Government to produce a defense witness at trial, at least where that witness is a civilian with whom the Government is not in contact (as with St. Louis) or has never been in contact (as with Johnson). In other words, Brady does not obligate the Government to conduct Laurent's investigation on his behalf.

Furthermore, because the Government provided Laurent with a reasonable opportunity to obtain evidence for use at trial, this case is an inappropriate vehicle for broadening the scope of the Government's obligations under Brady. First, Laurent does not claim the Government failed to disclose any substantive evidence. Second, Laurent has made "no proffer of any defense efforts to locate or speak with" any of these witnesses.[34] See Douglas, 525 F.3d at 246. This is particularly surprising in light of the size of Laurent's defense team—which, by the time of the Johnson disclosure, included three attorneys and one private investigator. Third, one of the witnesses (Ivies) was the victim of a murder conspiracy and separate attempted murder charged in this case; another witness (St. Louis) had been identified three years before trial; and the final witness (Johnson) has never met with the Government. That Laurent was unsuccessful in his endeavor to locate these witnesses—to the extent Laurent endeavored at all—is unfortunate, but does not establish that his opportunity to do so was unreasonable.[35]

---

[34] This deficiency is especially vexing. By failing to so much as allege what efforts were undertaken to make use of the Government's disclosures, Laurent has given the court little beyond speculation to support the conclusion that he was not provided a reasonable opportunity to do so.

[35] Laurent insists, "The fact that the Government subsequently lost track of the witnesses does not excuse the Government's failure to provide the Defense with accurate and timely discovery." (Laurent Mem. at 15.) But to hold the Government responsible for Laurent's inability to locate these witnesses would effectively require the Government to conduct Laurent's investigation for him. This is not what Brady demands.

Laurent has thus failed to establish that the Government suppressed any evidence within the meaning of Brady and its progeny.[36] Because the court did not err in rejecting his Brady claim at trial, Laurent's Rule 33 motion on this basis is DENIED.

### c. Exclusion of Unavailable Witness Statements

Because these three witnesses (Ivies, St. Louis, and Johnson) were unavailable, Laurent argued at trial that their underlying statements were nonetheless admissible under Federal Rules of Evidence 803 and 807. (Mot. in Limine at 8-15.) Laurent first reasoned that although these statements were hearsay, the reports in which they were contained were admissible as either business records, under Rule 803(6), or public records, under Rule 803(8). (Id. at 8-9.) Laurent recognized, however, that even if the reports themselves were admissible, the underlying statements themselves must also fall within recognized hearsay exceptions. See Fed. R. Evid. 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule."). Accordingly, Laurent insisted that each statement should be admitted pursuant to the "residual" exception to the rule against hearsay, set forth in Rule 807, which applies where a statement has "equivalent circumstantial guarantees of trustworthiness." Fed. R. Evid. 807(a)(1). (See Mot. in Limine at 9-11.)

The court rejected this argument at trial. (Tr. at 2414-16.) The court found that even if it were to consider admitting these documents as a sanction for the Government's violation of Brady—although the court concluded that no such violation had occurred, see also supra Part III.C.1.b—none of the statements were admissible under Rule 807. (Tr. at 2415-16.) The court first pointed out that not only was Ivies's statement itself hearsay (Ivies initially recounted that he was told "TK" was his shooter), but even that statement lacked any circumstantial

---

[36] Having concluded that no favorable evidence has been "suppressed," the court declines to address Laurent's argument that this evidence was also material, a claim the Government does not address in its memorandum.

guarantee of trustworthiness where Ivies subsequently recanted that identification and refused to cooperate with law enforcement. (Id. at 2415.) The court also rejected Laurent's argument that St. Louis's statements were trustworthy because he had "no reason to lie"; under the case law, having "no reason to lie" did not amount to a circumstantial guarantee of trustworthiness. (Id. (citing United States v. Carneglia, 256 F.R.D. 384, 392-93 (E.D.N.Y. 2009)).) In addition, the court discounted the probative value of St. Louis's identification, noting that St. Louis stated only that Baldeo "looks like the guy from the party, the shooter from the party," and that this statement was made two months after the shooting. (Id.) See also Fed. R. Evid. 807(a)(3) (statement must be "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts"). Finally, the court found Johnson's statements lacked circumstantial guarantees of trustworthiness given the direct conflict with St. Louis's statements: Johnson viewed the same lineup and identified Baldeo as someone who was at the party, but insisted that the shooter was not in the lineup. (Tr. at 2416.)

In his Rule 33 motion, Laurent claims the court "misunderstood the nature of [his] argument that, even if the Court did not permit introduction of the statements for their truth, admission of the fact that these civilian eyewitnesses had identified individuals other than Mr. Laurent as the perpetrator in two crimes was relevant and probative because it tended to disprove the statements of the Government's cooperating witnesses concerning those same events." (Laurent Mem. at 14.) In other words, Laurent argues, even if these statements were not admissible for the truth of the matters asserted therein, they should have been admitted "merely for the fact that they were made."[37] (Id. at 3.) This argument has no merit.

---

[37] While Laurent does not explicitly challenge the court's conclusion that these statements were not admissible for their truth, in a footnote to his Rule 33 motion Laurent indicates that he "incorporates the arguments made in [the motion in limine] in their entirety" therein. (Laurent Mem. at 3 n.1.) Other than the argument described above, however, Laurent's Rule 33 motion does not specifically address the court's analysis under Rule 807, and the court

Hearsay is an out-of-court statement offered "to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c)(2); see also United States v. Mergen, 764 F.3d 199, 206 n.3 (2d Cir. 2014). Hearsay is generally inadmissible. Fed. R. Evid. 802. A statement is not hearsay, however, if the significance of the offered statement "lies solely in the fact that it was made," and "no issue is raised as to the truth of anything asserted." Fed. R. Evid. 801(c) advisory committee's note to 1972 proposed rules; see also 2 McCormick on Evidence § 246 (7th ed. 2013). But "[a]n argument that a statement is not offered for its truth is not tenable . . . if it is relevant only if true." 2 McCormick on Evidence § 246 n.6 (citing United States v. Sesay, 313 F.3d 591, 599-600 (D.C. Cir. 2002) (rejecting argument that statement was offered for nonhearsay purpose of showing officer's state of mind because it "clearly relies on the truth of the statement")).

The fatal flaw in Laurent's argument is that these witnesses' statements are not relevant unless they are offered for their truth. For example, Laurent contends that he "should have been permitted to introduce evidence that Ivies made statements to law enforcement in which he identified his assailant and that he never mentioned Laurent's name." (Laurent Mem. at 14.) Similarly, he argues that St. Louis and Johnson were both eyewitnesses to the Duncan homicide, but "neither one named or identified Mr. Laurent." (Id.) Laurent reasons that these statements are relevant and probative "because they tend to disprove the statements of the Government's cooperating witnesses." (Id.) But as the Government points out, these statements only tend to disprove the testimony of cooperating witnesses if the jury is permitted to credit the veracity of those statements, which the jury clearly could not—both according to the rules of evidence (as the court's Rule 807 analysis illustrates) and Laurent's own concession (that the court need not

discerns no error upon review. Thus, to the extent Laurent has renewed any of the claims he raised exclusively in his motion in limine, those arguments are rejected for the same reasons they were rejected at trial.

admit them for their truth).[38]  Consequently, these statements, offered "for the fact that they were made," constitute hearsay, and were properly excluded.  To hold otherwise "would be to permit a loophole in the hearsay rule large enough to swallow the rule itself."  Sesay, 313 F.3d at 600.

### d.  Denial of Request for Missing Witness Instruction

Alternatively, Laurent argues that even if the witnesses' statements were inadmissible, the court should have issued a missing witness instruction as another sanction for the Government's alleged Brady violation.  (Laurent Mem. at 15.)  The court considered but rejected the same argument at trial, and Laurent fails to suggest any basis for concluding this decision was erroneous.

"When 'a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction' and fails to produce such witnesses, the jury may infer that 'the testimony, if produced, would be unfavorable' to that party."  United States v. Torres, 845 F.2d 1165, 1169 (2d Cir. 1988) (quoting Graves v. United States, 150 U.S. 118, 121 (1893); Burgess v. United States, 440 F.2d 226, 231 (D.C. Cir. 1970)).  "However, when a witness is equally available to both sides, the failure to produce is open to an inference against both parties."  Id. (emphasis, citation, and internal quotation marks omitted).  The availability of a witness "depend[s] . . . on all the facts and circumstances bearing upon the witness's relation to the parties."  Id. at 1170.  Ultimately, "[w]hether a missing witness charge should be given lies in the sound discretion of the trial court."  Id. at 1170-71.

At trial, the court found that Laurent had provided no basis for concluding that any of the unavailable witnesses were "peculiarly within [the Government's] power to produce."  (Tr.

---

[38] Laurent does not, for example, argue that these statements were admissible as evidence of: the declarant's "then-existing state of mind," see Fed. R. Evid. 803(3); the effect on the listener, see, e.g., United States v. Dupree, 706 F.3d 131, 136 (2d Cir. 2013); or verbal acts with legal effect, see, e.g., id. (citing Fed. R. Evid. 801(c) advisory committee's note to 1972 proposed rules (describing statements which themselves "affect[] the legal rights of the parties")).

at 2416.)  His Rule 33 motion is no different.  Other than his conclusory allegation that it was

"particularly [sic] within [the] power" of the Government to produce these witnesses (Laurent

Mem. at 15), Laurent offers no reasoned analysis of the record regarding the relationship

between these witnesses and the Government.  Essentially, Laurent claims that a missing witness

instruction is warranted because he was unable to locate Ivies, St. Louis, or Johnson.  But that is

not the relevant inquiry; the question is whether the witness is "equally available" to the parties.

See Torres, 845 F.2 at 1169.  As the court pointed out above, the Government has no information

regarding the whereabouts of any of these witnesses.  See supra Part. III.C.1.a.  Moreover, the

Government has never met with Johnson, and it last met with St. Louis and Ivies in 2011.  Id.

Absent any other information, the court cannot conclude that these witnesses were peculiarly

within the Government's power to produce.  Accordingly, the court properly refused to issue a

missing witness instruction, and the court's denial of Laurent's request did not result in a

"manifest injustice" that warrants a new trial pursuant to Rule 33.

2.      Prejudicial Misjoinder

Laurent also moves for Rule 33 relief on the basis of "retroactive misjoinder," arguing

that he was harmed by "prejudicial spillover" from evidence introduced against Defendant

Merritt in connection with the January 28, 2011, robbery and murder of Dasta James—

specifically, Merritt's statements to law enforcement, modified in accordance with Bruton v.

United States, 391 U.S. 123 (1968), and its progeny.  (Laurent Mem. at 18-19.)  This claim lacks

merit.

"The term 'retroactive misjoinder' refers to circumstances in which the 'joinder of

multiple counts was proper initially, but later developments—such as a district court's dismissal

of some counts for lack of evidence or an appellate court's reversal of less than all convictions—

render the initial joinder improper.'"  United States v. Hamilton, 334 F.3d 170, 181

(2d Cir. 2003) (quoting <u>United States v. Jones</u>, 16 F.3d 487, 493 (2d Cir. 1994)).  "In order to be entitled to a new trial on the ground of retroactive misjoinder, a defendant must show compelling prejudice."  <u>Id.</u> at 181-82 (citations and internal quotation marks omitted).  "Such 'compelling prejudice' may be found where there is '[p]rejudicial spillover from evidence used to obtain a conviction subsequently reversed on appeal.'"  <u>Id.</u> at 182 (quoting <u>Jones</u>, 16 F.3d at 493).  The concept of prejudicial spillover "requires an assessment of the likelihood that the jury, in considering one particular count or defendant, was affected by evidence that was relevant only to a different count or defendant."  <u>Id.</u>  The Second Circuit has articulated a three-part test for determining whether there was likely prejudicial spillover sufficient to establish retroactive misjoinder.  Courts must consider: "(1) whether the evidence introduced in support of the vacated count 'was of such an inflammatory nature that it would have tended to incite or arouse the jury into convicting the defendant on the remaining counts,' (2) whether the dismissed count and the remaining counts were similar, and (3) whether the government's evidence on the remaining counts was weak or strong."  <u>Id.</u> (quoting <u>United States v. Vebeliunas</u>, 76 F.3d 1283, 1294 (2d Cir. 1996)).

Here, as the Government points out, Laurent does not claim that there were any "later developments" of the type identified by the Second Circuit—counts dismissed by district court, or convictions vacated by an appellate court—that render the initial joinder of his case to Merritt's improper.  <u>See</u> <u>Hamilton</u>, 334 F.3d at 181.  Laurent was not acquitted of any counts, and the jury found all of the racketeering acts alleged against him to have been proved beyond a reasonable doubt.  Moreover, Laurent's motion under Rule 29 seeks reversal only as to the jury's verdict regarding the marketplace website robbery conspiracy and related robberies charged in Racketeering Acts 5, 6, 8, and 9, which Laurent argues were not "related" to the racketeering

enterprise. Even if the court had found that there was indeed insufficient evidence of "relatedness"—which the court has not, see supra Part II.C—this would have no effect on the admissibility of Merritt's statements, which were introduced against Merritt in connection with Racketeering Act 12 and Counts Eleven, Twelve, Thirteen, and Fourteen. Thus, where Laurent does not seek reversal for lack of evidence of any counts of conviction, his argument is mischaracterized as a "retroactive misjoinder" claim. Instead, Laurent is essentially asking the court to revisit its rulings under Bruton in light of certain statements made by both Merritt's counsel and the Government at trial.[39]

In its December 30, 2014, Memorandum and Order, the court held admissible against Merritt modified versions of five statements that he made to law enforcement regarding the robbery and murder of Dasta James. (Dkt. 252 at 22-40.) The court subsequently found that a modified version of a statement Merritt made regarding a January 12, 2011, cellphone robbery was also admissible against Merritt. (Feb. 11, 2015, Mem. & Order (Dkt. 332) at 49-61.) While all six of Merritt's statements—in their original form—implicated Laurent in the crimes, they were modified to replace references to Laurent with specific "neutral allusions." (See, e.g., id. at 53.) Applying Bruton and its progeny in the Second Circuit—in particular, United States v. Taylor, 745 F.3d 15 (2d Cir. 2014), and United States v. Jass, 569 F.3d 47 (2d Cir. 2009)—the court determined that admitting modified versions of these six statements against Merritt would

---

[39] Alternatively, Laurent's argument could be construed as challenging the court's decisions denying his multiple pre-trial motions to sever his and Merritt's trials. (See Dec. 30, 2014, Mem. & Order (Dkt. 252) at 40-45; Feb. 11, 2015, Mem. & Order (Dkt. 332) at 61-63.) In denying these motions, the court found that Laurent had failed to meet his "heavy burden" of demonstrating that introduction of Merritt's statements, as modified, would generate the "substantial prejudice" that was "sufficiently severe to outweigh the judicial economy that would be realized by avoiding multiple lengthy trials," a determination committed to the court's "virtually unreviewable" discretion. (Dec. 30, 2014, Mem. & Order at 41 (quoting United States v. Defreitas, 701 F. Supp. 2d 309, 316 (E.D.N.Y. 2010); United States v. Sampson, 385 F.3d 183, 190 (2d Cir. 2004); United States v. Walker, 142 F.3d 103, 110 (2d Cir. 1998); United States v. James, 712 F.3d 79, 104 (2d Cir. 2013)).) Because Laurent—who is represented by counsel—does not explicitly address the court's application of these standards, the court will not construe his Rule 33 motion as challenging these decisions.

not violate Laurent's rights under the Confrontation Clause of the Sixth Amendment.  As the court explained, the test for whether a modified statement complies with <u>Bruton</u> is: (1) whether the redacted statement gives any indication to the jury that the original statement contained actual names, and (2) whether the statement, standing alone, otherwise connects co-defendants to the crimes.  <u>Jass</u>, 459 F.3d at 58 (noting critical inquiry is "whether the neutral allusion sufficiently conceals the fact of explicit identification to eliminate the overwhelming probability that a jury will not follow a limiting instruction that precludes its consideration of a redacted confession against a defendant other than the declarant").  (<u>See</u> Feb. 11, 2015, Mem. & Order at 53.)  In addition, the court instructed the jury that it could consider Merritt's statements only as evidence against Merritt himself.  (Tr. at 2967-68.)

       As the Government points out, Laurent does not argue in his Rule 33 motion that the court's pre-trial <u>Bruton</u> rulings were erroneous.  Instead, Laurent contends that statements made by Merritt's counsel during the trial, and by the Government during closing arguments, ran afoul of the court's <u>Bruton</u> rulings.  (<u>See</u> Laurent Mem. at 7-8.)  With respect to Merritt's counsel, Laurent focuses on counsel's statements that Merritt "fingered" "the other guy," or "the guy he knew," as the other participant in the robbery and murder of Dasta James.  (<u>See</u> <u>id.</u> at 7-8.) Laurent also underscores the Government's summation, in which it argued that the jury could infer that Merritt knew a gun would be used in the Dasta James robbery because Laurent frequently carried a gun and was present at the robbery.  (<u>Id.</u> at 8 (quoting Tr. at 2719).)  Laurent argues that as a result of these alleged missteps, the jury became aware that Merritt "had named 'the guy he [knew],' whom the Government believed to be [Laurent]."  (<u>Id.</u> at 19.)  According to Laurent, this violated the court's explicit instruction that counsel not suggest that Merritt

specifically named Laurent in his statements to law enforcement.  (See Feb. 11, 2015, Mem & Order at 65.)

As the court ruled at trial, Merritt's counsel's embellishments did not run afoul of <u>Bruton</u>. (Tr. at 2007-09.)  Notwithstanding the court's warnings that counsel adhere to the carefully worded statements as modified, counsel's ambiguous suggestion that Merritt "fingered" someone else in the robbery and murder does not, in itself, suggest that he actually named his co-conspirator or that the co-conspirator was Laurent, even where counsel explained it was a "guy he knew."  <u>See</u> <u>Jass</u>, 569 F.3d at 61-62 (noting question is whether redacted confession signaled to the jury that declarant "had actually named" co-defendant).  The purpose of modifying a confession is not to obscure the fact that a declarant confessed to participation with a co-conspirator, but rather, to use words "that might actually have been said by a person admitting his own culpability in the charged conspiracy while shielding the <u>specific identity</u> of his confederate."  <u>Taylor</u>, 745 F.3d at 28 (emphasis added) (quoting <u>Jass</u>, 569 F.3d at 62).  (<u>See also</u> Dec. 30, 2014, Mem. & Order at 31.)  Merritt's counsel's suggestion that Merritt pointed to someone else as the shooter—even when coupled with the assertion that Merritt knew that person—did not contravene this court's rulings.  <u>See, e.g.</u>, <u>Taylor</u>, 745 F.3d at 29 (noting Second Circuit has previously allowed proper names to be replaced by "friend" (citing <u>United States v. Benitez</u>, 920 F.2d 1080, 1087 (2d Cir. 1990))).  (<u>See also</u> Feb. 11, 2015, Mem. & Order at 57 n.33 (noting that even redacted version of Merritt's statement, which identified shooter as another Folk member, did not violate <u>Bruton</u>).)

Moreover, it is clear that Merritt's statements, standing alone, did not otherwise connect Laurent to the robbery and murder of Dasta James.  <u>See</u> <u>Jass</u>, 569 F.3d at 58; <u>see also</u> <u>United States v. Williams</u>, 936 F.2d 698, 700-01 (2d Cir. 1991) ("[T]he appropriate analysis to be used

when applying the Bruton rule requires that [the court] view the redacted confession in isolation from the other evidence introduced at trial."). Rather, it was only when the Government introduced independent evidence placing Laurent at the scene—such as the cell site data and video of Laurent entering and leaving the building before and after the murder—that Laurent was connected to the crime.[40] Cf. Gray v. Maryland, 523 U.S. 185, 196 (1998) (defendant's Sixth Amendment right violated where jury could "immediately" infer that declarant inculpated co-defendant, "even were the confession the very first item introduced at trial"). Accordingly, the Government's argument in summation was also consistent with Bruton and its progeny. As the Second Circuit has explained, there is no Sixth Amendment violation if the jury infers that that the Government believed Laurent was "the other guy" that Merritt acknowledged, but—as far as the jury was aware—did not specifically identify in his confession. See Jass, 569 F.3d at 63.

Most importantly, Laurent has failed to demonstrate the "compelling prejudice" necessary to establish his entitlement to a new trial on the ground of retroactive misjoinder. See Hamilton, 334 F.3d at 181-82. The court finds that Laurent did not suffer any "prejudicial spillover" because the Government's evidence of Laurent's guilt with respect to the counts of conviction was overwhelming, as the court outlined above, see supra Part I.B. See Hamilton, 334 F.3d at 182 (requiring courts to consider whether Government's evidence on remaining counts was "weak or strong"). Because Laurent is therefore not entitled to relief under Rule 33, his motion is DENIED in its entirety.

### D. Merritt's Rule 33 Motion

In his letters, Merritt articulates four possible grounds for Rule 33 relief. Merritt argues that: (1) his defense was prejudiced by the court's Bruton rulings, (2) the jury verdict was

---

[40] As the Government points out, Laurent does not argue that the court erred in admitting evidence of Laurent's participation in the robbery and murder of Dasta James. (See also Feb. 11, 2015, Mem. & Order at 37-38.)

inconsistent, (3) he was prejudiced by local media coverage, and (4) the court's treatment of his counsel denied him a fair trial.

### 1.    Admission of Modified Statements to Law Enforcement

The court first considers Merritt's <u>Bruton</u> argument, which is essentially the opposite of Laurent's <u>Bruton</u> argument.  Merritt claims that he was prejudiced because the jury could not be made aware that Merritt specifically identified Laurent as Dasta James's killer.  (Merritt Supp. Ltr. at 3.)  According to Merritt, the redaction of his references to Laurent was an unfair "straightjacket" that made it appear that Merritt "was either covering up for someone or playing it too cute by half with law enforcement."  (<u>Id.</u>)  In other words, Merritt argues that the court's <u>Bruton</u> rulings prevented counsel from arguing that Merritt was forthcoming with law enforcement.

As an initial matter, the evidence at trial revealed that—irrespective of any modifications approved by the court—Merritt was <u>not</u> entirely truthful in his statements to law enforcement.  In fact, as the court has already observed, the Government demonstrated that Merritt lied about several important facts.  <u>See</u> <u>supra</u> Part I.B.7.  Merritt initially denied being involved in the robbery and murder of Dasta James, before he was confronted with telephone records and surveillance video that placed him at the scene of the crime.  Similarly, it was not until Merritt's final statement to law enforcement that he acknowledged knowing in advance that the other participant was planning to rob James.  Most significantly, Merritt consistently lied to law enforcement about the number of participants in the crime.  Whereas Merritt continued to insist that only he and Laurent were involved, the surveillance video established that there were actually three participants.  And not only did the Government prove that certain aspects of Merritt's statements were outright falsehoods, but the Government also successfully argued that Merritt's self-serving explanations—that he just happened to be walking by when someone else

robbed Keith Benjamin on January 14, 2011, and just happened to be present when someone else killed Dasta James—were effectively incredible. (See Tr. at 2712-13.)

Even more importantly, Merritt has failed to establish that the modifications unfairly distorted the original statements or excluded substantially exculpatory information, which is the relevant inquiry—as this court has repeatedly explained. See United States v. Alvarado, 882 F.2d 645, 651 (2d Cir. 1989) ("rule of completeness" embodied in Federal Rule of Evidence 106 is violated "only where admission of the statement in redacted form distorts its meaning or excludes information substantially exculpatory of the declarant"), overruled on other grounds by Bailey v. United States, 516 U.S. 137 (1995); see also United States v. Mussaleen, 35 F.3d 692, 696-97 (2d Cir. 1994) (no abuse of discretion to admit redacted version of statement that "did not unfairly distort the original, and certainly did not exclude substantially exculpatory information"). (See Jan. 21, 2015, Mem. & Order (Dkt. 288) at 3-4; Feb. 11, 2015, Mem. & Order at 64-65; Feb. 27, 2015, Mem. & Order (Dkt. 379) at 10.) In fact, the Second Circuit has specifically rejected the argument that the rule of completeness is violated where a Bruton redaction "distorts" the meaning of a statement by conveying the impression that the declarant omitted a co-defendant's name in order to protect him. See United States v. Yousef, 327 F.3d 56, 153-54 (2d Cir. 2003). Moreover, the fact that Merritt disclosed the name of one co-conspirator—notwithstanding his failure to disclose the participation of another co-conspirator—in no way negates his guilt with respect to the murder of Dasta James. As the Government points out, the modified statements are arguably less damaging to Merritt, in that his original statements acknowledge a relationship with Laurent, whose role in Six Tre was the subject of extensive testimony at trial, and where both he and Laurent were charged with racketeering in connection with their membership in a violent enterprise. (See Gov't Opp'n at 70.)

Although Merritt had an interest in having his statements presented in complete context, the court had "concurrent obligations" to protect the interests of Merritt's co-Defendants and "to consider the interests in judicial economy, which [were] advanced by a joint trial." Yousef, 327 F.3d at 154. Especially in light of the evidence adduced at trial, Merritt's argument does not seriously challenge the court's pre-trial analysis of the relative weights those interests carried. (See Jan. 21, 2015, Mem. & Order at 4-5.) Accordingly, Merritt is not entitled to Rule 33 relief on the basis of the court's Bruton rulings.

2.    Consistency of Jury Verdict

Merritt also argues, without citation or explanation, that the verdict "feels inconsistent." (Merritt Supp. Ltr. at 3.) Specifically, Merritt questions how the jury could have found Racketeering Act 12(C)—which charged Merritt with the felony murder of Dasta James—to be proved, when the jury simultaneously acquitted Merritt on Count Thirteen (Unlawful Use of a Firearm) and "impliedly acquitted" Merritt on Count Fourteen (Causing Death Through Use of a Firearm), in connection with the same underlying facts.  (See id.; see also Jury Verdict (Dkt. 454) at 18 (instructing jury to indicate verdict on Count Fourteen if and only if it found Merritt guilty as to Count Thirteen).)  To the extent Merritt seeks Rule 33 relief on the basis of "inconsistent verdicts," his motion is DENIED.

First, as the Government points out, the verdicts are not inconsistent.  Merritt was charged in Racketeering Act 12(C) with the murder of Dasta James, in violation of New York Penal Law sections 125.25(3) and 20.00.  (Indictment ¶ 31.)  Under section 125.25(3), a person is guilty of second-degree murder when "[a]cting either alone or with one or more persons, he commits or attempts to commit robbery . . . and, in the course of and in furtherance of such crime or immediate flight therefrom, he, or another participant . . . causes the death of a person other

than one of the participants."[41]  Thus, in order to find Racketeering Act 12(C) proved, it was not

necessary for the jury to find that Merritt knew that a co-conspirator would be carrying a firearm

during the robbery of Dasta James.  (See Tr. at 3029-32.)  However, the jury did have to make

that finding in order to convict Merritt of the unlawful use of a firearm in connection with Count

Thirteen (and relatedly, to convict him of causing death through the use of a firearm in Count

Fourteen).[42]  (Indictment ¶¶ 49, 50; Tr. at 3070-74.)  See also Rosemond v. United States, 134 S.

Ct. 1240, 1249 (2014) (holding that defendant must have advance knowledge of firearm to be

found guilty of aiding and abetting violation of 18 U.S.C. § 924(c)); United States v. Robinson,

--- F.3d ---, No. 14-809-CR, 2015 WL 5023781, at *3 (2d Cir. Aug. 26, 2015) (same).

Therefore, the jury's verdict was not inconsistent.

Second, and more importantly, it is well settled that a conviction on one count of an

indictment may not be challenged because it is inconsistent with an acquittal on another count.

See Dunn v. United States, 284 U.S. 390, 393 (1932).  The Supreme Court unanimously

reaffirmed this rule in United States v. Powell, 469 U.S. 57 (1984), where a jury acquitted the

defendant of conspiracy to possess and possession of cocaine with intent to distribute (as

predicate offenses), but convicted her of using a telephone to facilitate those crimes (the

compound offense).  Id. at 59-60.  In refusing to vacate arguably inconsistent verdicts, the Court

explained that although a jury is presumed to follow its instructions, it may make its ultimate

decisions "for impermissible reasons," such as "mistake, compromise, or lenity."  Id. at 63, 65.

Moreover, the Court reasoned "[t]he fact that the inconsistency may be the result of lenity,

---

[41] Racketeering Act 12(C) was also charged under an aiding and abetting theory.  (Indictment ¶ 31 (citing N.Y. Penal Law § 20.00); Tr. 3031-32.)

[42] Although the court also charged Counts Thirteen and Fourteen under the theory of liability set forth in Pinkerton v. United States, 328 U.S. 640, 647 (1946), the jury was still required to find that it was reasonably foreseeable that a firearm would be used and brandished pursuant to the conspiracy to rob Dasta James.  (Tr. at 3074-76.)  Evidently, the jury did not.

coupled with the Government's inability to invoke review [as a result of the Constitution's Double Jeopardy Clause], suggests that inconsistent verdicts should not be reviewable." Id. at 66; see also id. at 67 (observing that courts "have always resisted inquiring into a jury's thought process"). Thus, where a jury reaches inconsistent verdicts, its decision to do so is unreviewable, and "the court is not to try to guess which of the inconsistent verdicts is 'the one the jury really meant.'" United States v. Acosta, 17 F.3d 538, 545 (2d Cir. 1994) (quoting Powell, 469 U.S. at 68); see also id. ("When verdicts are inconsistent, '[t]he most that can be said . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt.'" (quoting Powell, 469 U.S. at 64-65)). Merritt's protection against an irrational verdict "is his ability to have the courts review the sufficiency of the evidence to support his conviction." Id.

Consequently, even if the jury's verdict were inconsistent—which it was not—Merritt's claim of inconsistent verdicts would not entitle him to relief under Rule 33. Therefore, to the extent his motion is based on this ground, it is DENIED.

### 3. Effect of Media Coverage

The court turns next to Merritt's claim for Rule 33 relief based on local media coverage of the trial that "demonized [his co-Defendant] Laurent and heroicized the presiding judge." (Merritt Supp. Ltr. at 2.) Merritt argues that he was prejudiced by local media coverage because "the press routinely appended the footnote that 'defendant Merritt is also charged with murder' when he was not." (Id.) In fact, Merritt was charged with murder in this case: Racketeering Act 12(C) charged Merritt with the felony murder of Dasta James under New York State law (Indictment ¶ 31), and Count Fourteen charged Merritt with causing the death of Dasta James through the use of a firearm, noting that the "killing" alleged was a murder, as defined by 18

U.S.C. § 1111(a) (id. ¶ 50).  More importantly, Merritt's argument that he was prejudiced by local media coverage is meritless.

<em>a.    Relevant Facts</em>

During the course of jury selection, the <u>New York Daily News</u> ("<u>Daily News</u>") published two articles discussing Laurent's violent conduct in connection with his attendance at trial proceedings.  The first article appeared in the online version of the <u>Daily News</u> on February 10, 2015, and discussed Laurent's outburst during proceedings the prior day, when he—among other things—cursed at the court.  John Marzulli, <u>Brooklyn gang member charged with killing rival curses at judge, gets kicked out of trial</u>, Daily News (Feb. 10, 2015), http://nydn.us/1IH6IDL.  That day, during a break in the jury selection process, the court brought the article to the attention of the parties, and noted that because it was not published in the print edition, "you have to search pretty hard to find it, fortunately."  (Tr. at 264.)[43]  No Defendant raised any concerns at that time.  (See id.)

During voir dire the next day, February 11, 2015, counsel for Laurent requested that the court ask a prospective juror—who indicated in his juror questionnaire that he read the <u>Daily News</u>—whether he had read any articles about this case in particular.  (Id. at 565.)  When the court asked, the prospective juror stated that he had inadvertently read the article that appeared the previous day, but that he had not discussed it with any other prospective jurors, and that it would not affect his ability to be fair and impartial.  (Id. at 567-68.)  Nevertheless, the court ultimately struck this prospective juror for cause, based on his failure to follow the court's instructions not to read anything about the case.  (Id. at 578-79.)

---

[43] The court sealed the transcript of this proceeding pursuant to a motion by Defendant Laurent.  (Tr. at 260, 265.)  The court hereby ORDERS that this portion of the transcript be unsealed.

The following day, February 12, 2015, as Laurent was being transported to the courthouse, he kicked out the window of the transport vehicle, injuring two Deputy U.S. Marshals, who were taken to the hospital to be treated for shards of glass in their eyes. Prior to resuming jury selection, the court asked a Deputy U.S. Marshal to provide a report of Laurent's most recent conduct for the record. (Id. at 635.) Before that report was provided, Laurent's counsel moved to seal the proceedings because the press was in the courtroom. (Id.) The court denied Laurent's application, reasoning that the public had the right to be present, and indicating that the court would take any steps necessary to guarantee Defendants' right to a fair trial. (Id.) Ashburn and Merritt then moved for a mistrial, which the court denied. (Id. at 637.) The Deputy U.S. Marshal then provided his report. (Id. at 640-41.) That afternoon, the Daily News published an article concerning Laurent's actions. John Marzulli, Brooklyn thug banished from court after kicking out van window, attacking marshals, Daily News (Feb. 12, 2015), http://nydn.us/1DKiYPu. Defendants never brought this article to the court's attention, however, nor did they specifically request that the court conduct any additional voir dire based its publication.[44]

Nonetheless, throughout the course of jury selection, Defendants repeatedly requested that the court inquire whether prospective jurors read the Daily News and whether they had read any articles about this case in particular. The court obliged, often on the basis of Defendants' specific requests, but other times sua sponte. (See Tr. at 627-28; 675-76; 690-92; 703-04; 859-60; 904.) None of the prospective jurors who were asked these questions had read any

---

[44] On February 24, 2015, the second day of testimony, the Daily News published a third article discussing Laurent's request to be permitted back in the courtroom. John Marzulli, Brooklyn gang thug pleads to be allowed back into courtroom after outburst, Daily News (Feb. 24, 2015), http://nydn.us/1JGXWX1. As the Government points out, Defendants did not request that the court conduct any additional examination based on the publication of this article, which did not mention the names of Laurent's co-Defendants. Thus, Merritt's name was mentioned in only two articles, the latter of which preceded the start of testimony by thirteen days.

articles about the case, and each affirmed their willingness to follow the court's instruction not to read any articles or conduct any research concerning the case.  (Id.)  In addition, during its preliminary remarks, the court instructed the jury that it "must not read, listen to, watch or access any accounts of this case on the internet, nor research nor seek outside information about any aspect of this case."  (Id. at 55; see also id. ("You must not consider anything you may have read or heard about the case outside of this courtroom, whether before or during the trial or during your deliberations.  If you see, hear or read any news about this case, change the channel on your TV, switch the radio station in your car, flip to the next page of the newspaper or click to the next online article.  Do not attempt any independent research or investigation about this case.").)  And at the conclusion of each trial day, the court again instructed the jury not to read, listen to, or watch any accounts of the case.

> b.      *Governing Law*

"Adverse publicity, without more, is not necessarily prejudicial.  The crucial issue is whether the jurors retain the requisite impartiality in the face of such publicity."  United States v. El-Jassem, 819 F. Supp. 166, 176 (E.D.N.Y. 1993), aff'd, 48 F.3d 1213 (2d Cir. 1994) (unpublished table decision); see also United States v. Gaggi, 811 F.2d 47, 52 (2d Cir. 1987) ("It is the impartiality of the jurors—not the quantum of publicity—that determines whether the trial proceedings may be fairly conducted.").  "Even where adverse publicity speaks directly to the character or possible guilt of the accused, courts have properly refused to grant a new trial if the trial judge concludes that no prejudice resulted."  Id. at 176-77 (collecting cases).

Although a trial judge "has wide discretion in determining how to pursue an inquiry into the effects of extra-record information upon a jury," United States v. Chang An-Lo, 851 F.2d 547, 558 (2d Cir. 1988), the Second Circuit has set forth general guidelines that courts

should following in determining whether a defendant has been unfairly prejudiced by media coverage:

> The simple three-step process is, first, to determine whether the coverage has a potential for unfair prejudice, second, to canvas the jury to find out if they have learned of the potentially prejudicial publicity and, third, to examine individual exposed jurors—outside the presence of the other jurors—to ascertain how much they know of the distracting publicity and what effect, if any, it has had on that juror's ability to decide the case fairly.

Gaggi, 811 F.2d at 51 (citing United States v. Lord, 565 F.2d 831, 838-39 (2d Cir. 1977)). "Ultimately, the trial judge must examine the 'special facts' of each case to determine whether the jurors remained impartial." Id. (quoting United States v. Persico, 425 F.2d 1375, 1382 (2d Cir. 1970)). "[A]bsent evidence to the contrary, [courts] presume that jurors remain true to their oath and conscientiously observe the instructions and admonitions of the court." United States v. Cartelli, 272 F. App'x 66, 69 (2d Cir. 2008) (summary order) (quoting United States v. Rosario, 111 F.3d 293, 300 (2d Cir. 1997)); see also United States v. McDonough, 56 F.3d 381, 387 (2d Cir. 1995) (noting "district court was entitled to presume that the jury followed its instructions to avoid contact with news reports about the trial and to limit their exposure if contact was unavoidable" (citing United States v. Casamento, 887 F.2d 1141, 1154 (2d Cir. 1989))).

### c. Application

This court properly followed the Second Circuit's three-step process and ensured that it empaneled a fair and impartial jury. First, the court brought the initial Daily News article to the attention of the parties, and expressed its concerns regarding future articles with the potential to cause prejudice. (Tr. at 264.) Second, the court repeatedly asked prospective jurors whether they had read any articles about the case, and throughout voir dire, continued to instruct prospective jurors not to read anything about the case. Third, when one prospective juror

indicated that he had read the February 10, 2015, article, the court struck the juror—even though the juror stated that he could be impartial—because the juror had failed to follow the court's instructions. The court further instructed the jury on each trial day that it was not to read, listen to, or watch any news reports concerning the case, and no juror later mentioned encountering any local media coverage. See United States v. Zichettello, 208 F.3d 72, 106 (2d Cir. 2000).

Given the court's clear adherence to the guidelines set forth in Gaggi, and the fact that Merritt has not identified any evidence that the jury failed to follow the court's instructions, the court presumes that the jurors remained impartial. See United States v. Elfgeeh, 515 F.3d 100, 129 (2d Cir. 2008) ("If [the Gaggi] process is followed, [courts] may presume, in the absence of any indication to the contrary, that the jurors have followed the court's instructions and have rendered their verdict solely on the basis of the evidence at trial."); see also Cartelli, 272 F. App'x at 70 (finding appellant "made no showing which would cause [the court] to reject the presumption that jurors are truthful" (citing United States v. Cox, 324 F.3d 77, 87 (2d Cir. 2003) (noting "a court should generally presume that jurors are being honest"))). As a result, the court concludes that Merritt was not unfairly prejudiced by local media coverage of this case, and his Rule 33 motion on this basis is DENIED.

4.        Treatment of Counsel

Finally, Merritt argues that the court treated his counsel unfairly, including in the jury's presence, and that this alleged treatment "visited incalculable harm on Merritt's cause." (Merritt Supp. Ltr. at 1.) In light of the court's authority to control the conduct of its proceedings, and the absence of unfair prejudice to Merritt's case—as Merritt's counsel conceded at trial—Merritt is not entitled to a new trial under Rule 33.

a.    *Governing Law*

Federal Rule of Evidence 611 provides that "[t]he court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment."  Fed. R. Evid. 611(a).  Thus, the Second Circuit has explained that a trial judge "exercises broad discretion in controlling the conduct of trial and the presentation of evidence."  United States ex rel. Nelson v. Follette, 430 F.2d 1055, 1059 (2d Cir. 1970); see also United States v. Quattrone, 441 F.3d 153, 183 (2d Cir. 2006) ("The trial-management authority entrusted to district courts includes the discretion to place reasonable limits on the presentation of evidence." (citation and internal quotation marks omitted)).  Because the court's duty to see the law correctly administered "cannot be properly discharged if the judge remains inert," a federal trial judge "is not a passive spectator or moderator."  United States v. Filani, 74 F.3d 378, 385 (2d Cir. 1996).

In determining whether the court's conduct toward defense counsel in front of the jury was sufficiently harmful as to warrant a new trial, "[t]he test is whether the jury was so impressed with the judge's partiality to the prosecution that it became a factor in determining the defendant's guilt, or whether it appear[ed] clear to the jury that the court believe[d] the accused is guilty."  United States v. Manselli, 116 F. App'x 298, 300 (2d Cir. 2004) (summary order) (quoting United States v. Amiel, 95 F.3d 135, 146 (2d Cir. 1996)).  Thus, a defendant is entitled to relief under Rule 33 only if the court's comments were "so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial."  United States v. Pisani, 773 F.2d 397, 402 (2d Cir. 1985) (citing United States v. Robinson, 635 F.2d 981, 984 (2d Cir. 1980)).  As the following discussion illustrates, Merritt's claims fail this test.

b.    *Application*

Merritt argues that the court's conduct in the presence of the jury resulted in unfair prejudice in three specific instances.  First, Merritt argues that the court "irreparably injured" his case when it admonished his counsel for failing to introduce himself to a witness before proceeding with his cross-examination, and instructed counsel that he would have to start his examination from the beginning as "penance."  (Merritt Supp. Ltr. at 1.)  However, the record reflects that on at least two prior occasions, the court had asked counsel to introduce himself to witnesses before commencing examination—an instruction that counsel continued to disregard.[45] (See Tr. at 1247, 1836.)  The record further reflects that at the point when the court interrupted counsel and directed him to begin again, counsel had begun to ask inappropriate and harassing questions of the witness, who had not been hostile.[46]  See Fed. R. Evid. 611(a)(3) (authorizing court to exercise reasonable control over mode of examination to "protect witnesses from harassment or undue embarrassment").  Under these circumstances, the court was well within its discretion to admonish Merritt's counsel, and the court's comments were not so severe as to deny Meritt's right to a fair trial.  See also Pisani, 773 F.2d at 403-04 ("At least some of [the trial judge]'s comments were provoked by counsel's continuing to do things that the court had

---

[45] As the Government points out, the court provided the same instruction to counsel for Defendant Laurent when counsel failed to introduce himself to cooperating witness Kevin Bell.  (Tr. at 559.)  Laurent's counsel subsequently complied with this instruction.  (E.g., id. at 858, 902, 937, 1053.)  Counsel for Defendant Ashburn also adhered to this practice in examining adverse witnesses throughout the trial (e.g., id. at 138, 225, 302, 567, 1002), as did counsel for the Government (id. at 2556).

[46] Through his questions to a first-responder witness to the Dasta James murder, counsel had begun to suggest that the witness was somehow to blame for the death of the victim—who had been shot in the head and back—by asking whether the witness had administered CPR.  (See Tr. at 1864.)  Counsel asked the witness if, "looking back, might you have tried . . . [to] do different?"  (Id. at 1865.)  After the court sustained the Government's objection to this question, counsel asked the witness, "Tough spot to be in to have to answer that question today; right?  Right?  Right, sir?"  (Id.)  Although counsel withdrew the question after the Government objected again, the court responded by striking the entire cross-examination up to that point, and directed counsel to start over by introducing himself to the witness.

specifically cautioned him to avoid, a factor that properly may be taken into account to determine whether defendant was prejudiced." (citing <u>Robinson</u>, 635 F.2d at 985)).

Second, Merritt complains that the court "irreparably harmed" his case when the court stated "God forbid," after Merritt's counsel asked if he should repeat a question during cross-examination of a criminal investigator, Erik Nesbitt.  (Merritt Supp. Ltr. at 1.)  Yet the six pages of transcript leading up to this comment reflect that the court had sustained seven objections to counsel's questions, and had twice asked counsel not to cut off the witness when he was attempting to answer counsel's questions.  (<u>See</u> Tr. at 2478-84.)  Merritt's counsel subsequently moved for a mistrial based on the court's remarks.  (<u>Id.</u> at 2509.)  In response, the court explained at sidebar:

> The problem is that some of what you do I view as being somewhat abusive of the witnesses, in the sense that when you stop them from finishing an answer and you go after them in your inimitable style—which is your style, I accept that, that's your style—it has the effect of, in my view, harassing witnesses.  I am here to make sure that your client gets a fair trial and that the witnesses are not abused. . . .
>
> Sometimes you have gone overboard, I have not said a single word, because I understand that you have a style.  The problem becomes when—take this particular witness.  This particular witness is not exactly a hostile witness.  This witness is not here to point a finger at your client as having seen something that your client did.  This is, I would say, one of the more benign or straightforward witnesses that we've had at this trial, not a cooperator.  And yet, you know, if I see something that's happening, like the kind of aggressive and I think over-the-top behavior, I've said to you on a number of occasions that you should let the witness finish an answer, but your style is to ignore me in effect and do what you want.  That's fine.  But you have to be prepared—I'm not going to call you to sidebar every time you do something abusive.  There comes a point where I'm going to tell you straight out, because that's my obligation.

(<u>Id.</u> at 2512-13.)  Accordingly, the court's comment had been precipitated by counsel's continued disregard of the court's instructions with respect to the examination of witnesses.  <u>See</u>

<u>also</u> Fed. R. Evid. 611(a).  In this context, the court's remark was not so damaging as to have

prejudiced Merritt's case.  <u>See Pisani</u>, 773 F.2d at 403-04.

Third, Merritt complains that during his counsel's cross-examination of cooperating

witness Kevin Bell, the court "irreparably harmed" Merritt's cause by "imparting the notion, in

front of the jury, that the defense attorney has to handle with kid gloves, the principal adverse

witness who did not deserve solicitous treatment."  (Merritt Supp. Ltr. at 2.)[47]  Notwithstanding

his characterization of the court's conduct, the record reflects that Merritt's counsel was

harassing Bell by repeatedly asking inappropriate questions—even after the court sustained

multiple objections by the Government.  (<u>See, e.g.</u>, Tr. at 637 ("Q:  You're not a stupid fellow,

are you?").)  In particular, Merritt's references a portion of the following exchange:

> Q:  Now, forgive me, but who the hell are you—
>
> MS. MACE:  Objection, Your Honor.
>
> Q:  —to break into—
>
> MS. MACE:  Objection.
>
> THE COURT:  Sustained.
>
> Q:  Who are you to break and enter into an apartment that doesn't
> belong to you?
>
> MS. MACE:  Objection, Your Honor.
>
> THE COURT:  Sustained.
>
> Q:  What gives you the right—
>
> MS. MACE:  Objection.
>
> Q:  —to break into an apartment or more than one that doesn't
> belong to you?

---

[47] While Merritt also complains that the court "more than once threatened to terminate [his counsel]'s cross examinations," Merritt fails to provide any citation to the trial transcript.  (<u>See</u> Merritt Supp. Ltr. at 2.)  To the extent the court did so in response to either counsel's improper questioning or disregard of the court's instructions, it was consistent with its obligation under Rule 611 to ensure that the trial was conducted in a fair and orderly manner.

THE COURT:  Sustained.  Don't answer.  Next question.

Q:  And when you used your shoulder to break into two apartments that didn't belong to you, you had no conscience about doing that, did you?

MS. MACE:  Objection, Your Honor.

THE COURT:  Sustained.  Sustained.  Next question.

(Id. at 638.)  The record thus establishes that the court properly controlled the conduct of the trial by proscribing counsel's ability to ask improper, argumentative questions, or to otherwise harass the Government's witness.  See Fed. R. Evid. 611(a); Robinson, 635 F.2d at 985 ("Such misconduct by defense counsel may properly be taken into account by [the court] in determining whether a defendant was prejudiced by the judge's response.").

Finally, notwithstanding his contrary position at trial, Merritt now argues that the harm to his case "was not undone by the generic charge to the jury having to do with lawyers," and that the court should have granted a mistrial "when these issues were raised at sidebar."  (Merritt Supp. Ltr. at 3.)  At that sidebar, however, the court indicated that it would address Merritt's complaints by instructing the jury to disregard the court's admonishments of counsel.  (Tr. at 2513.)  Merritt's counsel responded, "Problem solved.  Application withdrawn."  (Id.)  Accordingly, the court instructed the jury:

At times during the trial, I found it necessary to admonish the lawyers.  You should not, however, let that prejudice you toward a lawyer or that lawyer's client because I have found it necessary to correct him or her.  To the contrary, each attorney in this trial has professionally and competently served his or her client, and the Court has great respect for all the attorneys in this courtroom.

(Id. at 2942-43.)  Thus, to the extent the court's conduct toward counsel resulted in any prejudice to Merritt's case, it was cured by this instruction—even to the satisfaction of Merritt's counsel, who withdrew his motion for a mistrial in response to the court's offer to include such an

instruction in its charge to the jury.  See Pisani, 773 F.2d at 404 (noting district judge "at least partially mitigated the possibly prejudicial impact of his comments by explaining to the jury several times that his admonishments of counsel should have no bearing on their deliberations or determinations" (citing Robinson, 635 F.2d at 985)).

Most importantly, Merritt's complaints do not support finding that the jury was "so impressed" with the court's partiality to the Government that it became a factor in determining Merritt's guilt, or that it appeared clear to the jury that the court believed Merritt was guilty. Amiel, 95 F.3d at 146.  The court's comments were focused exclusively on the improper conduct of Merritt's counsel in cross-examination—the control of which is committed to the court's broad discretion—and never on the substance of his presentation.  Cf. Pisani, 773 F.2d at 403 (finding defendant not deprived of fair trial even though "with distressing frequency," court characterized counsel's questions as, among other things, "completely without merit").  Moreover, the absence of unfair prejudice is illustrated by the fact that Merritt was the only Defendant in this lengthy racketeering trial to be acquitted on any counts of the Indictment.[48]

---

[48] This fact also significantly undermines Merritt's counsel's speculation that he "might have been more aggressive in defense of this cause if [he] had not had to labor under the threat to [his] livelihood" caused by the court's suggestion—outside the presence of the jury—that it had left open the possibility of referring counsel for criminal contempt of court based on his repeated violation of the court's instructions.  (Merritt Supp. Ltr. at 3; see Tr. at 2007-08.)  While the Second Circuit has acknowledged that even remarks to counsel made outside of the jury's presence "may unnerve an attorney and make it difficult for him to serve his client to the full extent of his ability," Robinson, 635 F.2d at 986, the court's comment—understood in context—did not deprive Merritt of a fair trial.

Even before trial commenced in this case, Merritt's counsel—quite egregiously—explicitly threatened to intentionally deprive his client of the effective assistance of counsel as a means of protesting the court's decision to admit redacted versions of Merritt's statements to law enforcement pursuant to Bruton v. United States, 391 U.S. 123 (1968).  (See Def. Merritt's Jan. 19, 2015, Ltr. (Dkt. 283) at 1-2.)  Although counsel subsequently represented that he would not "shrink from [his] responsibility" to defend his client, the court warned counsel that he could be subject to criminal sanctions for refusing to comply with the court's Bruton rulings.  (Jan. 21, 2015, Mem. & Order at 5, 7.)  The court subsequently reminded counsel that violation of the court's instructions regarding his client's prior statements could also potentially cause a mistrial.  (Feb. 11, 2015, Mem. & Order at 65.)  Nonetheless, counsel proceeded to "run the risk of a mistrial" during cross-examination by embellishing the court-approved language that had been carefully developed in advance of trial.  (See generally Tr. at 2007-10.)  Thus, counsel's conduct, which threatened to "lead[] to the brink of a possible mistrial," is properly taken into account in determining whether Merritt was prejudiced by the court's remark.  Robinson, 635 F.2d at 985.

Because the court's conduct was not so prejudicial as to deny Merritt a fair trial, see id. at 402,

his motion for Rule 33 relief is DENIED.

## IV. CONCLUSION

Accordingly, for the reasons set forth above, each Defendant's Rule 29 motion and each

Defendant's Rule 33 motion is DENIED in its entirety.


SO ORDERED.

s/ Nicholas G. Garaufis

NICHOLAS G. GARAUFIS
United States District Judge

Dated: Brooklyn, New York
      August 31, 2015

---

More significantly, the record makes clear that Merritt was not, in fact, denied the effective assistance of counsel. Notwithstanding the court's comment at sidebar, or counsel's prior threat, Merritt's counsel vigorously and zealously represented his client at trial. Counsel thoroughly and extensively cross-examined each of the Government's witnesses, pursuing numerous lines of inquiry designed to impeach their credibility and recollections. See id. at 986. Counsel also took advantage of the leeway the court afforded him to pursue Merritt's defenses through cross-examination and long arguments to the jury. See id. Aside from the court's Bruton rulings, in which Merritt identifies no error, see supra Part III.D.1, counsel fails to suggest any other action by the court that prejudiced his client by precluding counsel from introducing evidence or making arguments that would have been helpful to Merritt's defense. As the court notes above, Merritt's counsel was the only attorney in this case who succeeded in obtaining an acquittal on his or her client's behalf. Thus, counsel's disingenuous hypothesis regarding his own performance is without merit, and insufficient to warrant a new trial under Rule 33.